# Exhibit 6

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NETWORK-1 TECHNOLOGIES, INC., | Case No. 14-cv-2396 |
| Plaintiff, | Case No. 14-cv-9558 |
| vs. | |
| GOOGLE LLC and YOUTUBE, LLC, | |
| Defendants. | |

### EXPERT REPORT OF MICHAEL MITZENMACHER, PH.D.
### REGARDING GOOGLE LLC AND YOUTUBE, LLC'S INFRINGEMENT

## CONFIDENTIAL OUTSIDE COUNSEL ONLY – PROSECUTION/ACQUISITION BAR MATERIALS

## TABLE OF CONTENTS

**Page**

1. INTRODUCTION ................................................................................................ 1
   1.1.   Retention .................................................................................................... 1
   1.2.   Qualifications ............................................................................................ 1
   1.3.   The Asserted Patents ................................................................................ 2
   1.4.   Materials Considered ................................................................................ 8
   1.5.   Legal Principles ........................................................................................ 8
   1.6.   Level of Ordinary Skill .......................................................................... 11
2. OVERVIEW OF DEFENDANTS' CONTENT ID ACCUSED INSTRUMENTALITIES.... 12
3. SUMMARY OF MY OPINIONS ...................................................................... 18
4. DEFENDANTS' INFRINGEMENT BY THE CONTENT ID ACCUSED INSTRUMENTALITIES. ................................................................................... 18
   4.1.   '988 patent claim 17 ............................................................................... 19
   4.2.   '237 patent claim 33 ............................................................................... 85
   4.3.   '237 patent claim 34 ............................................................................. 149
   4.4.   '237 patent claim 35 ............................................................................. 149
   4.5.   '464 patent claim 1 ............................................................................... 150
   4.6.   '464 patent claim 8 ............................................................................... 217
   4.7.   '464 patent claim 10 ............................................................................. 218
   4.8.   '464 patent claim 16 ............................................................................. 218
   4.9.   '464 patent claim 18 ............................................................................. 219
   4.10.  '464 patent claim 25 ............................................................................. 276
   4.11.  '464 patent claim 27 ............................................................................. 277
   4.12.  '464 patent claim 33 ............................................................................. 277
5. ALLEGED NON-INFRINGING ALTERNATIVES ....................................... 278
6. NON-COMPARABILITY OF LICENSES ....................................................... 293
7. CONCLUSION ................................................................................................. 295

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

## 1.     INTRODUCTION

### 1.1.    Retention

1.     I have been retained as an independent expert witness by the law firm of Russ August & Kabat on behalf of Network-1 Technologies, Inc. to testify as a technical expert in the following lawsuits concerning U.S. Patent Nos. 8,010,988 ("the '988 patent"); 8,205,237 ("the '237 patent"); and 8,904,464 ("the '464 patent") (collectively, the "Asserted Patents"):

> *Network-1 Technologies, Inc. v. Google LLC and YouTube, LLC*, 14-cv-2396 (S.D.N.Y)
> *Network-1 Technologies, Inc. v. Google LLC and YouTube, LLC*, 14-cv-9558 (S.D.N.Y)

> I refer to Google LLC and YouTube, LLC as "Defendants" or "Google" in this report.

2.     In this expert report, I provide opinions regarding the Asserted Patents, and Defendants' infringement of the currently asserted claims of the Asserted Patents.  I expect to testify at trial on these issues, as set forth in this report and in any supplemental reports or declarations that I may prepare for this litigation in the future.  I also expect to testify at trial with respect to the matters addressed by any expert testifying on behalf of Defendants, if asked about these matters by the Court or by the parties' counsel.  I may also testify on other matters relevant to this case, if asked by the Court or by the parties' counsel.

3.     To ensure that my opinions are complete and accurate, I reserve the right to supplement or amend this report if additional facts and information that affect my opinions become available.  Such information may include, for example, materials produced in this litigation, and information and documents relevant to this case that Defendants has not yet disclosed.  I may also supplement or amend my report or opinions in response to additional discovery or other events, and may rebut expert reports submitted by Defendants.

4.     My work in this case is being billed at my standard rate of $850 per hour, with reimbursement for actual expenses.  My payment is not contingent upon my testimony or the outcome of the case.  I have no personal interest in the outcome of the case.

### 1.2.    Qualifications

5.     My Curriculum Vitae, attached as **Exhibit B**, is a true and accurate listing of my qualifications.  I summarize some of these qualifications below.

6.     I am currently employed as a Professor of Computer Science at Harvard University.  Specifically, I am the Thomas J. Watson, Sr. Professor of Computer Science in the School of Engineering and Applied Sciences.  I joined the faculty of Harvard as an Assistant Professor in January 1999.  I was promoted to Associate Professor in 2002 and to Professor in 2005.  In 2010, I began a three-year term as Area Dean, which is essentially equivalent to what other schools call Department Chair, of Computer Science, and held that position through June 2013.  I served as Area Co-Chair of Computer Science for the 2018-2019 academic year.  My work address is 33 Oxford Street, Cambridge, MA 02138.  My primary research interests include design and analysis of algorithms, networks and data transmission, and information theory.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

7.    I received my undergraduate degree in Mathematics and Computer Science from Harvard College in 1991.  I received a Certificate of Advanced Study in Mathematics from Cambridge University in 1992.  I received a Ph.D. in Computer Science from the University of California at Berkeley in 1996.  From August 1996 to January 1999, I was employed as a Research Scientist at Digital Systems Research Center, where my work included projects on algorithms for the Internet.

8.    I am listed as an inventor or co-inventor on 19 issued patents, and am the co-author of a textbook entitled "Probability and Computing" published by Cambridge University Press.  I am a Fellow of the Association for Computing Machinery (ACM).

9.    I regularly serve on program committees for conferences in networking, algorithms, and communication.  For example, I have served on the program committee multiple times for the SIGCOMM conference, which is the flagship annual conference of the ACM Special Interest Group on Data Communication (SIGCOMM).  I have also served on numerous program committees related to algorithms, including the ACM Symposium on the Theory of Computing, the International Colloquium on Automata, Languages, and Programming, and the International Conference on Web Search and Data Mining.

10.    The field of endeavor at issue in this case is identification of electronic content (such as video or audio content) using algorithmic search techniques.  I have published over 200 research papers[1] in computer science and engineering conferences and journals, many of which have explored algorithms and data structures for algorithmic search techniques, including both mathematical analysis and applications.

### 1.3.    The Asserted Patents

11.    The Asserted Patents generally share a common specification, so for ease of reference, unless otherwise indicated, I will refer to the '988 patent specification in citing to the inventor's description of his invention.  I recognize that there are, however, some differences in the specifications of the Asserted Patents.  The "Summary of the Invention" (Section 2 in the text of the specification) varies somewhat among the patents.  Also, there are some additional discussions of certain material from the literature that was incorporated by reference in the earlier specification of the '988 patent that is set forth in greater detail in the later patents, such as, for example, in Section 4.2.1.1.3 of the specification.  In the '237 and '464 patents, for example, the specification contains more details drawn from one of the Yianilos references that was incorporated by reference.  '237 patent at 9:7-19; '464 patent at 9:1-14.

12.    As set forth in the Detailed Description section of the Asserted Patents (Section 4), the patents describe systems and methods "for identifying works without the need of embedding signals therein.  Once identified, such information can be used to determine a work-related action."  '988 patent at 5:39-42.  In simple terms, these systems can analyze an unknown digital "work" such as a piece of content (like an audio and/or a video file) using

---

[1] I note that in several comments in the source code Google produced in this case related to the ████████████  I describe in detail below, there is reference to one of my publication on this topic.  *See, e.g.*, GOOG-NETWORK-SC-00000564; GOOG-NETWORK-SC-00000607.

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

characteristics of that work, and then compare it, using those characteristics, to a collection of known references to determine if the unknown content matches one of the known references. *See, e.g.*, *id.* at 6:58-62.  If it does, the system can then take actions based on that identification. Such actions might include providing or displaying an advertisement, displaying a weblink, dialing a number, or performing an e-commerce transaction.  *See id.* at 9:59-10:1.

13.    An example of how this process may be carried out is illustrated in Figure 1 of the patens-in-suit:



FIGURE 1

The Asserted Patents explain:  "FIG. 1 is a process bubble diagram of operations that may be performed . . . in which intra-work information [information derived from the work itself, as opposed to information added or appended to the work] is used to identify the work."  *Id.* at 6:34-37.

## 1.3.1.  Feature Extraction

14.    The process of Figure 1 begins with a feature extraction operation that can be used to identify a known reference work.  *See id.* at 7:11-8:2 (§ 4.2.1.1.1).   The Asserted Patents explain that examples of a work can include "an image, an audio file or some portion of an audio signal or may be one or more frames or fields of a video signal, or a multimedia signal."  *Id.* at 7:18-20.   In the example of a music video, the reference work could be the audio file

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

and/or portions of the audio signal, the video file and/or portions of the video signal, or some combination.

15.    The Asserted Patents explain that "[t]he purpose of the feature extraction operation is to derive a compact representation of the work that can subsequently be used for the purpose of recognition." *Id.* at 7:20-23.  The patents recognize that electronic works can be represented with shorter "sketches" or "fingerprints" that require far less space to store in computer memory, and far less computing resources to compare, but must be sufficiently complex that each sketch or fingerprint represents the underlying content (the primary work) with a low likelihood that two different primary works will have the same sketch or fingerprint.  The patents refer to these so-called "sketches" or "fingerprints" as "compact electronic representations," "feature vectors," or "extracted features."

16.    The patent specification teaches numerous ways in which feature extraction can be accomplished.  *See id.* at 7:11-8:2 (§ 4.2.1.1.1).  The specification explains that feature extraction operations derive a representation of the work by, for example, using "a pseudo-random sample of pixels" from a frame of a video.  *Id.* at 7:23-26.  In addition, feature extraction can be accomplished through the use of a variety of mathematical operations including Fourier, wavelet, or cosine transforms/decompositions or statistical methods like principle component analysis.  *See id.* at 7:26-43.

### 1.3.2. Building the Databases of Reference Works

17.    In the example illustrated in Figure 1, the Asserted Patents contemplate assembling a database of these sketches or fingerprints of reference works and associated actions that are connected to the individual reference works.  *See id.* at 8:4-59 (§ 4.2.1.1.2).  This process is illustrated in the following excerpt of Figure 1:



Here, "WORK @t1" is the reference work, such as the music video I discuss above.  This reference is used in generating the reference database.  In Step 122, one or more "feature extraction operation(s)" are performed.  These operations extract features from the reference

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

work (such as a music video) to generate one or more sketches or fingerprints that can be used to identify this work.

18.    In Step 124, the extracted features can also be associated to a work identification number or reference called a "work id." Each work id is associated with a specific work, but may also be associated with one or more extracted features from the "WORK @t1." The feature(s) (vector) and work ids are tied together to form the database 110 referred to as "WID Information" in Figure 1.

19.    As part of the same or a different database, the work ids can be linked with "associated information" 136 (such as an action to be performed with respect to any works linked to the work id). This process is shown in the following excerpt also from Figure 1:



Thus, the patents describe a system in which the operator could create/maintain a database of known references. For example, this database might include popular songs from major record companies, and television programs from major studios. The full versions of the reference items in the database might be very large (for example, the electronic file for a single song might be more than 1 megabyte (1 million bytes of data) and a film might require more than 1 gigabyte (1 billion bytes of data)). Storing such references in their full length would require huge amounts of storage for a large database. Even more problematic, searching by comparing a reference to the entirety of a reference work would be very difficult and require significant computing resources and time.

20.    The patents contemplate a system where each reference work in the database is represented by a "sketch" or "fingerprint." Although these sketches or fingerprints may be far more compact than the complete media file, they still need to be sufficiently complex that numerous different reference works will each be very unlikely to have the same sketch or fingerprint.

### 1.3.3. Comparing an Unknown Work with the Reference Works in the Database

21.    To compare an unknown video to the database of reference works, the patents explain that one can obtain a sketch or fingerprint of the unknown video and then search for a match in the database. The following excerpt from Figure 1 illustrates an example of this process with reference to "WORK @t2:"

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



In the working example discussed earlier, the "WORK @t2" could be an uploaded video containing at least a portion of the song underlying the music video. Thus, in this portion of the process, the same feature extraction operations that were run on the reference works used to generate the WID Information database 110 could now be run in Step 140 on the unknown work ("WORK @t2")—the unknown video containing the same song as the reference work. The extracted features from the unknown work can then be matched with features in the WID Information database to identify a matching work.

22. The patents explain that the matching of these sketches or fingerprints is not equivalent to looking up a word in a dictionary. *Id.* at 8:63-9:5. Looking up a word in a dictionary is a search for an exact, or identity, match in an ordered set of data. All of the words in the dictionary have been pre-processed by organizing them in alphabetical order. If one is searching for a particular word in the dictionary, it is possible to search for an exact match very efficiently because of the pre-processing organization of the data set. As the patents explain, the kind of matching involved here is different both because the comparisons are not looking for exact matches, and because the data set involves high dimensional data that is not ordered in the way a dictionary can be ordered.

23. As explained in the patents, the comparisons of works are not necessarily looking for an exact match because there can be, for example, noise or distortions in the unknown video. *Id.* This could be a consequence of using imperfect recording technology, recording a video from a

6

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

signal that had some static in it (like a weak television broadcast), recording a video using a video recorder pointed at a television showing a program, or many other possible reasons. Similarly, the unknown video might be altered slightly from the reference. For example, a reference television program might be 22 minutes and 30 seconds long, but an uploaded recording of the same television program might have started recording a few seconds early so that the recording is 22 minutes and 45 seconds long. In each of these cases, the unknown video would not be identical to the reference work, but it is still desirable for the system to identify the two files as matching. Likewise, if one is searching for a song, an unknown sample might include only a portion of the song in it, but it still might be desirable to identify the unknown song as a match to the reference.

24.    The system needs to be designed to recognize the two exemplary similar videos discussed above as a match, even though they are not identical. Comparing the entirety of the files would be very difficult. For example, a single video or audio file might be many millions of bytes (megabytes) long. Comparing all of the millions of individual data bytes in the entire file to all of the millions of individual data bytes of another (reference) file to see how similar they are would be extremely time consuming and difficult. The patents discuss using feature vectors of, compact electronic representations of, and sets of features extracted from the files to help simplify the comparisons. Shorter representations of the electronic works are easier to compare than the entire files, but the representations must be sufficiently complex that each compact representation is very unlikely to be the same for more than one primary work. For example, if one wanted to represent a song, a measure of the tempo, such as the beats per minute of the song, would be a simple way to represent the song, but many songs could have the same tempo, so that representation by itself would not be very helpful for use in comparisons to identify an unknown work. Rather, one could capture snapshots of or "sample" particular values (for example the pitch and intensity values[2]) at multiple times during the song. *See id.* at 7:11-42 (describing various feature extraction methodologies). Each of these independent features could be compared to the same features of a reference work. If the values for many of the features were close to the same features for a reference work, it might be possible to infer that the two primary works (the works represented by the compact representations) were also similar. One would say that the two representations are close both in the feature space (the compact representations are similar) and close in the primary space (the works represented by the compact representations are also similar).

25.    The patents explain that the matching discussed could use such things as a statistical comparison of the compact representations to determine similarity. '988 patent at 9:3-5. The patents give several examples of such statistical comparisons including linear correlation, correlation coefficients, mutual information, Euclidean distance, and Lp-norms. *Id.* at 9:5-8. Each of these examples are types of comparisons that can be done between two feature vectors to try to measure not only whether they are the same, but whether they are sufficiently similar to characterize them (and the underlying works that the sketches or fingerprints represent) as matching.

---

[2] Although these exemplary features are "human-recognizable features," in practice the features may be defined via a mathematical process so they are recognizable to a computer processor, but are not necessarily recognizable by a human.

<u>**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**</u>
<u>**PROSECUTION/ACQUISITION BAR MATERIALS**</u>

26.    The patents further explain that other information can be stored with the reference works. For example, additional information can be connected with a reference work about actions that are to be performed in connection with that work.  *Id.* at 6:34-60.  This kind of action information could be stored in a single database as part of the same record for the reference work, or as part of a separate database identified with a common "key" that is also connected to the record for the reference work.  *Id.*  These actions could include various things like displaying an advertisement, displaying a weblink, or initiating an e-commerce transaction. *See, e.g.*, *id.* at 9:65-10:1.

27.    The patents go on to explain that when an unknown work is identified as a "match" to a reference work in the database, then the action that is connected with the reference work can also be performed in connection with the newly-identified uploaded work.  *Id.* at 9:59-10:4. Thus, for example, if an advertisement or weblink (or both) are to be displayed with a particular reference work, then those same actions can be performed with the identified uploaded work once it is identified.

28.    The following are the Asserted Claims:

- U.S. Pat. No. 8,010,988 ("the '988 patent"), claim 17;

- U.S. Pat. No. 8,205,237 ("the '237 patent"), claims 33-35; and

- U.S. Patent No. 8,904,464 ("the '464 patent"), claims 1, 8, 10, 16, 18, 25, 27, and 33.

## 1.4.    Materials Considered

29.    In preparation for this report and for expert testimony that I may be called upon to provide, I have considered and may rely on documents identified in this report or those referenced in the exhibits attached to this report.  This includes among other materials the Asserted Patents and their prosecution histories, Network-1's infringement contentions, the Court's claim construction, discovery and publicly available information regarding the patented subject matter and the accused systems, third-party information, deposition testimony and deposition exhibits, other discovery responses, and my interaction with the accused instrumentalities.  In addition to the materials explicitly reference in my report, I have also considered the materials listed in **Exhibit A** to this report.  My opinions are based on these sources of information, together with my education, training, and experience.

30.    In testifying, I may use some or all of the information referenced above, additional information identified in discovery, as well as any materials relied upon by Defendants' experts, to support or summarize my opinions.  In addition, I may prepare summaries and demonstrative exhibits to assist my presentation of testimony to the Court.

## 1.5.    Legal Principles

31.    I have been informed that the infringement analysis consists of two steps.  The first step is claim construction, in which the Court determines the scope and meaning of certain claim

<u>CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS</u>

terms.  My understanding is that all unconstrued claim terms are to be given their plain and ordinary meaning to a person of ordinary skill in the art.

32.    I have been informed that the second step in an infringement analysis is to compare the accused products with the properly construed claims.  A conclusion of infringement is proper if every element in an asserted claim is found in the accused product, either literally or by doctrine of equivalents.  To establish literal infringement, every limitation set forth in a claim must be found in an accused instrumentality.

33.    <u>Doctrine of Equivalents:</u>  If a claim limitation is not literally present in the accused product, infringement may still be found under the doctrine of equivalents.  An accused product will be found infringing under the doctrine of equivalents if insubstantial differences exist between the accused product and the limitations of the asserted claim (*i.e.*, they are substantially the same).  While no particular linguistic framework controls the inquiry, the insubstantial differences inquiry may be guided by, for example, determining whether the accused product performs substantially the same function in substantially the same way to obtain substantially the same result as the claim limitation.

34.    I understand that a dependent claim contains all of the limitations of the independent claim from which it depends.  Thus, to establish infringement, every limitation set forth in a dependent claim as well as the independent claim from which it depends must be found in an accused instrumentality.

35.    I have been informed that an entity that uses the claimed methods of the Asserted Patents can be found liable for infringement.  To directly infringe a method claim, the accused infringer must perform all the steps of the claimed method, either personally or through another acting under his direction or control.

36.    <u>Claim Construction:</u>  I understand that claim construction is a question of law for the Court.  I also understand that the Court has not yet issued an order on claim construction.  Because the Court has not yet issued a claim construction order, I reserve the right to supplement my report once the Court does so.  I also reserve the right to provide infringement opinions under the doctrine of equivalents if it is necessary to do so in light of the construction of one or more claim terms.

37.    In rendering my opinions below, I have applied the parties' agreed construction where there is such an agreed construction.  Where the parties dispute a construction, I have applied both constructions in my analysis.  Finally, I understand there are two terms that Defendants assert are indefinite; for those terms, because Defendants have not proposed any construction, I have applied the construction proposed by Network-1.

**<u>Agreed Constructions</u>**

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

| Claim Term | Agreed Construction |
|---|---|
| "sublinear" [search] | "A search whose execution time scales with a less than linear relationship to the size of the data set to be searched, assuming computing power is held constant." |
| "neighbor" "near neighbor" | "A close, but not necessarily exact or the closest, match of a feature vector, compact electronic representation, or set of extracted features to another, wherein the distance or difference between the two feature vectors, compact electronic representations, or sets of extracted features falls within a defined threshold." |
| "near neighbor search" | "A search using an algorithm designed to identify a close, but not necessarily exact or the closest, match of a feature vector, compact electronic representation, or set of extracted features to another, wherein the distance or difference between the two feature vectors, compact electronic representations, or sets of extracted features falls within a defined threshold." |
| "approximate nearest neighbor search" | "A search using an algorithm designed to identify a close, but not necessarily exact or the closest, match of a feature vector, compact electronic representation, or set of extracted features to another, wherein the distance or difference between the two feature vectors, compact electronic representations, or sets of extracted features falls within a defined threshold." |
| "machine-readable instructions" | "code or pseudocode that is executed using a computer processor, *i.e.*, that is discernable by a computer processor and dictates steps to be carried out by one or more computer processors" |

**Disputed Constructions**

10

CONFIDENTIAL OUTSIDE COUNSEL –
PROSECUTION/ACQUISITION BAR MATERIALS

| Claim Term | Network-1's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "non-exhaustive [. . .] search" | "A search designed to locate a [near] neighbor without comparing to all possible matches (*i.e.*, all records in the reference data set), even if the search does not locate a [near] neighbor."<br><br>Alternatively: "A search designed to locate a [near] neighbor without comparing to all possible matches (*i.e.*, all records in the reference data set), even if the search does not locate a [near] neighbor. Comparing to a match means comparing to sufficient data within the record to make a determination as to whether the record is a match." | Indefinite. |
| "correlation information" | Ordinary meaning.<br><br>Alternatively: "information that associates the first electronic media work with an electronic media work identifier" | Indefinite. |
| "extracted features" | "Electronic data sampled, calculated, or otherwise derived from a work itself, as opposed to from information added or appended to the work." | "Electronic data derived from a work itself, as opposed to from information added or appended to the work." |
| "extracting features" | "Sampling, calculating, or otherwise deriving electronic data from a work itself, as opposed to from information added or appended to the work." | "Deriving electronic data from a work itself, as opposed to from information added or appended to the work." |

To the extent Defendants expressly or implicitly provide constructions for additional terms, I reserve the right to respond to those constructions.

**1.6.    Level of Ordinary Skill**

38.    It is my understanding that the infringement analysis is to be undertaken from the perspective of a person of ordinary skill in the art to which the patents are directed at the time of the invention, here in 2000.  The Asserted Patents are directed to the field of identification of electronic content (such as video or audio content) using algorithmic search techniques.  In my opinion, a person of ordinary skill in this art would have a Bachelor's degree in computer

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

science, mathematics, or a similar discipline and two to three years of relevant experience, or a graduate degree in the same area.

## 2.    OVERVIEW OF DEFENDANTS' CONTENT ID ACCUSED INSTRUMENTALITIES

39.    Network-1 accuses the following of infringement:  the Content ID system and its implementation on the YouTube website.  I understand that there have been two main versions of Content ID during the relevant time period—the version that used locality sensitive hashing ("LSH") for indexing and searching ("Content ID LSH Version") and the version that is known as "Siberia" ("Content ID Siberia Version").  Collectively, I refer to these two versions as "Content ID Accused Instrumentalities."  *See, e.g.*, Pasula Depo. at 13:7-15; Kumar Depo. at 10:7-13:25; *see also, e.g.*, Section 4 (analysis regarding the Content ID LSH Version and Content ID Siberia Version).

40.    In general, Content ID is a set of tools that permits content owners (e.g., companies that own rights to music, television shows, and movies) to control how their content is used on YouTube.  *See, e.g.*, GOOG-NETWORK-00767770 ("98% of copyright management on YouTube takes place through Content ID (only 2% on DMCA)").

41.    Of particular relevance to this case, Content ID provides a vehicle for content owners to automatically "monetize" (or otherwise manage) versions of their content uploaded by YouTube users.  I describe the operation of Content ID in much more detail below in Section 4, but in general, it creates a "fingerprint" of each video uploaded to YouTube and scans that "fingerprint" of user-generated content (UGC) against a database of reference "fingerprints," i.e., fingerprints of content owners' works.  It then applies the "policy" specified by the content owner.  The following diagram provides a high-level overview of the operation of Content ID (GOOG-NETWORK-00767747):



**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

42.    Content ID finds "matches" of user-uploaded content to content owners' reference works not only for exact matches, but also for works that bear similarity to reference work.  This is beneficial to content owners because YouTube users will often upload videos that are not exact copies of reference works.  For example, a user could upload a video of a dance routine that uses a content owner's music.  Content ID is able to identify that song, even though the video file uploaded by the user is obviously not an exact match to what is provided by the content owner.  In addition, some YouTube users will transform videos in order to try to avoid detection, such as by adding a frame to or cropping a video that contains copyrighted material.  Content ID aims to identify such videos as matching the relevant reference work of a content owner.  In addition, Content ID's content identification technology therefore does not rely on information appended to the work, such as metadata or digital watermarks, to be able to identify it because it uses information from the work itself to generate "fingerprints" and corresponding "matches."  *See, e.g.*, analysis for '988 patent claim element 15b), '237 patent claim element 33b), '464 patent claim elements 1[b] and 18[c], and citations therein.

43.    If the Content ID system finds that the UGC video "matches" a reference work, it then automatically applies whatever "policy" the content owner has specified to the video—such as "block," "track," or "monetize."  A "block" policy means that the UGC video is not permitted to play on YouTube.  A "track" policy means that the UGC video is permitted to play on YouTube; no ads are displayed, but the content owner receives statistics concerning the views of that video.  A "monetize" policy means that the UGC video is both permitted to play, and that ads will be displayed on the video watch page.  *See, e.g.*, analysis for '988 patent claim elements 15c) and 15d) and '237 patent claim element 33c), and citations therein.  I understand that ███████████████████████████████.

44.    ████████████████████████████████████  *See, e.g.*, GOOG-NETWORK-00013857 ████████████████; GOOG-NETWORK-00781849 ID); GOOG-NETWORK-00782058 ████████████████; GOOG-NETWORK-00008143 ████████ *see also, e.g.*, Erb Depo. at 352:7-25, 356:13-21; Konrad Depo. at 217:5-218:23; GOOG-NETWORK-00002370; Rosenstein Depo. at 138:2-16, 141:12-143:4, 172:7-19; GOOG-NETWORK-00767750 ("Content ID has **paid** out over $2B to rightsholders.").

45.    Notably, Content ID's application of the "block," "track," or "monetize" policies, including displaying ads ████████████████ can be fully automated—the "fingerprinting," "matching," and policy application can occur without any manual input from a human being.  Content claimed *automatically* via Content ID accounts for a high percentage of videos subject to Content ID claims.  *See, e.g.*, Konrad Depo. at 218:24-219:24 ████████████████████████████ *see also, e.g.*, GOOG-NETWORK-00013549 Erb. Depo. at 349:23-350:5; Rosenstein Depo. at 73:10-21.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

46.    Such automatic claiming is critical given the volume of content uploaded to YouTube, and the size of the reference databases.  *See, e.g.*, GOOG-NETWORK-00767742 ("Users upload ~400 hours of content every minute"); GOOG-NETWORK-00767750 ("Content ID is operating at massive scale  More than 800 **rightholders** use Content ID, including many broadcasters, movie studios, record labels, and independent creators.  . . . We have more than 58 million **active reference files** in the Content ID Database.  . . . More than 600 **years** of audio and visual reference content.").



47.

. *See, e.g.*, GOOG-NETWORK-00782058 (                                        ; Pasula Depo. at 163:5-166:18

Rosenstein Depo. at 208:6-209:4

48.    The value of Content ID has been recognized outside of Google and YouTube.  In particular, Content ID has won two technical Emmys.  *See, e.g.*, *id.* at GOOG-NETWORK-00767743-45.

49.    In addition to sharing ad revenue and forging relationships with content owners, Content ID also encourages creators to make their content (i.e., UGC) available for free on YouTube, promoting fan engagement and connecting content owners with their fans.  *See, e.g.*, GOOG-NETWORK-00599525

"); Erb Depo. at 231:16-24 ("Q And with respect to ContentID, who are the customers to use the terminology you were using a moment ago?  A I always like to describe our customers as consisting of a combination of partners, video creators, content owners, and end users.  So we affect all of those communities in different ways."); GOOG-NETWORK-00771366 ("Content ID mission: Protect and Grow the creator ecosystem"); GOOG-NETWORK-00781834:

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



*See also, e.g.*, Rosenstein Depo. at 90:25-91:7, 98:4-25; GOOG-NETWORK-00010843, GOOG-NETWORK-00600052-53; GOOG-NETWORK-00604760-61; GOOG-NETWORK-00601474-79.

50.     Finally, Content ID's content identification technology is also used in ways other than generating ad revenue as I have described above, which offers benefits to YouTube, content owners, creators, the YouTube community, and beyond.  I provide some examples below.

a.



**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

functionality?  A We would attempt to de-duplicate things in search so you wouldn't

███████████████████████████████████████████████████████; *see also, id.*,
Goodrow Depo. at 19:16-21:11.

b.  Content ID's content identification technology is also used to identify and remove un-
    safe content on both YouTube and Google Drive.  *See, e.g.*, Pasula Depo. at 169:3-
    170:12 ("Q What other things does the match system do that you refer to?  A Well,
    for example, it lets us keep things like child porn or violent extremism that we already
    know about from being uploaded.  So that's not really a monetary thing, but it's like a
    -- you know, a thing that – it's like a positive effect of my work.  So that's nice.");
    Konrad Depo. at 243:9-22 ("I believe that there's an application of the match system
    in Google Drive.  Q And what's that application?  A For certain kinds of very
    sensitive policies -- and I'm not sure exactly which they are, they might be child porn,
    terrorism or extreme violence -- movies that are uploaded to Google Drive are
    scanned against these kind of indices.  Q And that is the same kind of scanning as, for
    example, checking partner copyright contect, just using different indices?  A It's the -
    - it's the same, it's also Siberia, it might not be parameterized in the exact same way,
    but yeah.").

c.  There are various features on YouTube that use Content ID to recognize UGC that
    matches a content owner's content, and then display clickable hyperlinks that allow a
    user to go to a page where the user can, for example, purchase a song or video
    ("click-to-buy"), or view the full version of the content owner's content (rather than
    or in addition to viewing the UGC video containing that content owner's content).
    These features serve as avenues for content owners to promote their content on
    YouTube.

    i.   YouTube's "click-to-buy" feature uses Content ID identification technology
         to identify content owner content, and then displays link where the user can go
         to buy the song on the watch page.  *See, e.g.*, GOOG-NETWORK-00010947
         ("Content ID identifies the song in the video by making a claim between a
         sound recording asset and the user uploaded video.  The buy-link is
         automatically generated for certain partners and songs matching the ISRC of
         the asset with iTunes."); Erb Depo. at 154:18-155:10 (click-to-buy also links
         to Amazon); Wiseman Depo. at 23:8-14 (click-to-buy also links to Google
         Play); *see also, e.g.*, Wang Depo. at 125:1-15; GOOG-NETWORK-
         00600441; GOOG-NETWORK-00701298-311; GOOG-NETWORK-
         00704536; GOOG-NETWORK-00704602; GOOG-NETWORK-00776921.

    ii.  YouTube's "programming from claimed" functionality works in a similar
         way, except that rather than a "buy-link," a link to view the official version of
         the content owner's content, or a link to rent the content from YouTube, is
         displayed.  *See, e.g.*, Erb Depo. at 155:18-156:13 ("Q How does programming
         from claimed function generally?  A A content owner can specify that we
         should provide a link from content that is claimed on -- user-generated content
         that is claimed to their content on YouTube.  Q Can you give me an example

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

of how that would operate in practice?  A Yes.  If a user uploads a scene from an episode of a television show, for example, that's available on YouTube, the claim on that could result in us displaying a link to the channel that contains the actual content owner's version of the full episode."); Rosenstein Depo. at 52:18-54:16 (noting that the reason for implementing programming from claimed "was another opportunity to provide some value to our content partners and, again, help them better connect with the fans of their content"); Wang Depo. at 160:5-24 ("So what I'm trying to understand is if a PfC link appears on a user-generated video that matched a TVOD asset, and a user clicked on that link, would the user be given the option to rent that asset?  A Yes.  Or not the asset, but the -- Q Rent the – A The video.  Q Or the TV show or -- A Yes.  Q move.  Oh, and the TVOD assets, were those both – are those both TV shows and movies or something else?  A It's TV shows and movies.  Q And do you know if YouTube gets any additional revenue or commissions from the -- such rentals?  A The rentals is a separate YouTube business.  Q Oh, so is the viewer renting the TV show or movie from YouTube?  A Yes."); *see also, e.g.*, GOOG-NETWORK-00776897 ("What is PfC?  . . . Instrumental in closing deals with partners, their content would not exist on YT without it."); Rosenstein Depo. at 58:8-60:10; Wang Depo. at 139:15-140:18, 162:11-164:19; GOOG-NETWORK-00776905-13; GOOG-NETWORK-00776915; GOOG-NETWORK-00776921.

 iii. On user-generated content that generates a Content ID match, YouTube's "Liner Notes" functionality similarly displays a hyperlink to the corresponding official music video.  *See, e.g.*, Wang Depo. at 174:15-23 ("And what is the hyperlink in Liner Notes?  A The official music video.  Q And that's a link displayed on a user-generated video?  A Yes.  Q That has a claim that could be based on a match in the match system?  A Yes."); *id.* at 171:16-172:2 ("Q Do you know why that product team led by David Rosenstein decided to pursue this project?  A I know some background context in that it was -- it would be useful to help the music industry understand the rights on – of what has been identified on YouTube, namely for songwriters."); *id.* at 176:12-15 ("[T]he Click-to-Buy link is actually part of the Liner Notes now, is inside that text area."); *see also, e.g.*, *id.* at 170:5-171:4, 176:21-25.

 d.



*See, e.g.*, Agrawal Depo. at 40:4-43:10

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

███████████████████████████████████████████████

A The technical process by which this happens I will leave to someone else, but when a user uploads content, that content is then scanned against our database of reference files. We also allow partners the opportunity to manually claim content. When a partner claim's applied, whether through CID or a manual claim, that content is either chosen to be made available across YouTube, both ad support and subscription services, or not made available. ███████████████████████████████████████

███████████████████████████████████████████████
.").

e.   As part of its Brand Safety protection, YouTube also uses Content ID to identify UGC that incorporates advertisements.  *See, e.g.*, GOOG-NETWORK-00602450 ("We enhanced our Brand Safety protection by launching a 'No Ads' classifier and content label.  We also launched an initial version of project 'Whack-A-Mole' to help with reactive Brand Safety issues . . . by leveraging our content-id system to help find and label the copycat uploads after a video has been flagged by our policy team."); *see also, e.g.*, GOOG-NETWORK-00603444-45.

f.   Google Play also utilizes Content ID content identification technology to identify and enhance content in users' libraries.  *See, e.g.*, Erb Depo. at 221:20-222:18 ("Are you familiar with a system that is sometimes referred to as 'sky jam matching' for Google Play?  A Yes.  Q What is sky jam matching?  A That's the process whereby users can upload their music collection to us, to Google, and we can identify what the contents of their music collection are so that we can do things like substituting higher quality versions or avoiding just doing duplicates of songs in our cloud service, in our cloud music service.  Q And does that matching process use the same engine at all as ContentID, or is it entirely separate?  A It uses the same matching engine.  Q And how does that work?  Is it just running essentially the audio channel of ContentID or is it something different?  A It's essentially running the audio channel of ContentID, with a particular reference collection of the music that Google Play has in its collection.").

**3.    SUMMARY OF MY OPINIONS**

51.   It is my opinion that Defendants infringe the currently Asserted Claims of the Asserted Patents.  At the very least, Defendants infringe the currently asserted claims of the Asserted Patents under the doctrine of equivalents.

52.   The basis for my opinions on infringement are set forth in detail below.

**4.    DEFENDANTS' INFRINGEMENT BY THE CONTENT ID ACCUSED INSTRUMENTALITIES**

**4.1.    '988 patent claim 17**

53.    Because claim 17 is a dependent claim that depends from claim 15, below I discuss the elements both claims 15 and 17, even though claim 15 is not asserted in this case.  As I mention above, to establish infringement, every limitation set forth in a dependent claim as well as the independent claim from which it depends must be found in an accused instrumentality.

**4.1.1. '988 patent claim 15 preamble**

> *15. A method for associating an electronic work with an action, the electronic work comprising at least one of audio and video, the method comprising:*

54.    To the extent preamble is limiting, each of the Content ID Accused Instrumentalities meets the preamble of claim 15.

55.    Each of the Content ID Accused Instrumentalities practices methods of associating an electronic work with an action, the electronic work comprising at least one of audio and video. For example, each of the Content ID Accused Instrumentalities electronically extracts features from videos uploaded by YouTube users, and uses those extracted features to associate that uploaded work with a reference work, and then determines actions to perform based on that association.  *See, e.g.*, analysis for '988 patent claim elements 15a), 15b), 15c) and 15d) and citations therein.

56.    As shown above, to the extent preamble is limiting, each of the Content ID Accused Instrumentalities meets the preamble of claim 15.

**4.1.2. '988 patent claim 15a)**

> *15a) electronically extracting features from the electronic work;*

57.    I understand that the parties dispute the construction of "extracting features."  I understand that Network-1 asserts this term should be construed as "sampling, calculating, or otherwise deriving electronic data from a work itself, as opposed to from information added or appended to the work," and Defendants assert this term should be construed as "deriving electronic data from a work itself, as opposed to from information added or appended to the work."  In my view, these constructions have the same scope.  Therefore, my infringement analysis is the same under either construction.

58.    Each of the Content ID Accused Instrumentalities meets claim element 15a).

*Content ID LSH Version*

59.    The Content ID LSH Version electronically extracts features from each audio and/or visual work uploaded by a YouTube user to generate its digital "fingerprint."  This "fingerprint," which is made up of "subfingerprints," is electronic data that is sampled, calculated, and/or otherwise derived from the work itself.  Google's technical witnesses

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

explained in detail how the fingerprints and subfingerprints are generated using, among other techniques, ███████████. The same general framework is used to generate fingerprints for each of the video, audio, and melody "channels." *See, e.g.*, Erb Depo. at 41:21-42:6 ("Q So what is the sort of first point at which a video uploaded by a user comes into contact in some way with the ContentID system? A It's processed by our fingerprinting modules. Q And what are the fingerprinting modules? A We fingerprint each video in three channels. One is audio, one is video, and one is melody, also known as CoverCat."); *id.* at 43:13-45:11 ("What differed about the fingerprint generation process for each of those three channels? A The video fingerprint used a combination of video filters that was obviously very different from what you would do in audio up front, ███████████

███████████████████████████, fingerprinting elements become much more common amount the multiple methods. The audio fingerprinting initially involved ███████████████

███████████████████████████ as input to the more common elements of the fingerprinting. Q And when you say -- you've referred a couple of times to 'the more common elements of the fingerprinting.' What are you referring to there? A It's a ███████████████. And a fingerprint is a series of subfingerprints. Q Now, you mentioned first a two-dimensional wavelet decomposition. In general terms, what does that involve? What does that mean? A It's a --

███████████████████████████

███████████████████████████

███████████████████████████ "); *id.* at 45:25-47:3 ("Q And I think you further indicated that, after this █████████████████

█████ A Yes. Q And what is a ███████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████ *id.* at 51:20-23

███████████████████████████ ); *see also, e.g.*, *id.* at 42:7-43:12, 45:12-24, 47:4-51:20, 51:24-54:8, 58:4-59:13, 63:3-64:3, 64:14-22; Pasula Depo. at 14:1-21:19, 217:21-219:8 (both having additional discussion of the "fingerprinting" process); Baluja Depo. at 48:6-51:14 ███████████████

███████████████████████████

███████████████████████████



**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



Defendants'
Response to Network-1's Request for Admission No. 55 (dated May 14, 2015) ("[a]dmit[ting] that the Content ID system uses fingerprints of uploaded videos").

60.    The "fingerprints" of reference works to which the "fingerprint" of the user-uploaded video is subsequently compared are generated in the same fashion. *See, e.g.*, Erb Depo. at 56:2-57:2 ("Is that same process performed on what I'll call a reference video, if, for example, a TV studio provides a piece of content like a video, is the same process performed to generate fingerprints of that reference video?  A In general, yes.  The only exception is that it's possible that that processing is done in a -- by an external party.  Q In other words, let me see if I understand correctly, is it the case that Google, at least for some partners, provides some piece of software that allows the partner to generate a fingerprint themselves and transmit the fingerprint rather than the content itself to Google?  A Correct.  Q And, but that, the process of that software is the same as the process you've described.  It just may be performed on the other side of the user's firewall, or the partner's firewall.  A That's correct."); *see also, e.g., id.* at 64:23-65:5; Rosenstein Depo. at 41:6-43:8; GOOG-NETWORK-00013854 ("[T]he technologies start with a database of reference material provided by rights owners from which YouTube extracts key visual and auditory signals.  Every user upload goes through a similar attribute extraction . . . .  We slice the digital (A or AV) files into small segments a few seconds long and generate fingerprints for each segment."); GOOG-NETWORK-00010570 (noting that content owners typically only create their own fingerprints for pre-releases); GOOG-NETWORK-00702327 (describing the tool provided to "important ContentID partners" for this purpose).

61.    As I mentioned above, the "fingerprints" are made up of subfingerprints, the latter of which ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  These subfingerprints are further broken down into smaller pieces called locality specific hashing (LSH) bands.  This is true for both the user-uploaded videos and the reference works.  The LSH bands of the reference works are indexed.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

*See, e.g.*, Erb Depo. at 71:15-22 ("Every subfingerprint is divided into what we call LSH bands. So a typical example is ████████████████████████████ ████████████████████████████████████████ and that's known as an LSH band."); *id.* at 80:12-81:4 ("Now, you've mentioned a number of times referring to these individual pieces as LSH bands. What does LSH stand for? A Locality-sensitive hashing. Q And what is locality-sensitive hashing? A It's a term that refers to the -- it's kind of an -- kind of an overblown term in a way. It really corresponds to just saying that out of a Hash value, and remember that the fingerprint was ████████████████████████, out of a Hash value, if a chunk of that Hash occurs at the same place, the same offset within another similarly computer Hash at the same locations, that's the locality-sensitive part, then the hashes may be similar. They are candidates to look at for similarity."); *see also, e.g.*, *id.* at 72:8-22, 77:20-78:6; Baluja Depo. at 53:2-61:5, 160:19-25 (both discussing of LSH bands and their indexing for the reference works).

62.     Defendants' documents described the "fingerprinting" process used in the Content ID LSH Version in a manner that is consistent with the testimony of Google's technical witnesses. *See, e.g.*, GOOG-NETWORK-00784835-37:

Google

## ContentId Fingerprints

  

GOOG-NETWORK-00018603-05 ("Feature extraction: . . . The fingerprint of a video is a compact representation of the video, which is easier to compare than raw video and audio data. . . . Transform a piece of video (0.05s-60s) into a *feature vector*, so that *similar* pieces of video give feature vectors with *low distance*, according to a suitable metric."); GOOG-NETWORK-00000670-75 ██████████████████████████████ GOOG-NETWORK-00000412-14, GOOG-NETWORK-00700423-25 ("The LSH (Locality Sensitive Hash) Tables are an inverted index of LSH bands (substrings extracted from the fingerprint) to the IDs of videos containing that band."); GOOG-NETWORK-00002595-96; GOOG-NETWORK-00005616-17; GOOG-NETWORK-00018613-17; GOOG-NETWORK-00162594-95; GOOG-NETWORK-00699813; GOOG-NETWORK-00702844-47; GOOG-NETWORK-00780504-05; GOOG-NETWORK-00785261-68.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

63.    Review of source code produced by Defendants in this case confirms my analysis of this claim element.[3]



---

[3] Where I cite to code and describe its behavior, I typically cite to the lines of code (as opposed to associated comments).  There are also instances where I do cite to comments.  However, when I cite to specific lines of code, any associated comments should be understood as being included and relevant to understanding the corresponding code, where such comments exist.

[4] See definition at lines 22-51 of file

(GOOG-NETWORK-SC-00000401)

[5] See code comment at lines 20-21 of file

OOG-NETWORK-SC-00000401)

[6] See the file

(GOOG-NETWORK-SC-00000425-27)

[7] See definition at lines 138-141 of file

(GOOG-NETWORK-SC-00000414)

[8] See implementation at lines 81-92 of file

(GOOG-NETWORK-SC-00000425)

[9] See implementation at lines 465-472 of file

(GOOG-NETWORK-SC-00000407)

[10] See implementation at lines 42-53 of file

(GOOG-NETWORK-SC-00000416)

[11] See implementation at lines 125-163 of file

(GOOG-NETWORK-SC-00000417-18)

[12] See implementation at lines 94-153 of file

(GOOG-NETWORK-SC-00000425-26)



**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**





[13] See line 22 of file ███████████████████ ████████████████ (GOOG-NETWORK-SC-00000399)

[14] See definition at lines 22-51 of file ██████████████ ████ (GOOG-NETWORK-SC-00000401)

[15] See implementation at lines 70-198 of file ██████████ ███████████ GOOG-NETWORK-SC-00000421-22)

[16] See implementation at lines 62-135 of file ████████ ████████ (GOOG-NETWORK-SC-00000399-400)

[17] See definition at lines 188-197 of file ████████████ ███ (GOOG-NETWORK-SC-00000145)

[18] See line 104 of file ██████████████ ██████ (GOOG-NETWORK-SC-00000400)

[19] See declaration at lines 42-46 of file ████████ ███████ (GOOG-NETWORK-SC-00000401)

[20] See implementation at lines 155-189 of file ████████ ██████ (GOOG-NETWORK-SC-00000426)

[21] See implementation at lines 192-197 of file ███████ ██████ (GOOG-NETWORK-SC-00000404)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



64.    In the above example,

65.    It is my opinion that the Content ID LSH Version meets claim element 15a) literally. However, to the extent this limitation is not literally met, for example, because the ███████ ███████ "fingerprint," "subfingerprints," and/or the LSH bands that ultimately comprise the subfingerprints are not interpreted as "extracted features," this limitation is met under the doctrine of equivalents.  The Content ID LSH Version's "fingerprint" (and its "subfingerprint" and LSH band components) performs substantially the same function, as it is a representation of an unknown work that can be used to identify it by comparing it to fingerprints of reference works in the subsequent claim step.  It is part of performing this identification/comparison function in substantially the same way as would any "extracted features," as this "fingerprint" is electronic data derived from a work itself.  It yields substantially the same result as would any "extracted features," namely providing a representation of the work that can be used to identify it by comparing it to fingerprints of references works in the subsequent claim steps.

66.    In sum, the Content ID LSH Version electronically extracts features from electronic works by generating a fingerprint comprised of subfingerprints, which are further broken down into smaller chunks called LSH bands.  These "fingerprints" are electronic data sampled



22 See implementation at lines 602-698 of file ████████████████████████

████████████████████ | GOOG-NETWORK-SC-00000409-11)

23 See definition at lines 166-169 of file ████████████████████

████ (GOOG-NETWORK-SC-00000145)

24 See definition at lines 54-152 of file ████████████████

████ (GOOG-NETWORK-SC-00000143-45)

25 See definition at lines 156-163 of file ████████████████

████ (GOOG-NETWORK-SC-00000145)

26 See line 57 of file ████████████████████

████ (GOOG-NETWORK-SC-00000143)

27 See line 61 of file ████████████████

████ (GOOG-NETWORK-SC-00000143)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

calculated, or otherwise derived from a work itself, as opposed to from information added or appended to the work.

*Content ID Siberia Version*

67.     The Content ID Siberia Version also meets claim element 15a).

68.     The Content ID Siberia Version similarly electronically extracts features from each audio and/or visual work uploaded by a YouTube user to generate its digital "fingerprint."  This "fingerprint," which is made up of "embeddings" that are each a vector ███████████ ███████ is electronic data that is sampled, calculated, and/or otherwise derived from the work itself.  Google's technical witnesses explained in detail how the fingerprints and embeddings are generated using ███████████████████████████████████████, part of the Google Brain project.  The same general framework is used to generate fingerprints for each of the video, audio, and melody "channels," and for regular uploads as well as live streams.  *See, e.g.*, Pasula Depo. at 21:22-29:13 ("The neural network-based fingerprinting also – well, I guess not also.  It generated ███████████ as the sub fingerprint; is that correct?  A No.  ███████████.  Q Thank you.  Sorry.  A And we stopped referring to them as sub fingerprints.  Q What is the reference to them at this point?  A Embeddings.  Q E-M-B-E-D-- A Yeah.  Things embedded in a space, yeah,  It's -- yeah.  It's what they would be called in the literature of neural networks.  Q And can you describe what each embedding is?  . . . It's a ███████████████████.  Q And that's represented ███████████?  A Yes.  It's a vector which is a description of a point in space.  Q And what does that ███████████ represent with respect to the underlying video?  A Not much.  It's not so much that it represents something intrinsically.  It has sort of a certain property.  Q Well, so when you say it has a certain property, what do you mean by that?  A So we trained the neural network so that embeddings corresponding to -- in video, video frames that came from the same footage, from the same point in the same footage, end up close together in the same space, even if they have been heavily transformed; and that embeddings that come from completely different frames, are far away.  Q So an individual embedding, that generated from a snapshot of a point in time within the video?  A For the video channel, it's a single frame.  Q And that single frame, how often are those captured to generate the embeddings?  A I believe it is still ███████████.  Q So let's step to just one of those.  So I take it, then, ███████████ there is something that essentially extracts a single frame at that point in time from the video, and then that is processed in some way to generate the ███████████ ███████ A I believe we just request a transcode that has ███████ from YouTube's infrastructure or we ask it to transcode it in such a way and then we process each frame individually.  Q When you say you ask it to process a transcode, can you just explain to me what that means?  A. So there are many different video represent -- a video can be represented many different ways, with like higher, smaller resolution.  There can be different frame rates, different N codings of the video.  We ask for a specific N coding which is -- in which the frames are explicit -- represented explicitly.  And they occur ███████████ ███████ YouTube has a lot of infrastructure for purchasing different transcodes for different purposes.  Q.  And so -- so you receive that transcode, and then it -- that's essentially a collection of frames from the video; is that fair?  A Yes.  Q Okay.  And each of those frames is then processed to generate one of these vectors or embeddings?  A For the video channel, yes.  Q And how is it different from the audio channel?  A The audio channel is -- well, based on

26

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

audio, and audio is a wave form.  So what we do is we produce what is called a spectrogram.
It is a visual representation of the frequencies and the times in the audio wave form, and it
basically sort of shows the notes that are occurring at different points in time and how they're
sustained.  And so we produces this rolling tape of what's going on with audio, and then we
take snapshots of it and produce embeddings from those.  . . . And is there a third way that -- I
believe you also mentioned there is a melody channel.  A I am less familiar with how the
melody channel preprocessing is done.  They also use spectrograms, but then they do some
more processing on it to really only extract musical notes and to make sure that these notes are
invariant to pitch shift.  So if you -- if you move the whole melody like a half tone up, it still
ends up in the same place.  Q Is there -- once the frames are captured or the spectrogram is
captured for audio, is there different code that is ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ for the
different channels or is it the same ones they've been preprocessed?  A It is the same
framework.  There are -- the system is actually, very complicated in other ways.  There are
several other things that might happen in the different channels.  But in the end, they all use a
neural network.  Q And do they call that neural network through the same code or is it different
code for each one?  A I mean, it's the same neural network, what you call it, tool kit, ▇▇▇
▇▇.  Q Did you say ▇▇▇▇▇▇▇▇▇▇        A Yeah, ▇▇▇▇▇▇.  ▇▇▇▇▇▇▇▇▇▇
source neural network tool kit.  It is famous among engineers.  Q And so the neural network is
what's used in each instance to calculate the ▇▇▇▇▇▇▇▇▇▇  A That is correct.  I mean, a
different neural network for each channel.");  *see also, e.g., id.* at 35:20-36:13, 125:17-127:22,
134:11-25, 155:4-156:13, 172:19-174:7; Kumar Depo. at 15:21-16:25, 17:13-23, 91:12-22,
102:13-23; Konrad Depo. at 79:24-80:14, 136:19-138:22; Erb Depo. at 54:9-55:20, 60:17-
61:24, 240:10-25, 242:17-244:25, 317:10-318:3; Defendants' Response to Network-1's
Request for Admission No. 55 (dated May 14, 2015) ("[a]dmit[ting] that the Content ID
system uses fingerprints of uploaded videos").

69.    The "fingerprints" of reference works to which the "fingerprint" of the user-uploaded
video is subsequently compared are generated in the same fashion.  *See, e.g.*, Kumar Depo. at
30:20-31:6 ("Q The underlying embeddings from the query are obtained in the same way as the
embeddings from the references; is that right?  A That's right.");  *see also, e.g.*, Pasula Depo. at
31:4-33:8, 36:16-21, 174:16-175:2.

70.    For user-uploaded videos, more than one sequence of embeddings may be used to
represent a single video in certain situations ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  In instances
where there are multiple sequences of embeddings for a single uploaded video, those
sequences of embeddings are generated in the same way as for a video with a single sequence
of embeddings.  *See, e.g.*, Pasula Depo. at 29:14-30:24 (Q So the number of these vectors that
would be used to represent a given video is dependent on the length of the video; is that fair?
A Yes.  We might also use several different sequences of embeddings to represent a single
video.  Q And is that because there might be video channel, audio channel or others, or is there
some other -- A There is another thing.  Q Go ahead.  A I don't know if you've seen on
YouTube ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Q So

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

you might have a set of embeddings for the video as a whole, and a set of embeddings ███████ A Yeah ███████ ███████ ("███████"); GOOG-NETWORK-00783283 ("███████ ███████"); *see also, e.g.*, GOOG-NETWORK-00770925; GOOG-NETWORK-00781031; GOOG-NETWORK-00789217-19; GOOG-NETWORK-00789369-71.

71.    In addition, for the video channel, there is a step referred to as ███████ ███████. *See, e.g.*, Pasula Depo. at 36:16-38:10 ("So the neural network-based embeddings, those are used to create the references that are in the index; is that correct?  A Several things are done to those embeddings.  And then some of them are placed in the index.  Q Okay.  So walk me through.  When you say several things are done to those embeddings, what do you mean?  A So sometimes, in -- well, actually, also in audio.  In video, several frames will be very similar to each other so they will produce very simila ███████ ███████ ███████ ███████"); *id.* at 58:22-59:9 ("When you have the uploaded video, there's a process that's sort of -- if I understood you correctly, you generate the embeddings, ███████ ███████ is that fair?  A Yes.  This process is like the first stage of either indexing or look up."); *see also, e.g.*, Erb Depo. at 241:1-242:16.

72.    Defendants' documents described the "fingerprinting" process used in the Content ID Siberia Version in a manner that is consistent with the testimony of Google's technical witnesses.  *See, e.g.*, GOOG-NETWORK-00702117 ("At the core of our matching technology lies a robust and compact representation of video content.  This compact representation is generated by a neural network ███████ ███████ ███████ ."); GOOG-NETWORK-00790986 ("Fingerprint: Compact representation of the image that provides a distance measure"); GOOG-NETWORK-00786357-60:

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

GOOG-NETWORK-00770923:

*See also, e.g.*, GOOG-NETWORK-00699390-98; GOOG-NETWORK-00699885-90; GOOG-NETWORK-00700607-09; GOOG-NETWORK-00701278-80; GOOG-NETWORK-00702421; GOOG-NETWORK-00704330; GOOG-NETWORK-00754011; GOOG-NETWORK-00754431-38; GOOG-NETWORK-00781030; GOOG-NETWORK-00781127; GOOG-NETWORK-00781872-73; GOOG-NETWORK-00787651; GOOG-NETWORK-00788058-66; GOOG-NETWORK-00789361-62; GOOG-NETWORK-00789372; GOOG-NETWORK-00790993-94; GOOG-NETWORK-00791817-19; GOOG-NETWORK-00791839-41.

73.    Review of source code produced by Defendants in this case confirms my analysis of this claim element.



<u>**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**</u>
<u>**PROSECUTION/ACQUISITION BAR MATERIALS**</u>

74.



75.



---

28 See definition at lines 20-34 of file

(OOG-NETWORK-SC-00001055)

29 See comment at lines 13-19 of file

(GOOG-NETWORK-SC-00001055)

30 See implementation at lines 16-21 of file

(GOOG-NETWORK-SC-00000675)

31 See comment at lines 14-15 of file

(GOOG-NETWORK-SC-00000675)

32 See lines 17-28 of file

(GOOG-NETWORK-SC-00000722).

33 See line 11-16 of file

(GOOG-NETWORK-SC-00000722).

34 See implementation at lines 14-33 of file

(GOOG-NETWORK-SC-00000195).

35 See lines 54-329 of file

(GOOG-NETWORK-SC-00000871 to 0875).

36 See lines 39-42 of file

(GOOG-NETWORK-SC-00000871).

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

76.    It is my opinion that the Content ID Siberia Version meets claim element 15a) literally. However, to the extent this limitation is not literally met, for example, because the "fingerprints" and/or "embeddings" are not "extracted features," this limitation is met under the doctrine of equivalents.  The Content ID Siberia Version's "fingerprint" (and its "embeddings") performs substantially the same function, as it is a representation of an unknown work that can be used to identify it by comparing it to fingerprints of reference works in the subsequent claim step.  It is part of performing this identification/comparison function in substantially the same way as would any "extracted features," as this fingerprint is electronic data derived from a work itself.  It yields substantially the same result as would any "extracted features," namely providing a representation of the work that can be used to identify it by comparing it to fingerprints of references works in the subsequent claim steps.

77.    In sum, the Content ID Siberia Version electronically extracts features from electronic works by generating a fingerprint comprised of embeddings.  As with the Content ID LSH Version, these "fingerprints" are electronic data sampled, calculated, or otherwise derived from a work itself, as opposed to from information added or appended to the work.

78.    As shown above, each of the Content ID Accused Instrumentalities meets claim element 15a).

### 4.1.3.  '988 patent claim 15b)

> *15b) electronically determining an identification of the electronic*
> *work based on the extracted features, wherein the identification is*
> *based on a non-exhaustive search identifying a neighbor;*

79.    I understand the parties agree that "neighbor" means "a close, but not necessarily exact or the closest, match of a feature vector, compact electronic representation, or set of extracted features to another, wherein the distance or difference between the two feature vectors, compact electronic representations, or sets of extracted features falls within a defined threshold."  I have applied this construction in my analysis below.

80.    I understand that the parties dispute the construction of "non-exhaustive search."  I understand that Defendants assert this term is indefinite, and that Network-1 asserts this term should be construed as "a search designed to locate a neighbor without comparing to all possible matches (*i.e.*, all records in the reference data set), even if the search does not locate a neighbor," or alternatively with the additional clarification "comparing to a match means comparing to sufficient data within the record to make a determination as to whether the record is a match."  As I state above, the clarifying phase is just that—a clarification of what "comparing to a match" means in the context of the construction and the patents.  Therefore, my infringement analysis is the same whether or not the clarifying phrase is ultimately included in the construction or not.

81.    I understand that the parties dispute the construction of "extracted features."  I understand that Network-1 asserts this term should be construed as "electronic data sampled, calculated, or otherwise derived from a work itself, as opposed to from information added or appended to the work," and Defendants assert this term should be construed as "electronic data derived from a

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

work itself, as opposed to from information added or appended to the work." In my view, these constructions have the same scope. Therefore, my infringement analysis is the same under either construction.

82.    Each of the Content ID Accused Instrumentalities meets claim element 15b).

*Content ID LSH Version*

83.    Once the Content ID LSH Version generates a "fingerprint" of the user-uploaded video, it then attempts to electronically determine an identification of the user-uploaded video (i.e., determining whether any reference works are neighbors, near neighbors, or approximate nearest neighbors to the user-uploaded video) by comparing that "fingerprint" with similarly-generated digital "fingerprints" of reference works. This process is commonly referred to as finding a *match* between the uploaded work and a reference work. *See, e.g.*, Erb Depo. at 69:25-71:2 ("Q So after the fingerprints are generated in the manner you've discussed already, what's sort of the next step, if you will, in the ContentID processing system? A The next step is matching. Q And is that sometimes referred to as 'the MatchSystem' within Google? A Yes. Q And can you -- I'll start at a high level and we'll probably have to work our way down, but at a high level, what does the MatchSystem do? A The MatchSystem compares fingerprints of user uploaded videos to various indices of videos for various purposes to identify any matches in which some portion of the user video corresponds to some portion of a reference video, audio, melody, channel, for some period of time. It, for each user-uploaded video, it creates a collection of zero or more matches and its output is for this collection of matches. A match consists of a time offset in the user video, a time offset in the reference video, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, as well as the identities of the user-uploaded video and the reference video."); *see also, e.g.*, GOOG-NETWORK-00002595-96.

84.    As I mention above, this identification is based on a search that identifies a neighbor (or a near neighbor or an approximate nearest neighbor)[37]—a close, but not necessarily exact or the closest, match of a feature vector, compact electronic representation, or set of extracted features to another, wherein the distance or difference between the two feature vectors, compact electronic representations, or sets of extracted features falls within a defined threshold. *See, e.g.*, Erb Depo. at 114:23-115:12 ("A match between a probe fingerprint and a reference fingerprint doesn't necessarily require that the two be exactly identical across their length, correct? A Definitely not. Q So -- sorry, go ahead. A They definitely do not need to be identical. Q And so a match would typically be called when there's some sufficient amount of similarity between the fingerprint of the probe and the fingerprint of the reference. A At some combination of offsets for some duration, yes."); *id.* at 267:3-4 ("ContentID finds matches with not only videos that are bit for bit exact copies, but for videos that are not bit for bit exact copies."); *id.* at 282:24-25 ("[T]he ContentID system searches for near neighbors."); *see also, e.g., id.* at 62:10-20 ("Our goal is that two similar videos are any two videos that a human being would recognize as being two instances of the same video despite transformations, including firming a screen with a hand-held camera, adding borders, cropping

---

[37] I understand that for the purposes of this case and in the context of the Asserted Claims of the Asserted Patents, the parties have agreed that "neighbor," "near neighbor," and "approximate nearest neighbor" are equivalent in meaning.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

the video, rotating the video, or otherwise transforming the video in a way that may intentionally or unintentionally make it different in literal content from the original video but still recognizable to a human being as the same content."); Baluja Depo. at 156:23-158:1 ("Q So this is essentially -- this LSH system is an approximation [sic] nearest neighbor solution, if you will, or -- A Right. So approximate in this case means you're guessing, right, to put it colloquially. Q In other words, it might be the nearest neighbor, and it might not be? A Yes."); *id.* at 162:7-14, 180:7-22. GOOG-NETWORK-00005616, GOOG-NETWORK-00699813 ("Our task is to find **similar** fingerprints, which means fingerprints that contain similar subfingerprints. This is a[n] 'approximate nearest neighbour' or 'near neighbour' problem, where the distance function between two subfingerprints is simply the number of bytes which differ (which therefore can take any value from 0 to 100). We use the technique known as 'location sensitive hashing' to do this . . . ."); GOOG-NETWORK-00006362 ("**Locality-Sensitive Hashing (LSH)** is an algorithm for solving the (approximate/exact) Near Neighbor Search in high dimensional spaces."); GOOG-NETWORK-00162593 ("LSH Tables: Allows efficient approximate nearest neighbor retrieval"); GOOG-NETWORK-00162594.

85.    The search algorithm of the Content ID LSH Version has two main stages: "Stage I" and "Stage II." *See, e.g.*, Erb Depo. at 71:3-9 ("Q So let's start with the process of generating these matches that you references. I think earlier, you talked a little but about a Stage I and a Stage II. Is that all part of the MatchSystem that you were describing a moment ago? A. Yes."); GOOG-NETWORK-00001093-94, GOOG-NETWORK-00702858 ("Matching takes a *probe fingerprint* and tries to find *reference fingerprints* that are entirely or partially the same or similar to it. This is a nearest-neighbour type of problem, which we divide into two stages: • Stage 1: use *indexes* to find candidate reference that might match. • Stage 2: for each candidate reference, compute where it actually matches (if it does)."); *see also, e.g.*, GOOG-NETWORK-00000676; GOOG-NETWORK-00785269; Pasula Depo. at 101:17-102:11.

86.    Stage I begins by searching an index of the LSH bands of the reference works for any LSH bands that are exact matches to any of the LSH bands of the user-uploaded video. The LSH lookup portion of Stage I is one example of the application of a threshold related to the distance or difference between the extracted features of the user-uploaded video and the extracted features of the reference videos (with the threshold here being there be at least one exact match in the LSH bands). That is, the "distance" is considered too high if no bands (features) match, but it is considered sufficient in this first stage if any bands match exactly. *See, e.g.*, Erb Depo. at 70:10-72:7 ("In Stage I, we look up in an index to see if any reference video had the precise value for an LSH band, meaning the same offset and the same value of the subfingerprint; and, if so, we record the time offset in the reference and the time offset of the subfingerprint that we're looking at in the -- in the user video along with the video identity – identity of the reference video."); *id.* at 72:23-73:10 ("[I]f we call the collection of videos that are indexed the reference videos, then the -- all the LSH bands from the reference videos for that particular context will be in that particular index. Q And when you say for that particular context, do you mean the different channels, for example? A That's one example."); *id.* at 74:16-77:19 ("The LSH bands are the keys to that index and then the values within that index tell us the time offset, which subfingerprint it was within the reference video and what video ID, so we can conceptually, we can -- we can look up for a given LSH band all the offsets for all the videos in which that LSH bans occurs among the reference set."); *id.* at 78:7-79:20 ("Q And the individual LSH bands are then -- how do they interact with the index that

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

you described?  A The -- each LSH band is used to do a lookup in the index to identify whether there exist any reference videos that had the same LSH band, the exact same, identical matching LSH band.  And the exhaustive list of all matching reference videos and offsets is -- that are contained in the index is returned from that lookup."); *id.* at 81:10-19 ("Q And would it be fair to say that Stage I is essentially generating candidates for further examination?  A Yes.  Q And in Stage I, is it also correct that the probe video or user-generated video is not being compared to the fingerprint of the reference videos, it's just the lookup in this LSH table?  A Yes."); *see also, e.g., id.* at 133:22-134:3; GOOG-NETWORK-00000412, GOOG-NETWORK-00000415-16; GOOG-NETWORK-00005618-19; GOOG-NETWORK-00162593-95; GOOG-NETWORK-00700423-25; GOOG-NETWORK-00780506; GOOG-NETWORK-00784836-37; GOOG-NETWORK-00785269; Pasula Depo. at 102:12-18.

87.    In the LSH lookup portion of Stage I, not all LSH bands in the reference index are compared to a given LSH band of the user-uploaded video.  *See, e.g.*, Erb Depo. at 314:23-316:7 ("Q Do you know whether Stage I, in order to determine whether a particular LSH band is in the LSH Table Index, whether it must compare the band in question to every entry on the index?  A No, it does not.  Q So you believe that it's an ordered index, that it doesn't require -- that Stage I does not require comparison of the LSH band to each entry in the LSH Table Index; is that right?  A That's correct.  . . . Am I correct that Stage I in the Content ID system does not access the full fingerprint repository?  A That's correct.  Q And Stage I does not use full fingerprints at all; is that correct?  A That's correct.  Q So is it correct that -- am -- do I understand correct -- correctly that Stage I does not compare the probe fingerprint to every fingerprint in the fingerprint repository?  A That's correct.  And does Stage II of the Content ID system compare to every fingerprint in the fingerprint repository?  No."); *see also, e.g.*, Baluja Depo. at 61:6-64:1 (explaining how and why an LSH-based search does not compare to all LSH bands).

88.    The search of the Content ID LSH Version is therefore non-exhaustive because the search does not compare to all possible matches (*i.e.*, all records in the reference data set).  The fact that the first step in the search is non-exhaustive renders the entire search algorithm non-exhaustive.  As I discuss in more detail below, only the reference works that have LSH bands that came back as matches from Stage I's LSH lookup are subjected to further consideration.  I understand that Defendants argue that "the first stage of the search evaluates whether *any work* in the hash table contains bands that match the query work."  Defendants' Response to Network-1's Interrogatory No. 7 (dated May 14, 2015).  However, this is in direct contradiction with Mr. Erb's and Dr. Baluja's testimony that I cite above.  This statement is also contrary to my understanding of how LSH lookups work in general.

89.    In addition, although the LSH lookup portion of Stage I only looks for exact matches between an LSH band of an uploaded video and LSH bands in the index, the overall search algorithm searches for a neighbor (or a near neighbor or an approximate nearest neighbor).  As I describe above, each subfingerprint is split up into smaller pieces called LSH bands.  The fingerprint of each video is made up of a large number of small LSH bands, and as I discuss in more detail below, the number of bands that match over time provide insight into how close of an overall match the reference video is to the user-uploaded video in question.  Indeed, the multiple stages (and substages) utilized by the Content ID LSH Version all aim toward the overall goal of finding a neighbor (or a near neighbor or an

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

approximate nearest neighbor), with each stage aiming to further reduce the pool of candidates to narrow the search to nearer, or better, neighbors. *See, e.g.*, GOOG-NETWORK-00162593:

## LSH Tables



- Allows efficient approximate nearest neighbor retrieval

- Approach:
  - Split each subfingerprint into smaller pieces (called *LSH bands*)
  - Use exact key lookup on each LSH band
  - Collect votes for each subfingerprint according to the number of exactly matched LSH bands

*See also, e.g.*, Erb Depo. at 80:12-81:8 ("[LSH] really corresponds just to saying that out of a Hash value, and remember that the fingerprint was typically computed ▮▮▮▮▮ out of a Hash value, if a chunk of that Hash occurs at the same place, the same offset within another similarly-computed Hash at the same locations, that's the locality sensitive part, then the hashes may be similar. They are candidates to look for similarity. Q So basically, and this is what you've been describing, this lookup in the index, is that the Stage I processing that you described? A It's part of the Stage I processing.").

90.  The candidates produced by Stage I's LSH look-up are further processed to eliminate candidates unlikely to be a match, which involves the use of various thresholds that compare features extracted from the reference work to features extracted from the user-uploaded or probe work. One example of a threshold is determining ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ such as by the "projection filter" I discuss below. *See, e.g.*, Erb Depo. at 81:20-85:5 ("What other processing is there in Stage I? A The LSH look-up typically returns a very large number of candidates. So we do some additional processing in Stage I to reject candidates that are clearly not going to be real matches, primarily by looking at the collection of matches for a given reference video over time against various subfingerprints that we look up from the probe. Q Can you explain in a little more detail how that works? A Sure. So if you, for a moment, just think only about a single reference video and imagine that you look at the collection, for every subfingerprint that we look up out of the probe at various offsets, look at the collection of all the return values, all of the hits that we get from the LSH band lookups for that over time; so effectively, what that does is, it shows us a map of the time offset in the reference video that might correspond to a time offset in the probe video. And looking at that behavior over time, if there's -- if there are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ a piece that we call the projection filter. Q Now, when you say ▮▮▮▮▮▮▮▮▮' what do you mean by that? A If -- in order to run the projection filter, we need some -- we need data. We need enough datapoints to

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

perform an analysis and so we -- if we got, say,

███████████

████████ ”); *see also, e.g.*, *id.* at 87:5-89:11 (explaining that for a data set with between 20 and 35 million, approximately a hundred thousand reference videos are returned as candidates before the projection filter is applied); 91:6-22.

91.    If there are enough time-correlated LSH lookup hits for a given reference work, that reference video and the user-uploaded video are further compared using the "projection filter." The "projection filter," and specifically ██████████████████████ is another example of thresholding in the MatchSystem Stage I.  *See, e.g.*, Erb Depo. at 85:6-87:4 ("Now, you've mentioned a couple of times the projection filter.  What is that?  . . . The projection filter is a conceptually something that

███████████████████████████

█████████████████████████████. Q And this is something that's performed at the projection filter as a means of ███████████████
A. Yes.

█████████████████████████

████████████████████ ”); *see also, e.g.*, *id.* at 89:17-90:18 (explaining that the projection filter does not access the full fingerprint of the reference video and typically reduces the number of hits by at least two orders of magnitude); *id.* at 91:6-22, 133:22-134:3; GOOG-NETWORK-00002048-59 (describing how the projection filter operates); Pasula Depo. at 102:22-103:10.

92.    ContentID LSH Version's Stage II compares the full fingerprint of the user-uploaded or probe video with only the full fingerprints of the reference works identified in Stage I (i.e., those potential matches output by the "projection filter"), and outputs "raw matches."  *See, e.g.*, Erb Depo. at 91:2-5 ("Q And am I correct that that Stage II processing is only performed with respect to the now pruned set of candidates [output from Stage I]?  A Correct."); *id.* at 92:24-93:11 ("[W]hat happens in Stage II?  A For each video ID that is a candidate that comes out of Stage I, we fetch the full fingerprint of the reference and compare the full fingerprint of the reference and the user-uploaded video at the appropriate -- at -- well, effectively at all possible combinations of offsets."); *see also, e.g.*, *id.* at 33:14-20 ("A raw match is the output of the MatchSystem, meaning a prospective march between a user-generated content video and a reference video on either the video, the audio or the melody channel, beginning at a certain

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

time offset in the probe UGC and a given time offset in the reference, and extending for some duration."); 93:19-94:18; GOOG-NETWORK-00780507.

93.   Using the full fingerprints, Stage II's comparison begins by ███████████████ ██████████████          the corresponding subfingerprints of the user-uploaded video and each of reference works identified in Stage I, and c██████████████████████████████ ███████████████████          . *See, e.g.*, Erb Depo. at 93:12-18 (Q And how is [Stage II's] comparison performed?  A We compute ███████████████████████ ████████████████████████████████████████████████ ████████████████████          ); *id.* at 94:19-96:19 ("Q And [comparing all the subfingerprints of the two videos] creates this ████████████████          Q Excuse me,



████      . . . Q And am I correct that, for each of these -- I assume there is a comparison that's done for each of the candidate fingerprints.  A Yes.  Q And what's the output of each of those comparisons?  A A set of matches.  What I described earlier as raw matches or sometimes referred to as candidate matches."); *see also, id.* at GOOG-NETWORK-00018607-08 ("Given two fingerprints X and Y, a ██████████████████████████████████ █████████████████████████████████████████████████████████          ").

94.   Stage II ███████████████████████████          if there is a period of time during which the user-uploaded video and the reference work being compared are sufficiently similar to be a match—with that period of time being another example of a threshold used to determine whether or not a reference video is a neighbor (or near neighbor or approximate nearest neighbor). ████████████████████          are the distance or difference functions that Stage II uses to make this comparison. *See, e.g.*, Erb Depo. at 216:6-19 ("Q And to your knowledge, in terms of the distance or difference functions used to g███████████ ████████████████████████████████████          that's the distance or difference function, correct? A Yes.); *id.* at 99:12-106:16 ("[I]n the current implementation of Stage II, known as the Sensitive Stage II, █████

<u>**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**</u>
<u>**PROSECUTION/ACQUISITION BAR MATERIALS**</u>



*see also, e.g.*, GOOG-

<u>**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**</u>
<u>**PROSECUTION/ACQUISITION BAR MATERIALS**</u>

NETWORK-00610863-70 (describing Sensitive Stage II); Erb Depo. at 185:3-186:23
(indicating GOOG-NETWORK-00610863-70 accurately described Sensitive Stage II); *id.* at
186:24-188:4 ("Step one in the algorithm as appears here [on GOOG-NETWORK-00610866]
is that areas of interest are determined, do you see that?  A Yes.  Q And how is that performed?
What is the mechanism or the value by which the system determines that something is an area
of interest?  A



"); *id.* at 200:11-202:24 (Q. And the document on page [GOOG-NETWORK-00610]869
or the page ending in 869 in step seven, it references

"); *id.* at 188:5-200:10, 219:24-221:19 (further describing the Sensitive
Stage II algorithm); Pasula Depo. at 103:11-104:13; GOOG-NETWORK-00785269:

**Stage 2**



CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

95.    I understand that the version of Stage II I describe immediately above (Sensitive Stage II) was implemented at some point in 2014.  Prior to 2014, Stage II was referred to as the "spike algorithm."  Because it  *See, e.g.*, Erb Depo. at 216:6-217:17 *id.* at 123:10-125:8 ("Q Now, at some point in time, am I correct that the algorithm used in Stage II was referred to as the spike algorithm?  A Yes.  That was the predecessor of the Sensitive Stage II.  Q And what's the difference between the spike algorithm and the Sensitive Stage II algorithm?  A The spike algorithm is -- *see also, e.g.*, *id.* at 12:20-13:2, 125:16-127:6 (indicating the spike algorithm was used for Stage II at least as early as August 2011); *id.* at 218:16-219:23, 221:6-19; GOOG-NETWORK-00000412; GOOG-NETWORK-00000416; GOOG-NETWORK-00001614-19; GOOG-NETWORK-00162593-95; GOOG-NETWORK-00700323-27; GOOG-NETWORK-00700423-26; GOOG-NETWORK-00702836-38; GOOG-NETWORK-00702889-90.

96.    As I discuss above, the Content ID LSH Version search is a non-exhaustive search for a neighbor because the search does not compare to all possible matches (*i.e.*, all records in the reference data set).  This is true even if the search does not locate a neighbor.  *See, e.g.*, Erb Depo. at 70:19-21 ("[The MatchSystem], for each user-uploaded video, it creates a collection of zero or more matches and its output is this collection of matches."); *id.* at 91:17-92:23 ("I know that there are cases where the set that comes out of Stage I is much larger than a thousand, but the -- or sometimes it's completely empty as well.  But depending on the nature of the user-uploaded video, but that's the general outline.  Q Now, when you say it's completely empty, does that mean that basically, the Stage I process didn't find any sufficient matching LSH bands and so there's essentially no candidates to examine further?  A Correct.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

Q And what does the system do when that occurs?  A That's a great question.  I think we run stage – I'm not completely certain, but I believe we run Stage II with an empty input set.  Q Okay.  So it's not -- as far as you know, the video proceeds into Stage II or the processing proceeds into Stage II; but essentially, since there's no input set, there wouldn't be anything to compare.  A Correct.  Q And I'm assuming, but tell me if I'm misunderstanding, that the end result of that would be that the system would determine there are no matches and there would be no, I think what you described as a raw match for that particular uploaded video.  A For that channel, for that uploaded video, yes."); *id.* at 96:19-99:11 ("Q And is there one or more than one such raw match [output from Stage II] for a particular candidate video ID fingerprint?  A There are zero or more.  There may be none, there may be one, there may be many."); *id.* at 218:16-19 ("Q What was the -- well, in the spike algorithm, the end resulting output was various matches, correct?  Zero or more matches?  A Correct.").

97.    The "raw matches" output from the Content ID LSH Version's MatchSystem are then sent to the claiming system for further analysis.  As I mentioned above ███████████████████
█████████████████████████████████████
███████████████████████████████  This is another example of a threshold that is applied to determine whether or not a reference video is a neighbor, a near neighbor, or an approximate nearest neighbor of a user-uploaded video.  *See, e.g.*, Erb Depo. at 111:22-114:11 ("Now, earlier today, I believe at some point, you mentioned something that I think you

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
); *id.* at 122:6-123:9 ███████████████████████

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

█████████████████████████████ .”); *see also, e.g., id.* at 125:4-15 (“Q.
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████
████████████████████ ); GOOG-NETWORK-00006734-35 (“
███████████████ ) . . . .”); GOOG-
NETWORK-00008864 (email discussing these thresholds); GOOG-NETWORK-00014310;
GOOG-NETWORK-00162595; GOOG-NETWORK-00000668:



98.    I understand that Defendants argue that Content ID LSH Version does not identify a
neighbor or a near neighbor (or an approximate nearest neighbor).  They assert that “the first
stage of the search does not employ a threshold of any kind, but simply selects a group of
likely candidates, regardless of their distance or difference from the query.  Similarly, the
second stage of the search determines a match based upon which works exhibit the most
similarity over time, as visualized by a heat map, but does not employ a defined threshold
based on a distance or difference.”  Defendants’ Response to Network-1’s Interrogatory No. 7
(dated May 14, 2015).  As a preliminary matter, Defendants’ own witnesses and documents
characterize this search as a search for a neighbor, a near neighbor, or an approximate nearest
neighbor.  Moreover, as I explain above, there are numerous thresholds that the Content ID
LSH Version uses to determines whether a potential match is similar enough to the user-
uploaded video to be reported as a match, including at least the following:  (a) the distance or
difference (of zero) between LSH bands in the LSH lookup (Stage I); (b) the ███████████
████████████████ Stage I); (c) the █████████████ in the projection filter (Stage I); (d) the
████████████████████████████████████████████████████████████████████

42

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

██████ (Stage II); and (e) ████████ (claiming logic).  I address each of these thresholds in turn.



a.  The LSH lookup portion of Stage I looks for exact LSH band matches.  A step of a search algorithm that looks for such exact matches using a threshold (i.e., a distance or difference of zero) to determine is a given LSH band is a match.  *See, e.g.*, Erb Depo. at 70:10-72:7 ("In Stage I, we look up in an index to see if any reference video had the precise value for an LSH band, meaning the same offset and the same value of the subfingerprint; and, if so, we record the time offset in the reference and the time offset of the subfingerprint that we're looking at in the -- in the user video along with the video identity – identity of the reference video.").

b.  The matching LSH bands from the LSH lookup portion of Stage I are pieced together to determine whether there are ████████████████████ ████████████████████████████████████ is a threshold that is a tied to the distance or difference between the features extracted from the reference work and the features extracted from the user-uploaded video.  *See, e.g.*, Erb Depo. at 82:9-85:5 ("So if you, for a moment, just think only about a single reference video and imagine that you look at the collection, for every subfingerprint that we look up out of the probe at various offsets, look at the collection of all the return values, all of the hits that we get from the LSH band lookups for that over time; so effectively, what that does is, it shows us a map of the time offset in the reference video that might correspond to a time offset in the probe video.  And looking at that behavior over time, if there's -- if there are ████████████████████████████████████████████ Q Now, when you say '██████████,' what do you mean by that?  A If -- in order to run the projection filter, we need some -- we need data.  We need enough datapoints to perform an analysis and so ██████████████████████████████████████ ).

c.  The ██████████ in the "projection filter" is another threshold that is a tied to the distance or difference between the features extracted from the reference work and the features extracted from the user-uploaded video.  If there ████████████████████████████ *See, e.g.*, Erb Depo. at 85:6-87:4 ("The projection filter is a conceptually ████████████████████████

<u>**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**</u>
<u>**PROSECUTION/ACQUISITION BAR MATERIALS**</u>



Q And this is something that's performed at the projection filter as a means of A. Yes.").

d. In the ▮▮▮▮▮▮▮▮ of Stage II, there is also ▮▮▮

*See, e.g.*, Erb Depo. at 216:6-19

*id.* at 99:12-106:16 ("[I]n the current implementation of Stage II, known as the Sensitive Stage II, the idea is that

e. Finally, the "raw matches" output from the Match System are processed by the claiming logic, which applies another threshold related to the distance or difference between the extracted features of the user-uploaded video and the reference work—▮▮▮. With both the Sensitive Stage II and the spike algorithm, the

*See, e.g.*, Erb Depo. at 111:22-114:11

*see also, e.g.*, *id.* at 125:4-15

99.    Review of source code produced by Defendants in this case confirms my analysis of this claim element.  As an example, ▮

---

[38] See definition at lines 192-223 of file ▮▮▮

▮  GOOG-NETWORK-SC-00001135-36)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



---

[39] See implementation at lines 197-198 of file ███████████████

████ ████ (GOOG-NETWORK-SC-00001135)

[40] See implementation at lines 174-186 of file ███████████████

████ ████ (GOOG-NETWORK-SC-00001113)

[41] See implementation at lines 510-573 of file ███████████████

████ ████ (GOOG-NETWORK-SC-00001116-17)

[42] The `Stage I` and `Stage II` do not appear to refer to the same "Stage I" and "Stage II" I describe above when discusses Defendants' testimony and their documents.

[43] See file ████████████

(GOOG-NETWORK-SC-00000153-55)

[44] See lines 56-58 of file ████████████

(GOOG-NETWORK-SC-00000153)

[45] See lines 56-58 of file ████████████

(GOOG-NETWORK-SC-00000153)

[46] See implementation at lines 47-67 of file ████████████

`cc.` (GOOG-NETWORK-SC-000001090-91)

[47] See implementation at lines 230-281 of the file ████████████

. (GOOG-NETWORK-SC-00000151)

[48] See implementation at lines 246-272 of file ████████████

████ (GOOG-NETWORK-SC-00000101)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**





[49] See implementation at lines 276-446 of file ███████████████

███ (GOOG-NETWORK-SC-00000101-04)

[50] See implementation at lines 211-229 of file ██████████████

`(GOOG-NETWORK-SC-00000100)`

[51] See implementation at lines 42-81 of file ███████████████

████████████ GOOG-NETWORK-SC-00000175 to 0176).

[52] See comments at lines 90-93 of file █████████████████

███ GOOG-NETWORK-SC-00000105-106)

[53] See implementation at lines 42-81 of file ████████████████

██████ OOG-NETWORK-SC-00000175-76)

[54] See implementation at lines 249-316 of file ███████████████

███ (GOOG-NETWORK-SC-00000168-69)

[55] See implementation at lines 585-591 of file ████████████████

███ (GOOG-NETWORK-SC-00000173)

[56] See implementation at lines 615-691 of file ███████████████

███ (GOOG-NETWORK-SC-00000174)

[57] See lines 671-673 of file ███████████████████

███ (GOOG-NETWORK-SC-00000174)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

match_strength. The `Compute` operation, using the sorted set of candidates, removes



---

[58] See implementation at lines 69-86 of file

(GOOG-NETWORK-SC-00001090)
[59] See implementation at lines 283-319 of file

.
(GOOG-NETWORK-SC-00000151-52)
[60] See implementation at lines 407-583 of file

(GOOG-NETWORK-SC-00000129-32)
[61] See implementation at lines 72-92 of file

(GOOG-NETWORK-SC-00000124)
[62] See definition at lines 24-196 of file

(GOOG-NETWORK-SC-00000135-38)
[63] See definition at lines 110-176 of file

(GOOG-NETWORK-SC-00000125-26)
[64] See implementation at lines 204-385 of file

(GOOG-NETWORK-SC-00000126-29)
[65] See implementation at lines 178-202 of file

(GOOG-NETWORK-SC-00000126)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

100.  It is my opinion that the Content ID LSH Version meets claim element 15b) literally.
However, to the extent this limitation is not literally met, for example, because the search
algorithm of the Content ID LSH Version does not "determin[e] an identification of [an]
electronic work" because it does not "identify" but rather "can be used to determine whether a
video uploaded to YouTube is similar in some sense to any of the video, audio, or melody
content in one or more reference," this limitation is met under the doctrine of equivalents. *See*
Defendants' Fourth Supplemental Response to Interrogatory No. 7 (dated September 30,
2019).  The Content ID LSH Version's search algorithm performs substantially the same
function (matching an unknown work with a reference work) in substantially the same way
(comparing the unknown work or features extracted from the unknown work to reference
works or features extracted from reference works) to obtain substantially the same result
(determining if the two works match) as would any technology that "determines an
identification of [an] electronic work."

101.  In sum, the Content ID LSH Version electronically determines an identification of the
user-uploaded video based on features extracted from that video.  This identification is based
on a non-exhaustive search identifying a neighbor (or a near neighbor or an approximate
nearest neighbor).  The Content ID LSH Version applies numerous thresholds to determine
whether a potential match is a close enough match for there to be a "claim" by a content owner
made on the user-uploaded video.

*Content ID Siberia Version*

102.  Once the Content ID Siberia Version generates a "fingerprint" of the user-uploaded
video, it then attempts to electronically determine an identification of the user-uploaded video
(i.e., determining whether any reference works are neighbors, near neighbors, or approximate
nearest neighbors to the user-uploaded video) by comparing that "fingerprint" with
"fingerprints" of reference works.  As I note above in my discussion of the Content ID LSH
Version, this process is commonly referred to as finding a *match* between the uploaded work
and a reference work.

103.  As I mention above, this identification in the Content ID Siberia Version is based on a
search that identifies a neighbor (or a near neighbor or an approximate nearest neighbor)—a
close, but not necessarily exact or the closest, match of a feature vector, compact electronic
representation, or set of extracted features to another.  I understand that a portion of the search
is based on what are known as ScaM.  *See, e.g.*, GOOG-NETWORK-00780160 ("Instead of
LSH, ScaM is used to do Approximate Nearest Neighbor Search."); GOOG-NETWORK-
00789360 ("Siberia: a new, sharded match engine . . . ScaM ==approximate nearest neighbor
search"); GOOG-NETWORK-00699371 ("ScaM (Scalable Matching) or Approximate Nearest
Neighbor (ANN) Search . . . The goal is to create a framework that can efficiently retrieve
(exact or approximate) nearest neighbors from small to **massive databases** containing billions
of items."); GOOG-NETWORK-00701295 ("[W]e use approximate nearest neighbor search
(ANN) based on ScaM technology, without own implementation optimized for batching
queries.  We find a number of approximate nearest neighbors for each shot."); Kumar Depo. at
78:2-6 ("What is ScaM?  A It is just a project name for one of my teams.  We work on
approximate similarity search algorithms, so it's an umbrella name for many of those
algorithms."); *see also, e.g.*, Pasula Depo. at 57:6-58:5 ("Q And the query, the unknown

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

embedding, is compared to ███████████████████████ ████████ A Within the ████████████████████████, yes.  Q And what's the output of that comparison?  A. Well, it's an ordered list in terms of ████████████████████. So that's not ██████████████████████. It's an ██████████████████████. And we usually take the top -- in the case of this index, I believe it's the ████████████ that we found per ████████████████████████████ Q So that would be ████████████████████████ from the reference index?  A Yes.  Well, I mean, the ████████████████████████ ████████); Kumar Depo. at 44:22-45:16 ("So you deal primarily only with that first piece, the lock up of the embeddings and the retrieval of those candidate embeddings?  A Right.  I would just try to clarify that look up is a very overloaded term in our community.  So just to make sure that means returning the most similar – approximately most similar items given a query embedding.  Q Now, when you say approximately most similar, what do you mean by that?  A Because it is an approximate similarity search.  So we return ██████████████████████████ But these are most similar in the approximate sense.  Because our ████████████████████ ████████████. It is not exact.  Q So it is possible that there is a more similar embedding somewhere that would not be retrieved?  Yes.");  *id.* at 99:19-24 ("Q Mr. Kumar, you mentioned a number of times the nature of the sort of ScaM search operations that are used as part of Content ID.  Now, those are not exact matching techniques; is that correct?  A Right."); *id.* at 166:19-24 ("So am I understanding correctly that this is illustrating the notion that a query using this kind of partitioning might not find the actual nearest neighbor because the nearest neighbor might be in a different partition from where it was searched?"); Konrad Depo. at 82:18-83:8; GOOG-NETWORK-00701295 ("Videos do not need to be exact duplicates to be detected."); GOOG-NETWORK-00700605 ("ScaM is used within Siberia ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ . . . In Siberia, this is just the beginning and followed by grouping all the nearest neighbors by references and refining/aligning the candidates."); Erb Depo. at 245:2-22.

104.  The search algorithm of the Content ID Siberia Version has three main stages:  "Index Lookup," "Sparse," and "Verifier."  *See, e.g.*, GOOG-NETWORK-00701295 ("A lookup runs in three stages: **search**, **sparse refining**, and **verification**."); GOOG-NETWORK-00781530:

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS



GOOG-NETWORK-00770926:



GOOG-NETWORK-00792065:

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



*See also, e.g.*, Pasula Depo. at 134:11-25, Kumar Depo. at 43:20-44:90, 55:24-56:11; GOOG-NETWORK-00701282; GOOG-NETWORK-00781875; GOOG-NETWORK-00787652; GOOG-NETWORK-00789630.

105.  Prior to the "index lookup," the "fingerprints" of the reference works (comprised of the embeddings ▮▮▮▮" I discuss above) are further manipulated, and indexed in a specific way.  I understand the indexing and resulting index lookup are based on a data structure developed by the ScaM (scalable matching) research team within Google.  I also understand that ScaM is an umbrella term for a number of data structures and associated algorithms, but here I aim to describe only those used in the Content ID Siberia Version.  *See, e.g.*, Pasula Depo. at 81:4-14 ("I've seen references that some portions of the match system use something called ScaM scaleable [sic] matching.  A Yes.  Q How does that relate to the match system that you've been describing?  A So the index, this structure we were talking about with the ▮▮▮▮▮▮▮▮▮▮, that is a data structure that was developed by the ScaM team in New York.").

106.  Each of the embeddings of the sequences of embeddings extracted from a given reference work is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ each embedding is what is stored in the reference index.  *See, e.g.*, Pasula Depo. at 45:7-47:16 ("Q And so when a given embedding is stored within the index, I take it it's stored with some metadata that indicates essentially which video ID it comes from and probably some other information about where in that video it comes from?  A So actually, what is stored is – it's like a reverse index.  What is stored is ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Q And so when you say it's ▮▮▮▮▮▮, can you explain what you mean.  What's ▮▮▮▮▮▮  A The embedding that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Q What kind ▮▮▮▮▮▮ A I think in this index, this is ▮▮▮▮▮▮▮▮ that I can try to explain.  Q In

<u>**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**</u>
<u>**PROSECUTION/ACQUISITION BAR MATERIALS**</u>

general terms, so when you say ███████████████, first of all, what do you mean by that?
A I mean that when you are doing the ████



, but you might not ████████████████; is that correct?  A When you're ████████████████ Q I see.  Okay.  So the ███████████████ A That is correct.  Q But it's ███████████████ A Yes.");
Kumar Depo. at 28:25-29:7 ("Q Now, in connection with a look up operation, is the same ████████████████ A No.  Q Okay.  And is that ████████████████?  A Yes."); Pasula Depo. at 112:11-114:4 ("[W]hat happens with those ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████; *see*
*also, e.g.*, Pasula Depo. at 139:9-25; Kumar Depo. at 13:18-15:4, 17:24-18:12, 18:17-22:4, 24:2-27:11, 27:24-28:24, 30:20-31:1, 75:8-76:6, 156:10-16; GOOG-NETWORK-00701226-31.

107.  Each of the reference indices (video, audio, and melody) is comprised of █████████
of the embeddings I described above.  Each of these indices is divided into a certain number of
"shards."  For simplicity, I will use the video index as an example, but each of the reference
indices are structured in the same manner.  The reference video index ███████████.
Information about a given reference video is placed ████████████████████.  *See, e.g.*, Pasula
Depo. at 39:6-41:5 ("And so then -- so the index has some collection of those values for each
video; is that a fair characterization?  A The contents of the index are generated using these
embeddings.  Q And what's the sort of data structure form of that index?  Is it a data base?
Can you describe it in some way?  A Well -- so first of all, the index is divided -- is sharded, is
parallelized.  It's divided into a bunch of smaller indexes that can each fit on one machine. . . .
And how many shards are there for the video index?  A For the █████████████. . . . Q And how was – what's the
organizing principle by which the things are divided into the shards?  A ████████.  Q And
am I correct that ████████████████████████████████ A Yes, we

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



. . . . Q And so the videos, based on their

A That is correct."); Kumar Depo. at 34:14-20 ("Q How many shards are there for the partner video index?  A I don't remember exact number.  Q I've heard references

.  Is that consistent with your understanding? A It is about that."); *see also, e.g.*, Pasula Depo. at 42:18-23, 108:14-109:5; Kumar Depo. at 34:24-36:7, 49:3-14.

108.

*See, e.g.*, Pasula Depo. at 43:6-45:6 ("So how -- within a given shard, how is the storage of the index organized?  A So within the shard, the embeddings are all mixed together regardless of which video they came from.  And they

Q You mentioned there are                    .  A Yes.  Q Is that true for                    A Yes.                                    .  Q And            s, did I understand you correctly, are chosen so that within -- obviously, it's not exact, but more or less there are                                        A Yes. Although, it is very approximate.  I think some ar

; Kumar Depo. at 165:15-166:18

; Konrad Depo. at 173:1-15 ("Q And my understanding is the

"); *see also, e.g.*, Pasula Depo. at 109:6-8, Kumar Depo. at 34:21-23, 36:8-37:15, 49:3-14, 156:10-16, 157:10-15; GOOG-NETWORK-00781874, GOOG-NETWORK-00790995:

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



GOOG-NETWORK-00701295; GOOG-NETWORK-00702301; GOOG-NETWORK-
00781876; GOOG-NETWORK-00789689-90; GOOG-NETWORK-00790997.



109.  The "index lookup" step of the search

. The Content ID Siberia Version then
outputs                              that are most similar to a given embedding from the user-
uploaded video.                              that the Content
ID Siberia Version uses—in order for a

s.  *See, e.g.*, Pasula Depo. at 51:19-56:4 ("[H]ow does the look up operation
or the comparison, however you want to describe it, how does that work?  A So this is very
long.  So you have a video which you want to look up which is represented by a sequence of
embeddings.  And the first thing you will do is you will try to see if anything in the index
might possibly be matching those individual embeddings.  So you will,
                              -- I mean, you will be looking them up in many indexes, but let's
say you're looking them up in just a single index, right?  You will send them against
            of that index, and in each            , you will try to -- you will first -- for each of those
embeddings, you will first scan all of these            that we talked about earlier and compare
that embedding            like the ones we discussed, like
                        . . . . ["A]m I understanding correctly that each embedding is sort of
looked up            A On an abstract level, yes.  On an actual implementation
level, not really.  Q Okay.  So -- so -- and I want to kind of walk through that look up process,
and I -- from the level of abstraction, I think it may be simpler if we talk about a single
embedding.  A Yes, sure.  Q But if that doesn't work, let me know.  So if we take that single
embedding, the index or            as you described earlier, correct?
A Yes.  Q And each of those is a                              A Each
                        n.  Q Okay.  So while there might be            , those actually sort of
represent, if you will,            A Yes.  Q Okay.  And you
compare the single embedding from the uploaded video to that list of            .  Is that --
does that make sense?  Is that the next step was my question.  A Yes.  Q And based on that
look up against the            , how many            are sort of identified to be processed
further with that particular embedding?  A So this depends in general on the particular type of

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

look up you are doing.  Usually when you're looking up new uploads against what we have been referring to as the reference index, ██████. Q 55████████ A Yes. Q And how is that look up performed to ██████ A You go though all of them.  You do ████ ██████.  Q Okay.  So you compare -- you do ███████ are the ones you then move to the next step?  A Yes."); *id.* at 111:11-112:10 ("Q What -- do you know what ████████ that the ████ ██████████████████████████████. Q Okay.  A So yeah.  Do you know what that is?  Q Not exactly.  I was going to ask if you could explain to me ███████████████████████████████████████ ████████████████████ Q And that ███████████████████████████. Is that -- A Yes. Q And just the top 55 are used, then?  A Yes."); Kumar Depo. at 39:5-8 ("Q So when the look up operation first compares to ███████, that's just a comparison to those ██████; is that correct?  A That's right."); *see also, e.g.*, Pasula Depo. at 110:15-23; Kumar Depo. at 29:8-30:19, 37:16-38:5, 60:19-64:5; Konrad Depo. at 85:2-24, 173:17-174:6; Erb Depo. at 245:23-246:19.

110.  The Content ID Siberia Version then ██████████████████ identified in the prior step in more detail.  To be clear, the system ██████████████. The Content ID Siberia Version outputs █████████████████████ as I described for the prior step.  This is another example of a threshold that the Content ID Siberia Version applies—in order for ██████████████. *See, e.g.* Pasula Depo. at 56:5-58:5 ("So then what's that next step with those ████████ A And then in all of the -- in each of those partitions, you will scan everything that's in that partition but ████████. . . . Q So each partition has some, I assume, █████████████ A Yes.  Q And those are all █████████, correct?  A Yes.  Q And the query, the unknown embedding, is compared to all of the hashes within that index or █████████ A Within the █████████, yes.  Q And what's the output of that comparison?  A. Well, it's an ordered list in terms of closeness in the ████████. So that's not the same █████████. It's an ████████. And we usually take the top -- in the case of this index, I believe it's the that we found per ██████████████. Q So that would be the ██████ from the reference index?  A Yes.  Well, I mean, the ████████"); Kumar Depo. at 40:19-42:16 ("What does that K represent?  So it's a number of essentially, candidate embeddings; is that fair?  A Yes.  Q And is that K a certain █████████ A It is ██████. Q So for each of ████████ ████████ correct?  A Just to understand correctly, each of the █████████ Q Right.  A For each query, we will ██████████████. Q Okay.  So -- and I think I've seen references to I think ██████. A That will be one example, yes.  Q Okay.  So in that instance, the ████████

55

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

█████████  A That's right.  Q Okay.  So what I'm trying to understand is you've looked at -- I think the number I've heard elsewhere ████████████████████████████████████████████. There's an output.  So if we assume ███████████████████████████████████████████████████. ██████████  A ████████████.  Because these are the things which you will return after █████████████████████████████████████████████████.  Q Okay.  So you get ████████████████████████████████████████, correct?  A That's right.  Q So let's see.  If I have ████████████████████████████ is that right?  A. Somewhere around that."); *id.* at 64:6-65:12 ("Q And once those 5 █████████████████████████, correct?  A Yes.  Q And did I understand you correctly that at that point, the █████████████████████████████████████████ is computed?  Or within █████████████, rather, excuse me, is computed?  A Yes.  Q And is tha ████████████████████████████████████████████████

██████  Q And then th ████████████████████████████████  A That's right.  One ████████████████████████████████████████████████████████. Q And the output of that is then the ████████████████████████████████████ for example?  A One can take these ██████████████████████████  Q And that sort is just whichever has -- I guess it would be the █████████████████████████, that's number one and so on?  A Yes."); Erb Depo. at 237:10-18 ("It's a system that partitions the reference -- all the references, all th █████████████████████████████████████████████ so that we can then search within those -- ████████████████  *see also, e.g.,* Pasula Depo. at 59:17-60:5, 110:24-111:3, 113:19-114:10; Kumar Depo. at 37:16-38:17, 39:9-19, 67:24-69:25, 74:23-75:7, 85:18-89:3; Konrad Depo. at 174:7-18; Erb Depo. at 237:19-238:4, 238:17-23, 247:5-13, 248:11-249:17.

111.  The search of the Content ID Siberia Version is non-exhaustive because the search does not compare to all possible matches (*i.e.*, all records in the reference data set).  The fact that the first step in the search (index lookup) is non-exhaustive renders the entire search algorithm non-exhaustive.  As I discuss in more detail below, only the reference works that have ████████████████████ that came back as matches from the index lookup step are subjected to further consideration.  *See, e.g.*, Pasula Depo. at 110:24-111:9 ("And then [an embedding from the uploaded video] will be compared to just the ████████████████████████████████████████, correct?  A Yes.  And it's never compared to the ██████████████████████████████████████████, correct?  . . . A Not during that lookup specifically."); 57:20-58:5 ("Q So that would be the █████████████████████████████ the reference index?  A Yes.  Well, I mean, the █████████████████████████.  . . . Q And is that a clarification?  Because it's ██████████████████████ A Yeah."); 150:20:151:15 (testifying concerning GOOG-NETWORK-00702118:  "Q Where Mr. Granstrom describes the aspects of the query process, and he writes 'In this way, the search is both non-exhaustive, as it happens for █████████ ██████████████████ . . .'  Do you see that?  A Yes.  Q And is he -- what is he describing there?  . . . A Well, he is describing the ScaM system, I'm pretty sure, and he is saying that we do not search -- we will not be searching all of ████████████.  We've been discussing that before, but ██████████████████████."); Kumar Depo. at 85:10-17 ("Q So you're not going to

56

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

compare the search query to everything in the database, only a subset?  A That's right.  Q Specifically, only a subset of the records, i.e., the references that ███████████████ ██████ correct?  Yes."); *see also, e.g.*, Kumar Depo. at 39:5-15.

112.  Once ████████ index hits are output, the Content ID Siberia Version then sorts them by video (puts all the embeddings ████████████████ from the same video together).  It then ████████████████████████████████████████████████████████████ ███████████████████████████ is another example of a threshold that is tied to the distance or difference between the user-uploaded video and a given reference work.  *See, e.g.*, Pasula Depo. at 60:11-24 ("What happens next with all those index hits?  A . . . The first meaningful thing that happens is you separate them out per reference video.  So all these hits were coming from all the different videos on the -- in ████████████████████████████ ██████████████████████████████████████████████████████████ So from now on, pretty much anything we would talk about would be about the pair of videos, no longer about the whole index."); *id.* at 63:7-18 ("Q And what kind of filtering is being done, then?  A . . . ████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████."); *id.* at 239:19-240:15 ("So in the case where ██████████████████ for each embedding that was run against the index; is that right?  A Yes.  Q And those would all still be passed to the sparse refiner?  A So before they passed the sparse refiner, they would ███████████████████████████████████████ I see.  A So there is some ████████████████████████████ Q. And so ███████████████████ A. That's right."); *see also, e.g.*, Konrad Depo. at 197:22-198:3.

113.  The reference works that have ████████████████████████ subjected to further consideration.  The next step is known colloquially as "sparse" or "sparse refiner."  Conceptually, sparse refiner *uses only the index hits* to ████████████████████████ ████████████████████████████████████████████████ for the reference video to potentially be a match—with that ███████████ being another example of a threshold used to determine whether or not a reference video should be subjected to further consideration in the next step of the search algorithm.  *See, e.g.*, Pasula Depo. at 61:19-63:24 ("Q. So after the index hits are sort of ███████████████ what's the next step in the analysis of the query?  A So the next step is something that we call sparse.  And the reason it is called sparse is because it's -- we have incomplete information about the relationship between the two videos.  So the way we think about what we have now as you will -- as you probably will see if you've seen our documents, █████████████████████████████.  So they are ████████████ ████████████████████████████████████████████████████████████ █████████████ you just put up in this case.  And if we had the full embeddings which we will later,

<u>**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**</u>
<u>**PROSECUTION/ACQUISITION BAR MATERIALS**</u>

you could have ▮▮▮▮▮▮ but we don't have that right now.  We only have hits.  That's why we call it sparse. . . . Q Is this sparse -- is this doing some further filtering of the results?  A Yes.  Q And what kind of filtering is being done then?  . . . [W]e attempt to find -- to see if these hits that sort of ▮▮▮▮▮▮▮▮▮▮▮"); *id.* at 64:23-66:4 ("Q In a general sense, does -- is sparse sort of a step in the process that cuts down at least some of the candidate video IDs, reference IDs, that might be further compared?  A Yes. ▮▮▮▮▮▮▮▮▮▮▮ Because sometimes you might have two videos that just generally resemble each other.  Like if you look at two recordings that take place in this room, a lot of the frames in those recordings will look a lot like each other, and those recordings will probably just ▮▮▮▮▮▮ Q And so sparse is the portion of the system that's -- or the portion of the process that's designed to kind of remove some of those poor candidates; is that fair?  A Yeah.  I mean, the whole system is -- I mean, what you're doing from -- once you get your index hits, is you're actually just trying to filter out more and more.  In sparse, the way I think about it, is sparse is everything that works on the index hits that doesn't have the full information.  That's why it's sparse."); *see also, e.g.*, Kumar Depo. at 42:17-44:15; Konrad Depo. at 86:6-87:6, 197:5-11; GOOGLE-NETWORK-00701295-96 ("[T]he search stage find nearest neighbors for ▮▮▮▮▮▮ and groups the results by reference.  Sparse refining is the process of taking such probe/reference pairs and deducing potential matching regions from the nearest neighbor hits."); GOOG-NETWORK-00781877; GOOG-NETWORK-00790998.

114.  The final step of the search algorithm is known as the "verifier."  Like sparse, it ▮▮▮▮▮▮ but uses the *full embeddings* rather than just the index hits.  I understand that there have been at least two versions of the verifier.  An earlier version ▮▮▮▮▮▮ examined by the verifier, and ▮▮▮▮▮▮ is another example of a threshold used by the Content ID Siberia Version.  A later versio ▮▮▮▮▮▮ Each of these criteria are also examples of thresholds used by the Content ID Siberia Version to determine if a given reference work is sufficiently similar to a user-uploaded work or not.  *See, e.g.*, Pasula Depo. at 67:7-71:6 ("So what's the next step after sparse?  A The next step is currently called the verifier.  Like it verifies things.  Q And what's the general operation, what does the verifier do?  A So in abstract terms, it is pretty much the same thing as sparse except that it works on the full embeddings and on ▮▮▮▮▮▮. . . . So we take these ▮▮▮▮▮▮

58

<u>**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**</u>
<u>**PROSECUTION/ACQUISITION BAR MATERIALS**</u>

. Q Okay. A But what we actually do is we first figure out                    We try to figure out                    . Because you know, there could be more than actually came out of sparse or they could be in a slightly different place. So we sort of -- we figure out                    . I don't remember what that part of the algorithm is called, but for sure,

I mean, we're not writing this down. The computer is calculating these things, and you know, keeping track of them. Or like

So we write down -- down to say, like a

. Q Is there a different system that's used? A For -- yes, we use

Q I see. And in CoverCat, that's the melody system, we use something called                    . . . . Q So putting aside the CoverCat for a moment, is this machine learning in the form of -- I assume, basically, what you're describing is

A For like a given combination of inter -- like I mean, for a                    . And actually, we don't always

"); *id.* at 71:18-74:13 ("Q And I take it that those decision tree pieces, each has some kind of parameter around -- A Yes. Q -- which it's measured? A Yes. . . . Q So -- and I think you said they're something in the order of                    A There are                    I think eventually, they                    . Q I see. So there is                    A Yeah. Like that yeah. Q So there is                    Is that -- A Yes. It's not just

. . . Q So you have these A Yeah. Q. And                    Is that essentially -- A The

Q I see. So for example, when it looks at

A That can happen, yes. Q Okay. So what is the sort of end output of this verifier? A It is the -- it is the set of matches that have been verified as actually being matches. By which I mean, it is -- they are pairs of end points, like –

59

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

it's -- in like regular English, it would be like from seconds -- in video A, from second10 --
video A from second 10 to second 30 matches video B from second 70 to second 90.  I cannot
remember if this is at this point stored in seconds or indexes into the embedding or whatever,
but that's the general idea.  Q I see.  So the verifier is outputting a set of time-based matches
that have been determined to actually constitute matches?  A Yes."); *id.* at 158:7-20 (testifying
concerning GOOG-NETWORK-00783282:  "And then can you explain to me this portion that
refers to ███████.  A Yes.  So apparently at this point, all we were doing in the
final stage of the verifier is after we had -- after we had figured out ████████████
███████████████████  Q And then I take it if █████████████████████, it
would be characterized as a match?  A Yes.  And then in the change, it's saying that we -- now
we have ████████  Q. And you're talking about -- this is on page 282, this description of the change,
that it's including ███████████████████  A Yes.  Q And so the idea is that
in the Video 7 or in the change that was at this time --  A Yes.  Q -- you would -- it would be
████████████████████████  A Yes.
Q Got it.  And how is that different now?  A It is much more complicated now.  Q Because of
the ████████████████████████████  A Yeah.  Because
now it is – it's not ████████████████████████████████████
████████████████  Q And so how does that ████████████████████
████████████████████████████████████  A Yes.
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████  So it's -- yeah.  Q And did I understand you correctly that
each of those decisions ████████████████████████████████████
████████████████  A You're looking at some kind of ████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████  Q Got it.  And
when was that switch to █████████████  implemented?  A. I want to say a year ago, but maybe
it's two years ago."); *see also, e.g.*, *id.* at 240:25-241:18; Kumar Depo. at 57:4-58:18; Konrad
Depo. at 87:6-25, 88:12-94:4, 198:4-15; GOOG-NETWORK-00701296 ("The final stage
verifies the candidate matches and outputs high-precision matches.  This is made possible by
loading the ███████████████  for each probe reference pair creating ████████████
a structure that contains the exact similarity between any probe/reference █████ . . . .").

115.  As I discuss above, the Content ID Siberia Version search is a non-exhaustive search for
a neighbor because the search does not compare to all possible matches (*i.e.*, all records in the
reference data set).  This is true even if the search does not locate a neighbor.  *See, e.g.*, Pasula
Depo. at 239:3-240:24 ("Q Now, when you're doing the overall search, it is possible that
ultimately, verifier does not identify any matches; is that right?  A That is more common than -

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

- that is the more common case -- Q Okay. A -- in the index that we have been talking about. Q Right. And why would it determine – so let me just walk through. So in the case where the verifier ultimately doesn't identify anything as a match, the index look up, that would still generate I think you said ███ index hits for each embedding that was run against the index; is that right? A Yes. Q And those would all still be passed to the sparse refiner? A So before they passed the sparse refiner, they would be sort of ████████████████████████

███████████████████████ Q I see. A So there is some

███████████████████████████████████████████████

Q. And so if it's ██████████████

████████████████████████████████████, and it's possible that something would be output from there but not passed at the verifier? A Yes. Q Okay. And so if it didn't meet the necessary requirement threshold for being a match in the verifier, there would be no match identified? A Yes."); Kumar Depo. at 56:22-57:3 ("So am I correct that it's quite possible that even though all those embeddings are output as index hits, the system might ultimately, not identify any match between the query video and videos in the reference index? A It is possible. . . . So the combination of the spare and the verifier, at the end of that even though it output whatever fixed number of index hits, there might be no match called, correct?. A That's right."); Konrad Depo. at 62:20-23 ("But not every video that's uploaded generates any matches. Correct? A There are videos that generate no matches, yes."); *see also, e.g.*, Kumar Depo. at 57:4-58:18; GOOG-NETWORK-00701282; GOOG-NETWORK-00701295; GOOG-NETWORK-00702295.

116. I understand that Defendants assert that "a process of ███████████████████ and/or neural networks" is not a "search." *See, e.g.*, Defendants' Supplemental Response to Interrogatory No. 7 (dated October 18, 2019). I understand this argument to be in reference to the verifier. I disagree with Defendants. A person of ordinary skill in the art would understand that ████████████ under discussion is clearly part of the search process. A search algorithm is designed to find an object satisfying desired criteria. The verifier uses ██████████ ███████████████████████████████████████████ ████ are part of the overall search methodology of the Content ID Siberia Version. The █████████████ is used as part of the search algorithm to remove from consideration objects that, ████████████████████████████████ to meet the criteria for a neighbor (or near neighbor, or approximate nearest neighbor). *See, e.g.*, Pasula Depo. at 67:1-71:6, 71:18-74:13, 158:7-20.

117. The matches output from the verifier are then sent to the claiming system for further analysis. As I mentioned above in regard to the Content ID LSH Version, a ████████████ ██████████████████████████, which the claiming system then uses to determine ███████████████ for a "claim" to be made. This is another example of a threshold that is applied to determine whether or not a reference video is a neighbor, a near neighbor, or an approximate nearest neighbor of a user-uploaded video.[66] *See, e.g.*, Wang Depo. at 32:7-

---

[66] I included a description of an analogous feature in the preceding section concerning the Content ID LSH Version, relying on testimony and documents concerning the older system. However, I understand that claiming system was generally, in terms of functionality, unchanged

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

34:2 ("Q And I think that you mentioned that the match claiming team takes information from matches from the match system?  A Mm-hmm.  Q And how does that work?  A This is very fuzzy to me, because it is not my area.  But I can only speculate that the match claiming team is called via API from the Matching team.  But like I said, this is not my area, so I'm only speculating.  Q And with --  with matches that are found by the match system, are those first fed into the match claiming team or the -- or something the -- that your  claiming team works on?  A It's first fed through the match claiming team.  Their logic, to be precise.  Q In -- in general, what does the match claiming team's logic do with those matches?  A A video can have lots of matches,



. . . Q You'd mentioned that the match claiming team                                          A Yes. Q How does that --

, is that determined by the match claiming logic or something else?  A I'm not exactly certain, but I just know it's one of the inputs from something, but I'm not exactly certain.  Q So you're not sure if it's the -- the matching component of content ID that provides                                        A I'm pretty sure it's actually the -- the match system's confidence score, just thinking about it logically."); Erb Depo. at 250:18-24 ("Q And ultimately computes                                        A Yes.  Q And the                                        is used then to determine whether there's a match or not a match?  A Correct."); *see also, e.g.*, Wang Depo. at 105:6-8 ("Is it the match claiming logic that decides where a claim should be made?  A Yes."); *id.* at 36:18-37:10; Pasula Depo. at 76:15-25; GOOG-NETWORK-00781530:

---

between the Content ID LSH Version and the Content ID Siberia Version.  Therefore, my analogous analysis in the Content ID LSH Version section applies here, and the analysis in this paragraph (relying on testimony and documents concerning the newer system) also applies in the Content ID LSH Version section above.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

## Matching: a Quick Overview



Confidential & Proprietary                                            You Tube

118.  Review of source code produced by Defendants in this case confirms my analysis of this claim element.  As an example,





---

[67] See implementation at lines 35-40 of file ████████████████████████████

████████████████  (GOOG-NETWORK-SC-00000364)

[68] See line 38 of file ████████████████████████████████████████████████

████████████  (GOOG-NETWORK-SC-00000153)

[69] See implementation at lines 676-840 of file ████████████████████████

██████████  (GOOG-NETWORK-SC-00000341-43)

[70] See a source code comment at line 675 of file ████████████████████████

██████████████  (GOOG-NETWORK-SC-00000341)

[71] See line 776 of file ████████████████████████

████████████████  GOOG-NETWORK-SC-00000342).

mapped to an implementation in the `Search`[72] function which calls the `SearchImpl`[73]



---

[72] See implementation at lines 110-144 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ GOOG-NETWORK-SC-00000365)

[73] See implementation at lines 146-179 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (GOOG-NETWORK-SC-00000365-66)

[74] See implementation at lines 247-288 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ (GOOG-NETWORK-SC-00000996-97)

[75] See definition at lines 42-100 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ (GOOG-NETWORK-SC-00001001-02)

[76] See lines 111-222 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (GOOG-NETWORK-SC-00000248-50)

[77] See lines 36-41 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ (GOOG-NETWORK-SC-00001001)

[78] See implementation at lines 122-203 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ (GOOG-NETWORK-SC-00000994 to 0996)

[79] See declaration at lines 61-64 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ (GOOG-NETWORK-SC-00001001)

[80] See lines 59-60 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ (GOOG-NETWORK-SC-00001001)

[81] See definition at lines 86-113 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ (GOOG-NETWORK-SC-00000714)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



119.  Continuing this example,



[82] See implementation at lines 338-407 of file

(GOOG-NETWORK-SC-00000711-12)

[83] For the preceding line cites, see file

(GOOG-NETWORK-SC-00000711-12)

[84] See implementation at lines 148-197 of file

OOG-NETWORK-SC-00000708)

[85] See lines 39-42 of file

(GOOG-NETWORK-SC-00000713)  My understanding is that the current implementation uses asymmetric hashing, but for completeness I have also included the Hamming option as well.

[86] See definition at lines 21-106 of file

(GOOG-NETWORK-SC-00000470-71)

[87] See lines 1-2 of file

(GOOG-NETWORK-SC-00000470)

[88] See implementation at lines 64-97 of file

.  (GOOG-NETWORK-SC-00000467-68)

[89] See definition at lines 133-336 of file

(GOOG-NETWORK-SC-00000669-72)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



120.



---

[90] See implementation at lines 75-80 of file

(GOOG-NETWORK-SC-00000668)

[91] See lines 60-74 of file

(GOOG-NETWORK-SC-00000667-68)

[92] See implementation at lines 157-186 of file

(GOOG-NETWORK-SC-00000495)

[93] See implementation at lines 265-289 of file

(GOOG-NETWORK-SC-00000496-97)

[94] See definition at lines 156-330 of file

(GOOG-NETWORK-SC-00000901-04)

[95] See implementation at lines 1076-1115 of file

(GOOG-NETWORK-SC-00000490)

[96] See definition at lines 30-82 of file

`(GOOG-NETWORK-SC-00000974 – 0975).`

[97] See implementation at lines 112-158 of file

`GOOG-NETWORK-SC-00000971 – 0972).`

[98] See lines 37-38 of file

`(GOOG-NETWORK-SC-00000974).`

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



---

[99] See lines 39-41 of file █████████████████████

██████████████████████ (GOOG-NETWORK-SC-00000974).

[100] See lines 45-46 of file █████████████████████

██████████████████████ (GOOG-NETWORK-SC-00000974).

[101] See lines 47-49 of file █████████████████████

██████████████████████ (GOOG-NETWORK-SC-00000974).

[102] See lines 25-54 of file █████████████████████

███████████████████ GOOG-NETWORK-SC-00000981).

[103] See lines 57-90 of file █████████████████████

██████████████████ (GOOG-NETWORK-SC-00000981 to 0982).

[104] See implementations at lines 19-32 and 57-70 of file See lines 25-54 of file ███████

███████████████████ (GOOG-NETWORK-SC-00000978 – 0979).

[105] See implementation at lines 141-204 in file ████████████████

██████████████████ (GOOG-NETWORK-SC-00000985 – 0986)

[106] See definition and implementation in files ███████████████

█████████████████████████████████████████

███████ (GOOG-NETWORK-SC-00000988 to 0992).

121.

122.  It is my opinion that the Content ID Siberia Version meets claim element 15b) literally. However, to the extent this limitation is not literally met, for example, because the search algorithm of the Content ID Siberia Version does not "determin[e] an identification of [an] electronic work" because it does not "identify" but rather "can be used to determine whether a video uploaded to YouTube is similar in some sense to any of the video, audio, or melody content in one or more reference," this limitation is met under the doctrine of equivalents.  *See* Defendants' Fourth Supplemental Response to Interrogatory No. 7 (dated September 30, 2019).  The Content ID Siberia Version's search algorithm performs substantially the same function (matching an unknown work with a reference work) in substantially the same way (comparing the unknown work or features extracted from the unknown work to reference works or features extracted from reference works) to obtain substantially the same result (determining if the two works match) as would any technology that "determines an identification of [an] electronic work."

123.  In sum, the Content ID Siberia Version electronically determines an identification of the user-uploaded video based on features extracted from that video.  This identification is based on a non-exhaustive search identifying a neighbor (or a near neighbor or an approximate nearest neighbor).  The Content ID Siberia Version applies numerous thresholds to determine whether a potential match is a close enough match for there to be a "claim" by a content owner made on the user-uploaded video.

124.  As shown above, each of the Content ID Accused Instrumentalities meets claim element 15b).

### 4.1.4. '988 patent claim 15c)

> 15c) electronically determining an action based on the
> identification of the electronic work; and

125.  Each of the Content ID Accused Instrumentalities meets claim element 15c).

126.  When each of the Content ID Accused Instrumentalities identifies a match between a user-uploaded audio and/or visual work and a reference work submitted by a rights holder, it electronically determines the action or actions that it needs to take with respect to the user-uploaded audio and/or visual work, including, but not limited to, actions based on the policy the rights holder has chosen to apply to user-uploads matching its reference work, such as blocking, tracking, or monetizing.  The claiming system of each of the Content ID Accused Instrumentalities makes these determinations.  I understand that the claiming system did not change when the matching system changes from the Content ID LSH Version to the Content ID Siberia Version.  Rather, the general functionality of the claiming system has not meaningfully changed since at least as early as 2006.  *See, e.g.*, Wang Depo. at 34:4-14 ("Are you aware of something called Siberia?  A I have heard that project name before.  Q And with, like, the claiming system that you're working on, did -- did your team develop a new version of the claiming system for Siberia or was it -- A No.  Q -- were those two separate pieces?  A My knowledge of Siberia is that it was something they did and changed.  Not at all what we did on

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

a day-to-day basis."); *id.* at 51:21-52:10 ("Q And since you started working on -- on the rights management team in 2006, how many versions of the claiming system have there been? A We're not very good with our obsolete code. There actually has really only been one -- it depends on how you define 'version.' We are still using the same old code as before, but a lot has been added to it over time. Q Was – with code being added over time, were they any points where the functionality changed significantly? A Not -- Q The functionality of the claiming system. A Not in any big way. We just developed more and more features over time."); Konrad Depo. at 147:20-149:3 ("Q And so when we talk about the, sort of, the earlier LSH system and the Siberia system, that didn't really -- there wasn't a changed LSH claiming system versus a Siberia claiming system. Is that fair? A I believe the claiming system was mostly agnostic to which system was providing the matches, whether it was the LSH-based one or the Siberia-based one.").

127.  As I describe above, the matches output from the matching component of each of the Content ID Accused Instrumentalities are processed into final matches by the claim logic, ███████████████████████ *See, e.g.*, analysis for '988 patent claim 15b) and citations therein.

128.  The claim logic then considers "policies" specified by the content owner on the matches from different channels that are "stitched together," such as the overall match duration. The first action that the claim logic determines is whether a claim should be made in the first place, based on these content owner policies. *See, e.g.*, Erb Depo. at 106:21-111: ("Once the raw matches are output from the Stage II processing, what's the next step in the process? A The raw matches are sent for -- when we're doing matching for purposes of what we usually describe as ContentID, the -- for the purpose of claiming, then the raw matches are sent to the claiming system for further analysis. And that's the point at which the matches from the different channels are combined. Q When you say 'the matches from the different channels are combined,' what do you mean? A I mean the matches from video, audio and melody are considered together in the claiming logic, whereas the match servers that we've been describing up to this point are each operating only on one channel. Q So how does that work? When you say that they are considered together, what's the processing that does that consideration? A. It's -- there's a lot of different logic in claiming that does things like, for example, ███████████████████████████████████ ██████████████████████. If we have, at the same time at the same offsets, we have a melody match and we have an audio match, then we -- the melody match isn't interesting so we forget about it, we drop it. If we have an audio match and a video matching at the same time, we combine them into an audio-visual match, and so on. There's kind of a lot of logic in claiming to decide what matches really -- to transform the raw matches into what we consider to be the final matches. . . . Q. And is that, is there a common term or is that referred to by some name within the architecture and within the system? A. We call it the claim logic. Q. And so, what are the -- I think you described a couple of different possible inputs, if you will, that the claim logic might consider in terms of analyzing these raw matches. How does it go about, let's say you have a series of several raw matches in the video channel. What does the claiming logic then do with those? A. Well, again, it considers the matches from all the channels together rather than just the video channel. But it does a wide variety of things. For example, ████████████████████████████████████████████████████████████

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

So in the case that we've completed all the match processing and we've converted, potentially converted audio and video matches into audio-visual matches, and so on, and all of that is done, then we compare each of the matches that remains in that set against the policies associated with the assets that the references that matched are tied to, and we use that to determine whether or not we should make claims. Q So these would be essentially policies often set by the content owner. A Yes. They are set by the content owner."); *id.* at 366:15-367:5 (describing how a content owner can alter this time duration, referring to GOOG-NETWORK-00008009-13); Rosenstein Depo. at 18:19-24:4 (Q. And if the video is determined to match some asset or some content that's been provided to Google, what happens next? A. There's a fairly complex series of logic that -- the match is sent to a system that determines if -- if the match is qualified to make a claim and then what the policy should be on that claim based on the characteristics of the match and the policy that is set by the -- the owner of that content. Q So when you say that there's some logic to determine if a match is qualified to make a claim -- A Uh-huh. Q -- can you explain how that works and what you mean by that? A Yes. The match needs to be – have certain characteristics that are eligible for claiming, such as be a -- long enough to be unambiguous, for example, a very short match is -- could -- a very short -- few seconds of a piece of content can match multiple, multiple things. So we make sure that the match is long enough to be unambiguous to match this piece of content, and we make sure that the policies that are -- that were described by the content owner are followed. So in some cases content owners may choose not to place a claim on certain types of matches."); *id.* at 219:25-220:7 ("Q So as a practical matter, the claiming logic, as I understood your testimony, processes the match or matches that are generated by the system to determine one of more claims that may be applicable to the particular piece of content; is that correct? A That's correct."); Wang Depo. at 61:17-62:3 ("Q Is there a minimum length that a -- a length or duration that a match needs to be for a claim to occur? A I believe so, yes. Q Do you know what that is? A They have been changing it, and I know it's short now. But I don't know for sure how short. It may be five or ten seconds, but I'm not certain. Q You said they keep changing it. Who is 'they'? A The -- the team in response to a product -- it's part of like a product decision. Q Is that your team or the Zurich match claiming team. A Zurich match claiming."); *see also, e.g.*, Rosenstein Depo. at 43:9-44:20; Wang Depo. at 34:21-5, 35:20-36:7; Konrad Depo. at 187:17-188:8; GOOG-NETWORK-00693810.

129. If the claim logic determines that a claim should be made on a reference video, the claim logic of each of the Content ID Accused Instrumentalities then determines what "match policy" should be applied. This is a second example of "determining an action" that is done by

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

Content ID's claim logic. The Content ID Instrumentalities do so by looking up the owner "match policies" that should be applied to a user-uploaded video matching a given reference video, with those policies being stored in a database. *See, e.g.*, Erb Depo. at 36:7-40:15 ("The -- there's a policy table, which in connection with the claim table, can related a particular video ID to a particular policy. So for a claimed video, the policy can provide information about the territories in which a video should have a claim policy applied to it, and that policy could include a policy to monetize, meaning a policy to show advertising against the video."); Rosenstein Depo. at 26:1-30:1 ("And so an example would be, using what you described a few moments ago, if a content owner had designated a policy of monetize this content, for example, and the match corresponded with the criteria for that claim -- A Uh-huh. Q -- then that policy of monetize would somehow be associated with the user-uploaded video? A. That's correct, the policy would be associated with the user-uploaded video scoped to whatever territories and whatever other criteria that policy had. Q Okay. And how is that done? How is that -- is it just as a function of that lookup connection that you described? A. The policy is ultimately written out to a table that holds policies and is used during the video playback to determine what to do when the video's played back. Q. Okay. So -- thank you. Let's then walk through that part of the process. A Okay. Q So the video was uploaded at Point A by some user, and the process you have described has happened. Now, at a second time, some other user is going to view this particular video through the YouTube system. So what happens to implement this policy that you just mentioned? A So my understanding would be that the player would look at the policy table for that video and determine what policy, based on the circumstances of the playback, territory, for example, and then would make -- based on that policy, would then determine what it should do, whether it should block that playback or -- or do nothing or request an ad for that playback."); *id.* at 17:16-18:4 ("The content owner is able to receive the videos that are matched, and we would apply a policy based on their instructions. Q When you say that 'we would apply a policy,' what are the kinds of policies that can be applied? A There are a number of policies. Content can be tracked to measure the reach of the -- the property asset provided by the content owner. It can be monetized. It can be sent to a review or it can be bought. And those policies can vary by a number of different parameters."); *id.* at 219:25-221:2 ("Q So as a practical matter, the claiming logic, as I understood your testimony, processes the match or matches that are generated by the system to determine one of more claims that may be applicable to the particular piece of content; is that correct? A That's correct. Q And then, based on those claims, policies are applied that are associated with those particular assets, correct? A That's correct. Q And is there any logic that is needed to apply those policies or is it sort of automatic, in that if this particular asset if [sic] claimed, then those policies are associated with it are applied? A If an asset is claimed and it has . . . [p]olicies associated with it, those are the ones applied. . . . And the system doesn't have some logic or choice functionality, if you will, as to how or when to apply those policies, it is more a binary: If the claim is made and there are policies set, then those are the policies that are applied? A That's correct."); Wang Depo. at 62:4-11 ("Q Is it the claiming logic developed by your team that determines what action to take if a match between user-generated content and partner contact is found? A Yes, in the sense that we apply what the partner has told us to do. Q And by, what the partner has told you to do, do you mean the -- the track, block, and monetize policies? A Yes."); *see also, e.g.*, Erb Depo. at 33:21-34:10 ("A claim is a database relation between an asset provided by a partner, and a user-generated video."); GOOG-NETWORK-00767789 ("Claim: A link between a partner's asset and a piece of content being uploaded to

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

YouTube."); GOOG-NETWORK-00781896 ("What is a CID Claim?  An assertion that the rights to distribute a video on YouTube are (co)owned by a partner *[in a given territory and for a given media type]*  Computed by YouTube based on matches and ownership statements made by partners *[references and metadata files]*"); Erb Depo. at 157:5-17, 349:23-350:5; Rosenstein Depo. at 44:21-45:1; GOOG-NETWORK-00006733 ("The claims logic is the code that runs during automated claiming.  As inputs it takes matches from the match system, █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. . . . The policies attached to these claims may prevent the video from becoming visible on youtube, or permit us to display ads against the video at watch-time."); Wang Depo. at 110:17-113:15; Konrad Depo. at 43:19-46:21; GOOG-NETWORK-00006734, GOOG-NETWORK-00702280 ("The consistent claims set provides a set of actions . . . .  These actions get executed . . . ."); GOOG-NETWORK-00006736-37 GOOG-NETWORK-00600441 ("If Content ID finds a match, we apply the rightsholder's desired policy."); GOOG-NETWORK-00693821; GOOG-NETWORK-00693829.

130.  The potential "match policies" that can be applied to a claimed video are block, track, or monetize.  Which policy to apply, and the ultimate outcome of the application of that policy, are both examples of actions that the claim logic determines should occur.  *See, e.g.*, Defendants' Response to Network-1's Request for Admission No. 49 (dated May 14, 2015) ("[a]dmit[ting] that the policies that may be chosen by content owners include 'monetize,' 'block,' and 'track'"); Erb Depo. at 153:18-154:13 ("Q And is that metadata that you mentioned that the partners would provide also inclusive of the various policies that might go along with that particular content?  A Yes.  Q And that would include, for example at the high level, the sort of block, monetize, or allow policies that would apply to a particular matched video?  A Among other things, yes.  Q And are there sort of subspecies, if you will, or nuanced variations of each of those categories, block, monetize and allow?  A It's block, monetize and track.  Q Sorry.  A And they are, apart from specifying under what conditions and for which users those policies apply, the policies are really -- there's no finer gradation of policy than block, monetize or track."); Wang Depo. at 44:18-21 ("Q Let's talk about those policies.  What do you mean by policies?  A There are several rules they can apply for reference, and they are monetized, track, or block.); *id.* at 72:1-25 ("Q Is it the claiming system or some other part of Content ID or YouTube that taken an action based on the partner-identified policies of monetized, track, or block?  . . . The claim logic takes whatever the partner has said to apply to that -- for that asset, in that video and propagates it to playability, which will use it at watch time.  . . . Q So the claim logic sends some sort of information to a playability system?  A Yes."); GOOG-NETWORK-00013853 ("When a subsequently uploaded video is matched, the content owner 'claims' it and the policy associated with the reference material is applied to the matched content, and the video is either blocked, monetized, or tracked to receive viewing metrics."); GOOG-NETWORK-00000668:

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

# YouTube video matching



GOOG-NETWORK-00767747:



GOOG-NETWORK-00781896:

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



*See also, e.g.*, GOOG-NETWORK-00009782, GOOG-NETWORK-00010544, GOOG-NETWORK-00010551; GOOG-NETWORK-00010579; GOOG-NETWORK-00014310; GOOG-NETWORK-00693761-63; GOOG-NETWORK-00693766; GOOG-NETWORK-00693768; GOOG-NETWORK-00693783; GOOG-NETWORK-00701274; GOOG-NETWORK-00767789; GOOG-NETWORK-00770921.

131. When the right holder's content is blocked, the Content ID LSH Version prevents the user-uploaded audio and/or visual work from either going live or continuing to be viewed, or it mutes the audio. By determining the "match policy" is block, the claim logic also determines that the video should not be allowed to play. *See, e.g.*, GOOG-NETWORK-00013853 ("'Block' means the matched content is blocked and not able to be viewed either worldwide, or in a specific territory that the content owner has defined."); *see also, e.g.*, Wang Depo. at 73:21-74:8; GOOG-NETWORK-00767795-96.

132. If the rights holder chose the "track" policy, the user-uploaded audio and/or visual work remains unaffected but the Content ID LSH Version gives the rights holder access to viewership statistics. By determining the "match policy" is track, the claim logic also determines that the video should be allowed to play and that the content owner should receive various statistical information. *See, e.g.*, GOOG-NETWORK-00013853 ("'Track' means the partner can see the viewing statistics such as the aggregate demographics of the viewers and general locations where the content is most popular, while the matched content remains on the site."); *see also, e.g.*, Wang Depo. at 74:14-24; GOOG-NETWORK-00767799-800.

133. If the policy is "monetize," the user-uploaded audio and/or visual work remains available on YouTube and the Content ID LSH Version displays with it advertisements and/or promotional information relating to the creator of the reference work, and tracks its viewership statistics. By determining the "match policy" is monetize, the claim logic also determines that the video should be allowed to play and that an ad should be displayed in conjunction with the video on the watch page, if the ad system determines that should happen. *See, e.g.*, GOOG-NETWORK-00013853 ("'Monetize' means the content is licensed to YouTube, ads will be served around the matched content, and YouTube will share the revenue with the partner."); Erb Depo. at 161:19-22 ("Q Now, 'monetized' generally speaking refers to displaying ads

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

along with the video, is that correct?  A Yes."); Rosenstein Depo. at 47:5-11 ("What happens with the videos, what does it mean that they are monetized?  A It generally means that the -- that the playback, the player will request an ad from an ad system that will determine if there's an ad that's appropriate to serve, and if there is, it will certainly -- it will run an ad."); Wang Depo. at 75:24-76:19 ("Q And we also talked about a usage policy of monetize.  What does that mean?  A It means the partner has specified that they would like to monetize that content. Q And how is that content monetized?  . . . When a video has a monetized policy, we send that signal -- or we don't sent that signal.  The as system is always fetching all the policy information at watch time as well.  And if is says monetize, they do whatever it is they do . . . . Q You mentioned the ad system, so you mean that an ad is displayed on a video that's monetized?  A No, I meant the ad system has logic as part of YouTube sort of just watch path, where it gets called if the policy is monetized, and so they know there is a monetize policy on this video, and they are allowed to show an ad, but it is up to them to determine what should actually happen."); *see also, e.g.*, *id.* at 76:8-77:17; Wiseman Depo. at 26:7-28:5 (describing the types of ads that may be displayed on a matched user-uploaded video); GOOG-NETWORK-00767797-98; GOOG-NETWORK-00693806:

| Policy | | Result |
|--------|---|--------|
| Monetize | $ | • Allows the user uploads to be viewable on YouTube and tracks viewership.<br>• Places ads (in the formats a partner allows) against user uploads that match the content in the reference file. |
| Track | | • Allows the user uploads to be viewable on YouTube and tracks viewership, but does not serve ads against it. |
| Block | | • Blocks user uploaded videos that match a partner's content from being hosted (i.e. viewable) on YouTube.<br>• Note: This is not a takedown and will not issue a strike to the user, but prevents the content from being live on site. |

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



134.  Review of source code produced by Defendants in this case confirms my analysis of this claim element.  As an example, a ███████████████████████████████████████



---

[107] See implementation at lines 15-38 of file ████████████████████████████

████ (GOOG-NETWORK-SC-00001109)

[108] See definition at lines 30-67 of file ████████████████████████

(GOOG-NETWORK-SC-00001106-07)

[109] See definition at lines 17-42 of file ████████████████████████

████████████ (GOOG-NETWORK-SC-00001112)

[110] See lines 26-29 of file ████████████████████

(GOOG-NETWORK-SC-00001106)

[111] See implementation at lines 47-55 of file ████████████████████

████████████ (GOOG-NETWORK-SC-00001110)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**





[112] See implementation at lines 132-136 of file ████████████████████████████████████████████ (GOOG-NETWORK-SC-00001111)

[113] See implementation at lines 124-178 of file ████████████████████████████ (GOOG-NETWORK-SC-00001105)

[114] See implementation at lines 121-139 of file ████████████████████████ (GOOG-NETWORK-SC-00000116-17)

[115] See implementation at lines 82-93 of file ████████████████████ (GOOG-NETWORK-SC-00000116)

[116] See implementation at lines 115-122 of file ████████████████████████ GOOG-NETWORK-SC-00001105)

[117] See implementation at lines 202-238 of file ████████████████████ (GOOG-NETWORK-SC-00000117-18)

[118] See implementation at lines 38-46 of file ████████████████ (GOOG-NETWORK-SC-00001100)

[119] See implementation at lines 31-98 of file ████████████████ (GOOG-NETWORK-SC-00001100-01)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

135.  Continuing this example,



---

[120] See definition at lines 629-654 of file

(GOOG-NETWORK-SC-00000317)
[121] See definition at lines 398-431 of file

(GOOG-NETWORK-SC-00000319-20) and definition at lines 61-65 of file

(GOOG-NETWORK-SC-00000358-59)
[122] See file

(GOOG-NETWORK-SC-00000318-20) and file

(GOOG-NETWORK-SC-00000358-63)
[123] See lines 399-428 of file

(GOOG-NETWORK-SC-00000319-20) and lines 31-60 of file

(GOOG-NETWORK-SC-00000358)
[124] See definition at lines 362-396 of file

(GOOG-NETWORK-SC-00000319) and definition at lines 72-87 of file

(GOOG-NETWORK-SC-00000359)
[125] See line 390 of file

(GOOG-NETWORK-SC-00000319) and definition at lines 97-187 of file

(GOOG-NETWORK-SC-00000359-60)
[126] See definition at lines 364-386 of file

(GOOG-NETWORK-SC-00000319)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



136.  As shown above, each of the Content ID Accused Instrumentalities meets claim element 15c).

### 4.1.5. '988 patent claim 15d)

>    *15d) electronically performing the action.*

137.  Each of the Content ID Accused Instrumentalities meets claim element 15d).

138.  Once each of the Content ID Accused Instrumentalities identifies a user-uploaded audio and/or visual work and determines the action or actions that it needs to take with respect to that work, it performs the action or actions electronically.  Upon identifying a user-uploaded audio and/or visual work as a match for a reference work submitted by a rights holder, each of the Content ID Accused Instrumentalities automatically performs the action corresponding to the policy specified by the rights holder for matching to that reference work, whether it is to block, track, or monetize.  *See, e.g.*, analysis for '988 patent claim 15c) and citations therein.

---

[127] See line 81 of file ███████████████

████████████████████████████████████████

(GOOG-NETWORK-SC-00000359)
[128] See definition at lines 289-380 of file ████████████

(GOOG-NETWORK-SC-00000318-19) and definition at lines 194-332 of file ███████

████████████████████████████████████████

(GOOG-NETWORK-SC-0000360-63)
[129] See definition at lines 326-360 of file ████████████████

GOOG-NETWORK-SC-0000318-19) and definition at lines 286-332 of file ██████

████████████████████████████████████████

(GOOG-NETWORK-SC-00000362 to 0363)
[130] See line 351 of file ███████████████

████████████████████████████████████████

(GOOG-NETWORK-SC-0000318)
[131] See line 321 of file ███████████████

████████████████████████████████████████

(GOOG-NETWORK-SC-00000362)

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

139.  As shown above, each of the Content ID Accused Instrumentalities meets claim element 15d).

### 4.1.6. '988 patent claim 17

>   *17. The method of claim 15, wherein the non-exhaustive search is sublinear.*

140.  Each of the Content ID Accused Instrumentalities meets claim 17.

141.  As an initial matter, each of the Content ID Accused Instrumentalities meets all the limitations of claim 15, the claim from which claim 17 depends.  *See, e.g.*, analysis for '988 patent claim 15 and citations therein.

142.  I understand the parties agree that "sublinear" [search] means "a search whose execution time scales with a less than linear relationship to the size of the data set to be searches, assuming computing power is held constant."  I have applied this construction in my analysis below.

143.  I understand that the parties dispute the construction of "non-exhaustive search."  I understand that Defendants assert this term is indefinite, and that Network-1 asserts this term should be construed as "a search designed to locate a neighbor without comparing to all possible matches (*i.e.*, all records in the reference data set), even if the search does not locate a neighbor," or alternatively with the additional clarification "comparing to a match means comparing to sufficient data within the record to make a determination as to whether the record is a match."  As I state above, the clarifying phase is just that—a clarification of what "comparing to a match" means in the context of the construction and the patents.  Therefore, my infringement analysis is the same whether or not the clarifying phrase is ultimately included in the construction or not.

### Content ID LSH Version

144.  The non-exhaustive search of the Content ID LSH Version is sublinear.  *See, e.g.*, Baluja Depo. at 138:15-18 ("Q So using this LSH approach allows the scaling of the system to be sublinear in that sense?  Is that what you're saying?  A Yes."); *id.* at 180:23-181:6 (testifying concerning GOOG-NETWORK-00613420:  "Q Then it goes on to state, 'LSH and other hash functions are sublinear in the number of elements examined compared to the size of the database.'  Do you see that?  A Yes.  Q Is that referring to the same sublinearity that we discussed earlier?  A Exactly."); *see also, e.g., id.* at 148:21-149:5; GOOG-NETWORK-00000418, GOOG-NETWORK-00700426 ("Disk space will scale approximately linearly with growth in reference set size (but the amount is insignificant), other resources (CPU, RAM) will scale sublinearly. . . . In other words, good scaling characteristics for reference set growth."); analysis for '988 patent claim 15b) and citations therein.

145.  Starting from the first step, the Content ID LSH Version system is designed to determine a very small subset of the reference works in the database, in particular a sublinear subset, that could be possible matches to the input work being queried.  This is through the creation of what is commonly referred to as an "inverted index" data structure, based on the LSH bands;

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

only reference works that match in terms of the LSH bands are subject to further analysis.  *See,
e.g.*, GOOG-NETWORK-00000412 ("The LSH (Locality Sensitive Hash) Tables are an
inverted index of LSH bands (substrings extracted from the fingerprint) to the IDs of videos
containing that band.").

146.  The inverted index is designed to be a sublinear data structure; that is, the inverted index,
on a query, specifically does not go through each of the references in the database to see if they
match the query.  Rather, in this setting, when given an LSH band, the inverted index can
directly return a list of the reference works that match that LSH band, in time proportional to
the number of the matches.  Hence the work done by the inverted index corresponds to the
number of index hits, not the number of references.  This is a general property of inverted
indexes.  *See, e.g.*, https://en.wikipedia.org/wiki/inverted_index.

147.  *See also, e.g.*, source code analysis for the Content ID LSH Version for claim element
15b) of the '988 patent.

*Content ID Siberia Version*

148.  The non-exhaustive search of the Content ID Siberia Version is also sublinear.

149.  As a preliminary matter, I would like to note that several of Defendants' technical
witnesses testified that if additional references were added *to the existing shard/partition
structure*, the ScaM portion of the search would scale linearly.  *See, e.g.*, Kumar Depo. at
50:11-51:21 ("[S]o I'm going to give you a hypothetical.  If you double the number if videos in
the data set, but you don't change the number of partitions or the number of shards, what does
that do to the portion of the search you've described?  . . . A Well, in the current system, it will
increase the cost by twice.  It will slow down by half.  Q And that's true because you have
███████████████████████████; is that fair?  A Because we're doing linear search.  Q
Within the individual partitions you search?  A Right.  Q And assuming you don't change the
number of K candidates that are output, then the second and third pieces would not change is
that right?  . . . A That's right, but each partition, if you increase the database by twice, and you
don't change the number of partitions or shards, then you are effectively having twice the
number of points on an average per partition.  In other words, if you keep the ███████████
constant, then you are looking at twice the number of points.  That means because it's linear
scan, so it increases by two times.");  Pasula Depo. at 92:8-93:15 ("I think you talked about
some component or portion being -- sort of scaling linearly, and I wanted to make sure I
understood what you were referring to.  A Well, you always have to search -- the way the
ScaM algorithm is set up, you always have to search a fixed portion of the index.  I mean, ███
███████████████  So that is -- yeah.  That's linear in the size of the index.  And actually, even if we
decided to take a different number of top hits, that wouldn't even help because we still have to
do the full scan.);  *see also, e.g.*, Pasula Depo. at 88:22-89:17; Konrad Depo. at 195:18-196:3.

150.  However, the hypothetical I discussed above—doubling the size of a reference index by
simply adding those references to the existing shards—is not what would be done.  This could
result in the ScaM portion of the search taking approximately twice as long, or an
(unnecessary) double of computing resources could be consumed for that portion of the

## CONFIDENTIAL OUTSIDE COUNSEL ONLY –
## PROSECUTION/ACQUISITION BAR MATERIALS

search.[132]  Rather than conducting the search in this inefficient manner, as the size of a reference index increases, so would the number of shards and partitions, as several of Google's technical witnesses explained.  Concerning increasing the number of shards, Mr. Konrad testified this would also be true with smaller size increases, such as a ten percent increase.  *See, e.g.*, Konrad Depo. at 194:21-195:17 (testifying concerning GOOG-NETWORK-00702308: "And then the last item on the first column there is the 'how many shards'.  Is that speaking to the number of shards in -- I think you said there were, or I think we talked about there are ███████████████████████████.  Is that right?  . . . Q At least for video.  A I believe at some point there ████████████████  I'm not – kind of 50/50.  And equally – it could just as well be ███████████, I really don't know.  It's -- for the – for the UGC index it's █████████.  Q And is -- am I understanding correctly the design is such that, as the index grows, for example if we're talking about the partner index, the way that that is achieved is basically you can add more shards?  A That is correct.  So if the overall index grows by ten percent, we would assume that we need plus/minus ten percent more shards.");  Pasula Depo. at 93:16-94:16 ("I think that if we just -- if the index suddenly had to double tomorrow because we suddenly get, I don't know, a bunch of new clients in China, we would just build more shards, and those shards would be contributing the same amount of processing to the later stages as the earlier shards, without returning.  Q I see.  Right.  A In fact, we would probably retune and maybe we could help with something, but not evenly.  I think it would have a huge impact.  Q Right.  And that's based on your sort of idea of adding additional shards and doing it that way, right?  A Yes.  I find it hard to image how we -- unless we do something about choosing to treat some index entries differently from others, I find it hard to imagine how we would do it differently.") *id.* at 129:10-21 ("Q But in other words, if you put another few references into the shard, you don't change from █████████ or something like that; is that correct?  A Well, right now, we are not changing it, but I feel like we discussed this earlier, and if our index size were increasing faster, I think we would have to rethink it.  Q And change the way you construct the search?  A And possibly, take more hits, but as I explained, probably what we would do is just add more shards."); *see also, e.g.*, GOOG-NETWORK-00702308 (listing "How many shards" as a "Tunable knob" in Siberia's search); Erb Depo. at 253:2-6.

151.  In addition, during the design phase, members of the ScaM team recognized that the Content ID Siberia Version would need to use a sublinear search to be practicable.  *See, e.g.*, GOOG-NETWORK-00704247-50 ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████); *see also, e.g.*, GOOG-NETWORK-00717464 ("ScaM is handing a number of neighbor search problems like Content ID copyright

---

[132] The time that the overall search takes (e.g., the combination of ScaM, Sparse, and Verifier steps) would increase by less than a factor of two if the number of hashed embeddings in the reference index were doubled.  This is because amount of time the latter two steps take would remain roughly constant since the number of index hits comes out of the ScaM step would remain the same.  In other words, the data set size and the search time of the Content ID Siberia Version do not have a one to one relationship.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

detection. ███████████████████████████████████
████████████████████████ )

152. I understand the graph below (taken from one of Defendants' documents) as illustrating that as the size of the reference index increases, assuming more shards are added, the search scales sublinearly. *See, e.g.*, GOOG-NETWORK-00704557:



153. The x-axis of the graph is equivalent to the number of shards in a given index because each shard is stored on a different machine. *See, e.g.*, Pasula Depo. at 77:19-78:17 ("[E]ach shard is stored on a different machine. Is that what you said? A Yes."); *see also, e.g.*, *id.* at 39:11-17.

154. The y-axis of the graph illustrates the total amount of computing power needed for searching the dataset, over all the machines on which the dataset is stored.

155. From the testimony and documents that I have reviewed, I understand that the Content ID Siberia Version is using a specific version of █████████████████, but may not be using █ ████████ implementation. *See, e.g.*, Kumar Depo. at 157:6-15 ("Content ID uses a very specific type of ████████████████████████████████████████████████████ ████████████████████████████████████).

156. Regardless of whether Content ID Siberia Version is using what is labeled ████████ ████████" according to the graph above, the search scales sublinearly. *See, e.g.,* GOOG-NETWORK-00704057 ("Unfortunately, sharding fails to fully exploit the economy of scale provided by ████████ which has query-costs that grow sub-linearly for increases in database size."); *see also generally, e.g.*, GOOG-NETWORK-00704053-85.

157. As Defendants' recognize, another "tunable knob" in the Content ID Siberia System is the ████████████████████████. *See, e.g.*, GOOG-NETWORK-00702308 (listing "How

many partitions" as a "Tunable knob" in Siberia's search); *see also, e.g.*, Konrad Depo. at 193:14-194:19.

158.  Increasing the ███████████████████ as the size of the data set size increases would result in sublinear scaling.  There are two main steps in ScaM's index lookup, in terms of the computational work required: (1) comparing the unknown work to ███████████ and (2) comparing the unknown work ███████████

███████████ The computational work of the first step is proportional to the ███████████████ which I denote by P).  The second step depends also on ███████████. For example, assuming that Siberia ███████████

███████████

███████████ *See, e.g.*, Pasula Depo. at 106:19-110:9 ███████████ While I acknowledge that there are further steps in ScaM's index lookup, they are computationally much less expensive than these steps, and do not affect my further analysis.

159.  Assuming that each comparison consumes the same amount of computing resources, one can think about the amount of computing resources as the "work" required or W.  In the simplified analysis above, W has two terms.  The first work term for W is proportional to the ███████████ (P).  The second work term for W is proportional to the number of comparisons in the second step, which is (approximately) equal to ███████████ ███████████. Hence the work can be represented as W = aP + bSTQ, where a and b are simply fixed constants.  Q can be represented as the total ███████████ (R) divided by the product of the ███████████, or Q = R/(SP).  Substituting for Q in the prior equation yields W = aP + bRT/P.  In order to maximize the efficiency of the search (minimize W), one of ordinary skill in the art would understand that the ███████████ P should increase roughly as the square root of the number of ███████████ R.  This is because, as shown in the equation above, the work term has a term that is proportional to P and proportional to the inverse of P; balancing out these two terms (which minimizes the overall work) would lead to setting P to the square root of R, so both terms grow as the square root of the number of references.  Said another way, a skilled artisan would know to increase P at a much slower rate the increase in R, would know that the way to do that is have P grow proportionally to the square root of R, and would know that the resulting search time would scale sublinearly with the number of ███████████ R.

160.  I would further emphasize that one does not need to specifically increase P proportional to the number of references R in order for the work to scale sublinearly with the number of ███████████ R.  Indeed, the work analysis above demonstrates that any natural scaling of P leads to sublinear work.  This is consistent with the Defendants' document GOOG-NETWORK-00704557.

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

161. *See also, e.g.*, source code analysis for the Content ID Siberia Version for claim element 15b) of the '988 patent.

162. As shown above, each of the Content ID Accused Instrumentalities meets claim 17.

## 4.2.   '237 patent claim 33

### 4.2.1. '237 patent claim 33 preamble

> *33. A computer-implemented method comprising:*

163. To the extent preamble is limiting, each of the Content ID Accused Instrumentalities meets the preamble of claim 33.

164. Each of the Content ID Accused Instrumentalities practices computer-implemented methods . For example, each of the Content ID Accused Instrumentalities electronically extracts features from videos uploaded by YouTube users, and uses those extracted features to associate that uploaded work with a reference work, and then determines actions to perform based on that association. *See, e.g.*, analysis for '237 patent claim elements 33a), 33b), and 33c) and citations therein.

165. As shown above, each of the Content ID Accused Instrumentalities meets the preamble of claim 33.

### 4.2.2. '237 patent claim 33a)

> *33a) obtaining, by a computer system including at least one*
> *computer, media work extracted features that were extracted from*
> *a media work, the media work uploaded from a client device;*

166. Each of the Content ID Accused Instrumentalities meets claim element 33a).

167. I understand that the parties dispute the construction of "extracted features." I understand that Network-1 asserts this term should be construed as "electronic data sampled, calculated, or otherwise derived from a work itself, as opposed to from information added or appended to the work," and Defendants assert this term should be construed as "electronic data derived from a work itself, as opposed to from information added or appended to the work." In my view, these constructions have the same scope. Therefore, my infringement analysis is the same under either construction.

168. Each of the Content ID Accused Instrumentalities is implemented on a computer system including at least one computer. Computer technology is required for each of the Content ID Accused Instrumentalities to operate.

   a. Content ID LSH System: *See, e.g.*, Erb Depo. at 145:12-146:20 (explaining that computer code that implements the Content ID LSH System resides on servers in Google data centers).

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

    b.  <u>Content ID Siberia System</u>:  *See, e.g.*, Konrad Depo. at 50:1-25 (discussing the data centers where the Content ID Siberia Version is run).

169.  With each of the Content ID Accused Instrumentalities, YouTube users can upload videos to YouTube, through client devices such as computer and mobile devices.  *See, e.g.*, Defendants' Responses to Network-1's Request for Admission No. 3 (dated May 14, 2015) ("[a]dmitting that the YouTube site allows users to upload video content to the site"); *id.* at Responses to Request for Admission Nos. 61-64 (admitting that "users upload videos to the YouTube site from cell phone devices" and "computers" and that such uploads are "analyzed using the Content ID system").

    a.  <u>Content ID LSH System</u>:  *See also, e.g.*, Erb Depo. at 40:24-41:25 ("So am I correct, first of all, that users have the ability to upload videos from various devices or platforms into the YouTube system as a general matter?  A Yes.  Q And that could be from a computer at their home or a laptop computer, correct?  A Yes.  Q And users also have the ability to upload videos from mobile devices like mobile phones?  A Yes. . . . Q So what is sort of first point at which a video uploaded by a user comes into contact in some way with the Content ID system?  It's processed by our fingerprinting modules."); GOOG-NETWORK-00600441 ("When a user uploads a video to YouTube, Content ID automatically scans it against our database."); GOOG-NETWORK-00000668:



    b.  <u>Content ID Siberia System</u>:  *See also, e.g.*, Konrad Depo. at 62:12-15 ("Every UGC video that's uploaded to YouTube is run through the Content ID match system.  Correct?  Ideally, yes, if we handle our cases correctly then it's done in every case.");

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

Pasula Depo. at 51:23-52:11 ("When a video is uploaded to YouTube, there is some kind of look up operation, if you will to determine whether it matches something in the reference set; is that fair? . . . A Yes. I mean, yes."); Goodrow Depo. at 64:15-65:11.

170. Each of the Content ID Accused Instrumentalities obtains media work extracted features that were extracted from a media work (i.e., features extracted from the user-uploaded video).

*Content ID LSH Version*

171. The Content ID LSH Version electronically extracts features from each audio and/or visual work uploaded by a YouTube user to generate its digital "fingerprint." This "fingerprint," which is made up of "subfingerprints," is electronic data that is sampled, calculated, and/or otherwise derived from the work itself. Google's technical witnesses explained in detail how the fingerprints and subfingerprints are generated using, among other techniques, ▮▮▮▮▮▮▮▮▮▮. The same general framework is used to generate fingerprints for each of the video, audio, and melody "channels." *See, e.g.*, Erb Depo. at 41:21-42:6 ("Q So what is the sort of first point at which a video uploaded by a user comes into contact in some way with the ContentID system? A It's processed by our fingerprinting modules. Q And what are the fingerprinting modules? A We fingerprint each video in three channels. One is audio, one is video, and one is melody, also known as CoverCat."); *id.* at 43:13-45:11 ("What differed about the fingerprint generation process for each of those three channels? A The video fingerprint used a combination of video filters that was obviously very different from what you would do in audio up front, ▮▮▮▮▮▮▮▮▮▮



▮▮▮▮ fingerprinting elements become much more common amount the multiple methods. The audio fingerprinting initially involved ▮▮▮▮▮

▮▮▮▮▮▮ as input to the more common elements of the fingerprinting. Q And when you say -- you've referred a couple of times to 'the more common elements of the fingerprinting.' What are you referring to there? A It's a ▮▮▮▮▮

▮▮▮▮▮▮ And a fingerprint is a series of subfingerprints. Q Now, you mentioned first a ▮▮▮▮▮. In general terms, what does that involve? What does that mean? A It's a --▮▮▮▮

▮▮▮▮▮▮ ); *id.* at 45:25-47:3 ("Q And I think you further indicated that, after this ▮▮▮▮▮ ▮▮▮▮▮ A Yes. Q And what is ▮▮▮▮▮

87

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



; *id.* at 51:20-23 ; *see also, e.g.*, *id.* at 42:7-43:12, 45:12-24, 47:4-51:20, 51:24-54:8, 58:4-59:13, 63:3-64:3, 64:14-22; Pasula Depo. at 14:1-21:19, 217:21-219:8 (both having additional discussion of the "fingerprinting" process); Baluja Depo. at 48:6-51:14

Defendants' Response to Network-1's Request for Admission No. 55 (dated May 14, 2015) ("[a]dmit[ting] that the Content ID system uses fingerprints of uploaded videos").

172.  The "fingerprints" of reference works to which the "fingerprint" of the user-uploaded video is subsequently compared are generated in the same fashion. *See, e.g.*, Erb Depo. at 56:2-57:2 ("Is that same process performed on what I'll call a reference video, if, for example, a TV studio provides a piece of content like a video, is the same process performed to generate fingerprints of that reference video?  A In general, yes.  The only exception is that it's possible that that processing is done in a -- by an external party.  Q In other words, let me see if I understand correctly, is it the case that Google, at least for some partners, provides some piece of software that allows the partner to generate a fingerprint themselves and transmit the fingerprint rather than the content itself to Google?  A Correct.  Q And, but that, the process of that software is the same as the process you've described.  It just may be performed on the other side of the user's firewall, or the partner's firewall.  A That's correct."); *see also, e.g., id.*

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

at 64:23-65:5; Rosenstein Depo. at 41:6-43:8; GOOG-NETWORK-00013854 ("[T]he technologies start with a database of reference material provided by rights owners from which YouTube extracts key visual and auditory signals. Every user upload goes through a similar attribute extraction . . . . We slice the digital (A or AV) files into small segments a few seconds long and generate fingerprints for each segment."); GOOG-NETWORK-00010570 (noting that content owners typically only create their own fingerprints for pre-releases); GOOG-NETWORK-00702327 (describing the tool provided to "important ContentID partners" for this purpose).

173. As I mentioned above, the "fingerprints" are made up of subfingerprints, the latter of which ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊. These subfingerprints are further broken down into smaller pieces called locality specific hashing (LSH) bands. This is true for both the user-uploaded videos and the reference works. The LSH bands of the reference works are indexed. *See, e.g.*, Erb Depo. at 71:15-22 ("Every subfingerprint is divided into what we call LSH bands. So a typical example is ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ ▊▊ an LSH band consists of ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ and that's known as an LSH band."); *id.* at 80:12-81:4 ("Now, you've mentioned a number of times referring to these individual pieces as LSH bands. What does LSH stand for? A Locality-sensitive hashing. Q And what is locality-sensitive hashing? A It's a term that refers to the -- it's kind of an -- kind of an overblown term in a way. It really corresponds to just saying that out of a Hash value, and remember that the fingerprint was ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊, out of a Hash value, if a chunk of that Hash occurs at the same place, the same offset within another similarly computer Hash at the same locations, that's the locality-sensitive part, then the hashes may be similar. They are candidates to look at for similarity."); *see also, e.g.*, *id.* at 72:8-22, 77:20-78:6; Baluja Depo. at 53:2-61:5, 160:19-25 (both discussing of LSH bands and their indexing for the reference works).

174. Defendants' documents described the "fingerprinting" process used in the Content ID LSH Version in a manner that is consistent with the testimony of Google's technical witnesses. *See, e.g.*, GOOG-NETWORK-00784835-37:



  

GOOG-NETWORK-00018603-05 ("Feature extraction: . . . The fingerprint of a video is a compact representation of the video, which is easier to compare than raw video and audio data.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

. . . Transform a piece of video (0.05s-60s) into a *feature vector*, so that *similar* pieces of video give feature vectors with *low distance*, according to a suitable metric."); GOOG-NETWORK-00000670-75 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ GOOG-NETWORK-00000412-14, GOOG-NETWORK-00700423-25 ("The LSH (Locality Sensitive Hash) Tables are an inverted index of LSH bands (substrings extracted from the fingerprint) to the IDs of videos containing that band."); GOOG-NETWORK-00002595-96; GOOG-NETWORK-00005616-17; GOOG-NETWORK-00018613-17; GOOG-NETWORK-00162594-95; GOOG-NETWORK-00699813; GOOG-NETWORK-00702844-47; GOOG-NETWORK-00780504-05; GOOG-NETWORK-00785261-68.

175.   Review of source code produced by Defendants in this case confirms my analysis of this claim element.[133]





---

[133] Where I cite to code and describe its behavior, I typically cite to the lines of code (as opposed to associated comments).  There are also instances where I do cite to comments.  However, when I cite to specific lines of code, any associated comments should be understood as being included and relevant to understanding the corresponding code, where such comments exist.

[134] See definition at lines 22-51 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ (GOOG-NETWORK-SC-00000401)

[135] See code comment at lines 20-21 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ (GOOG-NETWORK-SC-00000401)

[136] See the file ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (GOOG-NETWORK-SC-00000425-27)

[137] See definition at lines 138-141 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ OOG-NETWORK-SC-00000414)

[138] See implementation at lines 81-92 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ (GOOG-NETWORK-SC-00000425)

[139] See implementation at lines 465-472 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ (GOOG-NETWORK-SC-00000407)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



[140] See implementation at lines 42-53 of file ███████████████. (GOOG-NETWORK-SC-00000416)

[141] See implementation at lines 125-163 of file █████████████████ (GOOG-NETWORK-SC-00000417-18)

[142] See implementation at lines 94-153 of file ████████████████ (GOOG-NETWORK-SC-00000425-26)

[143] See line 22 of file ██████████████ (GOOG-NETWORK-SC-00000399)

[144] See definition at lines 22-51 of file ████████████ (GOOG-NETWORK-SC-00000401)

[145] See implementation at lines 70-198 of file ████████████████ (GOOG-NETWORK-SC-00000421-22)

[146] See implementation at lines 62-135 of file ████████████████ (GOOG-NETWORK-SC-00000399-400)

[147] See definition at lines 188-197 of file ██████████ (GOOG-NETWORK-SC-00000145)

[148] See line 104 of file ████████████████ OOG-NETWORK-SC-00000400)

[149] See declaration at lines 42-46 of file ██████████ (GOOG-NETWORK-SC-00000401)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



176. In the above example,



177. It is my opinion that the Content ID LSH Version meets claim element 33a) literally. However, to the extent this limitation is not literally met, for example, because the ████████ "fingerprint," "subfingerprints," and/or the LSH bands that ultimately comprise the subfingerprints are not interpreted as "extracted features," this limitation is met under the doctrine of equivalents. The Content ID LSH Version's "fingerprint" (and its "subfingerprint" and LSH band components) performs substantially the same function, as it is a representation of an unknown work that can be used to identify it by comparing it to fingerprints of reference

---

[150] See implementation at lines 155-189 of file ███████████████████████ ████████ (GOOG-NETWORK-SC-00000426)

[151] See implementation at lines 192-197 of file ██████████████████ ████████ (GOOG-NETWORK-SC-00000404)

[152] See implementation at lines 602-698 of file ████████████████████ ██████████ GOOG-NETWORK-SC-00000409-11)

[153] See definition at lines 166-169 of file ███████████████ ██████ (GOOG-NETWORK-SC-00000145)

[154] See definition at lines 54-152 of file ██████████████ ██████ (GOOG-NETWORK-SC-00000143-45)

[155] See definition at lines 156-163 of fil ██████████████ ██████ (GOOG-NETWORK-SC-00000145)

[156] See line 57 of file ████████████████ ██████ (GOOG-NETWORK-SC-00000143)

[157] See line 61 of file ██████████████ ██████ (GOOG-NETWORK-SC-00000143)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

works in the subsequent claim step.  It is part of performing this identification/comparison function in substantially the same way as would any "extracted features," as this "fingerprint" is electronic data derived from a work itself.  It yields substantially the same result as would any "extracted features," namely providing a representation of the work that can be used to identify it by comparing it to fingerprints of references works in the subsequent claim steps.

178.   In sum, the Content ID LSH Version obtains media work extracted features from electronic works uploaded by users by generating a fingerprint comprised of subfingerprints, which are further broken down into smaller chunks called LSH bands.  These "fingerprints" are electronic data sampled calculated, or otherwise derived from a work itself, as opposed to from information added or appended to the work.

*Content ID Siberia Version*

179.   The Content ID Siberia Version similarly electronically extracts features from each audio and/or visual work uploaded by a YouTube user to generate its digital "fingerprint."  This "fingerprint," which is made up of "embeddings" that are each a vector of ███████████████ ██████ is electronic data that is sampled, calculated, and/or otherwise derived from the work itself.  Google's technical witnesses explained in detail how the fingerprints and embeddings are generated using ██████████████████████████████████████████████, part of the Google Brain project.  The same general framework is used to generate fingerprints for each of the video, audio, and melody "channels," and for regular uploads as well as live streams.  *See, e.g.*, Pasula Depo. at 21:22-29:13 ("The neural network-based fingerprinting also – well, I guess not also.  It generated █████████████ as the sub fingerprint; is that correct?  A No.  ██████████████.  Q Thank you.  Sorry.  A And we stopped referring to them as sub fingerprints.  Q What is the reference to them at this point?  A Embeddings.  Q E-M-B-E-D-- A Yeah.  Things embedded in a space, yeah,  It's -- yeah.  It's what they would be called in the literature of neural networks.  Q And can you describe what each embedding is? . . . It's a ██████████████████████████.  Q And that's represented ██████████████████  A Yes.  It's a vector which is a description of a point in space.  Q And what does that ██████████████████ represent with respect to the underlying video?  A Not much.  It's not so much that it represents something intrinsically.  It has sort of a certain property.  Q Well, so when you say it has a certain property, what do you mean by that?  A So we trained the neural network so that embeddings corresponding to -- in video, video frames that came from the same footage, from the same point in the same footage, end up close together in the same space, even if they have been heavily transformed; and that embeddings that come from completely different frames, are far away.  Q So an individual embedding, is that generated from a snapshot of a point in time within the video?  A For the video channel, it's a single frame.  Q And that single frame, how often are those captured to generate the embeddings?  A I believe it is still██████████████.  Q So let's step to just one of those.  So I take it, then, ██████████████████, there is something that essentially extracts a single frame at that point in time from the video, and then that is processed in some way to generate the ████████████████ ██████████ A I believe we just request a transcode that has ████████████████████ from YouTube's infrastructure or we ask it to transcode it in such a way and then we process each frame individually.  Q When you say you ask it to process a transcode, can you just explain to me what that means?  A.  So there are many different video represent -- a video can be represented many different ways, with like higher, smaller resolution.  There can be



different frame rates, different N codings of the video. We ask for a specific N coding which is -- in which the frames are explicit -- represented explicitly. And they occur ███████████ ████. YouTube has a lot of infrastructure for purchasing different transcodes for different purposes. Q. And so -- so you receive that transcode, and then it -- that's essentially a collection of frames from the video; is that fair? A Yes. Q Okay. And each of those frames is then processed to generate one of these vectors or embeddings? A For the video channel, yes. Q And how is it different from the audio channel? A The audio channel is -- well, based on audio, and audio is a wave form. So what we do is we produce what is called a spectrogram. It is a visual representation of the frequencies and the times in the audio wave form, and it basically sort of shows the notes that are occurring at different points in time and how they're sustained. And so we produces this rolling tape of what's going on with audio, and then we take snapshots of it and produce embeddings from those. . . . And is there a third way that -- I believe you also mentioned there is a melody channel. A I am less familiar with how the melody channel preprocessing is done. They also use spectrograms, but then they do some more processing on it to really only extract musical notes and to make sure that these notes are invariant to pitch shift. So if you -- if you move the whole melody like a half tone up, it still ends up in the same place. Q Is there -- once the frames are captured or the spectrogram is captured for audio, is there different code that███████████████████████████ for the different channels or is it the same ones they've been preprocessed? A It is the same framework. There are -- the system is actually, very complicated in other ways. There are several other things that might happen in the different channels. But in the end, they all use a neural network. Q And do they call that neural network through the same code or is it different code for each one? A I mean, it's the same neural network, what you call it, tool kit, ████████████. ████ Q Did you say ███████████ A Yeah,███████████████████ It is famous among engineers. Q And so the neural network is what's used in each instance to calculate ███████████████ A That is correct. I mean, a different neural network for each channel."); *see also, e.g., id.* at 35:20-36:13, 125:17-127:22, 134:11-25, 155:4-156:13, 172:19-174:7; Kumar Depo. at 15:21-16:25, 17:13-23, 91:12-22, 102:13-23; Konrad Depo. at 79:24-80:14, 136:19-138:22; Erb Depo. at 54:9-55:20, 60:17-61:24, 240:10-25, 242:17-244:25, 317:10-318:3; Defendants' Response to Network-1's Request for Admission No. 55 (dated May 14, 2015) ("[a]dmit[ting] that the Content ID system uses fingerprints of uploaded videos").

180. The "fingerprints" of reference works to which the "fingerprint" of the user-uploaded video is subsequently compared are generated in the same fashion. *See, e.g.*, Kumar Depo. at 30:20-31:6 ("Q The underlying embeddings from the query are obtained in the same way as the embeddings from the references; is that right? A That's right."); *see also, e.g.*, Pasula Depo. at 31:4-33:8, 36:16-21, 174:16-175:2.

181. For user-uploaded videos, more than one sequence of embeddings may be used to represent a single video in certain situations ███████████████████████ In instances where there are multiple sequences of embeddings for a single uploaded video, those sequences of embeddings are generated in the same way as for a video with a single sequence of embeddings. *See, e.g.*, Pasula Depo. at 29:14-30:24 (Q So the number of these vectors that would be used to represent a given video is dependent on the length of the video; is that fair? A Yes. We might also use several different sequences of embeddings to represent a single video. Q And is that because there might be video channel, audio channel or others, or is there

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

some other -- A There is another thing. Q Go ahead. A I don't know if you've seen on YouTube ███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████ Q So you might have a set of embeddings for the video as a whole, and a set of embeddings ███████████████████████████████████? A Yeah, sub component or sub components. Sometimes it's four or three."); GOOG-NETWORK-00783283 ██████████ *see also, e.g.*, GOOG-NETWORK-00770925; GOOG-NETWORK-00781031; GOOG-NETWORK-00789217-19; GOOG-NETWORK-00789369-71.

182. In addition, for the video channel, there is a step referred to a ███████████████

████████████. *See, e.g.*, Pasula Depo. at 36:16-38:10 ("So the neural network-based embeddings, those are used to create the references that are in the index; is that correct? A Several things are done to those embeddings. And then some of them are placed in the index. Q Okay. So walk me through. When you say several things are done to those embeddings, what do you mean? A So sometimes, in -- well, actually, also in audio. In video, ████████████

███████████████████████████████████████████████████████████████████

████████████████████████████); *id.* at 58:22-59:9 ("When you have the uploaded video, there's a process that's sort of -- if I understood you correctly, you generate the embeddings █████████████████████████████████████████████████████ ; is that fair? A Yes. This process is like the first stage of either indexing or look up."); *see also, e.g.*, Erb Depo. at 241:1-242:16.

183. Defendants' documents described the "fingerprinting" process used in the Content ID Siberia Version in a manner that is consistent with the testimony of Google's technical witnesses. *See, e.g.*, GOOG-NETWORK-00702117 ("At the core of our matching technology lies a robust and compact representation of video content. This compact representation is generated by a neural network █████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ GOOG-NETWORK-00790986 ("Fingerprint: Compact representation of the image that provides a distance measure"); GOOG-NETWORK-00786357-60:

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



GOOG-NETWORK-00770923:



*See also, e.g.*, GOOG-NETWORK-00699390-98; GOOG-NETWORK-00699885-90; GOOG-NETWORK-00700607-09; GOOG-NETWORK-00701278-80; GOOG-NETWORK-00702421; GOOG-NETWORK-00704330; GOOG-NETWORK-00754011; GOOG-NETWORK-00754431-38; GOOG-NETWORK-00781030; GOOG-NETWORK-00781127; GOOG-NETWORK-00781872-73; GOOG-NETWORK-00787651; GOOG-NETWORK-00788058-66; GOOG-NETWORK-00789361-62; GOOG-NETWORK-00789372; GOOG-NETWORK-00790993-94; GOOG-NETWORK-00791817-19; GOOG-NETWORK-00791839-41.

184.  Review of source code produced by Defendants in this case confirms my analysis of this claim element.



**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

185.



186.

187.

---



[158] See definition at lines 20-34 of file ██████████████████████████
(GOOG-NETWORK-SC-00001055)

[159] See comment at lines 13-19 of file ████████████████████████████
(GOOG-NETWORK-SC-00001055)

[160] See implementation at lines 16-21 of file ████████████████
(GOOG-NETWORK-SC-00000675)

[161] See comment at lines 14-15 of file █████████████████████████
(GOOG-NETWORK-SC-00000675)

[162] See lines 17-28 of file ███████████████████████████████
GOOG-NETWORK-SC-00000722).

[163] See line 11-16 of file ████████████████████████████████
(GOOG-NETWORK-SC-00000722).

[164] See implementation at lines 14-33 of file ████████████████
(GOOG-NETWORK-SC-00000195).

[165] See lines 54-329 of file █████████████████████████████
(GOOG-NETWORK-SC-00000871 to 0875).

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

███████████████████████████████████████████████████████████
166

188.  It is my opinion that the Content ID Siberia Version meets claim element 33a) literally. However, to the extent this limitation is not literally met, for example, because the "fingerprints" and/or "embeddings" are not "extracted features," this limitation is met under the doctrine of equivalents.  The Content ID Siberia Version's "fingerprint" (and its "embeddings") performs substantially the same function, as it is a representation of an unknown work that can be used to identify it by comparing it to fingerprints of reference works in the subsequent claim step.  It is part of performing this identification/comparison function in substantially the same way as would any "extracted features," as this fingerprint is electronic data derived from a work itself.  It yields substantially the same result as would any "extracted features," namely providing a representation of the work that can be used to identify it by comparing it to fingerprints of references works in the subsequent claim steps.

189.  In sum, the Content ID Siberia Version obtains media work extracted features from electronic works uploaded by users by generating a fingerprint comprised of embeddings.  As with the Content ID LSH Version, these "fingerprints" are electronic data sampled, calculated, or otherwise derived from a work itself, as opposed to from information added or appended to the work.

190.  As shown above, each of the Content ID Accused Instrumentalities meets claim element 33a).

### 4.2.3. '237 patent claim 33b)

> 33b) determine, by the computer system, an identification of the
> media work using the media work extracted features to perform a
> sublinear approximate nearest neighbor search of reference
> extracted features of reference identified media works; and

191.  Each of the Content ID Accused Instrumentalities meets claim element 33b).

192.  I understand the parties agree that "sublinear" [search] means "a search whose execution time scales with a less than linear relationship to the size of the data set to be searches, assuming computing power is held constant."  I have applied this construction in my analysis below.

193.  I understand the parties agree that "approximate nearest neighbor search" means "a search using an algorithm designed to identify a close, but not necessarily exact or the closest, match of a feature vector, compact electronic representation, or set of extracted features to another, wherein the distance or different between the two feature vectors, compact electronic

---

166 See lines 39-42 of file ████████████████████████████
███████████████████████████████████████████
███████████████ (GOOG-NETWORK-SC-00000871).

representations, or sets of extracted features falls within a defined threshold." I have applied this construction in my analysis below.

194. I understand that the parties dispute the construction of "extracted features." I understand that Network-1 asserts this term should be construed as "electronic data sampled, calculated, or otherwise derived from a work itself, as opposed to from information added or appended to the work," and Defendants assert this term should be construed as "electronic data derived from a work itself, as opposed to from information added or appended to the work." In my view, these constructions have the same scope. Therefore, my infringement analysis is the same under either construction.

*Content ID LSH Version*

195. Once the Content ID LSH Version generates a "fingerprint" of the user-uploaded video, it then attempts to electronically determine an identification of the user-uploaded video (i.e., determining whether any reference works are neighbors, near neighbors, or approximate nearest neighbors to the user-uploaded video) by comparing that "fingerprint" with similarly-generated digital "fingerprints" of reference works. This process is commonly referred to as finding a *match* between the uploaded work and a reference work. *See, e.g.*, Erb Depo. at 69:25-71:2 ("Q So after the fingerprints are generated in the manner you've discussed already, what's sort of the next step, if you will, in the ContentID processing system? A The next step is matching. Q And is that sometimes referred to as 'the MatchSystem' within Google? A Yes. Q And can you -- I'll start at a high level and we'll probably have to work our way down, but at a high level, what does the MatchSystem do? A The MatchSystem compares fingerprints of user uploaded videos to various indices of videos for various purposes to identify any matches in which some portion of the user video corresponds to some portion of a reference video, audio, melody, channel, for some period of time. It, for each user-uploaded video, it creates a collection of zero or more matches and its output is this collection of matches. A match consists of a time offset in the user video, a time offset in the reference video, ████████████████████████████████ as well as the identities of the user-uploaded video and the reference video."); *see also, e.g.*, GOOG-NETWORK-00002595-96.

196. As I mention above, this identification is based on a search that identifies an approximate nearest neighbor (or a neighbor or a near neighbor)[167]—a close, but not necessarily exact or the closest, match of a feature vector, compact electronic representation, or set of extracted features to another, wherein the distance or difference between the two feature vectors, compact electronic representations, or sets of extracted features falls within a defined threshold. *See, e.g.*, Erb Depo. at 114:23-115:12 ("A match between a probe fingerprint and a reference fingerprint doesn't necessarily require that the two be exactly identical across their length, correct? A Definitely not. Q So -- sorry, go ahead. A They definitely do not need to be identical. Q And so a match would typically be called when there's some sufficient amount of similarity between the fingerprint of the probe and the fingerprint of the reference. A At some combination of offsets for some duration, yes."); *id.* at 267:3-4 ("ContentID finds

---

[167] I understand that for the purposes of this case and in the context of the Asserted Claims of the Asserted Patents, the parties have agreed that "neighbor," "near neighbor," and "approximate nearest neighbor" are equivalent in meaning.

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

matches with not only videos that are bit for bit exact copies, but for videos that are not bit for
bit exact copies."); *id.* at 282:24-25 ("[T]he ContentID system searches for near neighbors.");
*see also, e.g., id.* at 62:10-20 ("Our goal is that two similar videos are any two videos that a
human being would recognize as being two instances of the same video despite
transformations, including firming a screen with a hand-held camera, adding borders, cropping
the video, rotating the video, or otherwise transforming the video in a way that may
intentionally or unintentionally make it different in literal content from the original video but
still recognizable to a human being as the same content."); Baluja Depo. at 156:23-158:1 ("Q
So this is essentially -- this LSH system is an approximation [sic] nearest neighbor solution, if
you will, or -- A Right. So approximate in this case means you're guessing, right, to put it
colloquially.  Q In other words, it might be the nearest neighbor, and it might not be?  A
Yes."); *id.* at 162:7-14, 180:7-22.  GOOG-NETWORK-00005616, GOOG-NETWORK-
00699813 ("Our task is to find **similar** fingerprints, which means fingerprints that contain
similar subfingerprints.  This is a[n] 'approximate nearest neighbour' or 'near neighbour'
problem, where the distance function between two subfingerprints is simply the number of
bytes which differ (which therefore can take any value from 0 to 100).  We use the technique
known as 'location sensitive hashing' to do this . . . ."); GOOG-NETWORK-00006362
("**Locality-Sensitive Hashing (LSH)** is an algorithm for solving the (approximate/exact) Near
Neighbor Search in high dimensional spaces."); GOOG-NETWORK-00162593 ("LSH Tables:
Allows efficient approximate nearest neighbor retrieval"); GOOG-NETWORK-00162594.

197.  The search algorithm of the Content ID LSH Version has two main stages:  "Stage I" and
"Stage II."  *See, e.g.*, Erb Depo. at 71:3-9 ("Q So let's start with the process of generating these
matches that you references.  I think earlier, you talked a little but about a Stage I and a Stage
II.  Is that all part of the MatchSystem that you were describing a moment ago?  A.  Yes.");
GOOG-NETWORK-00001093-94, GOOG-NETWORK-00702858 ("Matching takes a *probe
fingerprint* and tries to find *reference fingerprints* that are entirely or partially the same or
similar to it.  This is a nearest-neighbour type of problem, which we divide into two stages: •
Stage 1: use *indexes* to find candidate reference that might match.  • Stage 2: for each
candidate reference, compute where it actually matches (if it does)."); *see also, e.g.*, GOOG-
NETWORK-00000676; GOOG-NETWORK-00785269; Pasula Depo. at 101:17-102:11.

198.  Stage I begins by searching an index of the LSH bands of the reference works for any
LSH bands that are exact matches to any of the LSH bands of the user-uploaded video.  The
LSH lookup portion of Stage I is one example of the application of a threshold related to the
distance or difference between the extracted features of the user-uploaded video and the
extracted features of the reference videos (with the threshold here being there be at least one
exact match in the LSH bands).  That is, the "distance" is considered too high if no bands
(features) match, but it is considered sufficient in this first stage if any bands match exactly.
*See, e.g.*, Erb Depo. at 70:10-72:7 ("In Stage I, we look up in an index to see if any reference
video had the precise value for an LSH band, meaning the same offset and the same value of
the subfingerprint; and, if so, we record the time offset in the reference and the time offset of
the subfingerprint that we're looking at in the -- in the user video along with the video identity
– identity of the reference video."); *id.* at 72:23-73:10 ("[I]f we call the collection of videos
that are indexed the reference videos, then the -- all the LSH bands from the reference videos
for that particular context will be in that particular index.  Q And when you say for that
particular context, do you mean the different channels, for example?  A That's one example.");

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

*id.* at 74:16-77:19 ("The LSH bands are the keys to that index and then the values within that index tell us the time offset, which subfingerprint it was within the reference video and what video ID, so we can conceptually, we can -- we can look up for a given LSH band all the offsets for all the videos in which that LSH bans occurs among the reference set."); *id.* at 78:7-79:20 ("Q And the individual LSH bands are then -- how do they interact with the index that you described? A The -- each LSH band is used to do a lookup in the index to identify whether there exist any reference videos that had the same LSH band, the exact same, identical matching LSH band. And the exhaustive list of all matching reference videos and offsets is -- that are contained in the index is returned from that lookup."); *id.* at 81:10-19 ("Q And would it be fair to say that Stage I is essentially generating candidates for further examination? A Yes. Q And in Stage I, is it also correct that the probe video or user-generated video is not being compared to the fingerprint of the reference videos, it's just the lookup in this LSH table? A Yes."); *see also, e.g.*, *id.* at 133:22-134:3; GOOG-NETWORK-00000412, GOOG-NETWORK-00000415-16; GOOG-NETWORK-00005618-19; GOOG-NETWORK-00162593-95; GOOG-NETWORK-00700423-25; GOOG-NETWORK-00780506; GOOG-NETWORK-00784836-37; GOOG-NETWORK-00785269; Pasula Depo. at 102:12-18.

199. In the LSH lookup portion of Stage I, not all LSH bands in the reference index are compared to a given LSH band of the user-uploaded video. *See, e.g.*, Erb Depo. at 314:23-316:7 ("Q Do you know whether Stage I, in order to determine whether a particular LSH band is in the LSH Table Index, whether it must compare the band in question to every entry on the index? A No, it does not. Q So you believe that it's an ordered index, that it doesn't require -- that Stage I does not require comparison of the LSH band to each entry in the LSH Table Index; is that right? A That's correct. . . . Am I correct that Stage I in the Content ID system does not access the full fingerprint repository? A That's correct. Q And Stage I does not use full fingerprints at all; is that correct? A That's correct. Q So is it correct that -- am -- do I understand correct -- correctly that Stage I does not compare the probe fingerprint to every fingerprint in the fingerprint repository? A That's correct. And does Stage II of the Content ID system compare to every fingerprint in the fingerprint repository? No."); *see also, e.g.*, Baluja Depo. at 61:6-64:1 (explaining how and why an LSH-based search does not compare to all LSH bands).

200. In addition, although the LSH lookup portion of Stage I only looks for exact matches between an LSH band of an uploaded video and LSH bands in the index, the overall search algorithm searches for an approximate nearest neighbor (or a neighbor or a near neighbor ). As I describe above, each subfingerprint is split up into smaller pieces called LSH bands. The fingerprint of each video is made up of a large number of small LSH bands, and as I discuss in more detail below, the number of bands that match over time provide insight into how close of an overall match the reference video is to the user-uploaded video in question. Indeed, the multiple stages (and substages) utilized by the Content ID LSH Version all aim toward the overall goal of finding an approximate nearest neighbor (or a neighbor or a near neighbor), with each stage aiming to further reduce the pool of candidates to narrow the search to nearer, or better, neighbors. *See, e.g.*, GOOG-NETWORK-00162593:

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

## LSH Tables 

- Allows efficient approximate nearest neighbor retrieval

- Approach:
  - Split each subfingerprint into smaller pieces (called *LSH bands*)
  - Use exact key lookup on each LSH band
  - Collect votes for each subfingerprint according to the number of exactly matched LSH bands

*See also, e.g.*, Erb Depo. at 80:12-81:8 ("[LSH] really corresponds just to saying that out of a Hash value, and remember that the fingerprint was typically computed ███████ out of a Hash value, if a chunk of that Hash occurs at the same place, the same offset within another similarly-computed Hash at the same locations, that's the locality sensitive part, then the hashes may be similar. They are candidates to look for similarity. Q So basically, and this is what you've been describing, this lookup in the index, is that the Stage I processing that you described? A It's part of the Stage I processing.").

201. The candidates produced by Stage I's LSH look-up are further processed to eliminate candidates unlikely to be a match, which involves the use of various thresholds that compare features extracted from the reference work to features extracted from the user-uploaded or probe work. One example of a threshold is determining ████████████████████████████████ ████████████████████████████████████ such as by the "projection filter" I discuss below. *See, e.g.*, Erb Depo. at 81:20-85:5 ("What other processing is there in Stage I? A The LSH look-up typically returns a very large number of candidates. So we do some additional processing in Stage I to reject candidates that are clearly not going to be real matches, primarily by looking at the collection of matches for a given reference video over time against various subfingerprints that we look up from the probe. Q Can you explain in a little more detail how that works? A Sure. So if you, for a moment, just think only about a single reference video and imagine that you look at the collection, for every subfingerprint that we look up out of the probe at various offsets, look at the collection of all the return values, all of the hits that we get from the LSH band lookups for that over time; so effectively, what that does is, it shows us a map of the time offset in the reference video that might correspond to a time offset in the probe video. And looking at that behavior over time, if there's -- if there are just a few random hits that don't seem to be linearly time-correlated, then it's clearly not going ████████████████████████████████████████ ████████████████████████████ a piece that we call the projection filter. Q Now, when you say ███████████ what do you mean by that? A If -- in order to run the projection filter, we need some -- we need data. We need enough datapoints to perform an analysis and so we -- if we got, say, ████████████████████████ ████████████████████████████████████

██████ ; *see also, e.g.*, *id.* at 87:5-89:11 (explaining that for a data set with between 20 and 35 million, approximately a hundred thousand reference videos are returned as candidates before the projection filter is applied); 91:6-22.

202.  If there are enough time-correlated LSH lookup hits for a given reference work, that reference video and the user-uploaded video are further compared using the "projection filter." The "projection filter," and specificall ████████████████████████ is another example of thresholding in the MatchSystem Stage I.  *See, e.g.*, Erb Depo. at 85:6-87:4 ("Now, you've mentioned a couple of times the projection filter.  What is that?  . . . The projection filter is a conceptually something that

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

Q And this is something that's performed at the projection filter as a means of

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████ ); *see also, e.g.*, *id.* at 89:17-90:18 (explaining that the projection filter does not access the full fingerprint of the reference video and typically reduces the number of hits by at least two orders of magnitude); *id.* at 91:6-22, 133:22-134:3; GOOG-NETWORK-00002048-59 (describing how the projection filter operates); Pasula Depo. at 102:22-103:10.

203.  ContentID LSH Version's Stage II compares the full fingerprint of the user-uploaded or probe video with only the full fingerprints of the reference works identified in Stage I (i.e., those potential matches output by the "projection filter"), and outputs "raw matches."  *See, e.g.*, Erb Depo. at 91:2-5 ("Q And am I correct that that Stage II processing is only performed with respect to the now pruned set of candidates [output from Stage I]?  A Correct."); *id.* at 92:24-93:11 ("[W]hat happens in Stage II?  A For each video ID that is a candidate that comes out of Stage I, we fetch the full fingerprint of the reference and compare the full fingerprint of the reference and the user-uploaded video at the appropriate -- at -- well, effectively at all possible combinations of offsets."); *see also, e.g.*, *id.* at 33:14-20 ("A raw match is the output of the MatchSystem, meaning a prospective march between a user-generated content video and a reference video on either the video, the audio or the melody channel, beginning at a certain time offset in the probe UGC and a given time offset in the reference, and extending for some duration."); 93:19-94:18; GOOG-NETWORK-00780507.

<u>**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**</u>
<u>**PROSECUTION/ACQUISITION BAR MATERIALS**</u>

204.  Using the full fingerprints, Stage II's comparison begins by ███████████ ████████████████ the corresponding subfingerprints of the user-uploaded video and each of reference works identified in Stage I, and ██████████████████████████ █████████████████████████. *See, e.g.*, Erb Depo. at 93:12-18 (Q And how is [Stage II's] comparison performed?  A We comput ██████████████████████████

██████████████████████); *id.* at 94:19-96:19 ("Q And [comparing all the subfingerprints of the two videos] creates this ████████████████████████

████████████  Q Excuse me, ██████████████████████████████

██████████  . . . Q And am I correct that, for each of these -- I assume there is a comparison that's done for each of the candidate fingerprints.  A Yes.  Q And what's the output of each of those comparisons?  A A set of matches.  What I described earlier as raw matches or sometimes referred to as candidate matches."); *see also, id.* at GOOG-NETWORK-00018607-08 ("Given two fingerprints X and Y ████████████████████████████

205.  Stage II ██████████████████████████████ if there is a period of time during which the user-uploaded video and the reference work being compared are sufficiently similar to be a match—with that period of time being another example of a threshold used to determine whether or not a reference video is an approximate nearest neighbor (or neighbor or near neighbor).  ████████████████ are the distance or difference functions that Stage II uses to make this comparison.  *See, e.g.*, Erb Depo. at 216:6-19 ("Q And to your knowledge, in terms of the distance or difference functions used to ██████████████████████████████████ that's the distance or difference function, correct?  A Yes.); *id.* at 99:12-106:16 ("[I]n the current implementation of Stage II, known as the Sensitive Stage II, ███████████████

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

diagonal; in other words, where the time -- the timeline of the user-uploaded video does not



; *see also, e.g.*, GOOG-NETWORK-00610863-70 (describing Sensitive Stage II); Erb Depo. at 185:3-186:23 (indicating GOOG-NETWORK-00610863-70 accurately described Sensitive Stage II); *id.* at 186:24-188:4 ("Step one in the algorithm as appears here [on GOOG-NETWORK-00610866]

<u>**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**</u>
<u>**PROSECUTION/ACQUISITION BAR MATERIALS**</u>

is that areas of interest are determined, do you see that?  A Yes.  Q And how is that performed?
What is the mechanism or the value by which the system determines that something is an area
of interest?  A ▮

▮ ; *id.* at 200:11-202:24 (Q. And the document on page [GOOG-NETWORK-00610]869
or the page ending in 869 in step seven, it references ▮

▮ *id.* at 188:5-200:10, 219:24-221:19 (further describing the Sensitive
Stage II algorithm); Pasula Depo. at 103:11-104:13; GOOG-NETWORK-00785269:

**Stage 2**



206.  I understand that the version of Stage II I describe immediately above (Sensitive Stage II)
was implemented at some point in 2014.  Prior to 2014, Stage II was referred to as the "spike
algorithm."  Because ▮

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



*See,* *e.g.*, Erb Depo. at 216:6-217:17

*id.* at 123:10-125:8 ("Q Now, at some point in time, am I correct that the algorithm used in Stage II was referred to as the spike algorithm? A Yes. That was the predecessor of the Sensitive Stage II. Q And what's the difference between the spike algorithm and the Sensitive Stage II algorithm? A The spike algorithm is --

; *see also, e.g.*, *id.* at 12:20-13:2, 125:16-127:6 (indicating the spike algorithm was used for Stage II at least as early as August 2011); *id.* at 218:16-219:23, 221:6-19; GOOG-NETWORK-00000412; GOOG-NETWORK-00000416; GOOG-NETWORK-00001614-19; GOOG-NETWORK-00162593-95; GOOG-NETWORK-00700323-27; GOOG-NETWORK-00700423-26; GOOG-NETWORK-00702836-38; GOOG-NETWORK-00702889-90.

207. The "raw matches" output from the Content ID LSH Version's MatchSystem are then sent to the claiming system for further analysis. As I mentioned above

This is another example of a threshold that is applied to determine whether or not a reference video is a neighbor, a near neighbor, or an approximate nearest neighbor of a user-uploaded video. *See, e.g.*, Erb Depo. at 111:22-114:11 ("Now, earlier today, I believe at some point, you mentioned something that I think you

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS



*id.* at 122:6-123:9

*ee also, e.g.*, *id.* at 125:4-15

GOOG-NETWORK-00006734-35
. . . .”); GOOG-
NETWORK-00008864 (email discussing these thresholds); GOOG-NETWORK-00014310;
GOOG-NETWORK-00162595; GOOG-NETWORK-00000668:

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

# YouTube video matching



208.  I understand that Defendants argue that Content ID LSH Version does not identify a neighbor or a near neighbor (or an approximate nearest neighbor).  They assert that "the first stage of the search does not employ a threshold of any kind, but simply selects a group of likely candidates, regardless of their distance or difference from the query.  Similarly, the second stage of the search determines a match based upon which works exhibit the most similarity over time, as visualized by a heat map, but does not employ a defined threshold based on a distance or difference."  Defendants' Response to Network-1's Interrogatory No. 7 (dated May 14, 2015).  As a preliminary matter, Defendants' own witnesses and documents characterize this search as a search for a neighbor, a near neighbor, or an approximate nearest neighbor.  Moreover, as I explain above, there are numerous thresholds that the Content ID LSH Version uses to determines whether a potential match is similar enough to the user-uploaded video to be reported as a match, including at least the following:  (a) the distance or difference (of zero) between LSH bands in the LSH lookup (Stage I); (b) the ███████████████ ████████████████████ (Stage I); (c) the ████████████ in the projection filter (Stage I); (d) the ████████████ (Stage II); and (e) ████████████████ (claiming logic).  I address each of these thresholds in turn.

   a.  The LSH lookup portion of Stage I looks for exact LSH band matches.  A step of a
       search algorithm that looks for such exact matches using a threshold (i.e., a distance
       or difference of zero) to determine is a given LSH band is a match.  *See, e.g.*, Erb
       Depo. at 70:10-72:7 ("In Stage I, we look up in an index to see if any reference video
       had the precise value for an LSH band, meaning the same offset and the same value
       of the subfingerprint; and, if so, we record the time offset in the reference and the

time offset of the subfingerprint that we're looking at in the -- in the user video along with the video identity – identity of the reference video.").

b. The matching LSH bands from the LSH lookup portion of Stage I are pieced together to determine whether there are ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████ is a threshold that is a tied to the distance or difference between the features extracted from the reference work and the features extracted from the user-uploaded video. *See, e.g.*, Erb Depo. at 82:9-85:5 ("So if you, for a moment, just think only about a single reference video and imagine that you look at the collection, for every subfingerprint that we look up out of the probe at various offsets, look at the collection of all the return values, all of the hits that we get from the LSH band lookups for that over time; so effectively, what that does is, it shows us a map of the time offset in the reference video that might correspond to a time offset in the probe video. And looking at that behavior over time, if there's -- if there are ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████ Q Now, when you say ███████████,' what do you mean by that? A If -- in order to run the projection filter, we need some -- we need data. We need enough datapoints to perform an analysis and so ████████ ███████████████████████████████████████ ███████████████████████████████████████

c. The ███████████ in the "projection filter" is another threshold that is a tied to the distance or difference between the features extracted from the reference work and the features extracted from the user-uploaded video. If there ████████████████████ ███████████. *See, e.g.*, Erb Depo. at 85:6-87:4 ("The projection filter is a conceptually ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ Q And this is something that's performed at the projection filter as a means o███████ █████████████ A. Yes.").

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

d.  In the ▮▮▮▮▮▮▮▮ of Stage II, there is also



*See, e.g.*, Erb Depo. at 216:6-19

"); *id.* at 99:12-106:16 ("[I]n the current implementation of Stage II, known as the Sensitive Stage II, the idea is that

e.  Finally, the "raw matches" output from the Match System are processed by the claiming logic, which applies another threshold related to the distance or difference between the extracted features of the user-uploaded video and the reference work—▮▮▮▮▮▮▮▮. With both the Sensitive Stage II and the spike algorithm, the



.  *See, e.g.*, Erb Depo. at 111:22-114:1

*see also, e.g.*, *id.* at 125:4-15

209.  The approximate nearest neighbor (or neighbor or near neighbor) search of the Content ID LSH Version is sublinear.  *See, e.g.*, Baluja Depo. at 138:15-18 ("Q So using this LSH approach allows the scaling of the system to be sublinear in that sense?  Is that what you're saying?  A Yes."); *id.* at 180:23-181:6 (testifying concerning GOOG-NETWORK-00613420: "Q Then it goes on to state, 'LSH and other hash functions are sublinear in the number of elements examined compared to the size of the database.'  Do you see that?  A Yes.  Q Is that referring to the same sublinearity that we discussed earlier?  A Exactly."); *see also, e.g.*, *id.* at 148:21-149:5; GOOG-NETWORK-00000418, GOOG-NETWORK-00700426 ("Disk space will scale approximately linearly with growth in refersnse set size (but the amount is insignificant), other resources (CPU, RAM) will scale sublinearly. . . . In other words, good scaling characteristics for reference set growth."); analysis for '988 patent claim 15b) and citations therein.

210.  Starting from the first step, the Content ID LSH Version system is designed to determine a very small subset of the reference works in the database, in particular a sublinear subset, that could be possible matches to the input work being queried.  This is through the creation of what is commonly referred to as an "inverted index" data structure, based on the LSH bands; only reference works that match in terms of the LSH bands are subject to further analysis.  *See, e.g.*, GOOG-NETWORK-00000412 ("The LSH (Locality Sensitive Hash) Tables are an

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

inverted index of LSH bands (substrings extracted from the fingerprint) to the IDs of videos containing that band.").

211.  The inverted index is designed to be a sublinear data structure; that is, the inverted index, on a query, specifically does not go through each of the references in the database to see if they match the query.  Rather, in this setting, when given an LSH band, the inverted index can directly return a list of the reference works that match that LSH band, in time proportional to the number of the matches.  Hence the work done by the inverted index corresponds to the number of index hits, not the number of references.  This is a general property of inverted indexes.  *See, e.g.*, https://en.wikipedia.org/wiki/inverted_index.

212.  Review of source code produced by Defendants in this case confirms my analysis of this claim element.  As an example,



---

168 See definition at lines 192-223 of file

(GOOG-NETWORK-SC-00001135-36)

169 See implementation at lines 197-198 of file

. (GOOG-NETWORK-SC-00001135)

170 See implementation at lines 174-186 of file

(GOOG-NETWORK-SC-00001113)

171 See implementation at lines 510-573 of file

(GOOG-NETWORK-SC-00001116-17)

172 The `Stage I` and `Stage II` do not appear to refer to the same "Stage I" and "Stage II" I describe above when discusses Defendants' testimony and their documents.

173 See file

(GOOG-NETWORK-SC-00000153-55)

174 See lines 56-58 of file

(GOOG-NETWORK-SC-00000153)



**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**





[175] See lines 56-58 of file ███████████████

(GOOG-NETWORK-SC-00000153)
[176] See implementation at lines 47-67 of file █████████████

█   GOOG-NETWORK-SC-000001090-91)
[177] See implementation at lines 230-281 of the file ████████████

.   (GOOG-NETWORK-SC-00000151)
[178] See implementation at lines 246-272 of file ████████████

█.  (GOOG-NETWORK-SC-00000101)
[179] See implementation at lines 276-446 of file ████████████

█   (GOOG-NETWORK-SC-00000101-04)
[180] See implementation at lines 211-229 of file ████████████

█   (GOOG-NETWORK-SC-00000100)
[181] See implementation at lines 42-81 of file ████████████

████████   (GOOG-NETWORK-SC-00000175 to 0176).
[182] See comments at lines 90-93 of file ████████████

█   GOOG-NETWORK-SC-00000105-106)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



---



[183] See implementation at lines 42-81 of file ████████████
████████████. (GOOG-NETWORK-SC-00000175-76)

[184] See implementation at lines 249-316 of file ████████████
████ (GOOG-NETWORK-SC-00000168-69)

[185] See implementation at lines 585-591 of file ████████████
████ (GOOG-NETWORK-SC-00000173)

[186] See implementation at lines 615-691 of file ████████████
████ (GOOG-NETWORK-SC-00000174)

[187] See lines 671-673 of file ████████████
████ (GOOG-NETWORK-SC-00000174)

[188] See implementation at lines 69-86 of file ████████████
████ (GOOG-NETWORK-SC-00001090)

[189] See implementation at lines 283-319 of file ████████████
(GOOG-NETWORK-SC-00000151-52)

[190] See implementation at lines 407-583 of file ████████████
████████ (GOOG-NETWORK-SC-00000129-32)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



213.  It is my opinion that the Content ID LSH Version meets claim element 33b) literally. However, to the extent this limitation is not literally met, for example, because the search algorithm of the Content ID LSH Version does not "determining . . . an identification of the media work" because it does not "identify" but rather "can be used to determine whether a video uploaded to YouTube is similar in some sense to any of the video, audio, or melody content in one or more reference," this limitation is met under the doctrine of equivalents. *See* Defendants' Fourth Supplemental Response to Interrogatory No. 7 (dated September 30, 2019).  The Content ID LSH Version's search algorithm performs substantially the same function (matching an unknown work with a reference work) in substantially the same way (comparing the unknown work or features extracted from the unknown work to reference works or features extracted from reference works) to obtain substantially the same result (determining if the two works match) as would any technology that "determin[es] . . . an identification of the media work."

214.  In sum, the Content ID LSH Version electronically determines an identification of the user-uploaded video based on features extracted from that video.  This identification is based on a sublinear search identifying an approximate nearest neighbor (or a neighbor or a near neighbor).  The Content ID LSH Version applies numerous thresholds to determine whether a



[191] See implementation at lines 72-92 of file
(GOOG-NETWORK-SC-00000124)
[192] See definition at lines 24-196 of file
(GOOG-NETWORK-SC-00000135-38)
[193] See definition at lines 110-176 of file
(GOOG-NETWORK-SC-00000125-26)
[194] See implementation at lines 204-385 of file
(GOOG-NETWORK-SC-00000126-29)
[195] See implementation at lines 178-202 of file
(GOOG-NETWORK-SC-00000126)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

potential match is a close enough match for there to be a "claim" by a content owner made on the user-uploaded video.

*Content ID Siberia Version*

215.  Once the Content ID Siberia Version generates a "fingerprint" of the user-uploaded video, it then attempts to electronically determine an identification of the user-uploaded video (i.e., determining whether any reference works are neighbors, near neighbors, or approximate nearest neighbors to the user-uploaded video) by comparing that "fingerprint" with "fingerprints" of reference works.  As I note above in my discussion of the Content ID LSH Version, this process is commonly referred to as finding a *match* between the uploaded work and a reference work.

216.  As I mention above, this identification in the Content ID Siberia Version is based on a search that identifies an approximate nearest neighbor (or a neighbor or a near neighbor)—a close, but not necessarily exact or the closest, match of a feature vector, compact electronic representation, or set of extracted features to another.  I understand that a portion of the search is based on what are known as ScaM.  *See, e.g.*, GOOG-NETWORK-00780160 ("Instead of LSH, ScaM is used to do Approximate Nearest Neighbor Search."); GOOG-NETWORK-00789360 ("Siberia: a new, sharded match engine . . . ScaM ==approximate nearest neighbor search"); GOOG-NETWORK-00699371 ("ScaM (Scalable Matching) or Approximate Nearest Neighbor (ANN) Search . . . The goal is to create a framework that can efficiently retrieve (exact or approximate) nearest neighbors from small to **massive databases** containing billions of items."); GOOG-NETWORK-00701295 ("[W]e use approximate nearest neighbor search (ANN) based on ScaM technology, without own implementation optimized for batching queries.  We find a number of approximate nearest neighbors for each shot."); Kumar Depo. at 78:2-6 ("What is ScaM?  A It is just a project name for one of my teams.  We work on approximate similarity search algorithms, so it's an umbrella name for many of those algorithms."); *see also, e.g.*, Pasula Depo. at 57:6-58:5 ("Q And the query, the unknown embedding, is compared ████████████████████████████████████████ ████████    A Within the ████████████████████████████, yes.  Q And what's the output of that comparison?  A. Well, it's an ordered list in terms of ████████████████████.  So that's not ████████████████████    It's an ████████████████████████  And we usually take the top -- in the case of this index, I believe it's the top 250 things that we found per ████████████████████.  Q So that would be the ████████████████████████ from the reference index?  A Yes.  Well, I mean, the ████████████████████████ ████████; Kumar Depo. at 44:22-45:16 ("So you deal primarily only with that first piece, the lock up of the embeddings and the retrieval of those candidate embeddings?  A Right.  I would just try to clarify that look up is a very overloaded term in our community.  So just to make sure that means returning the most similar – approximately most similar items given a query embedding.  Q Now, when you say approximately most similar, what do you mean by that?  A Because it is an approximate similarity search.  So we return ████████████████████████.  But these are most similar in the approximate sense.  Because our ████████████████████  It is not exact.  Q So it is possible that there is a more similar embedding somewhere that would not be retrieved?  Yes."); *id.* at 99:19-24 ("Q Mr. Kumar, you mentioned a number of times the nature of the sort of ScaM search operations that are used as part of Content ID.  Now, those are not exact matching techniques; is that correct?  A Right.");

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

*id.* at 166:19-24 ("So am I understanding correctly that this is illustrating the notion that a query using this kind of partitioning might not find the actual nearest neighbor because the nearest neighbor might be in a different partition from where it was searched?"); Konrad Depo. at 82:18-83:8; GOOG-NETWORK-00701295 ("Videos do not need to be exact duplicates to be detected."); GOOG-NETWORK-00700605 ("ScaM is used within Siberia ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ . . In Siberia, this is just the beginning and followed by grouping all the nearest neighbors by references and refining/aligning the candidates."); Erb Depo. at 245:2-22.

217.  The search algorithm of the Content ID Siberia Version has three main stages:  "Index Lookup," "Sparse," and "Verifier."  *See, e.g.*, GOOG-NETWORK-00701295 ("A lookup runs in three stages: **search**, **sparse refining**, and **verification**."); GOOG-NETWORK-00781530:



GOOG-NETWORK-00770926:

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



GOOG-NETWORK-00792065:



*See also, e.g.*, Pasula Depo. at 134:11-25, Kumar Depo. at 43:20-44:90, 55:24-56:11; GOOG-NETWORK-00701282; GOOG-NETWORK-00781875; GOOG-NETWORK-00787652; GOOG-NETWORK-00789630.

218.  Prior to the "index lookup," the "fingerprints" of the reference works (comprised of the embeddings ██████ I discuss above) are further manipulated, and indexed in a specific way.  I understand the indexing and resulting index lookup are based on a data structure developed by the ScaM (scalable matching) research team within Google.  I also understand that ScaM is an umbrella term for a number of data structures and associated algorithms, but here I aim to describe only those used in the Content ID Siberia Version.  *See, e.g.*, Pasula Depo. at 81:4-14 ("I've seen references that some portions of the match system use something

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

called ScaM scaleable [sic] matching.  A. Yes.  Q. How does that relate to the match system that you've been describing?  A. So the index, this structure we were talking about with the ███████████████████████████████████████████████, that is a data structure that was developed by the ScaM team in New York.").

219.  Each of the embeddings of the sequences of embeddings extracted from a given reference work is ███████



███████████████████████ of each embedding is what is stored in the reference index.  *See, e.g.*, Pasula Depo. at 45:7-47:16 ("Q And so when a given embedding is stored within the index, I take it it's stored with some metadata that indicates essentially which video ID it comes from and probably some other information about where in that video it comes from?  A So actually, what is stored is – it's like a reverse index.  What is stored is a hashed value of the embedding you're storing, and it points to a video ID and – it's --

███████████████████████████████████████.  Q And so when you say it's ███████████, can you explain what you mean.  What's ███████████  A The embedding

███████████████████████████████████████████████████

███████████████████████  A I think in this index, this is an asymmetric hash that I can try to explain.  Q In general terms, so when you say ███████████████████████  first of all, what do you mean by that?  A I mean that when you are doing the ███████████

███████████████ . . . Q So the embedding is ███████████

███████████; is that correct?  A When you're

███████████.  Q I see.  Okay.  So the ███████████  A That is correct.  Q But it's a ███████████  A Yes.");  Kumar Depo. at 28:25-29:7 ("Q Now, in connection with a look up operation, is the same ███████████  A No.  Q Okay.  And is that ███████████  A Yes."); Pasula Depo. at 112:11-114:4 ("[W]hat happens with those ███████████

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

███████████████████████████████████████████████████████); *see
also, e.g.*, Pasula Depo. at 139:9-25; Kumar Depo. at 13:18-15:4, 17:24-18:12, 18:17-22:4,
24:2-27:11, 27:24-28:24, 30:20-31:1, 75:8-76:6, 156:10-16; GOOG-NETWORK-00701226-
31.

220.  Each of the reference indices (video, audio, and melody) is comprised of ██████████
of the embeddings I described above.  Each of these indices is divided into a certain number of
"shards."  For simplicity, I will use the video index as an example, but each of the reference
indices are structured in the same manner.  The reference video index █████████████.
Information about a given reference video is placed ████████████████
████████████████████████████████████.  *See, e.g.*, Pasula
Depo. at 39:6-41:5 ("And so then -- so the index has some collection of those values for each
video; is that a fair characterization?  A The contents of the index are generated using these
embeddings.  Q And what's the sort of data structure form of that index?  Is it a data base?
Can you describe it in some way?  A Well -- so first of all, the index is divided -- is sharded, is
parallelized.  It's divided into a bunch of smaller indexes that can each fit on one machine. . . .
And how many shards are there for the video index?  A For the --████████████████████
████████████████████████. . . . Q And how was – what's the
organizing principle by which the things are divided into the shards?  A ████████████.  Q And
am I correct that ████████████████████████████████████████████
████████████████████████. . . . Q And so the videos, based on their
███████████████████?  A That is correct."); Kumar Depo. at 34:14-20 ("Q How many shards are
there for the partner video index?  A I don't remember exact number.  Q I've heard references
███████.  Is that consistent with your understanding? A It is about that."); *see also, e.g.*,
Pasula Depo. at 42:18-23, 108:14-109:5; Kumar Depo. at 34:24-36:7, 49:3-14.

221. ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████  *See, e.g.*, Pasula Depo. at 43:6-45:6 ("So how -- within a given shard, how is
the storage of the index organized?  A So within the shard, ████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████  Q You mentioned there are ██████████████████  A Yes.  Q Is that true for each
████████  A Yes. ████████████████████████████.  Q And ██████████,

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

did I understand you correctly, are chosen so that within -- obviously, it's not exact, but more or less there are ███████████████████████████████████████████████████████████████████████ A Yes. ████████████████████████████████████████████████████████ Although, it is very approximate.  I think some are like ████████████████████ And this is done ██████████ ████████████████████████████ Kumar Depo. at 165:15-166:18 ("Q ██████████████████████████████████████████████ "); Konrad Depo. at 173:1-15 ("Q And my understanding is ████████████████████████████████████████████████████████████████████████████████████████ ; *see also, e.g.*, Pasula Depo. at 109:6-8, Kumar Depo. at 34:21-23, 36:8-37:15, 49:3-14, 156:10-16, 157:10-15; GOOG-NETWORK-00781874, GOOG-NETWORK-00790995:



GOOG-NETWORK-00701295; GOOG-NETWORK-00702301; GOOG-NETWORK-00781876; GOOG-NETWORK-00789689-90; GOOG-NETWORK-00790997.

222.  The "index lookup" step of the search ███████████████████████████████████ ████████████████████████████████████████████████████████████████████████ .  The Content ID Siberia Version then outputs ██████████████████████ that are most similar to a given embedding from the user-uploaded video. ████████████████████████████████████████ that the Content ID Siberia Version uses—in order for a ████████████████████████████████████ ████████████████████████ *See, e.g.*, Pasula Depo. at 51:19-56:4 ("[H]ow does the look up operation or the comparison, however you want to describe it, how does that work?  A So this is very long.  So you have a video which you want to look up which is represented by a sequence of embeddings.  And the first thing you will do is you will try to see if anything in the index might possibly be matching those individual embeddings.  So you will, ████████████████ █████████████████████ -- I mean, you will be looking them up in many indexes, but let's

121

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

say you're looking them up in just a single index, right?  You will send them against ███████ ███████ of that index, and in each ██████, you will try to -- you will first -- for each of those embeddings, you will first scan all of these ████████████ we talked about earlier and compare that embedding ██████████████████████████████████ like the ones we discussed, like y. . . . ["A]m I understanding correctly that each embedding is sort of looked up in ██████████████ A On an abstract level, yes.  On an actual implementation level, not really.  Q Okay.  So -- so -- and I want to kind of walk through that look up process, and I -- from the level of abstraction, I think it may be simpler if we talk about a single embedding.  A Yes, sure.  Q But if that doesn't work, let me know.  So if we take that single embedding, the index or ███████████████████████ as you described earlier, correct?  A Yes.  Q And each of those is a ███████████████████████ A Each ████████████████████████████████████████████.  Q Okay.  So while there might be 300,000 centers, those actually sort of represent, if you will.██████████████████████ A Yes.  Q Okay.  And you compare the single embedding from the uploaded video to that list of ███████████.  Is that -- does that make sense?  Is that the next step was my question.  A Yes.  Q And based on that look up against the ████████████, how many ████████ are sort of identified to be processed further with that particular embedding?  A So this depends in general on the particular type of look up you are doing.  Usually when you're looking up new uploads against what we have been referring to as the reference index, ████████████████ Q █████████████ A Yes.  Q And how is that look up performed to ███████████████ A You go though all of them.  You do ████ ████████████████████████████████████ Q Okay.  So you compare -- you do ████████████████████████████████████████ are the ones you then move to the next step?  A Yes.");  *id.* at 111:11-112:10 ("Q What -- do you know what distance metric is used for the look up against the 300,000 centers?  Is that the cosign [sic] ████████ ███████████████ A Yes.  I mean, I think ████████████████████████████████ ████████████████████████████.  Q Okay.  A So yeah.  Do you know what that is?  Q Not exactly.  I was going to ask if you could explain to ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████ Q And that ██████████████████████████ Is that --  A Yes.  Q And just the ████████ are used, then?  A Yes.");  Kumar Depo. at 39:5-8 ("Q So when the look up operation first compares to ████████████████, that's just a comparison to those ███████████; is that correct?  A That's right.");  *see also, e.g.*, Pasula Depo. at 110:15-23; Kumar Depo. at 29:8-30:19, 37:16-38:5, 60:19-64:5; Konrad Depo. at 85:2-24, 173:17-174:6; Erb Depo. at 245:23-246:19.

223.  The Content ID Siberia Version then ████████████████████████████ in the prior step in more detail.  To be clear, the system ████████████ ███████.  The Content ID Siberia Version outputs ████████████ ████████████████████████████████ as I described for the prior step.  This is another example of a threshold that the Content ID Siberia Version applies—in order for a ████████████████████████████████████████ ██████████.  *See, e.g.* Pasula Depo. at 56:5-58:5 ("So then what's that next step with those ████████ And then

122

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

in all of the -- in each of those partitions, you will ███████████████████████████████████
█████████████████████████ . . . Q So each partition has some, I assume,
███████████████████? A Yes. Q And those are all ████████████████, correct? A Yes. Q
And the query, the unknown embedding, is ██████████████████████████████████████████
███████████████████████████ A Within the ████████████████████████████, yes. Q And
what's the output of that comparison? A. Well, it's an ordered list in terms of ████████
██████████████████. So that's not the ██████████████████. It's an ████████████
████████ And we usually take the top -- in the case of this index, I believe it's the ███
that we found ████████████████. By top, I mean closest. Q So that would be ████████
█████████████████████████████"); Kumar Depo. at 40:19-42:16 ("What does that K represent? So it's
a number of essentially, ████████████████████████; is that fair? A Yes. Q And is that K a certain
█████████████████████████ A It is ██████████████. Q So for each of ████████████
██████████████████████, correct? A Just to understand
correctly, each of the shards has 300,000, for example, partitions. Q Right. A For each query,
we wil ████████████████████████████████████
████████████████. Q Okay. So -- and I think I've seen references to I think it's ████████. A
That will be one example, yes. Q Okay. So in that instance, the K nearest neighbors would be
██████ A That's right. Q Okay. So what I'm trying to understand is you've looked at -- I
think the number I've heard elsewhere is ███████████████████████████████████████.
There's an output. So if we assume █████████████████████████████████████████████
██████████████████████████ A ██████████████. Because these are the things which you will return
after ██████████████████████████████. Q Okay. So you get ████████████████████████
████████████████████ A That's right. Q So let's see. If I have ████████████████████
██████████████; is that right? A. Somewhere around that."); *id.* at 64:6-
65:12 ("Q And once those 5 █████████████████████████████████████████████████████
████████████████ correct? A Yes. Q And did I understand you correctly that at that point, the dot
████████████████████████████████████████████████████ is computed? Or
within ██████████████, rather, excuse me, is computed? A Yes. Q And is that ████████
████████████████████████████████████████████████████████ A It's computed
███████████. Q And then the ████████████████████████████████
████████████████ A That's right █████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████.
Q And the output of that is then the ████████████████████████████████████████████
██████████████████████, for example? A One can take these █████████████████████
██████████████████████. Q And that sort is just whichever has -- I guess it would be the
highest dot product, that's number one and so on? A Yes."); Erb Depo. at 237:10-18 ("It's a
system that partitions the reference -- all the references, all the ███████████████████ a
-- in a way that allows us to tak ██████████████████████████████████████████████████
████████ so that we can then search within those -- █████████████████████"); *see also, e.g.*,
Pasula Depo. at 59:17-60:5, 110:24-111:3, 113:19-114:10; Kumar Depo. at 37:16-38:17, 39:9-
19, 67:24-69:25, 74:23-75:7, 85:18-89:3; Konrad Depo. at 174:7-18; Erb Depo. at 237:19-
238:4, 238:17-23, 247:5-13, 248:11-249:17.

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

224.  Once the ▮▮▮▮▮ index hits are output, the Content ID Siberia Version then sorts them by video (puts all the embeddings ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is another example of a threshold that is tied to the distance or difference between the user-uploaded video and a given reference work.  *See, e.g.*, Pasula Depo. at 60:11-24 ("What happens next with all those index hits?  A . . . The first meaningful thing that happens is you separate them out per reference video.  So all these hits were coming from all the different videos on the -- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  So from now on, pretty much anything we would talk about would be about the pair of videos, no longer about the whole index.");  *id.* at 63:7-18 ("Q And what kind of filtering is being done, then?  A . . . ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ ;  *id.* at 239:19-240:15 ("So in the case where ▮▮▮▮▮▮▮▮▮ for each embedding that was run against the index; is that right?  A Yes.  Q And those would all still be passed to the sparse refiner?  A So before they passed the sparse refiner, they would ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Q I see.  A So there is some k▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .  Q. And so if it's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  A. That's right.");  *see also, e.g.*, Konrad Depo. at 197:22-198:3.

225.  The reference works that have ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ are then subjected to further consideration.  The next step is known colloquially as "sparse" or "sparse refiner."  Conceptually, sparse refiner *uses only the index hits* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for the reference video to potentially be a match—with that ▮▮▮▮▮▮▮▮▮ being another example of a threshold used to determine whether or not a reference video should be subjected to further consideration in the next step of the search algorithm.  *See, e.g.*, Pasula Depo. at 61:19-63:24 ("Q. So after the index hits are sort of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ what's the next step in the analysis of the query?  A So the next step is something that we call sparse.  And the reason it is called sparse is because it's -- we have incomplete information about the relationship between the two videos.  So the way we think about what we have now as you will -- as you probably will see if you've seen our documents. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .  So they are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ you just put up in this case.  And if we had the full embeddings which we will later, you could have ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ , but we don't have that right now.  We only have hits.  That's why we call it sparse. . . . Q Is this sparse -- is this doing some further filtering of the results?  A Yes.  Q And what kind of filtering is being done then?  . . . [W]e attempt to find -- to see if these hits that

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

sort of ███████████████████████████████████████████
██████████████████████████████████████████ *id.* at 64:23-66:4 ("Q In a
general sense, does -- is sparse sort of a step in the process that cuts down at least some of the
candidate video IDs, reference IDs, that might be further compared?  A Yes █████████████
██████████████████████████████████████████████████████████████████
████████████████████████████████████████████████ Because
sometimes you might have two videos that just generally resemble each other.  Like if you look
at two recordings that take place in this room, a lot of the frames in those recordings will look a
lot like each other, and those recordings will probably just have like ████████████████
█████████████████████████████████████████. Q And so sparse is the portion
of the system that's -- or the portion of the process that's designed to kind of remove some of
those poor candidates; is that fair?  A Yeah.  I mean, the whole system is -- I mean, what
you're doing from -- once you get your index hits, is you're actually just trying to filter out
more and more.  In sparse, the way I think about it, is sparse is everything that works on the
index hits that doesn't have the full information.  That's why it's sparse."); *see also, e.g.*,
Kumar Depo. at 42:17-44:15; Konrad Depo. at 86:6-87:6, 197:5-11; GOOGLE-NETWORK-
00701295-96 ("[T]he search stage find nearest neighbors for ██████████████ and
groups the results by reference.  Sparse refining is the process of taking such probe/reference
pairs and deducing potential matching regions from the nearest neighbor hits."); GOOG-
NETWORK-00781877; GOOG-NETWORK-00790998.

226.  The final step of the search algorithm is known as the "verifier."  Like sparse,████████
█████████████████ but uses the *full embeddings* rather than just the index hits.  I understand
that there have been at least two versions of the verifier.  An earlier version ████████████
████████████ examined by the verifier, and ███████████████████████████
██████████████████████ is another example
of a threshold used by the Content ID Siberia Version.  A later version ███████████████
███████████████████████████████ Each of these criteria are also examples of thresholds
used by the Content ID Siberia Version to determine if a given reference work is sufficiently
similar to a user-uploaded work or not.  *See, e.g.*, Pasula Depo. at 67:7-71:6 ("So what's the
next step after sparse?  A The next step is currently called the verifier.  Like it verifies things.
Q And what's the general operation, what does the verifier do?  A So in abstract terms, it is
pretty much the same thing as sparse except that it works on the full embeddings and on ████
████████████ . . . So we take these ████████████████████████████████
██████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████. Q Okay.  A But what we actually do is we first
figure out ██████████████████████ We try to figure out ████████████████
█████████. Because you know, there could be more than

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

actually came out of sparse or they could be in a slightly different place.  So we sort of -- we figure out ▮▮▮▮▮▮▮ I don't remember what that part of the algorithm is called, but for sure ▮▮▮▮▮▮

▮▮▮▮▮▮ I mean, we're not writing this down.  The computer is calculating these things, and you know, keeping track of them.  Or like ▮▮▮▮

▮▮▮▮ So we write down -- down to say, like a ▮▮▮▮

▮▮▮▮ Q Is there a different system that's used?  A For -- yes, we use ▮▮▮▮

▮▮▮▮ Q I see.  A And in CoverCat, that's the melody system, we use something called ▮▮▮▮ . . . Q So putting aside the CoverCat for a moment, is this machine learning in the form of -- I assume, basically, what you're describing i▮▮▮

▮▮▮▮ A For like a given combination of inter -- like I mean, for a ▮▮▮▮ And actually, we don't always ▮▮▮▮

▮▮▮▮ *id.* at 71:18-74:13 ("Q And I take it that those ▮▮▮▮ , each has some kind of parameter around -- A Yes.  Q -- which it's measured?  A Yes.  . . . Q So -- and I think you said they're something in the order of ▮▮▮▮ A There are ▮▮▮▮ . I think eventually, they only ▮▮▮▮ . Q I see. So there is a ▮▮▮▮ A Yeah.  Like that ▮▮▮▮ . Q So there is ▮▮▮▮ s. Is that --  A Yes.  It's not jus ▮▮▮▮

▮▮▮▮ . . . Q So you have thes ▮▮▮▮ A Yeah.  Q. And th ▮▮▮▮

▮▮▮▮ Q Okay.  And then - ▮▮▮▮

▮▮▮▮ Q I see.  So for example, when it looks at the ▮▮▮▮

▮▮▮▮ A That can happen, yes.  Q Okay. So what is the sort of end output of this verifier?  A It is the -- it is the set of matches that have been verified as actually being matches.  By which I mean, it is -- they are pairs of end points, like – it's -- in like regular English, it would be like from seconds -- in video A, from second10 -- video A from second 10 to second 30 matches video B from second 70 to second 90.  I cannot remember if this is at this point stored in seconds or indexes into the embedding or whatever, but that's the general idea.  Q I see.  So the verifier is outputting a set of time-based matches

that have been determined to actually constitute matches?  A Yes."); *id.* at 158:7-20 (testifying concerning GOOG-NETWORK-00783282:  "And then can you explain to me this portion that refers to ██████████████.  A Yes.  So apparently at this point, all we were doing in the final stage of the verifier is after we had -- after we had figured out ████████████ ███████████████████.  Q And then I take it if the ████████████████████ it would be characterized as a match?  A Yes.  And then in the change, it's saying that we -- now we have ███████████████████ Q. And you're talking about -- this is on page 282, this description of the change, that it's including ████████████████ A Yes.  Q And so the idea is that in the Video 7 or in the change that was at this time --  A Yes.  Q -- you would -- it would be ████████████████████████ Q Got it.  And how is that different now?  A It is much more complicated now.  Q Because of the ███████████████████████████ A Yeah.  Because now it is – it's not ████████████████. Q And so how does ████████████████████ A Yes. ████████████████████████████. Q And did I understand you correctly that each of those decisions ████████████████ ████████████████ You're looking at some kind of ████ ████████████████████████████ Got it.  And when was that switch to ████████████ implemented?  A. I want to say a year ago, but maybe it's two years ago."); *see also, e.g., id.* at 240:25-241:18; Kumar Depo. at 57:4-58:18; Konrad Depo. at 87:6-25, 88:12-94:4, 198:4-15; GOOG-NETWORK-00701296 ("The final stage verifies the candidate matches and outputs high-precision matches.  This is made possible by loading ████████████████ for each probe reference pair creating a structure that contains the exact similarity between any probe/reference ██████ . .").

227.  I understand that Defendants assert that "a process of ████████████████ and/or neural networks" is not a "search."  *See, e.g.*, Defendants' Supplemental Response to Interrogatory No. 7 (dated October 18, 2019).  I understand this argument to be in reference to the verifier.  I disagree with Defendants.  A person of ordinary skill in the art would understand that the decision tree under discussion is clearly part of the search process.  A search algorithm is designed to find an object satisfying desired criteria.  The verifier uses ████████████████████████ are part of the overall search methodology of the Content ID Siberia Version.  The

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

████████████ is used as part of the search algorithm to remove from consideration objects that, ████████████████ to meet the criteria for an approximate nearest neighbor (or neighbor, or near neighbor). *See, e.g.*, Pasula Depo. at 67:1-71:6, 71:18-74:13, 158:7-20.

228.  The matches output from the verifier are then sent to the claiming system for further analysis.  As I mentioned above in regard to the Content ID LSH ████████████ ████████████████, which the claiming system then uses to determine █████████ ██████████ for a "claim" to be made.  This is another example of a threshold that is applied to determine whether or not a reference video is a neighbor, a near neighbor, or an approximate nearest neighbor of a user-uploaded video.[196]  *See, e.g.*, Wang Depo. at 32:7-34:2 ("Q And I think that you mentioned that the match claiming team takes information from matches from the match system? A Mm-hmm.  Q And how does that work?  A This is very fuzzy to me, because it is not my area.  But I can only speculate that the match claiming team is called via API from the Matching team.  But like I said, this is not my area, so I'm only speculating.  Q And with -- with matches that are found by the match system, are those first fed into the match claiming team or the -- or something the -- that your claiming team works on?  A It's first fed through the match claiming team.  Their logic, to be precise.  Q In -- in general, what does the match claiming team's logic do with those matches?  A A video can have lots of matches, ████████████████████████████████████████████ . . . Q You'd mentioned that the match claiming team ███████████████████████████████████ A Yes. Q How does that -- ██████████████████████████████████████████████████ ████████████████████████████████████████ is that determined by the match claiming logic or something else?  A I'm not exactly certain, but I just know it's one of the inputs from something, but I'm not exactly certain.  Q So you're not sure if it's the -- the matching component of content ID that provides █████████████████████████████████ A I'm pretty sure it's actually the -- the match system's ████████████████ just thinking about it logically."); Erb Depo. at 250:18-24 ("Q And ultimately computes ██████████████ A Yes.  Q And the ████████████████████████ is used then to determine whether there's a match or not a match?  A Correct."); *see also, e.g.*, Wang Depo. at 105:6-8 ("Is it the match claiming logic that decides where a claim should be made?  A Yes."); *id.* at 36:18-37:10; Pasula Depo. at 76:15-25; GOOG-NETWORK-00781530:

---

[196] I included a description of an analogous feature in the preceding section concerning the Content ID LSH Version, relying on testimony and documents concerning the older system. However, I understand that claiming system was generally, in terms of functionality, unchanged between the Content ID LSH Version and the Content ID Siberia Version.  Therefore, my analogous analysis in the Content ID LSH Version section applies here, and the analysis in this paragraph (relying on testimony and documents concerning the newer system) also applies in the Content ID LSH Version section above.

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

## Matching: a Quick Overview



Confidential & Proprietary                                                    You Tube

229.  The approximate nearest neighbor (or neighbor or nearest neighbor) search of the Content ID Siberia Version is also sublinear.  As a preliminary matter, I would like to note that several of Defendants' technical witnesses testified that if additional references were added *to the existing shard/partition structure*, the ScaM portion of the search would scale linearly.  I generally agree with this notion.  This is especially true if the number of index hits is kept constant, as the time the sparse and verifier steps take would therefore also be constants—250 index hits per the 50 shards (12,500 index hits total) would be subjected to further processing.  *See, e.g.*, Kumar Depo. at 50:11-51:21 ("[S]o I'm going to give you a hypothetical.  If you double the number if videos in the data set, but you don't change the number of partitions or the number of shards, what does that do to the portion of the search you've described?  . . . A Well, in the current system, it will increase the cost by twice.  It will slow down by half.  Q And that's true because you ███████████████████████████; is that fair?  A Because we're doing linear search.  Q Within the individual partitions you search?  A Right.  Q And assuming you don't change the number of K candidates that are output, then the second and third pieces would not change is that right?  . . . A That's right, but each partition, if you increase the database by twice, and you don't change the number of partitions or shards, then you are effectively having twice the number of points on an average per partition.  In other words, if you keep the ███████████ constant, then you are looking at twice the number of points.  That means because it's linear scan, so it increases by two times."); Pasula Depo. at 92:8-93:15 ("I think you talked about some component or portion being -- sort of scaling linearly, and I wanted to make sure I understood what you were referring to.  A Well, you always have to search -- the way the ScaM algorithm is set up, you always have to search a fixed portion of the index.  I mean, ████████████████████████████████████████████.  So that is -- yeah.  That's linear in the size of the index.  And actually, even if we decided to take a different number of top hits, that

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

wouldn't even help because we still have to do the full scan.); *see also, e.g.*, Pasula Depo. at 88:22-89:17; Konrad Depo. at 195:18-196:3.

230.   However, the hypothetical I discussed above—doubling the size of a reference index by simply adding those references to the existing shards—is not what would be done.  This could result in the ScaM portion of the search taking approximately twice as long, or an (unnecessary) double of computing resources could be consumed for that portion of the search.[197]  Rather than conducting the search in this inefficient manner, as the size of a reference index increases, so would the number of shards and partitions, as several of Google's technical witnesses explained.  Concerning increasing the number of shards, Mr. Konrad testified this would also be true with smaller size increases, such as a ten percent increase.  *See, e.g.*, Konrad Depo. at 194:21-195:17 (testifying concerning GOOG-NETWORK-00702308: "And then the last item on the first column there is the 'how many shards'.  Is that speaking to the number of shards in -- I think you said there were, or I think we talked about there are ███████████████████████████████.  Is that right?  . . . Q At least for video.  A I believe at some point there ████████████████, I'm not – kind of 50/50.  And equally – it could just as well be ██████████████████████████, I really don't know.  It's -- for the – for the UGC index it's ███████████████.  Q And is -- am I understanding correctly the design is such that, as the index grows, for example if we're talking about the partner index, the way that that is achieved is basically you can add more shards?  A That is correct.  So if the overall index grows by ten percent, we would assume that we need plus/minus ten percent more shards."); Pasula Depo. at 93:16-94:16 ("I think that if we just -- if the index suddenly had to double tomorrow because we suddenly get, I don't know, a bunch of new clients in China, we would just build more shards, and those shards would be contributing the same amount of processing to the later stages as the earlier shards, without returning.  Q I see.  Right.  A In fact, we would probably retune and maybe we could help with something, but not evenly.  I think it would have a huge impact.  Q Right.  And that's based on your sort of idea of adding additional shards and doing it that way, right?  A Yes.  I find it hard to image how we -- unless we do something about choosing to treat some index entries differently from others, I find it hard to imagine how we would do it differently.") *id.* at 129:10-21 ("Q But in other words, if you put another few references into the shard, you don't change from ██████████ or something like that; is that correct?  A Well, right now, we are not changing it, but I feel like we discussed this earlier, and if our index size were increasing faster, I think we would have to rethink it.  Q And change the way you construct the search?  A And possibly, take more hits, but as I explained, probably what we would do is just add more shards."); *see also, e.g.*, GOOG-NETWORK-00702308 (listing "How many shards" as a "Tunable knob" in Siberia's search); Erb Depo. at 253:2-6.

231.   In addition, during the design phase, members of the ScaM team recognized that the Content ID Siberia Version would need to use a sublinear search to be practicable.  *See, e.g.*,

---

[197] The time that the overall search takes (e.g., the combination of ScaM, Sparse, and Verifier steps) would increase by less than a factor of two if the number of hashed embeddings in the reference index were doubled.  This is because amount of time the latter two steps take would remain roughly constant since the number of index hits comes out of the ScaM step would remain the same.  In other words, the data set size and the search time of the Content ID Siberia Version do not have a one to one relationship.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

GOOG-NETWORK-00704247-50

 *see also, e.g.*, GOOG-NETWORK-00717464 ("ScaM is handing a number of neighbor search problems like Content ID copyright detection.

232.  I understand the graph below (taken from one of Defendants' documents) as illustrating that as the size of the reference index increases, assuming more shards are added, the search scales sublinearly.  *See, e.g.*, GOOG-NETWORK-00704557:



233.  The x-axis of the graph is equivalent to the number of shards in a given index because each shard is stored on a different machine.  *See, e.g.*, Pasula Depo. at 77:19-78:17 ("[E]ach shard is stored on a different machine.  Is that what you said?  A Yes."); *see also, e.g.*, *id.* at 39:11-17.

234.  The y-axis of the graph illustrates the total amount of computing power needed for searching the dataset, over all the machines on which the dataset is stored.

235.  From the testimony and documents that I have reviewed, I understand that the Content ID Siberia Version is using a specific version of but may not be using " implementation.  *See, e.g.*, Kumar Depo. at 157:6-15 ("Content ID uses a very specific type of

236.  Regardless of whether Content ID Siberia Version is using what is labeled ," according to the graph above, the search scales sublinearly.  *See, e.g.,* GOOG-

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

NETWORK-00704057 ("Unfortunately, sharding fails to fully exploit the economy of scale provided by ███████ which has query-costs that grow sub-linearly for increases in database size."); *see also generally, e.g.*, GOOG-NETWORK-00704053-85.

237. As Defendants' recognize, another "tunable knob" in the Content ID Siberia System is the █████████████████. *See, e.g.*, GOOG-NETWORK-00702308 (listing "How many partitions" as a "Tunable knob" in Siberia's search); *see also, e.g.*, Konrad Depo. at 193:14-194:19.

238. Increasing the ████████████████ as the size of the data set size increases would result in sublinear scaling. There are two main steps in ScaM's index lookup, in terms of the computational work required: (1) comparing the unknown work to ██████████████ and (2) comparing the unknown work to ████████████████████. The computational work of the first step is proportional to ████████████ which I denote by P). The second step depends also on ████████████████████████████. For example, assuming that Siberia ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *See, e.g.*, Pasula Depo. at 106:19-110:9 ███████████████████. While I acknowledge that there are further steps in ScaM's index lookup, they are computationally much less expensive than these steps, and do not affect my further analysis.

239. Assuming that each comparison consumes the same amount of computing resources, one can think about the amount of computing resources as the "work" required or W. In the simplified analysis above, W has two terms. The first work term for W is proportional to the ████████████████ (P). The second work term for W is proportional to the number of comparisons in the second step, which is (approximately) equal to ████████████████████ ████████████████████████████████. Hence the work can be represented as W = aP + bSTQ, where a and b are simply fixed constants. Q can be represented as the total number of ████████████████ (R) divided by the product of the ████████████████ ████████████████ or Q = R/(SP). Substituting for Q in the prior equation yields W = aP + bRT/P. In order to maximize the efficiency of the search (minimize W), one of ordinary skill in the art would understand that the ████████████████ P should increase roughly as the square root of the number of ████████████████ R. This is because, as shown in the equation above, the work term has a term that is proportional to P and proportional to the inverse of P; balancing out these two terms (which minimizes the overall work) would lead to setting P to the square root of R, so both terms grow as the square root of the number of references. Said another way, a skilled artisan would know to increase P at a much slower rate the increase in R, would know that the way to do that is have P grow proportionally to the square root of R, and would know that the resulting search time would scale sublinearly with the number of ████████████████ R.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

240.  I would further emphasize that one does not need to specifically increase P proportional to the number of references R in order for the work to scale sublinearly with the number of ▮▮▮▮▮▮▮▮▮▮ R.  Indeed, the work analysis above demonstrates that any natural scaling of P leads to sublinear work.  This is consistent with the Defendants' document GOOG-NETWORK-00704557.

241.  Review of source code produced by Defendants in this case confirms my analysis of this claim element.  As an example





[198] See implementation at lines 35-40 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ (GOOG-NETWORK-SC-00000364).

[199] See line 38 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ (GOOG-NETWORK-SC-00000153).

[200] See implementation at lines 676-840 of file ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ (GOOG-NETWORK-SC-00000341-43).

[201] See a source code comment at line 675 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ (GOOG-NETWORK-SC-00000341).

[202] See line 776 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ (GOOG-NETWORK-SC-00000342).

[203] See implementation at lines 110-144 of file ▮▮▮▮▮▮▮▮▮ ▮▮▮▮ (GOOG-NETWORK-SC-00000365).

[204] See implementation at lines 146-179 of file ▮▮▮▮▮▮▮▮▮ ▮▮▮▮ (GOOG-NETWORK-SC-00000365-66).

[205] See implementation at lines 247-288 of file ▮▮▮▮▮▮▮▮▮ ▮▮▮ (GOOG-NETWORK-SC-00000996-97).

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**





[206] See definition at lines 42-100 of file ███████████████████

██████████ GOOG-NETWORK-SC-00001001-02)
[207] See lines 111-222 of file ████████████████████████████

(GOOG-NETWORK-SC-00000248-50)
[208] See lines 36-41 of file ████████████████████████████

██████████ (GOOG-NETWORK-SC-00001001)
[209] See implementation at lines 122-203 of file ███████████

██████████ (GOOG-NETWORK-SC-00000994 to 0996)
[210] See declaration at lines 61-64 of file ███████████████

██████████ (GOOG-NETWORK-SC-00001001)
[211] See lines 59-60 of file ████████████████████████████

██████████ (GOOG-NETWORK-SC-00001001)
[212] See definition at lines 86-113 of file ██████████████

██████████ (GOOG-NETWORK-SC-00000714)
[213] See implementation at lines 338-407 of file ██████████

██████████ (GOOG-NETWORK-SC-00000711-12)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



242.



---

[214] For the preceding line cites, see file ██████████████████████

████████████████████  OOG-NETWORK-SC-00000711-12)

[215] See implementation at lines 148-197 of file ███████████████████████████████

███████████████  (GOOG-NETWORK-SC-00000708)

[216] See lines 39-42 of file ████████████████████████████████████

███████████████  (GOOG-NETWORK-SC-00000713)  My understanding is that the current
implementation uses asymmetric hashing, but for completeness I have also included the
Hamming option as well.

[217] See definition at lines 21-106 of file ██████████████████████████

███████████████████████████
(GOOG-NETWORK-SC-00000470-71)

[218] See lines 1-2 of file █████████████████████████.

(GOOG-NETWORK-SC-00000470)

[219] See implementation at lines 64-97 of file ███████████████████████████████

.  (GOOG-NETWORK-SC-00000467-68)

[220] See definition at lines 133-336 of file ███████████████████

████████████████████████
(GOOG-NETWORK-SC-00000669-72)

[221] See implementation at lines 75-80 of file █████████████████████████

████████████████████████████████████

(GOOG-NETWORK-SC-00000668)

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS



s.

243. ███

---

222 See lines 60-74 of file ███

(GOOG-NETWORK-SC-00000667-68)
223 See implementation at lines 157-186 of file ███

(GOOG-NETWORK-SC-00000495)
224 See implementation at lines 265-289 of file ███

(GOOG-NETWORK-SC-00000496-97)
225 See definition at lines 156-330 of file ███

(GOOG-NETWORK-SC-00000901-04)
226 See implementation at lines 1076-1115 of file ███

(GOOG-NETWORK-SC-00000490)
227 See definition at lines 30-82 of file ███

GOOG-NETWORK-SC-00000974 – 0975).
228 See implementation at lines 112-158 of file ███

(GOOG-NETWORK-SC-00000971 – 0972).
229 See lines 37-38 of file ███

(GOOG-NETWORK-SC-00000974).
230 See lines 39-41 of file ███

(GOOG-NETWORK-SC-00000974).
231 See lines 45-46 of file ███

OOG-NETWORK-SC-00000974).

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



244.  It is my opinion that the Content ID Siberia Version meets claim element 33b) literally. However, to the extent this limitation is not literally met, for example, because the search algorithm of the Content ID Siberia Version does not "determining . . . an identification of [an] electronic the media a video uploaded to YouTube is similar in some sense to any of the video, audio, or melody content in one or more reference," this limitation is met under the doctrine of equivalents.  *See* Defendants' Fourth Supplemental Response to Interrogatory No. 7 (dated September 30, 2019).  The Content ID Siberia Version's search algorithm performs substantially the same function (matching an unknown work with a reference work) in substantially the same way (comparing the unknown work or features extracted from the unknown work to reference works or features extracted from reference works) to obtain

---

[232] See lines 47-49 of file ███████████████████████████
████████████████████████████████████████████████ (GOOG-NETWORK-SC-00000974).

[233] See lines 25-54 of file ███████████████████████████
████████████████████████████████████████████████ (GOOG-NETWORK-SC-00000981).

[234] See lines 57-90 of file ███████████████████████████
████████████████████████████████████████████ (GOOG-NETWORK-SC-00000981 to 0982).

[235] See implementations at lines 19-32 and 57-70 of file See lines 25-54 of file ████████
███████████████████████████████████████████ GOOG-NETWORK-SC-00000978 – 0979).

[236] See implementation at lines 141-204 in file ██████████████████
████████████████████████████████ (GOOG-NETWORK-SC-00000985 – 0986)

[237] See definition and implementation in files ████████████████████
████████████████████████████████████████████████████
█████████ (GOOG-NETWORK-SC-00000988 to 0992).

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

substantially the same result (determining if the two works match) as would any technology that "determin[es] . . . an identification of the media work."

245.  In sum, the Content ID Siberia Version electronically determines an identification of the user-uploaded video based on features extracted from that video.  This identification is based on a sublinear search identifying an approximate nearest neighbor (or a neighbor or a near neighbor).  The Content ID Siberia Version applies numerous thresholds to determine whether a potential match is a close enough match for there to be a "claim" by a content owner made on the user-uploaded video.

246.  As shown above, each of the Content ID Accused Instrumentalities meets claim element 33b).

### 4.2.4. '237 patent claim 33c)

> *33c) determining, by the computer system, an action based on the determined identification of the media work.*

247.  Each of the Content ID Accused Instrumentalities meets claim element 33c).

248.  When each of the Content ID Accused Instrumentalities identifies a match between a user-uploaded audio and/or visual work and a reference work submitted by a rights holder, it electronically determines the action or actions that it needs to take with respect to the user-uploaded audio and/or visual work, including, but not limited to, actions based on the policy the rights holder has chosen to apply to user-uploads matching its reference work, such as blocking, tracking, or monetizing.  The claiming system of each of the Content ID Accused Instrumentalities makes these determinations.  I understand that the claiming system did not change when the matching system changes from the Content ID LSH Version to the Content ID Siberia Version.  Rather, the general functionality of the claiming system has not meaningfully changed since at least as early as 2006.  *See, e.g.*, Wang Depo. at 34:4-14 ("Are you aware of something called Siberia?  A I have heard that project name before.  Q And with, like, the claiming system that you're working on, did -- did your team develop a new version of the claiming system for Siberia or was it -- A No.  Q -- were those two separate pieces?  A My knowledge of Siberia is that it was something they did and changed.  Not at all what we did on a day-to-day basis."); *id.* at 51:21-52:10 ("Q And since you started working on -- on the rights management team in 2006, how many versions of the claiming system have there been?  A We're not very good with our obsolete code.  There actually has really only been one -- it depends on how you define 'version.'  We are still using the same old code as before, but a lot has been added to it over time.  Q Was – with code being added over time, were they any points where the functionality changed significantly?  A Not --  Q The functionality of the claiming system.  A Not in any big way.  We just developed more and more features over time."); Konrad Depo. at 147:20-149:3 ("Q And so when we talk about the, sort of, the earlier LSH system and the Siberia system, that didn't really -- there wasn't a changed LSH claiming system versus a Siberia claiming system.  Is that fair?  A I believe the claiming system was mostly agnostic to which system was providing the matches, whether it was the LSH-based one or the Siberia-based one.").

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

249.  As I describe above, the matches output from the matching component of each of the Content ID Accused Instrumentalities are processed into final matches by the claim logic, ███████████████████████████  *See, e.g.*, analysis for '237 patent claim 33b) and citations therein.

250.  The claim logic then considers "policies" specified by the content owner on the matches from different channels that are "stitched together," such as the overall match duration.  The first action that the claim logic determines is whether a claim should be made in the first place, based on these content owner policies.  *See, e.g.*, Erb Depo. at 106:21-111: ("Once the raw matches are output from the Stage II processing, what's the next step in the process?  A The raw matches are sent for -- when we're doing matching for purposes of what we usually describe as ContentID, the -- for the purpose of claiming, then the raw matches are sent to the claiming system for further analysis.  And that's the point at which the matches from the different channels are combined.  Q When you say 'the matches from the different channels are combined,' what do you mean?  A I mean the matches from video, audio and melody are considered together in the claiming logic, whereas the match servers that we've been describing up to this point are each operating only on one channel.  Q So how does that work?  When you say that they are considered together, what's the processing that does that consideration?  A It's -- there's a lot of different logic in claiming that does things like, for example ████████████████████████████████████████████████ ███████████████████████.  If we have, at the same time at the same offsets, we have a melody match and we have an audio match, then we -- the melody match isn't interesting so we forget about it, we drop it.  If we have an audio match and a video matching at the same time, we combine them into an audio-visual match, and so on.  There's kind of a lot of logic in claiming to decide what matches really -- to transform the raw matches into what we consider to be the final matches.  . . . Q. And is that, is there a common term or is that referred to by some name within the architecture and within the system?  A. We call it the claim logic.  Q. And so, what are the -- I think you described a couple of different possible inputs, if you will, that the claim logic might consider in terms of analyzing these raw matches.  How does it go about, let's say you have a series of several raw matches in the video channel.  What does the claiming logic then do with those?  A. Well, again, it considers the matches from all the channels together rather than just the video channel.  But it does a wide variety of things.  For example, ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████  So in the case that we've completed all the match processing and

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

we've converted, potentially converted audio and video matches into audio-visual matches, and so on, and all of that is done, then we compare each of the matches that remains in that set against the policies associated with the assets that the references that matched are tied to, and we use that to determine whether or not we should make claims.  Q So these would be essentially policies often set by the content owner.  A Yes.  They are set by the content owner."); *id.* at 366:15-367:5 (describing how a content owner can alter this time duration, referring to GOOG-NETWORK-00008009-13); Rosenstein Depo. at 18:19-24:4 (Q. And if the video is determined to match some asset or some content that's been provided to Google, what happens next?  A. There's a fairly complex series of logic that -- the match is sent to a system that determines if -- if the match is qualified to make a claim and then what the policy should be on that claim based on the characteristics of the match and the policy that is set by the -- the owner of that content.  Q So when you say that there's some logic to determine if a match is qualified to make a claim --  A Uh-huh.  Q -- can you explain how that works and what you mean by that?  A Yes. The match needs to be – have certain characteristics that are eligible for claiming, such as be a -- long enough to be unambiguous, for example, a very short match is -- could -- a very short -- few seconds of a piece of content can match multiple, multiple things. So we make sure that the match is long enough to be unambiguous to match this piece of content, and we make sure that the policies that are -- that were described by the content owner are followed.  So in some cases content owners may choose not to place a claim on certain types of matches."); *id.* at 219:25-220:7 ("Q So as a practical matter, the claiming logic, as I understood your testimony, processes the match or matches that are generated by the system to determine one of more claims that may be applicable to the particular piece of content; is that correct?  A That's correct."); Wang Depo. at 61:17-62:3 ("Q Is there a minimum length that a -- a length or duration that a match needs to be for a claim to occur?  A I believe so, yes.  Q Do you know what that is?  A They have been changing it, and I know it's short now.  But I don't know for sure how short.  It may be five or ten seconds, but I'm not certain.  Q You said they keep changing it.  Who is 'they'?  A The -- the team in response to a product -- it's part of like a product decision.  Q Is that your team or the Zurich match claiming team.  A Zurich match claiming."); *see also, e.g.*, Rosenstein Depo. at 43:9-44:20; Wang Depo. at 34:21-5, 35:20-36:7; Konrad Depo. at 187:17-188:8; GOOG-NETWORK-00693810.

251.  If the claim logic determines that a claim should be made on a reference video, the claim logic of each of the Content ID Accused Instrumentalities then determines what "match policy" should be applied.  This is a second example of "determining an action" that is done by Content ID's claim logic.  The Content ID Instrumentalities do so by looking up the owner "match policies" that should be applied to a user-uploaded video matching a given reference video, with those policies being stored in a database.  *See, e.g.*, Erb Depo. at 36:7-40:15 ("The -- there's a policy table, which in connection with the claim table, can related a particular video ID to a particular policy.  So for a claimed video, the policy can provide information about the territories in which a video should have a claim policy applied to it, and that policy could include a policy to monetize, meaning a policy to show advertising against the video."); Rosenstein Depo. at 26:1-30:1 ("And so an example would be, using what you described a few moments ago, if a content owner had designated a policy of monetize this content, for example, and the match corresponded with the criteria for that claim --  A Uh-huh.  Q -- then that policy of monetize would somehow be associated with the user-uploaded video?  A. That's correct, the policy would be associated with the user-uploaded video scoped to whatever territories and whatever other criteria that policy had.  Q Okay.  And how is that done?  How is that -- is it

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

just as a function of that lookup connection that you described?  A. The policy is ultimately written out to a table that holds policies and is used during the video playback to determine what to do when the video's played back.  Q. Okay.  So -- thank you.  Let's then walk through that part of the process.  A Okay.  Q So the video was uploaded at Point A by some user, and the process you have described has happened.  Now, at a second time, some other user is going to view this particular video through the YouTube system.  So what happens to implement this policy that you just mentioned?  A So my understanding would be that the player would look at the policy table for that video and determine what policy, based on the circumstances of the playback, territory, for example, and then would make -- based on that policy, would then determine what it should do, whether it should block that playback or -- or do nothing or request an ad for that playback.");  *id.* at 17:16-18:4 ("The content owner is able to receive the videos that are matched, and we would apply a policy based on their instructions.  Q When you say that 'we would apply a policy,' what are the kinds of policies that can be applied?  A There are a number of policies.  Content can be tracked to measure the reach of the -- property asset provided by the content owner.  It can be monetized.  It can be sent to a review or it can be bought.  And those policies can vary by a number of different parameters.");  *id.* at 219:25-221:2 ("Q So as a practical matter, the claiming logic, as I understood your testimony, processes the match or matches that are generated by the system to determine one of more claims that may be applicable to the particular piece of content; is that correct?  A That's correct.  Q And then, based on those claims, policies are applied that are associated with those particular assets, correct?  A That's correct.  Q And is there any logic that is needed to apply those policies or is it sort of automatic, in that if this particular asset if [sic] claimed, then those policies are associated with it are applied?  A If an asset is claimed and it has . . . [p]olicies associated with it, those are the ones applied.  . . . And the system doesn't have some logic or choice functionality, if you will, as to how or when to apply those policies, it is more a binary:  If the claim is made and there are policies set, then those are the policies that are applied?  A That's correct.");  Wang Depo. at 62:4-11 ("Q Is it the claiming logic developed by your team that determines what action to take if a match between user-generated content and partner contact is found?  A Yes, in the sense that we apply what the partner has told us to do.  Q And by, what the partner has told you to do, do you mean the -- the track, block, and monetize policies?  A Yes.");  *see also, e.g.*, Erb Depo. at 33:21-34:10 ("A claim is a database relation between an asset provided by a partner, and a user-generated piece.");  GOOG-NETWORK-00767789 ("Claim: A link between a partner's asset and a piece of content being uploaded to YouTube.");  GOOG-NETWORK-00781896 ("What is a CID Claim?  An assertion that the rights to distribute a video on YouTube are (co)owned by a partner *[in a given territory and for a given media type]*  Computed by YouTube based on matches and ownership statements made by partners *[references and metadata files]*");  Erb Depo. at 157:5-17, 349:23-350:5;  Rosenstein Depo. at 44:21-45:1;  GOOG-NETWORK-00006733 ("The claims logic is the code that runs during automated claiming.  As inputs it takes matches from the match system, ██████

██████████████████████████████████████████████████████████████████████████████

████████████████████████████████████  . . . The policies attached to these claims may prevent the video from becoming visible on youtube, or permit us to display ads against the video at watch-time.");  Wang Depo. at 110:17-113:15;  Konrad Depo. at 43:19-46:21;  GOOG-NETWORK-00006734, GOOG-NETWORK-00702280 ("The consistent claims set provides a

## CONFIDENTIAL OUTSIDE COUNSEL ONLY – PROSECUTION/ACQUISITION BAR MATERIALS

set of actions . . . .  These actions get executed . . . ."); GOOG-NETWORK-00006736-37 GOOG-NETWORK-00600441 ("If Content ID finds a match, we apply the rightsholder's desired policy."); GOOG-NETWORK-00693821; GOOG-NETWORK-00693829.

252.  The potential "match policies" that can be applied to a claimed video are block, track, or monetize.  Which policy to apply, and the ultimate outcome of the application of that policy, are both examples of actions that the claim logic determines should occur.  *See, e.g.*, Defendants' Response to Network-1's Request for Admission No. 49 (dated May 14, 2015) ("[a]dmit[ting] that the policies that may be chosen by content owners include 'monetize,' 'block,' and 'track'"); Erb Depo. at 153:18-154:13 ("Q And is that metadata that you mentioned that the partners would provide also inclusive of the various policies that might go along with that particular content?  A Yes.  Q And that would include, for example at the high level, the sort of block, monetize, or allow policies that would apply to a particular matched video?  A Among other things, yes.  Q And are there sort of subspecies, if you will, or nuanced variations of each of those categories, block, monetize and allow?  A It's block, monetize and track.  Q Sorry.  A And they are, apart from specifying under what conditions and for which users those policies apply, the policies are really -- there's no finer gradation of policy than block, monetize or track."); Wang Depo. at 44:18-21 ("Q Let's talk about those policies.  What do you mean by policies?  A There are several rules they can apply for reference, and they are monetized, track, or block.); *id.* at 72:1-25 ("Q Is it the claiming system or some other part of Content ID or YouTube that taken an action based on the partner-identified policies of monetized, track, or block?  . . . The claim logic takes whatever the partner has said to apply to that -- for that asset, in that video and propagates it to playability, which will use it at watch time. . . . Q So the claim logic sends some sort of information to a playability system?  A Yes."); GOOG-NETWORK-00013853 ("When a subsequently uploaded video is matched, the content owner 'claims' it and the policy associated with the reference material is applied to the matched content, and the video is either blocked, monetized, or tracked to receive viewing metrics."); GOOG-NETWORK-00000668:

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

# YouTube video matching



GOOG-NETWORK-00767747:



GOOG-NETWORK-00781896:

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



*See also, e.g.*, GOOG-NETWORK-00009782, GOOG-NETWORK-00010544, GOOG-NETWORK-00010551; GOOG-NETWORK-00010579; GOOG-NETWORK-00014310; GOOG-NETWORK-00693761-63; GOOG-NETWORK-00693766; GOOG-NETWORK-00693768; GOOG-NETWORK-00693783; GOOG-NETWORK-00701274; GOOG-NETWORK-00767789; GOOG-NETWORK-00770921.

253.  When the right holder's content is blocked, the Content ID LSH Version prevents the user-uploaded audio and/or visual work from either going live or continuing to be viewed, or it mutes the audio.  By determining the "match policy" is block, the claim logic also determines that the video should not be allowed to play.  *See, e.g.*, GOOG-NETWORK-00013853 ("'Block' means the matched content is blocked and not able to be viewed either worldwide, or in a specific territory that the content owner has defined."); *see also, e.g.*, Wang Depo. at 73:21-74:8; GOOG-NETWORK-00767795-96.

254.  If the rights holder chose the "track" policy, the user-uploaded audio and/or visual work remains unaffected but the Content ID LSH Version  gives the rights holder access to viewership statistics.  By determining the "match policy" is track, the claim logic also determines that the video should be allowed to play and that the content owner should receive various statistical information.  *See, e.g.*, GOOG-NETWORK-00013853 ("'Track' means the partner can see the viewing statistics such as the aggregate demographics of the viewers and general locations where the content is most popular, while the matched content remains on the site."); *see also, e.g.*, Wang Depo. at 74:14-24; GOOG-NETWORK-00767799-800.

255.  If the policy is "monetize," the user-uploaded audio and/or visual work remains available on YouTube and the Content ID LSH Version displays with it advertisements and/or promotional information relating to the creator of the reference work, and tracks its viewership statistics.  By determining the "match policy" is monetize, the claim logic also determines that the video should be allowed to play and that an ad should be displayed in conjunction with the video on the watch page, if the ad system determines that should happen.  *See, e.g.*, GOOG-NETWORK-00013853 ("'Monetize' means the content is licensed to YouTube, ads will be served around the matched content, and YouTube will share the revenue with the partner."); Erb Depo. at 161:19-22 ("Q Now, 'monetized' generally speaking refers to displaying ads

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

along with the video, is that correct?  A Yes."); Rosenstein Depo. at 47:5-11 ("What happens with the videos, what does it mean that they are monetized?  A It generally means that the -- that the playback, the player will request an ad from an ad system that will determine if there's an ad that's appropriate to serve, and if there is, it will certainly -- it will run an ad."); Wang Depo. at 75:24-76:19 ("Q And we also talked about a usage policy of monetize.  What does that mean?  A It means the partner has specified that they would like to monetize that content. Q And how is that content monetized?  . . . When a video has a monetized policy, we send that signal -- or we don't sent that signal.  The as system is always fetching all the policy information at watch time as well.  And if is says monetize, they do whatever it is they do . . . . Q You mentioned the ad system, so you mean that an ad is displayed on a video that's monetized?  A No, I meant the ad system has logic as part of YouTube sort of just watch path, where it gets called if the policy is monetized, and so they know there is a monetize policy on this video, and they are allowed to show an ad, but it is up to them to determine what should actually happen."); *see also, e.g., id.* at 76:8-77:17; Wiseman Depo. at 26:7-28:5 (describing the types of ads that may be displayed on a matched user-uploaded video); GOOG-NETWORK-00767797-98; GOOG-NETWORK-00693806:

| Policy | | Result |
|---|---|---|
| Monetize | $ | • Allows the user uploads to be viewable on YouTube and tracks viewership.<br>• Places ads (in the formats a partner allows) against user uploads that match the content in the reference file. |
| Track | | • Allows the user uploads to be viewable on YouTube and tracks viewership, but does not serve ads against it. |
| Block | | • Blocks user uploaded videos that match a partner's content from being hosted (i.e. viewable) on YouTube.<br>• Note: This is not a takedown and will not issue a strike to the user, but prevents the content from being live on site. |



256.  Review of source code produced by Defendants in this case confirms my analysis of this claim element.  As an example ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



---

[238] See implementation at lines 15-38 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ (GOOG-NETWORK-SC-00001109)

[239] See definition at lines 30-67 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[240] See definition at lines 17-42 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ (GOOG-NETWORK-SC-00001112)

## CONFIDENTIAL OUTSIDE COUNSEL ONLY –
## PROSECUTION/ACQUISITION BAR MATERIALS





[241] See lines 26-29 of file ███████████████ (GOOG-NETWORK-SC-00001106)

[242] See implementation at lines 47-55 of file ███████████ (GOOG-NETWORK-SC-00001110)

[243] See implementation at lines 132-136 of file ███████ (GOOG-NETWORK-SC-00001111)

[244] See implementation at lines 124-178 of file ███████ (GOOG-NETWORK-SC-00001105)

[245] See implementation at lines 121-139 of file ███████ (GOOG-NETWORK-SC-00000116-17)

[246] See implementation at lines 82-93 of file ███████ (GOOG-NETWORK-SC-00000116)

[247] See implementation at lines 115-122 of file ███████ (GOOG-NETWORK-SC-00001105)

[248] See implementation at lines 202-238 of file ███████ (GOOG-NETWORK-SC-00000117-18)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



257.  Continuing this example



---

[249] See implementation at lines 38-46 of file

(GOOG-NETWORK-SC-00001100)
[250] See implementation at lines 31-98 of file

(GOOG-NETWORK-SC-00001100-01)
[251] See definition at lines 629-654 of file

(GOOG-NETWORK-SC-00000317)
[252] See definition at lines 398-431 of file

(GOOG-NETWORK-SC-00000319-20) and definition at lines 61-65 of file

(GOOG-NETWORK-SC-00000358-59)
[253] See file

(GOOG-NETWORK-SC-00000318-20) and file

(GOOG-NETWORK-SC-00000358-63)
[254] See lines 399-428 of file

(GOOG-NETWORK-SC-00000319-20) and lines 31-60 of file

(GOOG-NETWORK-SC-00000358)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



---

[255] See definition at lines 362-396 of file ███████████████

(GOOG-NETWORK-SC-00000319) and definition at lines 72-87 of file ██████
████████████

(GOOG-NETWORK-SC-00000359)
[256] See line 390 of file ████████████

(GOOG-NETWORK-SC-00000319) and definition at lines 97-187 of file █████
████████████

(GOOG-NETWORK-SC-00000359-60)
[257] See definition at lines 364-386 of file ████████████

(GOOG-NETWORK-SC-00000319)
[258] See line 81 of file ███████████
████████████

(GOOG-NETWORK-SC-00000359)
[259] See definition at lines 289-380 of file ████████████

(GOOG-NETWORK-SC-00000318-19) and definition at lines 194-332 of file █████
████████████

(GOOG-NETWORK-SC-0000360-63)
[260] See definition at lines 326-360 of file ████████████

GOOG-NETWORK-SC-0000318-19) and definition at lines 286-332 of file ██████
████████████

(GOOG-NETWORK-SC-00000362 to 0363)
[261] See line 351 of file ███████████
████████████

(GOOG-NETWORK-SC-0000318)
[262] See line 321 of file ███████████
████████████

(GOOG-NETWORK-SC-00000362)

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

258.  As shown above, each of the Content ID Accused Instrumentalities meets claim element 33c).

259.  In sum, in my opinion each of the Content ID Accused Instrumentalities meets all of the limitations of claim 33 and thereby infringes claim 33 of the '237 patent.

### 4.3.    '237 patent claim 34

> *34. The method of claim 33, wherein the action comprises*
> *providing to and/or displaying, at another client device, additional*
> *information in association with the media work.*

260.  Each of the Content ID Accused Instrumentalities meets claim 34.

261.  As an initial matter, each of the Content ID Accused Instrumentalities meets all the limitations of claim 33, the claim from which claim 34 depends.  *See, e.g.*, analysis for '237 patent claim 33 and citations therein.

262.  When each of the Content ID Accused Instrumentalities identifies a match between a media work uploaded by a user and a reference media work for which the rights holder has set a policy of "monetize" for matching user-uploaded works, the user-uploaded media work remains available on YouTube, and additional information such as advertisements and promotional information relating to the creator of the reference work will be displayed in association with it when it is accessed by another YouTube user through his or her computer or mobile device (i.e., another client device.).  *See, e.g.*, analysis for '237 patent claim element 33c) and citations therein.

263.  As shown above, each of the Content ID Accused Instrumentalities meets claim 34.

### 4.4.    '237 patent claim 35

> *35. The method of claim 34, wherein the additional information is*
> *an advertisement.*

264.  Each of the Content ID Accused Instrumentalities meets claim 35.

265.  As an initial matter, each of the Content ID Accused Instrumentalities meets all the limitations of claim 34, the claim from which claim 35 depends.  *See, e.g.*, analysis for '237 patent claim 34 and citations therein.

266.  When each of the Content ID Accused Instrumentalities identifies a match between a media work uploaded by a user and a reference media work for which the rights holder has set a policy of "monetize" for matching user-uploaded works, the user-uploaded media work remains available on YouTube, and advertisements may be displayed in association with it when it is accessed by another YouTube user through his or her computer or mobile device (i.e., another client device.).  *See, e.g.*, analysis for '237 patent claim element 33c) and citations therein.

<u>CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS</u>

267. As shown above, each of the Content ID Accused Instrumentalities meets claim 35.

### 4.5.  '464 patent claim 1

### 4.5.1. '464 patent claim 1 preamble

> *1. A method comprising:*

268.  To the extent preamble is limiting, each of the Content ID Accused Instrumentalities meets the preamble of claim 1.

269.  Each of the Content ID Accused Instrumentalities practices computer-implemented methods.  For example, each of the Content ID Accused Instrumentalities electronically extracts features from videos uploaded by YouTube users, and uses those extracted features to associate that uploaded work with a reference work, and then determines actions to perform based on that association.  *See, e.g.*, analysis for '464 patent claim elements 1[a], 1[b], 1[c], 1[d], 1[e], 1[f], 1[f], 1[g], 1[h], and 1[i] and citations therein.

270.  As shown above, to the extent preamble is limiting, each of the Content ID Accused Instrumentalities meets the preamble of claim 1.

### 4.5.2. '464 patent claim element 1[a]

> *1[a] receiving, by a computer system including at least one computer, a first electronic media work;*

271.  Each of the Content ID Accused Instrumentalities meets claim element 1[a].

272.  Each of the Content ID Accused Instrumentalities is implemented on a computer system including at least one computer.  Computer technology is required for each of the Content ID Accused Instrumentalities to operate.

    a.   <u>Content ID LSH System</u>:  *See, e.g.*, Erb Depo. at 145:12-146:20 (explaining that computer code that implements the Content ID LSH System resides on servers in Google data centers).

    b.   <u>Content ID Siberia System</u>:  *See, e.g.*, Konrad Depo. at 50:1-25 (discussing the data centers where the Content ID Siberia Version is run).

273.  With each of the Content ID Accused Instrumentalities, a YouTube user can upload a video (i.e., a first electronic media work) to YouTube.  *See, e.g.*, Defendants' Responses to Network-1's Request for Admission No. 3 (dated May 14, 2015) ("[a]dmitting that the YouTube site allows users to upload video content to the site"); *id.* at  Responses to Request for Admission Nos. 61-64 (admitting that "users upload videos to the YouTube site from cell phone devices" and "computers" and that such uploads are "analyzed using the Content ID system").

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

a. <u>Content ID LSH System</u>:  *See also, e.g.*, Erb Depo. at 40:24-41:25 ("So am I correct, first of all, that users have the ability to upload videos from various devices or platforms into the YouTube system as a general matter?  A Yes.  Q And that could be from a computer at their home or a laptop computer, correct?  A Yes.  Q And users also have the ability to upload videos from mobile devices like mobile phones?  A Yes.  . . . Q So what is sort of first point at which a video uploaded by a user comes into contact in some way with the Content ID system?  It's processed by our fingerprinting modules."); GOOG-NETWORK-00600441 ("When a user uploads a video to YouTube, Content ID automatically scans it against our database."); GOOG-NETWORK-00000668:



b. <u>Content ID Siberia System</u>:  *See also, e.g.*, Konrad Depo. at 62:12-15 ("Every UGC video that's uploaded to YouTube is run through the Content ID match system.  Correct?  Ideally, yes, if we handle our cases correctly then it's done in every case."); Pasula Depo. at 51:23-52:11 ("When a video is uploaded to YouTube, there is some kind of look up operation, if you will to determine whether it matches something in the reference set; is that fair?  . . . A Yes.  I mean, yes."); Goodrow Depo. at 64:15-65:11.

274.  As shown above, each of the Content ID Accused Instrumentalities meets claim element 1[a].

**4.5.3. '464 patent claim element 1[b]**

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

*1[b] correlating, by the computer system using a non-exhaustive,*
*near neighbor search, the first electronic media work with an*
*electronic media work identifier;*

275.  Each of the Content ID Accused Instrumentalities meets claim element 1[b].

276.  I understand the parties agree that "near neighbor" means "a close, but not necessarily exact or the closest, match of a feature vector, compact electronic representation, or set of extracted features to another, wherein the distance or difference between the two feature vectors, compact electronic representations, or sets of extracted features falls within a defined threshold."  I have applied this construction in my analysis below.

277.  I understand that the parties dispute the construction of "non-exhaustive . . . search."  I understand that Defendants assert this term is indefinite, and that Network-1 asserts this term should be construed as "a search designed to locate a near neighbor without comparing to all possible matches (*i.e.*, all records in the reference data set), even if the search does not locate a near neighbor," or alternatively with the additional clarification "comparing to a match means comparing to sufficient data within the record to make a determination as to whether the record is a match."  As I state above, the clarifying phase is just that—a clarification of what "comparing to a match" means in the context of the construction and the patents.  Therefore, my infringement analysis is the same whether or not the clarifying phrase is ultimately included in the construction or not.

*Content ID LSH Version*

**Fingerprinting**

278.  Before any correlation is performed, the Content ID LSH Version electronically extracts features from each audio and/or visual work uploaded by a YouTube user (i.e., the first electronic media work) to generate its digital "fingerprint."  This "fingerprint," which is made up of "subfingerprints," is electronic data that is sampled, calculated, and/or otherwise derived from the work itself.  Google's technical witnesses explained in detail how the fingerprints and subfingerprints are generated using, among other techniques, ▮▮▮▮▮▮▮▮▮▮▮▮▮  The same general framework is used to generate fingerprints for each of the video, audio, and melody "channels."  *See, e.g.*, Erb Depo. at 41:21-42:6 ("Q So what is the sort of first point at which a video uploaded by a user comes into contact in some way with the ContentID system?  A It's processed by our fingerprinting modules.  Q And what are the fingerprinting modules?  A We fingerprint each video in three channels.  One is audio, one is video, and one is melody, also known as CoverCat.");  *id.* at 43:13-45:11 ("What differed about the fingerprint generation process for each of those three channels?  A The video fingerprint used a combination of video filters that was obviously very different from what you would do in audio up front, t ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ fingerprinting elements become much more common amount the multiple methods.  The audio fingerprinting initially involved ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

created a chromatogram but extracted interesting features from that chromatogram and used a ███████████████████ as input to the more common elements of the fingerprinting.  Q And when you say -- you've referred a couple of times to 'the more common elements of the fingerprinting.'  What are you referring to there?  A It's a ████████████████████████ ███████████████████████████████████████ And a fingerprint is a series of subfingerprints.  Q Now, you mentioned first a ████████████████████ ████████████. In general terms, what does that involve?  What does that mean?  A It's a -- a ████████████████████████████████████████████████████████████████████

*id.* at 45:25-47:3 ("Q And I think you further indicated that, after this ███████████████████ A Yes.  Q And what is ████████████████████

*id.* at 51:20-2

*see also, e.g.*, *id.* at 42:7-43:12, 45:12-24, 47:4-51:20, 51:24-54:8, 58:4-59:13, 63:3-64:3, 64:14-22; Pasula Depo. at 14:1-21:19, 217:21-219:8 (both having additional discussion of the "fingerprinting" process); Baluja Depo. at 48:6-51:14

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████ Defendants' Response to Network-1's Request for Admission No. 55 (dated May 14, 2015) ("[a]dmit[ting] that the Content ID system uses fingerprints of uploaded videos").

279.  The "fingerprints" of reference works to which the "fingerprint" of the user-uploaded video is subsequently compared are generated in the same fashion.  *See, e.g.*, Erb Depo. at 56:2-57:2 ("Is that same process performed on what I'll call a reference video, if, for example, a TV studio provides a piece of content like a video, is the same process performed to generate fingerprints of that reference video?  A In general, yes.  The only exception is that it's possible that that processing is done in a -- by an external party.  Q In other words, let me see if I understand correctly, is it the case that Google, at least for some partners, provides some piece of software that allows the partner to generate a fingerprint themselves and transmit the fingerprint rather than the content itself to Google?  A Correct.  Q And, but that, the process of that software is the same as the process you've described.  It just may be performed on the other side of the user's firewall, or the partner's firewall.  A That's correct."); *see also, e.g.*, *id.* at 64:23-65:5; Rosenstein Depo. at 41:6-43:8; GOOG-NETWORK-00013854 ("[T]he technologies start with a database of reference material provided by rights owners from which YouTube extracts key visual and auditory signals.  Every user upload goes through a similar attribute extraction . . . .  We slice the digital (A or AV) files into small segments a few seconds long and generate fingerprints for each segment."); GOOG-NETWORK-00010570 (noting that content owners typically only create their own fingerprints for pre-releases); GOOG-NETWORK-00702327 (describing the tool provided to "important ContentID partners" for this purpose).

280.  As I mentioned above, the "fingerprints" are made up of subfingerprints, the latter of which ████████████████████████████  These subfingerprints are further broken down into smaller pieces called locality specific hashing (LSH) bands.  This is true for both the user-uploaded videos and the reference works.  The LSH bands of the reference works are indexed. *See, e.g.*, Erb Depo. at 71:15-22 ("Every subfingerprint is divided into what we call LSH bands.  So a typical example is ████████████████████████████████ an LSH band consists o████ ████████████████████████████████ and that's known as an LSH band."); *id.* at 80:12-81:4 ("Now, you've mentioned a number of times referring to these individual pieces as LSH bands.  What does LSH stand for?  A Locality-sensitive hashing.  Q And what is locality-sensitive hashing?  A It's a term that refers to the -- it's kind of an -- kind of an overblown term in a way.  It really corresponds to just saying that out of a Hash value, and remember that the fingerprint was ████████████████████████, out of a Hash value, if a chunk of that Hash occurs at the same place, the same offset within another similarly computer Hash at the same locations, that's the locality-sensitive part, then the hashes may be similar.  They are candidates to look at for similarity."); *see also, e.g.*, *id.* at 72:8-22, 77:20-78:6; Baluja Depo. at 53:2-61:5, 160:19-25 (both discussing of LSH bands and their indexing for the reference works).

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

281. Defendants' documents described the "fingerprinting" process used in the Content ID LSH Version in a manner that is consistent with the testimony of Google's technical witnesses. *See, e.g.*, GOOG-NETWORK-00784835-37:

Google

## ContentId Fingerprints

  

GOOG-NETWORK-00018603-05 ("Feature extraction: . . . The fingerprint of a video is a compact representation of the video, which is easier to compare than raw video and audio data. . . . Transform a piece of video (0.05s-60s) into a *feature vector*, so that *similar* pieces of video give feature vectors with *low distance*, according to a suitable metric."); GOOG-NETWORK-00000670-75 ("                                                       "); GOOG-NETWORK-00000412-14, GOOG-NETWORK-00700423-25 ("The LSH (Locality Sensitive Hash) Tables are an inverted index of LSH bands (substrings extracted from the fingerprint) to the IDs of videos containing that band."); GOOG-NETWORK-00002595-96; GOOG-NETWORK-00005616-17; GOOG-NETWORK-00018613-17; GOOG-NETWORK-00162594-95; GOOG-NETWORK-00699813; GOOG-NETWORK-00702844-47; GOOG-NETWORK-00780504-05; GOOG-NETWORK-00785261-68.

282. Review of source code produced by Defendants in this case confirms my analysis .[263] As an example,

---

[263] Where I cite to code and describe its behavior, I typically cite to the lines of code (as opposed to associated comments). There are also instances where I do cite to comments. However, when I cite to specific lines of code, any associated comments should be understood as being included and relevant to understanding the corresponding code, where such comments exist.

[264] See definition at lines 22-51 of file _____ (GOOG-NETWORK-SC-00000401)

[265] See code comment at lines 20-21 of file _____ GOOG-NETWORK-SC-00000401)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



[266] See the file ▮▮▮▮▮▮▮▮▮▮ (GOOG-NETWORK-SC-00000425-27)

[267] See definition at lines 138-141 of file ▮▮▮▮▮ GOOG-NETWORK-SC-00000414)

[268] See implementation at lines 81-92 of file ▮▮▮▮▮ (GOOG-NETWORK-SC-00000425)

[269] See implementation at lines 465-472 of file ▮▮▮▮▮ GOOG-NETWORK-SC-00000407)

[270] See implementation at lines 42-53 of file ▮▮▮▮▮ (GOOG-NETWORK-SC-00000416)

[271] See implementation at lines 125-163 of file ▮▮▮▮▮ (GOOG-NETWORK-SC-00000417-18)

[272] See implementation at lines 94-153 of file ▮▮▮▮▮ (GOOG-NETWORK-SC-00000425-26)

[273] See line 22 of file ▮▮▮▮▮ (GOOG-NETWORK-SC-00000399)

[274] See definition at lines 22-51 of file ▮▮▮▮▮ (GOOG-NETWORK-SC-00000401)

[275] See implementation at lines 70-198 of file ▮▮▮▮▮ (GOOG-NETWORK-SC-00000421-22)

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS





[276] See implementation at lines 62-135 of file ███████████████ (GOOG-NETWORK-SC-00000399-400)

[277] See definition at lines 188-197 of file ███████████████ (GOOG-NETWORK-SC-00000145)

[278] See line 104 of file ███████████████ (GOOG-NETWORK-SC-00000400)

[279] See declaration at lines 42-46 of file ███████████████ (GOOG-NETWORK-SC-00000401)

[280] See implementation at lines 155-189 of file ███████████████ (GOOG-NETWORK-SC-00000426)

[281] See implementation at lines 192-197 of file ███████████████ (GOOG-NETWORK-SC-00000404)

[282] See implementation at lines 602-698 of file ███████████████ (GOOG-NETWORK-SC-00000409-11)

[283] See definition at lines 166-169 of file ███████████████ (GOOG-NETWORK-SC-00000145)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



**Correlating**

284.  Once the Content ID LSH Version generates a "fingerprint" of the user-uploaded video, it then attempts to correlate the user-uploaded video (i.e., determining whether any reference works are neighbors, near neighbors, or approximate nearest neighbors to the user-uploaded video) by comparing that "fingerprint" with similarly-generated digital "fingerprints" of reference works (which each have an electronic media work identifier).  This process is commonly referred to as finding a *match* between the uploaded work and a reference work.  *See, e.g.*, Erb Depo. at 69:25-71:2 ("Q So after the fingerprints are generated in the manner you've discussed already, what's sort of the next step, if you will, in the ContentID processing system?  A The next step is matching.  Q And is that sometimes referred to as 'the MatchSystem' within Google?  A Yes.  Q And can you -- I'll start at a high level and we'll probably have to work our way down, but at a high level, what does the MatchSystem do?  A The MatchSystem compares fingerprints of user uploaded videos to various indices of videos for various purposes to identify any matches in which some portion of the user video corresponds to some portion of a reference video, audio, melody, channel, for some period of time.  It, for each user-uploaded video, it creates a collection of zero or more matches and its output is this collection of matches.  A match consists of a time offset in the user video, a time offset in the reference video, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, as well as the identities of the user-uploaded video and the reference video."); *see also, e.g.*, GOOG-NETWORK-00002595-96.

285.  As I mention above, this identification is based on a search that identifies a near neighbor (or a neighbor or an approximate nearest neighbor)[288]—a close, but not necessarily exact or the closest, match of a feature vector, compact electronic representation, or set of extracted features to another, wherein the distance or difference between the two feature vectors,



[284] See definition at lines 54-152 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ (GOOG-NETWORK-SC-00000143-45)
[285] See definition at lines 156-163 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ (GOOG-NETWORK-SC-00000145)
[286] See line 57 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ (GOOG-NETWORK-SC-00000143)
[287] See line 61 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ (GOOG-NETWORK-SC-00000143)
[288] I understand that for the purposes of this case and in the context of the Asserted Claims of the Asserted Patents, the parties have agreed that "neighbor," "near neighbor," and "approximate nearest neighbor" are equivalent in meaning.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

compact electronic representations, or sets of extracted features falls within a defined
threshold. *See, e.g.*, Erb Depo. at 114:23-115:12 ("A match between a probe fingerprint and a
reference fingerprint doesn't necessarily require that the two be exactly identical across their
length, correct? A Definitely not. Q So -- sorry, go ahead. A They definitely do not need to
be identical. Q And so a match would typically be called when there's some sufficient amount
of similarity between the fingerprint of the probe and the fingerprint of the reference. A At
some combination of offsets for some duration, yes."); *id.* at 267:3-4 ("ContentID finds
matches with not only videos that are bit for bit exact copies, but for videos that are not bit for
bit exact copies."); *id.* at 282:24-25 ("[T]he ContentID system searches for near neighbors.");
*see also, e.g.*, *id.* at 62:10-20 ("Our goal is that two similar videos are any two videos that a
human being would recognize as being two instances of the same video despite
transformations, including firming a screen with a hand-held camera, adding borders, cropping
the video, rotating the video, or otherwise transforming the video in a way that may
intentionally or unintentionally make it different in literal content from the original video but
still recognizable to a human being as the same content."); Baluja Depo. at 156:23-158:1 ("Q
So this is essentially -- this LSH system is an approximation [sic] nearest neighbor solution, if
you will, or -- A Right. So approximate in this case means you're guessing, right, to put it
colloquially. Q In other words, it might be the nearest neighbor, and it might not be? A
Yes."); *id.* at 162:7-14, 180:7-22. GOOG-NETWORK-00005616, GOOG-NETWORK-
00699813 ("Our task is to find **similar** fingerprints, which means fingerprints that contain
similar subfingerprints. This is a[n] 'approximate nearest neighbour' or 'near neighbour'
problem, where the distance function between two subfingerprints is simply the number of
bytes which differ (which therefore can take any value from 0 to 100). We use the technique
known as 'location sensitive hashing' to do this . . . ."); GOOG-NETWORK-00006362
("**Locality-Sensitive Hashing (LSH)** is an algorithm for solving the (approximate/exact) Near
Neighbor Search in high dimensional spaces."); GOOG-NETWORK-00162593 ("LSH Tables:
Allows efficient approximate nearest neighbor retrieval"); GOOG-NETWORK-00162594.

286.  The search algorithm of the Content ID LSH Version has two main stages: "Stage I" and
"Stage II." *See, e.g.*, Erb Depo. at 71:3-9 ("Q So let's start with the process of generating these
matches that you references. I think earlier, you talked a little but about a Stage I and a Stage
II. Is that all part of the MatchSystem that you were describing a moment ago? A. Yes.");
GOOG-NETWORK-00001093-94, GOOG-NETWORK-00702858 ("Matching takes a *probe
fingerprint* and tries to find *reference fingerprints* that are entirely or partially the same or
similar to it. This is a nearest-neighbour type of problem, which we divide into two stages: •
Stage 1: use *indexes* to find candidate reference that might match. • Stage 2: for each
candidate reference, compute where it actually matches (if it does)."); *see also, e.g.*, GOOG-
NETWORK-00000676; GOOG-NETWORK-00785269; Pasula Depo. at 101:17-102:11.

287.  Stage I begins by searching an index of the LSH bands of the reference works for any
LSH bands that are exact matches to any of the LSH bands of the user-uploaded video. The
LSH lookup portion of Stage I is one example of the application of a threshold related to the
distance or difference between the extracted features of the user-uploaded video and the
extracted features of the reference videos (with the threshold here being there be at least one
exact match in the LSH bands). That is, the "distance" is considered too high if no bands
(features) match, but it is considered sufficient in this first stage if any bands match exactly.
*See, e.g.*, Erb Depo. at 70:10-72:7 ("In Stage I, we look up in an index to see if any reference

video had the precise value for an LSH band, meaning the same offset and the same value of the subfingerprint; and, if so, we record the time offset in the reference and the time offset of the subfingerprint that we're looking at in the -- in the user video along with the video identity – identity of the reference video."); *id.* at 72:23-73:10 ("[I]f we call the collection of videos that are indexed the reference videos, then the -- all the LSH bands from the reference videos for that particular context will be in that particular index. Q And when you say for that particular context, do you mean the different channels, for example? A That's one example."); *id.* at 74:16-77:19 ("The LSH bands are the keys to that index and then the values within that index tell us the time offset, which subfingerprint it was within the reference video and what video ID, so we can conceptually, we can -- we can look up for a given LSH band all the offsets for all the videos in which that LSH bans occurs among the reference set."); *id.* at 78:7-79:20 ("Q And the individual LSH bands are then -- how do they interact with the index that you described? A The -- each LSH band is used to do a lookup in the index to identify whether there exist any reference videos that had the same LSH band, the exact same, identical matching LSH band. And the exhaustive list of all matching reference videos and offsets is -- that are contained in the index is returned from that lookup."); *id.* at 81:10-19 ("Q And would it be fair to say that Stage I is essentially generating candidates for further examination? A Yes. Q And in Stage I, is it also correct that the probe video or user-generated video is not being compared to the fingerprint of the reference videos, it's just the lookup in this LSH table? A Yes."); *see also, e.g., id.* at 133:22-134:3; GOOG-NETWORK-00000412, GOOG-NETWORK-00000415-16; GOOG-NETWORK-00005618-19; GOOG-NETWORK-00162593-95; GOOG-NETWORK-00700423-25; GOOG-NETWORK-00780506; GOOG-NETWORK-00784836-37; GOOG-NETWORK-00785269; Pasula Depo. at 102:12-18.

288. In the LSH lookup portion of Stage I, not all LSH bands in the reference index are compared to a given LSH band of the user-uploaded video. *See, e.g.,* Erb Depo. at 314:23-316:7 ("Q Do you know whether Stage I, in order to determine whether a particular LSH band is in the LSH Table Index, whether it must compare the band in question to every entry on the index? A No, it does not. Q So you believe that it's an ordered index, that it doesn't require -- that Stage I does not require comparison of the LSH band to each entry in the LSH Table Index; is that right? A That's correct. . . . Am I correct that Stage I in the Content ID system does not access the full fingerprint repository? A That's correct. Q And Stage I does not use full fingerprints at all; is that correct? A That's correct. Q So is it correct that -- am -- do I understand correct -- correctly that Stage I does not compare the probe fingerprint to every fingerprint in the fingerprint repository? A That's correct. And does Stage II of the Content ID system compare to every fingerprint in the fingerprint repository? No."); *see also, e.g.,* Baluja Depo. at 61:6-64:1 (explaining how and why an LSH-based search does not compare to all LSH bands).

289. The search of the Content ID LSH Version is therefore non-exhaustive because the search does not compare to all possible matches (*i.e.,* all records in the reference data set). The fact that the first step in the search is non-exhaustive renders the entire search algorithm non-exhaustive. As I discuss in more detail below, only the reference works that have LSH bands that came back as matches from Stage I's LSH lookup are subjected to further consideration. I understand that Defendants argue that "the first stage of the search evaluates whether *any work* in the hash table contains bands that match the query work." Defendants' Response to Network-1's Interrogatory No. 7 (dated May 14, 2015). However, this is in direct

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

contradiction with Mr. Erb's and Dr. Baluja's testimony that I cite above. This statement is also contrary to my understanding of how LSH lookups work in general.

290. In addition, although the LSH lookup portion of Stage I only looks for exact matches between an LSH band of an uploaded video and LSH bands in the index, the overall search algorithm searches for a near neighbor (or a neighbor or an approximate nearest neighbor). As I describe above, each subfingerprint is split up into smaller pieces called LSH bands. The fingerprint of each video is made up of a large number of small LSH bands, and as I discuss in more detail below, the number of bands that match over time provide insight into how close of an overall match the reference video is to the user-uploaded video in question. Indeed, the multiple stages (and substages) utilized by the Content ID LSH Version all aim toward the overall goal of finding a near neighbor (or a neighbor or an approximate nearest neighbor), with each stage aiming to further reduce the pool of candidates to narrow the search to nearer, or better, neighbors. *See, e.g.*, GOOG-NETWORK-00162593:



## LSH Tables

- Allows efficient approximate nearest neighbor retrieval

- Approach:
  - Split each subfingerprint into smaller pieces (called *LSH bands*)
  - Use exact key lookup on each LSH band
  - Collect votes for each subfingerprint according to the number of exactly matched LSH bands

*See also, e.g.*, Erb Depo. at 80:12-81:8 ("[LSH] really corresponds just to saying that out of a Hash value, and remember that the fingerprint was typically computed ▮▮▮▮▮▮▮▮, out of a Hash value, if a chunk of that Hash occurs at the same place, the same offset within another similarly-computed Hash at the same locations, that's the locality sensitive part, then the hashes may be similar. They are candidates to look for similarity. Q So basically, and this is what you've been describing, this lookup in the index, is that the Stage I processing that you described? A It's part of the Stage I processing.").

291. The candidates produced by Stage I's LSH look-up are further processed to eliminate candidates unlikely to be a match, which involves the use of various thresholds that compare features extracted from the reference work to features extracted from the user-uploaded or probe work. One example of a threshold is determining ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ such as by the "projection filter" I discuss below. *See, e.g.*, Erb Depo. at 81:20-85:5 ("What other processing is there in Stage I? A The LSH look-up typically returns a very large number of candidates. So we do some additional processing in Stage I to reject candidates that are clearly not going to be real matches, primarily by looking at the collection of matches for a given reference video over time against various subfingerprints that we look up from the probe. Q Can you explain in a little more

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

detail how that works?  A Sure.  So if you, for a moment, just think only about a single
reference video and imagine that you look at the collection, for every subfingerprint that we
look up out of the probe at various offsets, look at the collection of all the return values, all of
the hits that we get from the LSH band lookups for that over time; so effectively, what that
does is, it shows us a map of the time offset in the reference video that might correspond to a
[redacted]
[redacted] of a piece that we call the
projection filter.  Q Now, when you say '[redacted],' what do you mean by that?  A If -- in
order to run the projection filter, we need some -- we need data.  We need enough datapoints to
perform an analysis and so we -- if we got, say, [redacted]
[redacted] ); *see also, e.g.*, *id.* at 87:5-89:11 (explaining that for a data set with between 20 and 35
million, approximately a hundred thousand reference videos are returned as candidates before
the projection filter is applied); 91:6-22.

292.  If there are enough time-correlated LSH lookup hits for a given reference work, that
reference video and the user-uploaded video are further compared using the "projection filter."
The "projection filter," and specifically [redacted]
[redacted] is another example of thresholding in the
MatchSystem Stage I.  *See, e.g.*, Erb Depo. at 85:6-87:4 ("Now, you've mentioned a couple of
times the projection filter.  What is that?  . . . The projection filter is a conceptually something
[redacted]
[redacted] Q And this is something that's performed at the projection filter as a
means of [redacted]
A. Yes. [redacted]
[redacted] ; *see also, e.g.*, *id.* at
89:17-90:18 (explaining that the projection filter does not access the full fingerprint of the
reference video and typically reduces the number of hits by at least two orders of magnitude);
*id.* at 91:6-22, 133:22-134:3; GOOG-NETWORK-00002048-59 (describing how the projection
filter operates); Pasula Depo. at 102:22-103:10.

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

293.  ContentID LSH Version's Stage II compares the full fingerprint of the user-uploaded or
probe video with only the full fingerprints of the reference works identified in Stage I (i.e.,
those potential matches output by the "projection filter"), and outputs "raw matches."  *See,
e.g.*, Erb Depo. at 91:2-5 ("Q And am I correct that that Stage II processing is only performed
with respect to the now pruned set of candidates [output from Stage I]?  A Correct."); *id.* at
92:24-93:11 ("[W]hat happens in Stage II?  A For each video ID that is a candidate that comes
out of Stage I, we fetch the full fingerprint of the reference and compare the full fingerprint of
the reference and the user-uploaded video at the appropriate -- at -- well, effectively at all
possible combinations of offsets."); *see also, e.g.*, *id.* at 33:14-20 ("A raw match is the output
of the MatchSystem, meaning a prospective march between a user-generated content video and
a reference video on either the video, the audio or the melody channel, beginning at a certain
time offset in the probe UGC and a given time offset in the reference, and extending for some
duration."); 93:19-94:18; GOOG-NETWORK-00780507.

294.  Using the full fingerprints, Stage II's comparison begins by ███████████████████
████████████████ the corresponding subfingerprints of the user-uploaded video and
each of reference works identified in Stage I, and ██████████████████████████████
█████████████████████████ *See, e.g.*, Erb Depo. at 93:12-18 (Q And how is
[Stage II's] comparison performed?  A We compute ██████████████████████████████
███████████████████████████████████████████████
██████████████████████); *id.* at 94:19-96:19 ("Q And [comparing all the
subfingerprints of the two videos] creates ████████████████████████████████████
███████.  Q Excuse me.█



     . . . Q And am I correct that, for each of these -- I assume there is a comparison that's
done for each of the candidate fingerprints.  A Yes.  Q And what's the output of each of those
comparisons?  A A set of matches.  What I described earlier as raw matches or sometimes
referred to as candidate matches."); *see also, id.* at GOOG-NETWORK-00018607-08 ("Given
two fingerprints X and Y ██████████████████████████████████████████████
██████████████████████████

295.  Stage II ██████████████████████████████████ if there is a period of
time during which the user-uploaded video and the reference work being compared are
sufficiently similar to be a match—with that period of time being another example of a
threshold used to determine whether or not a reference video is a near neighbor (or neighbor or
approximate nearest neighbor).  ████████████████████ are the distance or difference
functions that Stage II uses to make this comparison.  *See, e.g.*, Erb Depo. at 216:6-19 ("Q And

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

to your knowledge, in terms of the distance or difference functions used ██████████████████ that's the distance or difference function, correct? A Yes.); *id.* at 99:12-106:16 ("[I]n the current implementation of Stage II, known as the Sensitive Stage II,



**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



*see also, e.g.*, GOOG-NETWORK-00610863-70 (describing Sensitive Stage II); Erb Depo. at 185:3-186:23 (indicating GOOG-NETWORK-00610863-70 accurately described Sensitive Stage II); *id.* at 186:24-188:4 ("Step one in the algorithm as appears here [on GOOG-NETWORK-00610866] is that areas of interest are determined, do you see that?  A Yes.  Q And how is that performed? What is the mechanism or the value by which the system determines that something is an area of interest?  A

; *id.* at 200:11-202:24 (Q. And the document on page [GOOG-NETWORK-00610]869 or the page ending in 869 in step seven, it references

; *id.* at 188:5-200:10, 219:24-221:19 (further describing the Sensitive Stage II algorithm); Pasula Depo. at 103:11-104:13; GOOG-NETWORK-00785269:

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



296.  I understand that the version of Stage II I describe immediately above (Sensitive Stage II) was implemented at some point in 2014.  Prior to 2014, Stage II was referred to as the "spike algorithm."  Because it



*See, e.g.*, Erb Depo. at 216:6-217:17

*id.* at 123:10-125:8 ("Q Now, at some point in time, am I correct that the algorithm used in Stage II was referred to as the spike algorithm?  A Yes.  That was the predecessor of the Sensitive Stage II.  Q And what's the difference between the spike algorithm and the Sensitive Stage II algorithm?  A The spike algorithm is --

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

); *see also, e.g.*, *id.* at 12:20-13:2, 125:16-127:6 (indicating the spike algorithm was used for Stage II at least as early as August 2011); *id.* at 218:16-219:23, 221:6-19; GOOG-NETWORK-00000412; GOOG-NETWORK-00000416; GOOG-NETWORK-00001614-19; GOOG-NETWORK-00162593-95; GOOG-NETWORK-00700323-27; GOOG-NETWORK-00700423-26; GOOG-NETWORK-00702836-38; GOOG-NETWORK-00702889-90.

297.    As I discuss above, the Content ID LSH Version search is a non-exhaustive search for a near neighbor because the search does not compare to all possible matches (*i.e.*, all records in the reference data set). This is true even if the search does not locate a near neighbor. *See, e.g.*, Erb Depo. at 70:19-21 ("[The MatchSystem], for each user-uploaded video, it creates a collection of zero or more matches and its output is this collection of matches."); *id.* at 91:17-92:23 ("I know that there are cases where the set that comes out of Stage I is much larger than a thousand, but the -- or sometimes it's completely empty as well. But depending on the nature of the user-uploaded video, but that's the general outline. Q Now, when you say it's completely empty, does that mean that basically, the Stage I process didn't find any sufficient matching LSH bands and so there's essentially no candidates to examine further? A Correct. Q And what does the system do when that occurs? A That's a great question. I think we run stage – I'm not completely certain, but I believe we run Stage II with an empty input set. Q Okay. So it's not -- as far as you know, the video proceeds into Stage II or the processing proceeds into Stage II; but essentially, since there's no input set, there wouldn't be anything to compare. A Correct. Q And I'm assuming, but tell me if I'm misunderstanding, that the end result of that would be that the system would determine there are no matches and there would be no, I think what you described as a raw match for that particular uploaded video. A For that channel, for that uploaded video, yes."); *id.* at 96:19-99:11 ("Q And is there one or more than one such raw match [output from Stage II] for a particular candidate video ID fingerprint? A There are zero or more. There may be none, there may be one, there may be many."); *id.* at 218:16-19 ("Q What was the -- well, in the spike algorithm, the end resulting output was various matches, correct? Zero or more matches? A Correct.").

298.    The "raw matches" output from the Content ID LSH Version's MatchSystem are then sent to the claiming system for further analysis. As I mentioned above

This is another example of a threshold that is applied to determine whether or not a reference video is a neighbor, a near neighbor, or an approximate nearest neighbor of a user-uploaded video. *See, e.g.*, Erb Depo. at 111:22-114:11 ("Now, earlier today, I believe at some point, you mentioned something that I think you

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



; *id.* at 122:6-123:9

; *see also, e.g.*, *id.* at 125:4-15 ("Q.

GOOG-NETWORK-00006734-35

. . ."); GOOG-
NETWORK-00008864 (email discussing these thresholds); GOOG-NETWORK-00014310;
GOOG-NETWORK-00162595; GOOG-NETWORK-00000668:

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

# YouTube video matching



299. I understand that Defendants argue that Content ID LSH Version does not identify a neighbor or a near neighbor (or an approximate nearest neighbor). They assert that "the first stage of the search does not employ a threshold of any kind, but simply selects a group of likely candidates, regardless of their distance or difference from the query. Similarly, the second stage of the search determines a match based upon which works exhibit the most similarity over time, as visualized by a heat map, but does not employ a defined threshold based on a distance or difference." Defendants' Response to Network-1's Interrogatory No. 7 (dated May 14, 2015). As a preliminary matter, Defendants' own witnesses and documents characterize this search as a search for a neighbor, a near neighbor, or an approximate nearest neighbor. Moreover, as I explain above, there are numerous thresholds that the Content ID LSH Version uses to determines whether a potential match is similar enough to the user-uploaded video to be reported as a match, including at least the following: (a) the distance or difference (of zero) between LSH bands in the LSH lookup (Stage I); (b) ███████ ████████████████ (Stage I); (c) the ██████████████ in the projection filter (Stage I); (d) the ████████████ (Stage II); and (e) ████████████ (claiming logic). I address each of these thresholds in turn.

    a.   The LSH lookup portion of Stage I looks for exact LSH band matches. A step of a search algorithm that looks for such exact matches using a threshold (i.e., a distance or difference of zero) to determine is a given LSH band is a match. *See, e.g.*, Erb Depo. at 70:10-72:7 ("In Stage I, we look up in an index to see if any reference video had the precise value for an LSH band, meaning the same offset and the same value of the subfingerprint; and, if so, we record the time offset in the reference and the

<u>**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**</u>
<u>**PROSECUTION/ACQUISITION BAR MATERIALS**</u>

time offset of the subfingerprint that we're looking at in the -- in the user video along with the video identity – identity of the reference video.").

b.   The matching LSH bands from the LSH lookup portion of Stage I are pieced together to determine whether there are ███████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ is a threshold that is a tied to the distance or difference between the features extracted from the reference work and the features extracted from the user-uploaded video. *See, e.g.*, Erb Depo. at 82:9-85:5 ("So if you, for a moment, just think only about a single reference video and imagine that you look at the collection, for every subfingerprint that we look up out of the probe at various offsets, look at the collection of all the return values, all of the hits that we get from the LSH band lookups for that over time; so effectively, what that does is, it shows us a map of the time offset in the reference video that might correspond to a time offset in the probe video. And looking at that behavior over time, if there's -- if there are ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████. Q Now, when you say ████████████,' what do you mean by that? A If -- in order to run the projection filter, we need some -- we need data. We need enough datapoints to perform an analysis and so ████████ ████████████████████████████████████████████ ████████████████████████████████████.

c.   The ████████████ in the "projection filter" is another threshold that is a tied to the distance or difference between the features extracted from the reference work and the features extracted from the user-uploaded video. If there ██████████████████████ ████████████████████████. *See, e.g.*, Erb Depo. at 85:6-87:4 ("The projection filter is a conceptually ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ Q And this is something that's performed at the projection filter as a means of ████████████ ████████████████████████████████. A. Yes.").

d.  of Stage II, there is also *See, e.g.*, Erb Depo. at 216:6-19 ("Q "); *id.* at 99:12-106:16 ("[I]n the current implementation of Stage II, known as the Sensitive Stage II, the idea is that ").

e. Finally, the "raw matches" output from the Match System are processed by the claiming logic, which applies another threshold related to the distance or difference between the extracted features of the user-uploaded video and the reference work— . With both the Sensitive Stage II and the spike algorithm, the *See, e.g.*, Erb Depo. at 111:22-114:11 *see also, e.g., id.* at 125:4-15

300. Review of source code produced by Defendants in this case confirms my analysis of this claim element. As an example,

---

[289] See definition at lines 192-223 of file (GOOG-NETWORK-SC-00001135-36)
[290] See implementation at lines 197-198 of file (GOOG-NETWORK-SC-00001135)
[291] See implementation at lines 174-186 of file (GOOG-NETWORK-SC-00001113)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



---

292 See implementation at lines 510-573 of file ██████████████████████

███████████     (GOOG-NETWORK-SC-00001116-17)

293 The `Stage I` and `Stage II` do not appear to refer to the same "Stage I" and "Stage II" I describe above when discusses Defendants' testimony and their documents.

294 See file ████████████████████

(GOOG-NETWORK-SC-00000153-55)

295 See lines 56-58 of file █████████████████████

(GOOG-NETWORK-SC-00000153)

296 See lines 56-58 of file █████████████████████

(GOOG-NETWORK-SC-00000153)

297 See implementation at lines 47-67 of file ███████████

cc. (GOOG-NETWORK-SC-000001090-91)

298 See implementation at lines 230-281 of the file ███████████████

.    (GOOG-NETWORK-SC-00000151)

299 See implementation at lines 246-272 of file ███████████████

██    (GOOG-NETWORK-SC-00000101)

300 See implementation at lines 276-446 of file ███████████

██    (GOOG-NETWORK-SC-00000101-04)

301 See implementation at lines 211-229 of file ████████████████

██    (GOOG-NETWORK-SC-00000100)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



---

[302] See implementation at lines 42-81 of file ███████████████████ (GOOG-NETWORK-SC-00000175 to 0176).

[303] See comments at lines 90-93 of file ███████████ (GOOG-NETWORK-SC-00000105-106)

[304] See implementation at lines 42-81 of file ███████████████████ GOOG-NETWORK-SC-00000175-76)

[305] See implementation at lines 249-316 of file ███████████ (GOOG-NETWORK-SC-00000168-69)

[306] See implementation at lines 585-591 of file ████████████ (GOOG-NETWORK-SC-00000173)

[307] See implementation at lines 615-691 of file ████████████ (GOOG-NETWORK-SC-00000174)

[308] See lines 671-673 of file ███████████████ (GOOG-NETWORK-SC-00000174)

[309] See implementation at lines 69-86 of file ███████████████ (GOOG-NETWORK-SC-00001090)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



.

301.  It is my opinion that the Content ID LSH Version meets claim element 1[b] literally. However, to the extent this limitation is not literally met, for example, because the search algorithm of the Content ID LSH Version does not "correlat[e] . . . the first electronic media work with an electronic media work identifier" because it does not "correlate" but rather "can be used to determine whether a video uploaded to YouTube is similar in some sense to any of the video, audio, or melody content in one or more reference," this limitation is met under the doctrine of equivalents.  *See* Defendants' Fourth Supplemental Response to Interrogatory No. 7 (dated September 30, 2019).  The Content ID LSH Version's search algorithm performs substantially the same function (matching an unknown work with a reference work) in substantially the same way (comparing the unknown work or features extracted from the

---

[310] See implementation at lines 283-319 of file ████████████████████

████████████████████ (GOOG-NETWORK-SC-00000151-52)

[311] See implementation at lines 407-583 of file ████████████████████████

████████████       (GOOG-NETWORK-SC-00000129-32)

[312] See implementation at lines 72-92 of file ████████████████████

████████       (GOOG-NETWORK-SC-00000124)

[313] See definition at lines 24-196 of file ████████████████████

████████       (GOOG-NETWORK-SC-00000135-38)

[314] See definition at lines 110-176 of file ████████████████████

████████       (GOOG-NETWORK-SC-00000125-26)

[315] See implementation at lines 204-385 of file ████████████████████

████████       (GOOG-NETWORK-SC-00000126-29)

[316] See implementation at lines 178-202 of file ████████████████████

████████       (GOOG-NETWORK-SC-00000126)

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

unknown work to reference works or features extracted from reference works) to obtain substantially the same result (determining if the two works match) as would any technology that "correlat[es] . . . the first electronic media work with an electronic media work identifier."

302.  In sum, the Content ID LSH Version correlates a user-uploaded video (first electronic media work) based on features extracted from that video.  This correlation is based on a non-exhaustive search identifying a near neighbor (or a neighbor or an approximate nearest neighbor).  The Content ID LSH Version applies numerous thresholds to determine whether a potential match is a close enough match for there to be a "claim" by a content owner made on the user-uploaded video.  As I detail below, this correlation or "match" between the first uploaded media work (user-uploaded video) and the electronic media work identifier (of the reference work) is then written to a database that is part of the claiming system.  *See, e.g.*, analysis for '464 patent claim element 1[c] and citations therein.

*Content ID Siberia Version*

**Fingerprinting**

303.  Before any correlation occurs, the Content ID Siberia Version similarly electronically extracts features from each audio and/or visual work uploaded by a YouTube user to generate its digital "fingerprint."  This "fingerprint," which is made up of "embeddings" that are each a vector of ███████████████, is electronic data that is sampled, calculated, and/or otherwise derived from the work itself.  Google's technical witnesses explained in detail how the fingerprints and embeddings are generated using ████████████████████████████████ ███████████████████ part of the Google Brain project.  The same general framework is used to generate fingerprints for each of the video, audio, and melody "channels," and for regular uploads as well as live streams.  *See, e.g.*, Pasula Depo. at 21:22-29:13 ("The neural network-based fingerprinting also – well, I guess not also.  It generated ███████████ as the sub fingerprint; is that correct?  A No.███████████████.  Q Thank you.  Sorry.  A And we stopped referring to them as sub fingerprints.  Q What is the reference to them at this point?  A Embeddings.  Q E-M-B-E-D--  A Yeah.  Things embedded in a space, yeah, It's -- yeah.  It's what they would be called in the literature of neural networks.  Q And can you describe what each embedding is?  . . ██████████████████████████  Q And that's represented by ██████████████  A Yes.  It's a vector which is a description of a point in space.  Q And what does that ████████████  represent with respect to the underlying video?  A Not much.  It's not so much that it represents something intrinsically.  It has sort of a certain property.  Q Well, so when you say it has a certain property, what do you mean by that?  A So we trained the neural network so that embeddings corresponding to -- in video, video frames that came from the same footage, from the same point in the same footage, end up close together in the same space, even if they have been heavily transformed; and that embeddings that come from completely different frames, are far away.  Q So an individual embedding, is that generated from a snapshot of a point in time within the video?  A For the video channel, it's a single frame.  Q And that single frame, how often are those captured to generate the embeddings?  A I believe it is still ████████████  Q So let's step to just one of those.  So I take it, then, ████████████████  there is something that essentially extracts a single frame at that point in time from the video, and then that is processed in some way to generate █████ ████████████████████  A I believe we just request a transcode that has

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

████████████ from YouTube's infrastructure or we ask it to transcode it in such a way and then we process each frame individually.  Q When you say you ask it to process a transcode, can you just explain to me what that means?  A. So there are many different video represent -- a video can be represented many different ways, with like higher, smaller resolution.  There can be different frame rates, different N codings of the video.  We ask for a specific N coding which is -- in which the frames are explicit -- represented explicitly.  And they occur ████████████ YouTube has a lot of infrastructure for purchasing different transcodes for different purposes. Q. And so -- so you receive that transcode, and then it -- that's essentially a collection of frames from the video; is that fair?  A Yes.  Q Okay.  And each of those frames is then processed to generate one of these vectors or embeddings?  A For the video channel, yes.  Q And how is it different from the audio channel?  A The audio channel is -- well, based on audio, and audio is a wave form.  So what we do is we produce what is called a spectrogram.  It is a visual representation of the frequencies and the times in the audio wave form, and it basically sort of shows the notes that are occurring at different points in time and how they're sustained.  And so we produces this rolling tape of what's going on with audio, and then we take snapshots of it and produce embeddings from those.  . . . And is there a third way that -- I believe you also mentioned there is a melody channel.  A I am less familiar with how the melody channel preprocessing is done.  They also use spectrograms, but then they do some more processing on it to really only extract musical notes and to make sure that these notes are invariant to pitch shift.  So if you -- if you move the whole melody like a half tone up, it still ends up in the same place.  Q Is there -- once the frames are captured or the spectrogram is captured for audio, is there different code that is ████████████ for the different channels or is it the same ones they've been preprocessed?  A It is the same framework.  There are -- the system is actually, very complicated in other ways.  There are several other things that might happen in the different channels.  But in the end, they all use a neural network.  Q And do they call that neural network through the same code or is it different code for each one?  A I mean, it's the same neural network, what you call it, tool kit, ████████████  Q Did you say ████████████ A Yeah, █████ It is famous among engineers.  Q And so the neural network is what's used in each instance to calculate ████████████ A That is correct.  I mean, a different neural network for each channel."); *see also, e.g., id.* at 35:20-36:13, 125:17-127:22, 134:11-25, 155:4-156:13, 172:19-174:7; Kumar Depo. at 15:21-16:25, 17:13-23, 91:12-22, 102:13-23; Konrad Depo. at 79:24-80:14, 136:19-138:22; Erb Depo. at 54:9-55:20, 60:17-61:24, 240:10-25, 242:17-244:25, 317:10-318:3; Defendants' Response to Network-1's Request for Admission No. 55 (dated May 14, 2015) ("[a]dmit[ting] that the Content ID system uses fingerprints of uploaded videos").

304.  The "fingerprints" of reference works to which the "fingerprint" of the user-uploaded video is subsequently compared are generated in the same fashion.  *See, e.g.*, Kumar Depo. at 30:20-31:6 ("Q The underlying embeddings from the query are obtained in the same way as the embeddings from the references; is that right?  A That's right."); *see also, e.g.*, Pasula Depo. at 31:4-33:8, 36:16-21, 174:16-175:2.

305.  For user-uploaded videos, more than one sequence of embeddings may be used to represent a single video in certain situations ████████████  In instances where there are multiple sequences of embeddings for a single uploaded video, those sequences of embeddings are generated in the same way as for a video with a single sequence

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

of embeddings. *See, e.g.*, Pasula Depo. at 29:14-30:24 (Q So the number of these vectors that would be used to represent a given video is dependent on the length of the video; is that fair? A Yes. We might also use several different sequences of embeddings to represent a single video. Q And is that because there might be video channel, audio channel or others, or is there some other -- A There is another thing. Q Go ahead. A I don't know if you've seen on YouTube ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ Q So you might have a set of embeddings for the video as a whole, and a set of embeddings ███████████████████████████████████████████ A Yeah, ██████████████████████████████████████████████; GOOG-NETWORK-00783283 ████████████████████████████████████████████████████ ████████████ *see also, e.g.*, GOOG-NETWORK-00770925; GOOG-NETWORK-00781031; GOOG-NETWORK-00789217-19; GOOG-NETWORK-00789369-71.

306.  In addition, for the video channel, there is a step referred to as ████████████ ██████████████████████ *See, e.g.*, Pasula Depo. at 36:16-38:10 ("So the neural network-based embeddings, those are used to create the references that are in the index; is that correct? A Several things are done to those embeddings. And then some of them are placed in the index. Q Okay. So walk me through. When you say several things are done to those embeddings, what do you mean? A So sometimes, in -- well, actually, also in audio. In video, ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████); *id.* at 58:22-59:9 ("When you have the uploaded video, there's a process that's sort of -- if I understood you correctly, you generate the embeddings, ████████████████████████████████████████████████████████ ████████████████████████████; is that fair?  A Yes.  This process is like the first stage of either indexing or look up."); *see also, e.g.*, Erb Depo. at 241:1-242:16.

307.  Defendants' documents described the "fingerprinting" process used in the Content ID Siberia Version in a manner that is consistent with the testimony of Google's technical witnesses.  *See, e.g.*, GOOG-NETWORK-00702117 ("At the core of our matching technology lies a robust and compact representation of video content.  This compact representation is generated by a neural network █████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████); GOOG-NETWORK-00790986 ("Fingerprint: Compact representation of the image that provides a distance measure"); GOOG-NETWORK-00786357-60:

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



GOOG-NETWORK-00770923:



*See also, e.g.*, GOOG-NETWORK-00699390-98; GOOG-NETWORK-00699885-90; GOOG-NETWORK-00700607-09; GOOG-NETWORK-00701278-80; GOOG-NETWORK-00702421; GOOG-NETWORK-00704330; GOOG-NETWORK-00754011; GOOG-NETWORK-00754431-38; GOOG-NETWORK-00781030; GOOG-NETWORK-00781127; GOOG-NETWORK-00781872-73; GOOG-NETWORK-00787651; GOOG-NETWORK-00788058-66; GOOG-NETWORK-00789361-62; GOOG-NETWORK-00789372; GOOG-NETWORK-00790993-94; GOOG-NETWORK-00791817-19; GOOG-NETWORK-00791839-41.

308.  Review of source code produced by Defendants in this case confirms my analysis of this claim element.



**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**





**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

██████████████████████████████████████████████████████████████████

### Correlating

312.  Once the Content ID Siberia Version generates a "fingerprint" of the user-uploaded video, it then attempts to correlate the user-uploaded video (i.e., determining whether any reference works are neighbors, near neighbors, or approximate nearest neighbors to the user-uploaded video) by comparing that "fingerprint" with "fingerprints" of reference works (which each have an electronic media work identifier).  As I note above in my discussion of the Content ID LSH Version, this process is commonly referred to as finding a *match* between the uploaded work and a reference work.

313.  As I mention above, this identification in the Content ID Siberia Version is based on a search that identifies a near neighbor (or a neighbor or an approximate nearest neighbor)—a close, but not necessarily exact or the closest, match of a feature vector, compact electronic representation, or set of extracted features to another.  I understand that a portion of the search is based on what are known as ScaM.  *See, e.g.*, GOOG-NETWORK-00780160 ("Instead of LSH, ScaM is used to do Approximate Nearest Neighbor Search."); GOOG-NETWORK-00789360 ("Siberia: a new, sharded match engine . . . ScaM ==approximate nearest neighbor search"); GOOG-NETWORK-00699371 ("ScaM (Scalable Matching) or Approximate Nearest Neighbor (ANN) Search . . . The goal is to create a framework that can efficiently retrieve (exact or approximate) nearest neighbors from small to **massive databases** containing billions of items."); GOOG-NETWORK-00701295 ("[W]e use approximate nearest neighbor search (ANN) based on ScaM technology, without own implementation optimized for batching queries.  We find a number of approximate nearest neighbors for each shot."); Kumar Depo. at 78:2-6 ("What is ScaM?  A It is just a project name for one of my teams.  We work on approximate similarity search algorithms, so it's an umbrella name for many of those algorithms."); *see also, e.g.*, Pasula Depo. at 57:6-58:5 ("Q And the query, the unknown embedding, is compared ███████████████████ ███████ A Within the █████████████████████, yes.  Q And what's the output of that comparison?  A. Well, it's an ordered list in terms of ████████████████████  So that's not ███████████████████.  It's an ███████████████████████.  And we usually take the top -- in the case of this index, I believe it's the █████████████ that we found ████████████████████  Q So that would be the ███████████ ███████████"); Kumar Depo. at 44:22-45:16 ("So you deal primarily only with that first piece, the lock up of the embeddings and the retrieval of those candidate embeddings?  A Right.  I would just try to clarify that look up is a very overloaded term in our community.  So just to make sure that means returning the most similar – approximately most similar items given a query embedding.  Q Now, when you say approximately most similar, what do you mean by that?  A Because it is an approximate similarity search.  So we return ███████████████████.  But these are most similar in the approximate sense.  Because our ██████████████████████

---

[325] See lines 39-42 of file ████████████████████████ ███████████████████████████ ██████████████████ (GOOG-NETWORK-SC-00000871).

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

████████████ It is not exact.  Q So it is possible that there is a more similar embedding somewhere that would not be retrieved?  Yes."); *id.* at 99:19-24 ("Q Mr. Kumar, you mentioned a number of times the nature of the sort of ScaM search operations that are used as part of Content ID.  Now, those are not exact matching techniques; is that correct?  A Right."); *id.* at 166:19-24 ("So am I understanding correctly that this is illustrating the notion that a query using this kind of partitioning might not find the actual nearest neighbor because the nearest neighbor might be in a different partition from where it was searched?"); Konrad Depo. at 82:18-83:8; GOOG-NETWORK-00701295 ("Videos do not need to be exact duplicates to be detected."); GOOG-NETWORK-00700605 ("ScaM is used within Siberia ██████

████████████████████████████████████████ . . . In Siberia, this is just the beginning and followed by grouping all the nearest neighbors by references and refining/aligning the candidates."); Erb Depo. at 245:2-22.

314.  The search algorithm of the Content ID Siberia Version has three main stages:  "Index Lookup," "Sparse," and "Verifier."  *See, e.g.*, GOOG-NETWORK-00701295 ("A lookup runs in three stages: **search**, **sparse refining**, and **verification**."); GOOG-NETWORK-00781530:



GOOG-NETWORK-00770926:

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



GOOG-NETWORK-00792065:



*See also, e.g.*, Pasula Depo. at 134:11-25, Kumar Depo. at 43:20-44:90, 55:24-56:11; GOOG-NETWORK-00701282; GOOG-NETWORK-00781875; GOOG-NETWORK-00787652; GOOG-NETWORK-00789630.

315.  Prior to the "index lookup," the "fingerprints" of the reference works (comprised of the embeddings ▮▮▮▮▮▮▮ I discuss above) are further manipulated, and indexed in a specific way.  I understand the indexing and resulting index lookup are based on a data structure developed by the ScaM (scalable matching) research team within Google.  I also understand that ScaM is an umbrella term for a number of data structures and associated algorithms, but here I aim to describe only those used in the Content ID Siberia Version. *See, e.g.*, Pasula Depo. at 81:4-14 ("I've seen references that some portions of the match system use something

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

called ScaM scaleable [sic] matching.  A Yes.  Q How does that relate to the match system that you've been describing?  A. So the index, this structure we were talking about with the ██████████████████████████ that is a data structure that was developed by the ScaM team in New York.").

316.  Each of the embeddings of the sequences of embeddings extracted from a given reference work is ███████████████████████████████████████████████████████████████████ of each embedding is what is stored in the reference index.  *See, e.g.*, Pasula Depo. at 45:7-47:16 ("Q And so when a given embedding is stored within the index, I take it it's stored with some metadata that indicates essentially which video ID it comes from and probably some other information about where in that video it comes from?  A So actually, what is stored is – it's like a reverse index.  What is stored is ████████████████████████████████████████████████████████████████ Q And so when you say it's ███████ can you explain what you mean.  What's ████████████████ A The embedding that ██████████████████████████████████████████████ A I think in this index, this is ██████████ that I can try to explain.  Q In general terms, so when you say it's █████████████, first of all, what do you mean by that?  A I mean that when you are doing the ███████████████████████████████████████████████████ . . . Q So the embedding is ████████████████████ is that correct?  A When you're ████████████████ Q I see.  Okay.  So the █████████████████ A That is correct.  Q But it's a ██████████████████ A Yes.");  Kumar Depo. at 28:25-29:7 ("Q Now, in connection with a look up operation, is the same ██████████████████████ A No.  Q Okay.  And is that ██████████████ A Yes."); Pasula Depo. at 112:11-114:4 ("[W]hat happens with those ███████████████████████████████████████████████

183

███████████████████████████████████████████████████████████
█████████████████████████████"); *see
also, e.g.*, Pasula Depo. at 139:9-25; Kumar Depo. at 13:18-15:4, 17:24-18:12, 18:17-22:4,
24:2-27:11, 27:24-28:24, 30:20-31:1, 75:8-76:6, 156:10-16; GOOG-NETWORK-00701226-
31.

317.  Each of the reference indices (video, audio, and melody) is comprised of ████████████
of the embeddings I described above.  Each of these indices is divided into a certain number of
"shards."  For simplicity, I will use the video index as an example, but each of the reference
indices are structured in the same manner.  The reference video index ████████████████
Information about a given reference video is placed ████████████████████████████████
██████████████████████████████████ *See, e.g.*, Pasula
Depo. at 39:6-41:5 ("And so then -- so the index has some collection of those values for each
video; is that a fair characterization?  A The contents of the index are generated using these
embeddings.  Q And what's the sort of data structure form of that index?  Is it a data base?
Can you describe it in some way?  A Well -- so first of all, the index is divided -- is sharded, is
parallelized.  It's divided into a bunch of smaller indexes that can each fit on one machine. . . .
And how many shards are there for the video index?  A For the -- ███████████████████████
██████████████████████████. . . . Q And how was – what's the
organizing principle by which the things are divided into the shards?  A ███████████. Q And
am I correct that ██████
████████████████████. . . . Q And so the videos, based on their ████████
████████████████████  A That is correct."); Kumar Depo. at 34:14-20 ("Q How many shards are
there for the partner video index?  A I don't remember exact number.  Q I've heard references
███████████  Is that consistent with your understanding? A It is about that."); *see also, e.g.*,
Pasula Depo. at 42:18-23, 108:14-109:5; Kumar Depo. at 34:24-36:7, 49:3-14.

318. ████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
█████████████████████████████████████████████
██████████████████. *See, e.g.*, Pasula Depo. at 43:6-45:6 ("So how -- within a given shard, how is
the storage of the index organized?  A So within the shard, ████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████  Q You mentioned there are ██████████████. A Yes.  Q Is that true for ███████
████████  A Yes. ████████████████████████████████████. Q And ███

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

did I understand you correctly, are chosen so that within -- obviously, it's not exact, but more or less there are ███████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ A Yes. Although, it is very approximate.  I think some are like █████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████ ████████████████████████████ "); Kumar Depo. at 165:15-166:18 ("Q ████████ ████████████████████████ ); Konrad Depo. at 173:1-15 ("Q And my understanding is ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████ ); *see also, e.g.*, Pasula Depo. at 109:6-8, Kumar Depo. at 34:21-23, 36:8-37:15, 49:3-14, 156:10-16, 157:10-15; GOOG-NETWORK-00781874, GOOG-NETWORK-00790995:



GOOG-NETWORK-00701295; GOOG-NETWORK-00702301; GOOG-NETWORK-00781876; GOOG-NETWORK-00789689-90; GOOG-NETWORK-00790997.

319.  The "index lookup" step of the search ██████████████████████████ ███████████████████████████████████████████████████████████████████ █████████████████████████████████████ The Content ID Siberia Version then outputs ██████████████████████████ that are most similar to a given embedding from the user-uploaded video.  █████████████████████████████████████ that the Content ID Siberia Version uses—in order fo ███████████████████████████████████ ████████████████████████ *See, e.g.*, Pasula Depo. at 51:19-56:4 ("[H]ow does the look up operation or the comparison, however you want to describe it, how does that work?  A So this is very long.  So you have a video which you want to look up which is represented by a sequence of embeddings.  And the first thing you will do is you will try to see if anything in the index might possibly be matching those individual embeddings.  So you will █████████████████████ ████████████████████████████████ I mean, you will be looking them up in many indexes, but let's

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

say you're looking them up in just a single index, right?  You will send them against ████
████ of that index, and in each ████, you will try to -- you will first -- for each of those
embeddings, you will first scan all of these ████████ that we talked about earlier and compare
that embedding to ████████████████████ like the ones we discussed, like
████████████ . . ["A]m I understanding correctly that each embedding is sort of
looked ████  A On an abstract level, yes.  On an actual implementation
level, not really.  Q Okay.  So -- so -- and I want to kind of walk through that look up process,
and I -- from the level of abstraction, I think it may be simpler if we talk about a single
embedding.  A Yes, sure.  Q But if that doesn't work, let me know.  So if we take that single
embedding, the index or ████████████████████ as you described earlier, correct?
A Yes.  Q And each of those i████
████████ Q Okay.  So while there might be ██████  those actually sort of
represent, if you will, ████████████████  A Yes.  Q Okay.  And you
compare the single embedding from the uploaded video to that list of ████████.  Is that --
does that make sense?  Is that the next step was my question.  A Yes.  Q And based on that
look up against the ████████, how many ████████ are sort of identified to be processed
further with that particular embedding?  A So this depends in general on the particular type of
look up you are doing.  Usually when you're looking up new uploads against what we have
been referring to as the reference index, ████████  Q ████████  A Yes.  Q And how is
that look up performed to ████████████  A You go though all of them.  You do all the
████████████████  Q Okay.  So you compare -- you do
████████████████  are the ones you then move to
the next step?  A Yes."); *id.* at 111:11-112:10 ("Q What -- do you know what
████████████████████████████████
████████████████████████████████████  Q Okay.  A
So yeah.  Do you know what that is?  Q Not exactly.  I was going to ask if you could explain to
████████████████████████████████████████
████████████████████████████████████████
████████████  Q And that ████████████████████  Is that -- A
Yes.  Q And just the top 55 are used, then?  A Yes."); Kumar Depo. at 39:5-8 ("Q So when the
look up operation first compares to the ████████, that's just a comparison to those
████████; is that correct?  A That's right."); *see also, e.g.*, Pasula Depo. at 110:15-23;
Kumar Depo. at 29:8-30:19, 37:16-38:5, 60:19-64:5; Konrad Depo. at 85:2-24, 173:17-174:6;
Erb Depo. at 245:23-246:19.

320.  The Content ID Siberia Version then ████████████████  identified in the
prior step in more detail.  To be clear, the system ████████
████████  The Content ID Siberia Version outputs the ████████
████████████████████  as I described
for the prior step.  This is another example of a threshold that the Content ID Siberia Version
applies—in order for ████████████████████████
████████████████████████████████████  *See, e.g.*
Pasula Depo. at 56:5-58:5 ("So then what's that next step with those ████████  A And then

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

in all of the -- in each of those partitions, you will ████████████████████████████ . . . . Q So each partition has some, I assume, ████████████████████████████ it?  A Yes.  Q And those are all ████████████████ correct?  A Yes.  Q And the query, the unknown embedding, is ████████████████████████████ A Within the ████████████████, yes.  Q And what's the output of that comparison?  A. Well, it's an ordered list in terms of ████████████ So that's not the same ████████████.  It's an ████████████ . And we usually take the top -- in the case of this index, I believe it's the ████████ that we found ████████████████ from the reference index?  A Yes.  Q So that would be the ████████████████ ; Kumar Depo. at 40:19-42:16 ("What does that K represent?  So it's a number of essentially, ████████████ is that fair?  A Yes.  Q And is that K a certain ████████████████████████ A It is ████████  Q So for each of the ████████████ ████████████ correct?  A Just to understand ████████████████ correctly, each of ████████████ Q Right.  A For each query, we will ████████████████████████ Q Okay.  So -- and I think I've seen references to I think it's ████████ . A That will be one example, yes.  Q Okay.  So in that instance, the ████████████████ ████████ A That's right.  Q Okay.  So what I'm trying to understand is you've looked at -- I think the number I've heard elsewhere is ████████████████████████ There's an output.  So if we assume ████████████████████ ████████████████████████ Because these are the things which you will return ████████████████████████ .  Q Okay.  So you get ████████████████ correct?  A That's right.  Q So let's see.  If I have ████████████████ ; is that right?  A. Somewhere around that."); *id.* at 64:6-65:12 ("Q And once those ████████████ ████████████████████ correct?  A Yes.  Q And did I understand you correctly that at that point, the ████████████████████████ is computed?  Or within ████████████ , rather, excuse me, is computed?  A Yes.  Q And is that ████████████████████████████████ A It's computed ████████ .  Q And then the ████████████████ ████████████ A That's right.  One ████████████████████ Q And the output of that is then the ████████ ████████████████ for example?  A One can take these ████████████ ████████████ .  Q And that sort is just whichever has -- I guess it would be the ████████████████ , that's number one and so on?  A Yes."); Erb Depo. at 237:10-18 ("It's a system that partitions the reference -- all the references, all the ████████████ into a -- in a way that allows us to tak ████████████████████████ ████████ so that we can then search within those -- ████████████████ "); *see also, e.g.,* Pasula Depo. at 59:17-60:5, 110:24-111:3, 113:19-114:10; Kumar Depo. at 37:16-38:17, 39:9-19, 67:24-69:25, 74:23-75:7, 85:18-89:3; Konrad Depo. at 174:7-18; Erb Depo. at 237:19-238:4, 238:17-23, 247:5-13, 248:11-249:17.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

321.  The search of the Content ID Siberia Version is non-exhaustive because the search does not compare to all possible matches (*i.e.*, all records in the reference data set).  The fact that the first step in the search (index lookup) is non-exhaustive renders the entire search algorithm non-exhaustive.  As I discuss in more detail below, only the reference works that have ████ ████████ that came back as matches from the index lookup step are subjected to further consideration.  *See, e.g.*, Pasula Depo. at 110:24-111:9 ("And then [an embedding from the uploaded video] will be compared to just the ██████████████████████████████████ ███████████████████████████, correct?  A Yes.  And it's never compared to the ████████████████ ███████████████████████, correct?  . . . A Not during that lookup specifically."); 57:20-58:5 ("Q So that would be the ██████████████████████████ ██████████ A Yes.  Well, I mean, the ████████████████████████████████████████ ██████████ A Yeah."); 150:20:151:15 (testifying concerning GOOG-NETWORK-00702118:  "Q Where Mr. Granstrom describes the aspects of the query process, and he writes 'In this way, the search is both non-exhaustive, as it happens for ██████████ . . . .'  Do you see that?  A Yes.  Q And is he -- what is he describing there?  . . . A Well, he is describing the ScaM system, I'm pretty sure, and he is saying that we do not search -- we will not be searching all of ████████.  We've been discussing that before, but ████████████████."); Kumar Depo. at 85:10-17 ("Q So you're not going to compare the search query to everything in the database, only a subset?  A That's right.  Q Specifically, only a subset of the records, i.e., the references that ██████████████████ ████████ correct?  Yes."); *see also, e.g.*, Kumar Depo. at 39:5-15.

322.  Once the ██████████ hits are output, the Content ID Siberia Version then sorts them by video (puts all the embeddings ████████████ set from the same video together).  It then ██████████████████████████████████████████████████████ is another example of a threshold that is tied to the distance or difference between the user-uploaded video and a given reference work.  *See, e.g.*, Pasula Depo. at 60:11-24 ("What happens next with all those index hits?  A . . . The first meaningful thing that happens is you separate them out per reference video.  So all these hits were coming from all the different videos on the -██████████████████████████  So from now on, pretty much anything we would talk about would be about the pair of videos, no longer about the whole index."); *id.* at 63:7-18 ("Q And what kind of filtering is being done, then?  A . . . ██████████████████████████████████████████████████████ ████████████████████████████████████████████████ *id.* at 239:19-240:15 ("So in the case where the ████████████ ██████████████████████████████████████████████████████ for each embedding that was run against the index; is that right?  A Yes.  Q And those would all still be passed to the sparse refiner?  A So before they passed the sparse refiner, they would ██████████████████████████████████████████████████████ ████████████████████████████████████████████████ A. That's right."); *see also, e.g.*, Konrad Depo. at 197:22-198:3.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

323.  The reference works that have a ███████████████████ subjected to
further consideration.  The next step is known colloquially as "sparse" or "sparse refiner."
Conceptually, sparse refiner *uses only the index hits* ████████████████████████
████████████████████████████████████████████████████████████████ for the reference video
to potentially be a match—with that ████████████ being another example of a threshold used
to determine whether or not a reference video should be subjected to further consideration in
the next step of the search algorithm.  *See, e.g.*, Pasula Depo. at 61:19-63:24 ("Q. So after the
index hits are sort of ███████████████ what's the next step in the analysis of the query?  A
So the next step is something that we call sparse.  And the reason it is called sparse is because
it's -- we have incomplete information about the relationship between the two videos.  So the
way we think about what we have now as you will -- as you probably will see if you've seen
our documents, is █████████████████████████.  So they are
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████, you just put up in this case.  And if we had the full embeddings which we will later,
you could have ███████████████████████████████████████████████████████
███████████ but we don't have that right now.  We only have hits.  That's why we call it
sparse.  . . . Q Is this sparse -- is this doing some further filtering of the results?  A Yes.  Q And
what kind of filtering is being done then?  . . . [W]e attempt to find -- to see if these hits that
sort of ████████████████████████████████████████████████████████
████████████████████████████████████████████████████.");  *id.* at 64:23-66:4 ("Q In a
general sense, does -- is sparse sort of a step in the process that cuts down at least some of the
candidate video IDs, reference IDs, that might be further compared?  A Yes.
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████  Because
sometimes you might have two videos that just generally resemble each other.  Like if you look
at two recordings that take place in this room, a lot of the frames in those recordings will look a
lot like each other, and those recordings will probably just have ███████████████████████
██████████████████████  Q And so sparse is the portion
of the system that's -- or the portion of the process that's designed to kind of remove some of
those poor candidates; is that fair?  A Yeah.  I mean, the whole system is -- I mean, what
you're doing from -- once you get your index hits, is you're actually just trying to filter out
more and more.  In sparse, the way I think about it, is sparse is everything that works on the
index hits that doesn't have the full information.  That's why it's sparse.");  *see also, e.g.*,
Kumar Depo. at 42:17-44:15; Konrad Depo. at 86:6-87:6, 197:5-11; GOOGLE-NETWORK-
00701295-96 ("[T]he search stage find nearest neighbors for ███████████████████ and
groups the results by reference.  Sparse refining is the process of taking such probe/reference
pairs and deducing potential matching regions from the nearest neighbor hits.");  GOOG-
NETWORK-00781877; GOOG-NETWORK-00790998.

189

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

324.  The final step of the search algorithm is known as the "verifier."  Like sparse, it ███████ ███████, but uses the *full embeddings* rather than just the index hits.  I understand that there have been at least two versions of the verifier.  An earlier version ███████ ███████ examined by the verifier, and ███████ is another example ███████ of a threshold used by the Content ID Siberia Version.  A later version ███████ ███████ Each of these criteria are also examples of thresholds used by the Content ID Siberia Version to determine if a given reference work is sufficiently similar to a user-uploaded work or not.  *See, e.g.*, Pasula Depo. at 67:7-71:6 ("So what's the next step after sparse?  A The next step is currently called the verifier.  Like it verifies things.  Q And what's the general operation, what does the verifier do?  A So in abstract terms, it is pretty much the same thing as sparse except that it works on the full embeddings and on the ███████ . . . . So we take these ███████

███████ Q Okay.  A But what we actually do is we first figure out ███████.  We try to figure out ███████ ███████.  Because you know, there could be more than actually came out of sparse or they could be in a slightly different place.  So we sort of -- we figure out ███████ I don't remember what that part of the algorithm is called, but for sure, ███████

███████ I mean, we're not writing this down.  The computer is calculating these things, and you know, keeping track of them.  Or like ███████

███████ So we write down -- down to say, like a ███████

███████ Q Is there a different system that's used?  A For -- yes, we use ███████ Q I see.  A And in CoverCat, that's the melody system, we use something called ███████ . . . . Q So putting aside the CoverCat for a moment, is this machine learning in the form of -- I assume, basically, what you're describing i ███████

███████ A For like a given combination of inter -- like I mean, for ███████ And actually, we don't always ███████

███████ ; *id.* at 71:18-74:13 ("Q And I take it that those ███████ pieces, each has some

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

kind of parameter around -- A Yes.  Q -- which it's measured?  A Yes.  . . . Q So -- and I think you said they're something in the order of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

A There are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ I think eventually, they ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Q I see. So there is a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ A Yeah.  Like that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ , yeah.  Q So there is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Is that --  A Yes.  It's not just ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

. . . Q So you have these ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ A Yeah.  Q. And the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Is that essentially --  A ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Q I see.  So for example, when it looks at the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ A That can happen, yes.  Q Okay. So what is the sort of end output of this verifier?  A It is the -- it is the set of matches that have been verified as actually being matches.  By which I mean, it is -- they are pairs of end points, like – it's -- in like regular English, it would be like from seconds -- in video A, from second10 -- video A from second 10 to second 30 matches video B from second 70 to second 90.  I cannot remember if this is at this point stored in seconds or indexes into the embedding or whatever, but that's the general idea.  Q I see.  So the verifier is outputting a set of time-based matches that have been determined to actually constitute matches?  A Yes."); *id.* at 158:7-20 (testifying concerning GOOG-NETWORK-00783282:  "And then can you explain to me this portion that refers to the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  A Yes.  So apparently at this point, all we were doing in the final stage of the verifier is after we had -- after we had figured out ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Q And then I take it if the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, it would be characterized as a match?  A Yes.  And then in the change, it's saying that we -- now we have ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Q. And you're talking about -- this is on page 282, this description of the change, that it's including ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ A Yes.  Q And so the idea is that in the Video 7 or in the change that was at this time --  A Yes.  Q -- you would -- it would be ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ A Yes. Q Got it.  And how is that different now?  A It is much more complicated now.  Q Because of the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ A Yeah.  Because now it is – it's not ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Q And so how does that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

So it's -- yeah.  Q And did I understand you correctly that each of those decisions ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS



A You're looking at some kind of

Q Got it.  And
when was that switch to ⬛ implemented?  A. I want to say a year ago, but maybe
it's two years ago.");  *see also, e.g.*, *id.* at 240:25-241:18; Kumar Depo. at 57:4-58:18; Konrad
Depo. at 87:6-25, 88:12-94:4, 198:4-15; GOOG-NETWORK-00701296 ("The final stage
verifies the candidate matches and outputs high-precision matches.  This is made possible by
loading the ⬛ for each probe reference pair creating ⬛
a structure that contains the exact similarity between any probe/reference ⬛ . . .").

325.  As I discuss above, the Content ID Siberia Version search is a non-exhaustive search for
a near neighbor because the search does not compare to all possible matches (*i.e.*, all records in
the reference data set).  This is true even if the search does not locate a near neighbor.  *See,
e.g.*, Pasula Depo. at 239:3-240:24 ("Q Now, when you're doing the overall search, it is
possible that ultimately, verifier does not identify any matches; is that right?  A That is more
common than -- that is the more common case --  Q Okay.  A -- in the index that we have been
talking about.  Q Right.  And why would it determine – so let me just walk through.  So in the
case where the verifier ultimately doesn't identify anything as a match, the index look up, that
would still generate I think you said ⬛ index hits for each embedding that was run against the
index; is that right?  A Yes.  Q And those would all still be passed to the sparse refiner?  A So
before they passed the sparse refiner, they would be sort ⬛
⬛  Q I see.  A So there is some ⬛
⬛  Q. And so if it's ⬛ A. That's
right.  Q. And if it's ⬛, and it's possible that
something would be output from there but not passed at the verifier?  A Yes.  Q Okay.  And so
if it didn't meet the necessary requirement threshold for being a match in the verifier, there
would be no match identified?  A Yes.");  Kumar Depo. at 56:22-57:3 ("So am I correct that it's
quite possible that even though all those embeddings are output as index hits, the system might
ultimately, not identify any match between the query video and videos in the reference index?
A It is possible. . . .  So the combination of the spare and the verifier, at the end of that even
though it output whatever fixed number of index hits, there might be no match called, correct?.
A That's right.");  Konrad Depo. at 62:20-23 ("But not every video that's uploaded generates
any matches.  Correct?  A There are videos that generate no matches, yes.");  *see also, e.g.*,
Kumar Depo. at 57:4-58:18; GOOG-NETWORK-00701282; GOOG-NETWORK-00701295;
GOOG-NETWORK-00702295.

326.  I understand that Defendants assert that "a process of ⬛
and/or neural networks" is not a "search."  *See, e.g.*, Defendants' Supplemental Response to
Interrogatory No. 7 (dated October 18, 2019).  I understand this argument to be in reference to
the verifier.  I disagree with Defendants.  A person of ordinary skill in the art would understand

192

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

that ████████████ under discussion is clearly part of the search process. A search algorithm is designed to find an object satisfying desired criteria. The verifier uses ██████████████ ███████████████████████████████████████████████████████████████████ ████████ are part of the overall search methodology of the Content ID Siberia Version. The ██████████████ is used as part of the search algorithm to remove from consideration objects that, ████████████████████ to meet the criteria for a near neighbor (or neighbor, or approximate nearest neighbor). *See, e.g.*, Pasula Depo. at 67:1-71:6, 71:18-74:13, 158:7-20.

327. The matches output from the verifier are then sent to the claiming system for further analysis. As I mentioned above in regard to the Content ID LSH Version, a ██████████████ ████████████████████████, which the claiming system then uses to determine ██████████████ ██████████████████ for a "claim" to be made. This is another example of a threshold that is applied to determine whether or not a reference video is a neighbor, a near neighbor, or an approximate nearest neighbor of a user-uploaded video.[326]  *See, e.g.*, Wang Depo. at 32:7-34:2 ("Q And I think that you mentioned that the match claiming team takes information from matches from the match system? A Mm-hmm. Q And how does that work? A This is very fuzzy to me, because it is not my area. But I can only speculate that the match claiming team is called via API from the Matching team. But like I said, this is not my area, so I'm only speculating. Q And with -- with matches that are found by the match system, are those first fed into the match claiming team or the -- or something the -- that your claiming team works on? A It's first fed through the match claiming team. Their logic, to be precise. Q In -- in general, what does the match claiming team's logic do with those matches? A A video can have lots of matches, █████████████████████████████████████████████████████ ████████████████████████████████████████ . . . Q You'd mentioned that the match claiming team ██████████████████████████████████████ A Yes. Q How does that -- ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ is that determined by the match claiming logic or something else? A I'm not exactly certain, but I just know it's one of the inputs from something, but I'm not exactly certain. Q So you're not sure if it's the -- the matching component of content ID that provides ████████████████████████████████████████████ A I'm pretty sure it's actually the -- the match system's ████████████████████ just thinking about it logically."); Erb Depo. at 250:18-24 ("Q And ultimately computes ██████████████████████████ A Yes. Q And the ████████████████████████ is used then to determine whether there's a match or not a match? A Correct."); *see also, e.g.*, Wang Depo. at 105:6-8 ("Is it the match claiming logic that

---

[326] I included a description of an analogous feature in the preceding section concerning the Content ID LSH Version, relying on testimony and documents concerning the older system. However, I understand that claiming system was generally, in terms of functionality, unchanged between the Content ID LSH Version and the Content ID Siberia Version. Therefore, my analogous analysis in the Content ID LSH Version section applies here, and the analysis in this paragraph (relying on testimony and documents concerning the newer system) also applies in the Content ID LSH Version section above.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

decides where a claim should be made?  A Yes."); *id.* at 36:18-37:10; Pasula Depo. at 76:15-25; GOOG-NETWORK-00781530:





328.  Review of source code produced by Defendants in this case confirms my analysis of this claim element.  As an example,



---

[327] See implementation at lines 35-40 of file ███████████████████████

███████████████████████████ (GOOG-NETWORK-SC-00000364)

[328] See line 38 of file ████████████████████████

███████████████████████ (GOOG-NETWORK-SC-00000153)

[329] See implementation at lines 676-840 of file ████████████

███████████████████████ (GOOG-NETWORK-SC-00000341-43)

[330] See a source code comment at line 675 of file ████████████

████████████████ (GOOG-NETWORK-SC-00000341)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



[331] See line 776 of file ███████████████ (GOOG-NETWORK-SC-00000342).

[332] See implementation at lines 110-144 of file ████████████████. (GOOG-NETWORK-SC-00000365)

[333] See implementation at lines 146-179 of file ███████████ GOOG-NETWORK-SC-00000365-66)

[334] See implementation at lines 247-288 of file ████████████ (GOOG-NETWORK-SC-00000996-97)

[335] See definition at lines 42-100 of file ██████████ (GOOG-NETWORK-SC-00001001-02)

[336] See lines 111-222 of file ██████████████ (GOOG-NETWORK-SC-00000248-50)

[337] See lines 36-41 of file ████████████ (GOOG-NETWORK-SC-00001001)

[338] See implementation at lines 122-203 of file ██████ GOOG-NETWORK-SC-00000994 to 0996)

[339] See declaration at lines 61-64 of file ██████████ (GOOG-NETWORK-SC-00001001)

[340] See lines 59-60 of file ██████████████ (GOOG-NETWORK-SC-00001001)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



329.  Continuing this example,

---

[341] See definition at lines 86-113 of file

(GOOG-NETWORK-SC-00000714)

[342] See implementation at lines 338-407 of file

(GOOG-NETWORK-SC-00000711-12)

[343] For the preceding line cites, see file

(GOOG-NETWORK-SC-00000711-12)

[344] See implementation at lines 148-197 of file

(GOOG-NETWORK-SC-00000708)

[345] See lines 39-42 of file

(GOOG-NETWORK-SC-00000713)  My understanding is that the current implementation uses asymmetric hashing, but for completeness I have also included the Hamming option as well.

[346] See definition at lines 21-106 of file

(GOOG-NETWORK-SC-00000470-71)

[347] See lines 1-2 of file

(GOOG-NETWORK-SC-00000470)

[348] See implementation at lines 64-97 of file

.  (GOOG-NETWORK-SC-00000467-68)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



330. ██████████

---

[349] See definition at lines 133-336 of file ████████████

(GOOG-NETWORK-SC-00000669-72)
[350] See implementation at lines 75-80 of file ████████████

(GOOG-NETWORK-SC-00000668)
[351] See lines 60-74 of file ██████████

(GOOG-NETWORK-SC-00000667-68)
[352] See implementation at lines 157-186 of file ████████████

(GOOG-NETWORK-SC-00000495)
[353] See implementation at lines 265-289 of file ████████████

(GOOG-NETWORK-SC-00000496-97)
[354] See definition at lines 156-330 of file ████████████

(GOOG-NETWORK-SC-00000901-04)
[355] See implementation at lines 1076-1115 of file ████████████

(GOOG-NETWORK-SC-00000490)
[356] See definition at lines 30-82 of file ██████████

(GOOG-NETWORK-SC-00000974 – 0975).
[357] See implementation at lines 112-158 of file ████████████

[358] See lines 37-38 of file ██████████

(GOOG-NETWORK-SC-00000974).

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



[359] See lines 39-41 of file ███████████████████████████
████████████████ (GOOG-NETWORK-SC-00000974).

[360] See lines 45-46 of file ███████████████████████████
████████████████ (GOOG-NETWORK-SC-00000974).

[361] See lines 47-49 of file ███████████████████████████
████████████████ (GOOG-NETWORK-SC-00000974).

[362] See lines 25-54 of file ███████████████████████████
████████████████ GOOG-NETWORK-SC-00000981).

[363] See lines 57-90 of file ███████████████████████████
████████████████ (GOOG-NETWORK-SC-00000981 to 0982).

[364] See implementations at lines 19-32 and 57-70 of file See lines 25-54 of file ████
█████████████████████████████████████████████████
████████████████ GOOG-NETWORK-SC-00000978 – 0979).

[365] See implementation at lines 141-204 in file ██████████████
███████████████ (GOOG-NETWORK-SC-00000985 – 0986)

[366] See definition and implementation in files ██████████████
█████████████████████████

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

331.  It is my opinion that the Content ID Siberia Version meets claim element 1[b] literally. However, to the extent this limitation is not literally met, for example, because the search algorithm of the Content ID Siberia Version does not "correlat[e] . . . the first electronic media work with an electronic media work identifier" because it does not "correlate" but rather "can be used to determine whether a video uploaded to YouTube is similar in some sense to any of the video, audio, or melody content in one or more reference," this limitation is met under the doctrine of equivalents.  *See* Defendants' Fourth Supplemental Response to Interrogatory No. 7 (dated September 30, 2019).  The Content ID Siberia Version's search algorithm performs substantially the same function (matching an unknown work with a reference work) in substantially the same way (comparing the unknown work or features extracted from the unknown work to reference works or features extracted from reference works) to obtain substantially the same result (determining if the two works match) as would any technology that "correlat[es] . . . the first electronic media work with an electronic media work identifier."

332.  In sum, the Content ID Siberia Version correlates a user-uploaded video (first electronic media work) based on features extracted from that video.  This correlation is based on a non-exhaustive search identifying a near neighbor (or a neighbor or an approximate nearest neighbor).  The Content ID Siberia Version applies numerous thresholds to determine whether a potential match is a close enough match for there to be a "claim" by a content owner made on the user-uploaded video.  As I detail below, this correlation or "match" between the first uploaded media work (user-uploaded video) and the electronic media work identifier (of the reference work) is then written to a database that is part of the claiming system.  *See, e.g.*, analysis for '464 patent claim element 1[c] and citations therein.

333.  As shown above, each of the Content ID Accused Instrumentalities meets claim element 1[b].

### 4.5.4.  '464 patent claim element 1[c]

> *1[c] storing, by the computer system, correlation information*
> *associating the first electronic media work and the electronic*
> *media work identifier;*

334.  Each of the Content ID Accused Instrumentalities meets claim element 1[c].

335.  I understand that the parties dispute the construction of "correlation information."  I understand that Defendants assert this term is indefinite, and that Network-1 asserts this term should be given its ordinary meaning or, alternatively, construed as "information that associates the first electronic media work with an electronic media work identifier."  In my view, the alternative construction is consistent with the ordinary meaning of this phrase. Therefore, whether this term is simply given its ordinary meaning or construed as "information that associates the first electronic media work with an electronic media work identifier" does not affect my infringement analysis.

---

(GOOG-NETWORK-SC-00000988 to 0992).

<u>**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**</u>
<u>**PROSECUTION/ACQUISITION BAR MATERIALS**</u>

336.  When each of the Content ID Accused Instrumentalities identifies a match between a user uploaded media work and a reference media work, the claiming system[367] of each of the Content ID Accused Instrumentalities then stores information associated the user-uploaded media work with the electronic media work identifier that corresponds to the reference media work to which the user-uploaded media work was correlated.  Once a claim is created, a database record is created that contains, among other things, identifiers for both the user-uploaded video and reference work.  *See, e.g.*, Erb Depo. at 158:19-25 ("The claiming system that I described earlier as one of the side effects of creating a claim writes a record into the claim table."); Rosenstein Depo. at 26:14-27:3 ("Do you know if, for example, a pointer or anything like that that connect the now-identified video to whatever content asset it was matched to is created to -- A Yes.  Q And how is that done?  A A claim is created that contains the identifier for the video and the identifier for the asset.  Q And where is that claim you described stored or created?  A In another database."); Wang Depo. at 39:2-42:7 ("Q And when you -- when your claiming logic receives – receives the information we discussed from the match claiming logic, does it store that information somewhere?  A Yes.  Q Where is that?  A In our claim back end, the Bigtable. . . . Q So when the information comes into the claim back end from the match claiming logic, how is it -- how is it stored in Bigtable?  A We store the fields in the Bigtable row."); *id.* at 63:12- ("Q so the linkage between the matched reference and the user-uploaded video is stored after the match claiming team calls your API?  A Yes.  The linkage is stored within a claim.  That's what a claim is."); Konrad Depo. at 47:3-48:21 ("Q And does the claim platform store the identifier for a given video and somehow link that to the various claims that it's -- that are -- that are associated with the video?  . . . I Believe that the claim platform has a -- has encrypted video IDs with which it reference to the claimed video, and also has some identifier in how it links an asset in which the claim is against or multiple, yeah."); *see also, e.g.*, Erb Depo. at 33:2-10, Pasula Depo. at 74:14-75:14.

337.  As shown above, each of the Content ID Accused Instrumentalities meets claim element 1[c].

### 4.5.5.  '464 patent claim element 1[d]

> *1[d] accessing, by the computer system, associated information*
> *related to an action to be performed in association with one or*
> *more electronic media works corresponding to the electronic*
> *media work identifier;*

338.  Each of the Content ID Accused Instrumentalities meets claim element 1[d].

339.  When each of the Content ID Accused Instrumentalities identifies a match between a user-uploaded audio and/or visual work and a reference work submitted by a rights holder, it access information related to the action or actions that it needs to take with respect to the user-uploaded audio and/or visual work that correlated with a reference work (which has an electronic media work identifier), including, but not limited to, actions based on the policy the rights holder has chosen to apply to user-uploads matching its reference work, such as

---

[367] I understand that the functionality of the claiming system did not change when the matching system changed from the Content ID LSH Version to the Content ID Siberia Version.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

blocking, tracking, or monetizing. The claiming system of each of the Content ID Accused Instrumentalities makes these determinations. I understand that the claiming system did not change when the matching system changes from the Content ID LSH Version to the Content ID Siberia Version. Rather, the general functionality of the claiming system has not meaningfully changed since at least as early as 2006. *See, e.g.*, Wang Depo. at 34:4-14 ("Are you aware of something called Siberia? A I have heard that project name before. Q And with, like, the claiming system that you're working on, did -- did your team develop a new version of the claiming system for Siberia or was it -- A No. Q -- were those two separate pieces? A My knowledge of Siberia is that it was something they did and changed. Not at all what we did on a day-to-day basis."); *id.* at 51:21-52:10 ("Q And since you started working on -- on the rights management team in 2006, how many versions of the claiming system have there been? A We're not very good with our obsolete code. There actually has really only been one -- it depends on how you define 'version.' We are still using the same old code as before, but a lot has been added to it over time. Q Was – with code being added over time, were they any points where the functionality changed significantly? A Not -- Q The functionality of the claiming system. A Not in any big way. We just developed more and more features over time."); Konrad Depo. at 147:20-149:3 ("Q And so when we talk about the, sort of, the earlier LSH system and the Siberia system, that didn't really -- there wasn't a changed LSH claiming system versus a Siberia claiming system. Is that fair? A I believe the claiming system was mostly agnostic to which system was providing the matches, whether it was the LSH-based one or the Siberia-based one.").

340. As I describe above, the matches output from the matching component of each of the Content ID Accused Instrumentalities are processed into final matches by the claim logic, ██████████████████████████ *See, e.g.*, analysis for '464 patent claim 1[b] and citations therein.

341. The claim logic then considers "policies" specified by the content owner on the matches from different channels that are "stitched together," such as the overall match duration. The first action that the claim logic determines is whether a claim should be made in the first place, based on these content owner policies. *See, e.g.*, Erb Depo. at 106:21-111: ("Once the raw matches are output from the Stage II processing, what's the next step in the process? A The raw matches are sent for -- when we're doing matching for purposes of what we usually describe as ContentID, the -- for the purpose of claiming, then the raw matches are sent to the claiming system for further analysis. And that's the point at which the matches from the different channels are combined. Q When you say 'the matches from the different channels are combined,' what do you mean? A I mean the matches from video, audio and melody are considered together in the claiming logic, whereas the match servers that we've been describing up to this point are all operating only on one channel. Q So how does that work? When you say that they are considered together, what's the processing that does that consideration? A. It's -- there's a lot of different logic in claiming that does things like, for example, ██████████████████████████████████████████ If we have, at the same time at the same offsets, we have a melody match and we have an audio match, then we -- the melody match isn't interesting so we forget about it, we drop it. If we have an audio match and a video matching at the same time, we combine them into an audio-visual match, and so on. There's kind of a lot of logic in claiming to decide what matches really -- to transform the raw matches into what we consider

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

to be the final matches. . . . Q. And is that, is there a common term or is that referred to by some name within the architecture and within the system?  A. We call it the claim logic.  Q. And so, what are the -- I think you described a couple of different possible inputs, if you will, that the claim logic might consider in terms of analyzing these raw matches.  How does it go about, let's say you have a series of several raw matches in the video channel. What does the claiming logic then do with those?  A. Well, again, it considers the matches from all the channels together rather than just the video channel.  But it does a wide variety of things.  For example, if

So in the case that we've completed all the match processing and we've converted, potentially converted audio and video matches into audio-visual matches, and so on, and all of that is done, then we compare each of the matches that remains in that set against the policies associated with the assets that the references that matched are tied to, and we use that to determine whether or not we should make claims.  Q So these would be essentially policies often set by the content owner.  A Yes.  They are set by the content owner.");  *id.* at 366:15-367:5 (describing how a content owner can alter this time duration, referring to GOOG-NETWORK-00008009-13); Rosenstein Depo. at 18:19-24:4 (Q. And if the video is determined to match some asset or some content that's been provided to Google, what happens next?  A. There's a fairly complex series of logic that -- the match is sent to a system that determines if -- if the match is qualified to make a claim and then what the policy should be on that claim based on the characteristics of the match and the policy that is set by the -- the owner of that content.  Q So when you say that there's some logic to determine if a match is qualified to make a claim --  A Uh-huh.  Q -- can you explain how that works and what you mean by that?  A Yes. The match needs to be – have certain characteristics that are eligible for claiming, such as be a -- long enough to be unambiguous, for example, a very short match is -- could -- a very short -- few seconds of a piece of content can match multiple, multiple things. So we make sure that the match is long enough to be unambiguous to match this piece of content, and we make sure that the policies that are -- that were described by the content owner are followed.  So in some cases content owners may choose not to place a claim on certain types of matches.");  *id.* at 219:25-220:7 ("Q So as a practical matter, the claiming logic, as I understood your testimony, processes the match or matches that are generated by the system to determine one of more claims that may be applicable to the particular piece of content; is that correct?  A That's correct.");  Wang Depo. at 61:17-62:3 ("Q Is there a minimum length that a -- a length or duration that a match needs to be for a claim to occur?  A I believe so, yes.  Q Do

202

you know what that is? A They have been changing it, and I know it's short now. But I don't know for sure how short. It may be five or ten seconds, but I'm not certain. Q You said they keep changing it. Who is 'they'? A The -- the team in response to a product -- it's part of like a product decision. Q Is that your team or the Zurich match claiming team. A Zurich match claiming."); *see also, e.g.*, Rosenstein Depo. at 43:9-44:20; Wang Depo. at 34:21-5, 35:20-36:7; Konrad Depo. at 187:17-188:8; GOOG-NETWORK-00693810.

342. If the claim logic determines that a claim should be made on a reference video, the claim logic of each of the Content ID Accused Instrumentalities then determines what "match policy" should be applied. This is a second example of "determining an action" that is done by Content ID's claim logic. The Content ID Instrumentalities do so by looking up the owner "match policies" that should be applied to a user-uploaded video matching a given reference video, with those policies being stored in a database. *See, e.g.*, Erb Depo. at 36:7-40:15 ("The -- there's a policy table, which in connection with the claim table, can related a particular video ID to a particular policy. So for a claimed video, the policy can provide information about the territories in which a video should have a claim policy applied to it, and that policy could include a policy to monetize, meaning a policy to show advertising against the video."); Rosenstein Depo. at 26:1-30:1 ("And so an example would be, using what you described a few moments ago, if a content owner had designated a policy of monetize this content, for example, and the match corresponded with the criteria for that claim -- A Uh-huh. Q -- then that policy of monetize would somehow be associated with the user-uploaded video? A. That's correct, the policy would be associated with the user-uploaded video scoped to whatever territories and whatever other criteria that policy had. Q Okay. And how is that done? How is that -- is it just as a function of that lookup connection that you described? A. The policy is ultimately written out to a table that holds policies and is used during the video playback to determine what to do when the video's played back. Q. Okay. So -- thank you. Let's then walk through that part of the process. A Okay. Q So the video was uploaded at Point A by some user, and the process you have described has happened. Now, at a second time, some other user is going to view this particular video through the YouTube system. So what happens to implement this policy that you just mentioned? A So my understanding would be that the player would look at the policy table for that video and determine what policy, based on the circumstances of the playback, territory, for example, and then would make -- based on that policy, would then determine what it should do, whether it should block that playback or -- or do nothing or request an ad for that playback."); *id.* at 17:16-18:4 ("The content owner is able to receive the videos that are matched, and we would apply a policy based on their instructions. Q When you say that 'we would apply a policy,' what are the kinds of policies that can be applied? A There are a number of policies. Content can be tracked to measure the reach of the -- the property asset provided by the content owner. It can be monetized. It can be sent to a review or it can be bought. And those policies can vary by a number of different parameters."); *id.* at 219:25-221:2 ("Q So as a practical matter, the claiming logic, as I understood your testimony, processes the match or matches that are generated by the system to determine one of more claims that may be applicable to the particular piece of content; is that correct? A That's correct. Q And then, based on those claims, policies are applied that are associated with those particular assets, correct? A That's correct. Q And is there any logic that is needed to apply those policies or is it sort of automatic, in that if this particular asset if [sic] claimed, then those policies are associated with it are applied? A If an asset is claimed and it has . . . [p]olicies associated with it, those are the ones applied. . . . And the system doesn't have some logic or choice

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

functionality, if you will, as to how or when to apply those policies, it is more a binary: If the claim is made and there are policies set, then those are the policies that are applied? A That's correct."); Wang Depo. at 62:4-11 ("Q Is it the claiming logic developed by your team that determines what action to take if a match between user-generated content and partner contact is found? A Yes, in the sense that we apply what the partner has told us to do. Q And by, what the partner has told you to do, do you mean the -- the track, block, and monetize policies? A Yes."); *see also, e.g.*, Erb Depo. at 33:21-34:10 ("A claim is a database relation between an asset provided by a partner, and a user-generated video."); GOOG-NETWORK-00767789 ("Claim: A link between a partner's asset and a piece of content being uploaded to YouTube."); GOOG-NETWORK-00781896 ("What is a CID Claim? An assertion that the rights to distribute a video on YouTube are (co)owned by a partner *[in a given territory and for a given media type]* Computed by YouTube based on matches and ownership statements made by partners *[references and metadata files]*"); Erb Depo. at 157:5-17, 349:23-350:5; Rosenstein Depo. at 44:21-45:1; GOOG-NETWORK-00006733 ("The claims logic is the code that runs during automated claiming. As inputs it takes matches from the match system, ███

██████████████████████████████████████████████████████████████████████████████████████

██████████████████████████ . . . The policies attached to these claims may prevent the video from becoming visible on youtube, or permit us to display ads against the video at watch-time."); Wang Depo. at 110:17-113:15; Konrad Depo. at 43:19-46:21; GOOG-NETWORK-00006734, GOOG-NETWORK-00702280 ("The consistent claims set provides a set of actions . . . . These actions get executed . . . ."); GOOG-NETWORK-00006736-37 GOOG-NETWORK-00600441 ("If Content ID finds a match, we apply the rightsholder's desired policy."); GOOG-NETWORK-00693821; GOOG-NETWORK-00693829.

343. The potential "match policies" that can be applied to a claimed video are block, track, or monetize. Which policy to apply, and the ultimate outcome of the application of that policy, are both examples of actions that the claim logic determines should occur. *See, e.g.*, Defendants' Response to Network-1's Request for Admission No. 49 (dated May 14, 2015) ("[a]dmit[ting] that the policies that may be chosen by content owners include 'monetize,' 'block,' and 'track'"); Erb Depo. at 153:18-154:13 ("Q And is that metadata that you mentioned that the partners would provide also inclusive of the various policies that might go along with that particular content? A Yes. Q And that would include, for example at the high level, the sort of block, monetize, or allow policies that would apply to a particular matched video? A Among other things, yes. Q And are there sort of subspecies, if you will, or nuanced variations of each of those categories, block, monetize and allow? A It's block, monetize and track. Q Sorry. A And they are, apart from specifying under what conditions and for which users those policies apply, the policies are really -- there's no finer gradation of policy than block, monetize or track."); Wang Depo. at 44:18-21 ("Q Let's talk about those policies. What do you mean by policies? A There are several rules they can apply for reference, and they are monetized, track, or block.); *id.* at 72:1-25 ("Q Is it the claiming system or some other part of Content ID or YouTube that taken an action based on the partner-identified policies of monetized, track, or block? . . . The claim logic takes whatever the partner has said to apply to that -- for that asset, in that video and propagates it to playability, which will use it at watch time. . . . Q So the claim logic sends some sort of information to a playability system? A

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

Yes."); GOOG-NETWORK-00013853 ("When a subsequently uploaded video is matched, the content owner 'claims' it and the policy associated with the reference material is applied to the matched content, and the video is either blocked, monetized, or tracked to receive viewing metrics."); GOOG-NETWORK-00000668:



GOOG-NETWORK-00767747:

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS



GOOG-NETWORK-00781896:



*See also, e.g.*, GOOG-NETWORK-00009782, GOOG-NETWORK-00010544, GOOG-NETWORK-00010551; GOOG-NETWORK-00010579; GOOG-NETWORK-00014310; GOOG-NETWORK-00693761-63; GOOG-NETWORK-00693766; GOOG-NETWORK-00693768; GOOG-NETWORK-00693783; GOOG-NETWORK-00701274; GOOG-NETWORK-00767789; GOOG-NETWORK-00770921.

344.  When the right holder's content is blocked, the Content ID LSH Version prevents the user-uploaded audio and/or visual work from either going live or continuing to be viewed, or it mutes the audio.  By determining the "match policy" is block, the claim logic also determines that the video should not be allowed to play.  *See, e.g.*, GOOG-NETWORK-00013853

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

("'Block' means the matched content is blocked and not able to be viewed either worldwide, or in a specific territory that the content owner has defined."); *see also, e.g.*, Wang Depo. at 73:21-74:8; GOOG-NETWORK-00767795-96.

345.  If the rights holder chose the "track" policy, the user-uploaded audio and/or visual work remains unaffected but the Content ID LSH Version  gives the rights holder access to viewership statistics.  By determining the "match policy" is track, the claim logic also determines that the video should be allowed to play and that the content owner should receive various statistical information.  *See, e.g.*, GOOG-NETWORK-00013853 ("'Track' means the partner can see the viewing statistics such as the aggregate demographics of the viewers and general locations where the content is most popular, while the matched content remains on the site."); *see also, e.g.*, Wang Depo. at 74:14-24; GOOG-NETWORK-00767799-800.

346.  If the policy is "monetize," the user-uploaded audio and/or visual work remains available on YouTube and the Content ID LSH Version displays with it advertisements and/or promotional information relating to the creator of the reference work, and tracks its viewership statistics.  By determining the "match policy" is monetize, the claim logic also determines that the video should be allowed to play and that an ad should be displayed in conjunction with the video on the watch page, if the ad system determines that should happen.  *See, e.g.*, GOOG-NETWORK-00013853 ("'Monetize' means the content is licensed to YouTube, ads will be served around the matched content, and YouTube will share the revenue with the partner."); Erb Depo. at 161:19-22 ("Q Now, 'monetized' generally speaking refers to displaying ads along with the video, is that correct?  A Yes."); Rosenstein Depo. at 47:5-11 ("What happens with the videos, what does it mean that they are monetized?  A It generally means that the -- that the playback, the player will request an ad from an ad system that will determine if there's an ad that's appropriate to serve, and if there is, it will certainly -- it will run an ad."); Wang Depo. at 75:24-76:19 ("Q And we also talked about a usage policy of monetize.  What does that mean?  A It means the partner has specified that they would like to monetize that content.  Q And how is that content monetized?  . . . When a video has a monetized policy, we send that signal -- or we don't sent that signal.  The as system is always fetching all the policy information at watch time as well.  And if is says monetize, they do whatever it is they do . . . .  Q You mentioned the ad system, so you mean that an ad is displayed on a video that's monetized?  A No, I meant the ad system has logic as part of YouTube sort of just watch path, where it gets called if the policy is monetized, and so they know there is a monetize policy on this video, and they are allowed to show an ad, but it is up to them to determine what should actually happen."); *see also, e.g.*, *id.* at 76:8-77:17; Wiseman Depo. at 26:7-28:5 (describing the types of ads that may be displayed on a matched user-uploaded video); GOOG-NETWORK-00767797-98; GOOG-NETWORK-00693806:

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



| Policy | | Result |
|---|---|---|
| Monetize | **$** | • Allows the user uploads to be viewable on YouTube and tracks viewership.<br>• Places ads (in the formats a partner allows) against user uploads that match the content in the reference file. |
| Track | | • Allows the user uploads to be viewable on YouTube and tracks viewership, but does not serve ads against it. |
| Block | | • Blocks user uploaded videos that match a partner's content from being hosted (i.e. viewable) on YouTube.<br>• Note: This is not a takedown and will not issue a strike to the user, but prevents the content from being live on site. |

347.  Review of source code produced by Defendants in this case confirms my analysis of this claim element.  As an example, ███████████

---

[368] See implementation at lines 15-38 of file ███████████ (GOOG-NETWORK-SC-00001109)

[369] See definition at lines 30-67 of file ███████████ (GOOG-NETWORK-SC-00001106-07)

[370] See definition at lines 17-42 of file ███████████ (GOOG-NETWORK-SC-00001112)

[371] See lines 26-29 of file ███████████ (GOOG-NETWORK-SC-00001106)

[372] See implementation at lines 47-55 of file ███████████ (GOOG-NETWORK-SC-00001110)

[373] See implementation at lines 132-136 of file ███████████ (GOOG-NETWORK-SC-00001111)

[374] See implementation at lines 124-178 of file ███████████ (GOOG-NETWORK-SC-00001105)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



348.  Continuing this example, a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[375] See implementation at lines 121-139 of file ▮▮▮▮▮▮▮▮▮▮ (GOOG-
NETWORK-SC-00000116-17)

[376] See implementation at lines 82-93 of file ▮▮▮▮▮▮▮▮▮ (GOOG-
NETWORK-SC-00000116)

[377] See implementation at lines 115-122 of file ▮▮▮▮▮▮▮▮▮▮▮
▮▮▮ (GOOG-NETWORK-SC-00001105)

[378] See implementation at lines 202-238 of file ▮▮▮▮▮▮▮▮▮ (GOOG-
NETWORK-SC-00000117-18)

[379] See implementation at lines 38-46 of file ▮▮▮▮▮▮▮▮▮▮
(GOOG-NETWORK-SC-00001100)

[380] See implementation at lines 31-98 of file ▮▮▮▮▮▮▮▮▮▮
(GOOG-NETWORK-SC-00001100-01)

[381] See definition at lines 629-654 of file ▮▮▮▮▮▮▮▮
(GOOG-NETWORK-SC-00000317)

[382] See definition at lines 398-431 of fil ▮▮▮▮▮▮▮▮▮
(GOOG-NETWORK-SC-00000319-20) and definition at lines 61-65 of file ▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
(GOOG-NETWORK-SC-00000358-59)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



---

[383] See file 

(GOOG-NETWORK-SC-00000318-20) and file

(GOOG-NETWORK-SC-00000358-63)

[384] See lines 399-428 of file

(GOOG-NETWORK-SC-00000319-20) and lines 31-60 of file

(GOOG-NETWORK-SC-00000358)

[385] See definition at lines 362-396 of file

(GOOG-NETWORK-SC-00000319) and definition at lines 72-87 of file

(GOOG-NETWORK-SC-00000359)

[386] See line 390 of file

(GOOG-NETWORK-SC-00000319) and definition at lines 97-187 of file

(GOOG-NETWORK-SC-00000359-60)

[387] See definition at lines 364-386 of file

(GOOG-NETWORK-SC-00000319)

[388] See line 81 of file

(GOOG-NETWORK-SC-00000359)

[389] See definition at lines 289-380 of file

(GOOG-NETWORK-SC-00000318-19) and definition at lines 194-332 of file

(GOOG-NETWORK-SC-0000360-63)

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

349.  As shown above, each of the Content ID Accused Instrumentalities meets claim element 1[d].

### 4.5.6. '464 patent claim element 1[e]

> 1[e] generating, by the computer system, a tag associated with the first electronic media work;

350.  Each of the Content ID Accused Instrumentalities meets claim element 1[e].

351.  Each of the Content ID Accused Instrumentalities generates a tag that is associated with the first electronic media work (the user-uploaded video).  For example, the various pieces of information generated that relate to the button, banner, and/or link displayed on the watch page of a monetized user-uploaded video are tags.  Some of those tags are comprised of a URL.

352.  When there is a claim generated that has a "monetize" policy, an advertisement is displayed on the user-uploaded video's watch page.  *See, e.g.*, analysis for '464 patent claim element 1[d] and citations therein.

353.  As an example of a YouTube video with such advertisements, please see the video found at URL https://www.youtube.com/watch?v=ffA7_OaGqiY.  This video begins with an ad break and plays further videos during ad breaks throughout the video.  The screenshot below was captured from the above URL and it displays an ad break in progress:

---

[390] See definition at lines 326-360 of file ██████████████████████

GOOG-NETWORK-SC-0000318-19) and definition at lines 286-332 of file █████████

(GOOG-NETWORK-SC-00000362 to 0363)
[391] See line 351 of file ████████████████████

(GOOG-NETWORK-SC-0000318)
[392] See line 321 of file ████████████████

(GOOG-NETWORK-SC-00000362)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



Examination of the advertisement shows multiple clickable items, including by selecting the "Save Your Time" banner, the "Learn More" button, or by clicking the URL displayed below the grey box, "godaddy.com/pro". Each of these clickable items is reflective of a tag that is generated by each of the Content ID Accused Instrumentalities. The following screenshot provides a close up of these clickable items:



354. Using the menu option to view debug information for the advertisement (by right clicking on the video and selecting copy debug info), a snippet of code can be abstracted from the video advertisement. For example, on page 4 of this code is an identifier "ad-text" associated with a value of "godaddy.com/pro", an identifier "visit-advertiser:1y" associated with a value of "godaddy.com/pro", and a "span" html element identified as "ytp-ad-button-text" associated with a value of "godaddy.com/pro." *See* **Exhibit C** (the file YouTube_AdBreak1_dbg_info.txt obtained as I describe above). These identifiers correspond to the godaddy.com/pro URL displayed below the banner.

355. Clicking on the "Save Your Time" banner, the "Learn More" button, or the "godaddy.com/pro" URL will cause the user's web browser to be directed to the advertiser's desired web page, further confirming that a tag containing a hyperlink was generated. The following screenshot shows the web page displayed to the user after clicking on any of the options described above:

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS



356. The Google support page found at
https://support.google.com/displayspecs/answer/6055025?hl=en&ref_topic=4588474 for
YouTube content creators and advertisers discusses actions defined for an ad. The screenshot
below identifies two URLs required for video ads. These two URLs allow such a tag to be
generated based on an instruction that contains a hyperlink to a URL:

| Display URL | Required | Required by Google Ads UI. The domain will show on the live video. |
|---|---|---|
| Final URL | Required | The destination can be your website or YouTube video or channel. |

357. In addition to ad breaks that play advertiser videos, banner advertisements that display
over the video are supported as well. The screenshot below was also captured from the video
found at URL https://www.youtube.com/watch?v=ffA7_OaGqiY and it shows an example of a
banner advertisement:

**CONFIDENTIAL OUTSIDE COUNSEL –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



Selecting the Honey advertisement in the above screenshot directs the user to the advertiser's desired web page, indicating that a tag containing a hyperlink was similarly generated. As an example, selecting the banner ad above will take the user to the joinhoney.com site shown in the screenshot below:



**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

358.  Source code produced by Defendants confirms my analysis concerning this claim element.  For example. the



359.  As shown above, each of the Content ID Accused Instrumentalities meets claim element 1[e].

---

[393] See definition at lines 259-313 of file
(GOOG-NETWORK-SC-0000446)

[394] See definition at lines 163-239 of file
. (GOOG-NETWORK-SC-0000447-48)

[395] See definition at lines 191 to 236 of file
(GOOG-NETWORK-SC-0000447-48)

[396] See definition at lines 194-203 of file
(GOOG-NETWORK-SC-0000447)

[397] See definition at lines 198-201 of file
(GOOG-NETWORK-SC-0000447)

[398] See definition at lines 266-288 of file
(GOOG-NETWORK-SC-0000448)

[399] See definition at lines 243-247 of file
(GOOG-NETWORK-SC-0000448)

[400] See definition at lines 18-38 of file
(GOOG-NETWORK-SC-0000379)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

### 4.5.7. '464 patent claim element 1[f]

> *1[f] providing, from the computer system to a user electronic
> device, the first electronic media work and the associated tag;*

360.  Each of the Content ID Accused Instrumentalities meets claim element 1[f].

361.  Each of the Content ID Accused Instrumentalities generates a tag containing a hyperlink associated with the user-uploaded video (first electronic media work) and provides the user-uploaded video and the tag containing a hyperlink to a user electronic device (the device of an individual who is viewing the user-uploaded video being monetized).  *See, e.g.*, analysis for '464 patent claim element 1[e] and citations therein.

362.  As shown above, each of the Content ID Accused Instrumentalities meets claim element 1[f].

### 4.5.8. '464 patent claim element 1[g]

> *1[g] obtaining, by the computer system from the user electronic
> device, a request related to the associated tag;*

363.  Each of the Content ID Accused Instrumentalities meets claim element 1[g].

364.  Each of the Content ID Accused Instrumentalities obtains from the user electronic device (the device of the individual viewing the user-uploaded video) a request related to the tag (e.g., a request to visit the advertiser's linked website resulting from the user clicking on an item containing the link).  *See, e.g.*, analysis for '464 patent claim element 1[e] and 1[f] and citations therein.

365.  As shown above, each of the Content ID Accused Instrumentalities meets claim element 1[g].

### 4.5.9. '464 patent claim element 1[h]

> *1[h] generating, using the computer system, machine-readable
> instructions based upon the associated information to be used in
> performing, at the user electronic device, the action; and*

366.  Each of the Content ID Accused Instrumentalities meets claim element 1[h].

367.  I understand the parties agree that "machine-readable instructions" means "code or pseudocode that is executed using a computer processor, *i.e.*, that is discernable by a computer processor and dictates steps to be carried out by one or more computer processors."  I have applied this construction in my analysis below.

368.  Each of the Content ID Accused Instrumentalities generates machine-readable instructions (the URL) based upon the associated information (monetize policy) to be used in performing, at the user electronic device, the action (displaying an ad with a hyperlink and

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

redirecting the user to the hyperlink's URL upon request by the user). *See, e.g.*, analysis for '464 patent claim element 1[e], 1[f], and 1[g] and citations therein.

369.  As shown above, each of the Content ID Accused Instrumentalities meets claim element 1[h].

### 4.5.10.    '464 patent claim element 1[i]

*1[i] providing, from the computer system to the user electronic device, the machine-readable instructions to perform the action in response to the request.*

370.  Each of the Content ID Accused Instrumentalities meets claim element 1[i].

371.  I understand the parties agree that "machine-readable instructions" means "code or pseudocode that is executed using a computer processor, *i.e.*, that is discernable by a computer processor and dictates steps to be carried out by one or more computer processors." I have applied this construction in my analysis below.

372.  Each of the Content ID Accused Instrumentalities provides machine-readable instructions (the URL) the user electronic device to perform the action (redirecting the user to the hyperlink's URL) in response to the request (the user clicking on the link). *See, e.g.*, analysis for '464 patent claim element 1[e], [f], 1[g], and 1[h] and citations therein.

373.  As shown above, each of the Content ID Accused Instrumentalities meets claim element 1[i].

374.  In sum, in my opinion each of the Content ID Accused Instrumentalities meets all of the limitations of claim 1 and thereby infringes claim 1 of the '464 patent.

### 4.6.    '464 patent claim 8

*8. The method of claim 1, wherein the first electronic media work is received from a first electronic device, the associated information is received from a second electronic device, and the first electronic device, the second electronic device, and the user electronic device are different from one another.*

375.  Each of the Content ID Accused Instrumentalities meets claim 8.

376.  As an initial matter, each of the Content ID Accused Instrumentalities meets all the limitations of claim 1, the claim from which claim 8 depends. *See, e.g.*, analysis for '464 patent claim 1 and citations therein.

377.  With each of the Content ID Accused Instrumentalities, the first electronic media work (user-uploaded video) is uploaded by a first user using a first electronic device, and the associated information is received from a second electronic device operated by a rights holder. The user electronic device is a device operated by a second user viewing the user-uploaded

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

media work uploaded by the first user.  *See, e.g.*, analysis for '464 patent claim 1 and citations therein.

378.  As shown above, each of the Content ID Accused Instrumentalities meets claim 8.

### 4.7.    '464 patent claim 10

> *10. The method of claim 1, wherein the associated information is related to an advertisement.*

379.  Each of the Content ID Accused Instrumentalities meets claim 10.

380.  As an initial matter, each of the Content ID Accused Instrumentalities meets all the limitations of claim 1, the claim from which claim 10 depends.  *See, e.g.*, analysis for '464 patent claim 1 and citations therein.

381.  When each of the Content ID Accused Instrumentalities identifies a match between a media work uploaded by a user and a reference media work for which the rights holder has set a policy of "monetize" for matching user-uploaded works, the user-uploaded media work remains available on YouTube, and advertisements may be displayed in association with it when it is accessed by another YouTube user through his or her computer or mobile device .  *See, e.g.*, analysis for '464 patent claim element 1[d], 1[e], 1[f], 1[g], 1[h], 1and 1[i] and citations therein.

382.  As shown above, each of the Content ID Accused Instrumentalities meets claim 10.

### 4.8.    '464 patent claim 16

> *16. The method of claim 1, wherein the machine-readable instructions comprise a hyperlink to a URL.*

383.  Each of the Content ID Accused Instrumentalities meets claim 16.

384.  I understand the parties agree that "machine-readable instructions" means "code or pseudocode that is executed using a computer processor, *i.e.*, that is discernable by a computer processor and dictates steps to be carried out by one or more computer processors."  I have applied this construction in my analysis below.

385.  As an initial matter, each of the Content ID Accused Instrumentalities meets all the limitations of claim 1, the claim from which claim 16 depends.  *See, e.g.*, analysis for '464 patent claim 1 and citations therein.

386.  Each of the Content ID Accused Instrumentalities provides machine-readable instructions that comprise a URL to a user viewing a user-uploaded video.  *See, e.g.*, analysis for '464 patent claim element 1[e], [f], 1[g], 1[h], and 1[i] and citations therein.

387.  As shown above, each of the Content ID Accused Instrumentalities meets claim 16.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

### 4.9.   '464 patent claim 18

### 4.9.1. '464 patent claim 18 preamble

> *18. A method comprising:*

388.  To the extent preamble is limiting, each of the Content ID Accused Instrumentalities meets the preamble of claim 1.

389.  Each of the Content ID Accused Instrumentalities practices computer-implemented methods.  For example, each of the Content ID Accused Instrumentalities electronically extracts features from videos uploaded by YouTube users, and uses those extracted features to associate that uploaded work with a reference work, and then determines actions to perform based on that association.  *See, e.g.*, analysis for '464 patent claim elements 18[a], 18[b], 18[c], 18[d], 18[e], 18[f], 18[f], 18[g], 18[h], and 18[i] and citations therein.

390.  As shown above, to the extent preamble is limiting, each of the Content ID Accused Instrumentalities meets the preamble of claim 1.

### 4.9.2. '464 patent claim element 18[a]

> *18[a] receiving, by a computer system including at least one computer, associated information related to an action to be performed in association with a first electronic media work identifier;*

391.  Each of the Content ID Accused Instrumentalities meets claim element 18[a].

392.  Each of the Content ID Accused Instrumentalities is implemented on a computer system including at least one computer.  Computer technology is required for each of the Content ID Accused Instrumentalities to operate.

 a. <u>Content ID LSH System</u>:  *See, e.g.*, Erb Depo. at 145:12-146:20 (explaining that computer code that implements the Content ID LSH System resides on servers in Google data centers).

 b. <u>Content ID Siberia System</u>:  *See, e.g.*, Konrad Depo. at 50:1-25 (discussing the data centers where the Content ID Siberia Version is run).

393.  Each reference work has an electronic media work identifier.  *See, e.g.*, Rosenstein Depo. at 26:14-27:3 ("Do you know if, for example, a pointer or anything like that that connect the now-identified video to whatever content asset it was matched to is created to -- A Yes.  Q And how is that done?  A A claim is created that contains the identifier for the video and the identifier for the asset."); Wang Depo. at 39:2-42:7 ("Q And when you -- when your claiming logic receives – receives the information we discussed from the match claiming logic, does it store that information somewhere?  A Yes.  Q Where is that?  A In our claim back end, the Bigtable.  . . . Q So when the information comes into the claim back end from the match claiming logic, how is it -- how is it stored in Bigtable?  A We store the fields in the Bigtable

row."); *id.* at 63:12- ("Q so the linkage between the matched reference and the user-uploaded video is stored after the match claiming team calls your API?  A Yes.  The linkage is stored within a claim.  That's what a claim is."); Konrad Depo. at 47:3-48:21 ("Q And does the claim platform store the identifier for a given video and somehow link that to the various claims that it's -- that are -- that are associated with the video?  . . . I believe that the claim platform has a - - has encrypted video IDs with which it reference to the claimed video, and also has some identifier in how it links an asset in which the claim is against or multiple, yeah."); *see also, e.g.*, Erb Depo. at 33:2-10, Pasula Depo. at 74:14-75:14.

394.  Each of the Content Accused Instrumentalities receive associated information such as policy information[401] related to an action to be performed in association with reference works. *See, e.g.*, Erb Depo. at 152:24 ("What kind of information or data is provided through the Content Management System by the partners?  A Partners provides us with a wide variety of metadata about videos, including things like whether they want it to be published and available as content, what channel they want it to be on, and a huge amount of other potential metadata related to the video and how YouTube should handle it.  . . . Q And is that metadata that you mentioned that the partners would provide also inclusive of the various policies that might go along with that particular content?  A Yes.  Q And that would include, for example, at the high level, the sort of block, monetize, or allow policies that would apply to a particular matched video?  A Among other things, yes.").

395.  As shown above, each of the Content ID Accused Instrumentalities meets claim element 18[a].

### 4.9.3.  '464 patent claim element 18[b]

> *18[b] receiving, by the computer system, a first electronic media work;*

396.  Each of the Content ID Accused Instrumentalities meets claim element 18[b].

397.  With each of the Content ID Accused Instrumentalities, a YouTube user can upload a video (i.e., a first electronic media work) to YouTube.  *See, e.g.*, Defendants' Responses to Network-1's Request for Admission No. 3 (dated May 14, 2015) ("[a]dmitting that the YouTube site allows users to upload video content to the site"); *id.* at  Responses to Request for Admission Nos. 61-64 (admitting that "users upload videos to the YouTube site from cell phone devices" and "computers" and that such uploads are "analyzed using the Content ID system").

    a.  Content ID LSH System:  *See also, e.g.*, Erb Depo. at 40:24-41:25 ("So am I correct, first of all, that users have the ability to upload videos from various devices or platforms into the YouTube system as a general matter?  A Yes.  Q And that could be from a computer at their home or a laptop computer, correct?  A Yes.  Q And users

---

[401] I understand that the functionality of the claiming system, which handles the policy information, did not change when the matching system changed from the Content ID LSH Version to the Content ID Siberia Version.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

also have the ability to upload videos from mobile devices like mobile phones?  A
Yes. . . . Q So what is sort of first point at which a video uploaded by a user comes
into contact in some way with the Content ID system?  It's processed by our
fingerprinting modules."); GOOG-NETWORK-00600441 ("When a user uploads a
video to YouTube, Content ID automatically scans it against our database."); GOOG-
NETWORK-00000668:



398.  <u>Content ID Siberia System</u>:  *See also, e.g.*, Konrad Depo. at 62:12-15 ("Every UGC
video that's uploaded to YouTube is run through the Content ID match system.  Correct?
Ideally, yes, if we handle our cases correctly then it's done in every case."); Pasula Depo. at
51:23-52:11 ("When a video is uploaded to YouTube, there is some kind of look up operation,
if you will to determine whether it matches something in the reference set; is that fair?  . . . A
Yes.  I mean, yes."); Goodrow Depo. at 64:15-65:11.

399.  As shown above, each of the Content ID Accused Instrumentalities meets claim element
18[b].

**4.9.4. '464 patent claim element 18[c]**

> *18[c] correlating, by the computer system using a non-exhaustive,
> near neighbor search, the first electronic media work with the
> electronic media work identifier;*

400.  Each of the Content ID Accused Instrumentalities meets claim element 18[c].

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

401.  I understand the parties agree that "near neighbor" means "a close, but not necessarily exact or the closest, match of a feature vector, compact electronic representation, or set of extracted features to another, wherein the distance or difference between the two feature vectors, compact electronic representations, or sets of extracted features falls within a defined threshold."  I have applied this construction in my analysis below.

402.  I understand that the parties dispute the construction of "non-exhaustive . . . search."  I understand that Defendants assert this term is indefinite, and that Network-1 asserts this term should be construed as "a search designed to locate a near neighbor without comparing to all possible matches (*i.e.*, all records in the reference data set), even if the search does not locate a near neighbor," or alternatively with the additional clarification "comparing to a match means comparing to sufficient data within the record to make a determination as to whether the record is a match."  As I state above, the clarifying phase is just that—a clarification of what "comparing to a match" means in the context of the construction and the patents.  Therefore, my infringement analysis is the same whether or not the clarifying phrase is ultimately included in the construction or not.

*Content ID LSH Version*

**Fingerprinting**

403.  Before any correlation is performed, the Content ID LSH Version electronically extracts features from each audio and/or visual work uploaded by a YouTube user (i.e., the first electronic media work) to generate its digital "fingerprint."  This "fingerprint," which is made up of "subfingerprints," is electronic data that is sampled, calculated, and/or otherwise derived from the work itself.  Google's technical witnesses explained in detail how the fingerprints and subfingerprints are generated using, among other techniques, ▮▮▮▮▮▮▮▮▮.  The same general framework is used to generate fingerprints for each of the video, audio, and melody "channels."  *See, e.g.*, Erb Depo. at 41:21-42:6 ("Q So what is the sort of first point at which a video uploaded by a user comes into contact in some way with the ContentID system?  A It's processed by our fingerprinting modules.  Q And what are the fingerprinting modules?  A We fingerprint each video in three channels.  One is audio, one is video, and one is melody, also known as CoverCat."); *id.* at 43:13-45:11 ("What differed about the fingerprint generation process for each of those three channels?  A The video fingerprint used a combination of video filters that was obviously very different from what you would do in audio up front, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ fingerprinting elements become much more common amount the multiple methods.  The audio fingerprinting initially involved ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as input to the more common elements of the fingerprinting.  Q And when you say -- you've referred a couple of times to 'the more common elements of the fingerprinting.'  What are you referring to there?  A It's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  And a fingerprint is a series of subfingerprints.  Q Now, you mentioned first a ▮▮▮▮▮▮▮▮▮▮▮▮

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



.  In general terms, what does that involve?  What does that mean?  A It's a -- a

"); *id.* at 45:25-47:3 ("Q And I think you further indicated that, after this

A Yes.  Q And what is a

; *id.* at 51:20-2

*see also, e.g.*, *id.* at 42:7-43:12, 45:12-24, 47:4-51:20, 51:24-54:8, 58:4-59:13, 63:3-64:3, 64:14-22; Pasula Depo. at 14:1-21:19, 217:21-219:8 (both having additional discussion of the "fingerprinting" process); Baluja Depo. at 48:6-51:14

Defendants' Response to Network-1's Request for Admission No.

55 (dated May 14, 2015) ("[a]dmit[ting] that the Content ID system uses fingerprints of uploaded videos").

404.    The "fingerprints" of reference works to which the "fingerprint" of the user-uploaded video is subsequently compared are generated in the same fashion.  *See, e.g.*, Erb Depo. at 56:2-57:2 ("Is that same process performed on what I'll call a reference video, if, for example, a TV studio provides a piece of content like a video, is the same process performed to generate fingerprints of that reference video?  A In general, yes.  The only exception is that it's possible that that processing is done in a -- by an external party.  Q In other words, let me see if I understand correctly, is it the case that Google, at least for some partners, provides some piece of software that allows the partner to generate a fingerprint themselves and transmit the fingerprint rather than the content itself to Google?  A Correct.  Q And, but that, the process of that software is the same as the process you've described.  It just may be performed on the other side of the user's firewall, or the partner's firewall.  A That's correct."); *see also, e.g.*, *id.* at 64:23-65:5; Rosenstein Depo. at 41:6-43:8; GOOG-NETWORK-00013854 ("[T]he technologies start with a database of reference material provided by rights owners from which YouTube extracts key visual and auditory signals.  Every user upload goes through a similar attribute extraction . . . .  We slice the digital (A or AV) files into small segments a few seconds long and generate fingerprints for each segment."); GOOG-NETWORK-00010570 (noting that content owners typically only create their own fingerprints for pre-releases); GOOG-NETWORK-00702327 (describing the tool provided to "important ContentID partners" for this purpose).

405.    As I mentioned above, the "fingerprints" are made up of subfingerprints, the latter of which are ████████████████████.  These subfingerprints are further broken down into smaller pieces called locality specific hashing (LSH) bands.  This is true for both the user-uploaded videos and the reference works.  The LSH bands of the reference works are indexed. *See, e.g.*, Erb Depo. at 71:15-22 ("Every subfingerprint is divided into what we call LSH bands.  So a typical example is a ███████████████████████████████████ and an LSH band consists of ██████████████ ███████████████████████████ and that's known as an LSH band."); *id.* at 80:12-81:4 ("Now, you've mentioned a number of times referring to these individual pieces as LSH bands.  What does LSH stand for?  A Locality-sensitive hashing.  Q And what is locality-sensitive hashing?  A It's a term that refers to the -- it's kind of an -- kind of an overblown term in a way.  It really corresponds to just saying that out of a Hash value, and remember that the fingerprint was ████████████████████ out of a Hash value, if a chunk of that Hash occurs at the same place, the same offset within another similarly computer Hash at the same locations, that's the locality-sensitive part, then the hashes may be similar.  They are candidates to look at for similarity."); *see also, e.g.*, *id.* at 72:8-22, 77:20-78:6; Baluja Depo. at 53:2-61:5, 160:19-25 (both discussing of LSH bands and their indexing for the reference works).

406.    Defendants' documents described the "fingerprinting" process used in the Content ID LSH Version in a manner that is consistent with the testimony of Google's technical witnesses. *See, e.g.*, GOOG-NETWORK-00784835-37:

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

Google

## ContentId Fingerprints

  

GOOG-NETWORK-00018603-05 ("Feature extraction: . . . The fingerprint of a video is a compact representation of the video, which is easier to compare than raw video and audio data. . . . Transform a piece of video (0.05s-60s) into a *feature vector*, so that *similar* pieces of video give feature vectors with *low distance*, according to a suitable metric."); GOOG-NETWORK-00000670-75 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓); GOOG-NETWORK-00000412-14, GOOG-NETWORK-00700423-25 ("The LSH (Locality Sensitive Hash) Tables are an inverted index of LSH bands (substrings extracted from the fingerprint) to the IDs of videos containing that band."); GOOG-NETWORK-00002595-96; GOOG-NETWORK-00005616-17; GOOG-NETWORK-00018613-17; GOOG-NETWORK-00162594-95; GOOG-NETWORK-00699813; GOOG-NETWORK-00702844-47; GOOG-NETWORK-00780504-05; GOOG-NETWORK-00785261-68.

407. Review of source code produced by Defendants in this case confirms my analysis .[402]  As an example, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[402] Where I cite to code and describe its behavior, I typically cite to the lines of code (as opposed to associated comments).  There are also instances where I do cite to comments.  However, when I cite to specific lines of code, any associated comments should be understood as being included and relevant to understanding the corresponding code, where such comments exist.

[403] See definition at lines 22-51 of file ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓ (GOOG-NETWORK-SC-00000401)

[404] See code comment at lines 20-21 of file ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓ OOG-NETWORK-SC-00000401)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



[405] See the file ████████████████████████ (GOOG-NETWORK-SC-00000425-27)

[406] See definition at lines 138-141 of file ████████████████████ (GOOG-NETWORK-SC-00000414)

[407] See implementation at lines 81-92 of file ████████████████ (GOOG-NETWORK-SC-00000425)

[408] See implementation at lines 465-472 of file ████████████ (GOOG-NETWORK-SC-00000407)

[409] See implementation at lines 42-53 of file ████████████████ (GOOG-NETWORK-SC-00000416)

[410] See implementation at lines 125-163 of file ████████████ OOG-NETWORK-SC-00000417-18)

[411] See implementation at lines 94-153 of file ████████████████ (GOOG-NETWORK-SC-00000425-26)

[412] See line 22 of file ████████████████ (GOOG-NETWORK-SC-00000399)

[413] See definition at lines 22-51 of file ████████████ GOOG-NETWORK-SC-00000401)

[414] See implementation at lines 70-198 of file ████████████████ (GOOG-NETWORK-SC-00000421-22)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



408. In the above example,



---

[415] See implementation at lines 62-135 of file
(GOOG-NETWORK-SC-00000399-400)

[416] See definition at lines 188-197 of file
(GOOG-NETWORK-SC-00000145)

[417] See line 104 of file
(GOOG-NETWORK-SC-00000400)

[418] See declaration at lines 42-46 of file
(GOOG-NETWORK-SC-00000401)

[419] See implementation at lines 155-189 of file
(GOOG-NETWORK-SC-00000426)

[420] See implementation at lines 192-197 of file
(GOOG-NETWORK-SC-00000404)

[421] See implementation at lines 602-698 of file
(GOOG-NETWORK-SC-00000409-11)

[422] See definition at lines 166-169 of file
(GOOG-NETWORK-SC-00000145)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



**Correlating**

409.  Once the Content ID LSH Version generates a "fingerprint" of the user-uploaded video, it then attempts to correlate the user-uploaded video (i.e., determining whether any reference works are neighbors, near neighbors, or approximate nearest neighbors to the user-uploaded video) by comparing that "fingerprint" with similarly-generated digital "fingerprints" of reference works (which each have an electronic media work identifier).  This process is commonly referred to as finding a *match* between the uploaded work and a reference work.  *See, e.g.*, Erb Depo. at 69:25-71:2 ("Q So after the fingerprints are generated in the manner you've discussed already, what's sort of the next step, if you will, in the ContentID processing system?  A The next step is matching.  Q And is that sometimes referred to as 'the MatchSystem' within Google?  A Yes.  Q And can you -- I'll start at a high level and we'll probably have to work our way down, but at a high level, what does the MatchSystem do?  A The MatchSystem compares fingerprints of user uploaded videos to various indices of videos for various purposes to identify any matches in which some portion of the user video corresponds to some portion of a reference video, audio, melody, channel, for some period of time.  It, for each user-uploaded video, it creates a collection of zero or more matches and its output is this collection of matches.  A match consists of a time offset in the user video, a time offset in the reference video███████████████████████████████, as well as the identities of the user-uploaded video and the reference video."); *see also, e.g.*, GOOG-NETWORK-00002595-96.

410.  As I mention above, this identification is based on a search that identifies a near neighbor (or a neighbor or an approximate nearest neighbor)[427]—a close, but not necessarily exact or the closest, match of a feature vector, compact electronic representation, or set of extracted features to another, wherein the distance or difference between the two feature vectors,



---

[423] See definition at lines 54-152 of file █████████████████████
████████ (GOOG-NETWORK-SC-00000143-45)
[424] See definition at lines 156-163 of file ███████████████████
██████ (GOOG-NETWORK-SC-00000145)
[425] See line 57 of file ████████████████████
████████ (GOOG-NETWORK-SC-00000143)
[426] See line 61 of file ███████████████████
████████ (GOOG-NETWORK-SC-00000143)
[427] I understand that for the purposes of this case and in the context of the Asserted Claims of the Asserted Patents, the parties have agreed that "neighbor," "near neighbor," and "approximate nearest neighbor" are equivalent in meaning.

compact electronic representations, or sets of extracted features falls within a defined threshold. *See, e.g.*, Erb Depo. at 114:23-115:12 ("A match between a probe fingerprint and a reference fingerprint doesn't necessarily require that the two be exactly identical across their length, correct? A Definitely not. Q So -- sorry, go ahead. A They definitely do not need to be identical. Q And so a match would typically be called when there's some sufficient amount of similarity between the fingerprint of the probe and the fingerprint of the reference. A At some combination of offsets for some duration, yes."); *id.* at 267:3-4 ("ContentID finds matches with not only videos that are bit for bit exact copies, but for videos that are not bit for bit exact copies."); *id.* at 282:24-25 ("[T]he ContentID system searches for near neighbors."); *see also, e.g.*, *id.* at 62:10-20 ("Our goal is that two similar videos are any two videos that a human being would recognize as being two instances of the same video despite transformations, including firming a screen with a hand-held camera, adding borders, cropping the video, rotating the video, or otherwise transforming the video in a way that may intentionally or unintentionally make it different in literal content from the original video but still recognizable to a human being as the same content."); Baluja Depo. at 156:23-158:1 ("Q So this is essentially -- this LSH system is an approximation [sic] nearest neighbor solution, if you will, or -- A Right. So approximate in this case means you're guessing, right, to put it colloquially. Q In other words, it might be the nearest neighbor, and it might not be? A Yes."); *id.* at 162:7-14, 180:7-22. GOOG-NETWORK-00005616, GOOG-NETWORK-00699813 ("Our task is to find **similar** fingerprints, which means fingerprints that contain similar subfingerprints. This is a[n] 'approximate nearest neighbour' or 'near neighbour' problem, where the distance function between two subfingerprints is simply the number of bytes which differ (which therefore can take any value from 0 to 100). We use the technique known as 'location sensitive hashing' to do this . . . ."); GOOG-NETWORK-00006362 ("**Locality-Sensitive Hashing (LSH)** is an algorithm for solving the (approximate/exact) Near Neighbor Search in high dimensional spaces."); GOOG-NETWORK-00162593 ("LSH Tables: Allows efficient approximate nearest neighbor retrieval"); GOOG-NETWORK-00162594.

411. The search algorithm of the Content ID LSH Version has two main stages: "Stage I" and "Stage II." *See, e.g.*, Erb Depo. at 71:3-9 ("Q So let's start with the process of generating these matches that you references. I think earlier, you talked a little but about a Stage I and a Stage II. Is that all part of the MatchSystem that you were describing a moment ago? A. Yes."); GOOG-NETWORK-00001093-94, GOOG-NETWORK-00702858 ("Matching takes a *probe fingerprint* and tries to find *reference fingerprints* that are entirely or partially the same or similar to it. This is a nearest-neighbour type of problem, which we divide into two stages: • Stage 1: use *indexes* to find candidate reference that might match. • Stage 2: for each candidate reference, compute where it actually matches (if it does)."); *see also, e.g.*, GOOG-NETWORK-00000676; GOOG-NETWORK-00785269; Pasula Depo. at 101:17-102:11.

412. Stage I begins by searching an index of the LSH bands of the reference works for any LSH bands that are exact matches to any of the LSH bands of the user-uploaded video. The LSH lookup portion of Stage I is one example of the application of a threshold related to the distance or difference between the extracted features of the user-uploaded video and the extracted features of the reference videos (with the threshold here being there be at least one exact match in the LSH bands). That is, the "distance" is considered too high if no bands (features) match, but it is considered sufficient in this first stage if any bands match exactly. *See, e.g.*, Erb Depo. at 70:10-72:7 ("In Stage I, we look up in an index to see if any reference

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

video had the precise value for an LSH band, meaning the same offset and the same value of the subfingerprint; and, if so, we record the time offset in the reference and the time offset of the subfingerprint that we're looking at in the -- in the user video along with the video identity – identity of the reference video."); *id.* at 72:23-73:10 ("[I]f we call the collection of videos that are indexed the reference videos, then the -- all the LSH bands from the reference videos for that particular context will be in that particular index.  Q And when you say for that particular context, do you mean the different channels, for example?  A That's one example."); *id.* at 74:16-77:19 ("The LSH bands are the keys to that index and then the values within that index tell us the time offset, which subfingerprint it was within the reference video and what video ID, so we can conceptually, we can -- we can look up for a given LSH band all the offsets for all the videos in which that LSH bans occurs among the reference set."); *id.* at 78:7-79:20 ("Q And the individual LSH bands are then -- how do they interact with the index that you described?  A The -- each LSH band is used to do a lookup in the index to identify whether there exist any reference videos that had the same LSH band, the exact same, identical matching LSH band.  And the exhaustive list of all matching reference videos and offsets is -- that are contained in the index is returned from that lookup."); *id.* at 81:10-19 ("Q And would it be fair to say that Stage I is essentially generating candidates for further examination?  A Yes.  Q And in Stage I, is it also correct that the probe video or user-generated video is not being compared to the fingerprint of the reference videos, it's just the lookup in this LSH table?  A Yes."); *see also, e.g., id.* at 133:22-134:3; GOOG-NETWORK-00000412, GOOG-NETWORK-00000415-16; GOOG-NETWORK-00005618-19; GOOG-NETWORK-00162593-95; GOOG-NETWORK-00700423-25; GOOG-NETWORK-00780506; GOOG-NETWORK-00784836-37; GOOG-NETWORK-00785269; Pasula Depo. at 102:12-18.

413.  In the LSH lookup portion of Stage I, not all LSH bands in the reference index are compared to a given LSH band of the user-uploaded video.  *See, e.g.*, Erb Depo. at 314:23-316:7 ("Q Do you know whether Stage I, in order to determine whether a particular LSH band is in the LSH Table Index, whether it must compare the band in question to every entry on the index?  A No, it does not.  Q So you believe that it's an ordered index, that it doesn't require -- that Stage I does not require comparison of the LSH band to each entry in the LSH Table Index; is that right?  A That's correct. . . . Am I correct that Stage I in the Content ID system does not access the full fingerprint repository?  A That's correct.  Q And Stage I does not use full fingerprints at all; is that correct?  A That's correct.  Q So is it correct that -- am -- do I understand correct -- correctly that Stage I does not compare the probe fingerprint to every fingerprint in the fingerprint repository?  A That's correct.  And does Stage II of the Content ID system compare to every fingerprint in the fingerprint repository?  No."); *see also, e.g.*, Baluja Depo. at 61:6-64:1 (explaining how and why an LSH-based search does not compare to all LSH bands).

414.  The search of the Content ID LSH Version is therefore non-exhaustive because the search does not compare to all possible matches (*i.e.*, all records in the reference data set).  The fact that the first step in the search is non-exhaustive renders the entire search algorithm non-exhaustive.  As I discuss in more detail below, only the reference works that have LSH bands that came back as matches from Stage I's LSH lookup are subjected to further consideration.  I understand that Defendants argue that "the first stage of the search evaluates whether *any work* in the hash table contains bands that match the query work."  Defendants' Response to Network-1's Interrogatory No. 7 (dated May 14, 2015).  However, this is in direct

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

contradiction with Mr. Erb's and Dr. Baluja's testimony that I cite above. This statement is also contrary to my understanding of how LSH lookups work in general.

415. In addition, although the LSH lookup portion of Stage I only looks for exact matches between an LSH band of an uploaded video and LSH bands in the index, the overall search algorithm searches for a near neighbor (or a neighbor or an approximate nearest neighbor). As I describe above, each subfingerprint is split up into smaller pieces called LSH bands. The fingerprint of each video is made up of a large number of small LSH bands, and as I discuss in more detail below, the number of bands that match over time provide insight into how close of an overall match the reference video is to the user-uploaded video in question. Indeed, the multiple stages (and substages) utilized by the Content ID LSH Version all aim toward the overall goal of finding a near neighbor (or a neighbor or an approximate nearest neighbor), with each stage aiming to further reduce the pool of candidates to narrow the search to nearer, or better, neighbors. *See, e.g.*, GOOG-NETWORK-00162593:



# LSH Tables

- Allows efficient approximate nearest neighbor retrieval

- Approach:
  - Split each subfingerprint into smaller pieces (called *LSH bands*)
  - Use exact key lookup on each LSH band
  - Collect votes for each subfingerprint according to the number of exactly matched LSH bands

*See also, e.g.*, Erb Depo. at 80:12-81:8 ("[LSH] really corresponds just to saying that out of a Hash value, and remember that the fingerprint was typically computed ███████ out of a Hash value, if a chunk of that Hash occurs at the same place, the same offset within another similarly-computed Hash at the same locations, that's the locality sensitive part, then the hashes may be similar. They are candidates to look for similarity. Q So basically, and this is what you've been describing, this lookup in the index, is that the Stage I processing that you described? A It's part of the Stage I processing.").

416. The candidates produced by Stage I's LSH look-up are further processed to eliminate candidates unlikely to be a match, which involves the use of various thresholds that compare features extracted from the reference work to features extracted from the user-uploaded or probe work. One example of a threshold is determining ████████████████████ ██████████████████████████████████████ uch as by the "projection filter" I discuss below. *See, e.g.*, Erb Depo. at 81:20-85:5 ("What other processing is there in Stage I? A The LSH look-up typically returns a very large number of candidates. So we do some additional processing in Stage I to reject candidates that are clearly not going to be real matches, primarily by looking at the collection of matches for a given reference video over time against various subfingerprints that we look up from the probe. Q Can you explain in a little more

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

detail how that works?  A Sure.  So if you, for a moment, just think only about a single reference video and imagine that you look at the collection, for every subfingerprint that we look up out of the probe at various offsets, look at the collection of all the return values, all of the hits that we get from the LSH band lookups for that over time; so effectively, what that does is, it shows us a map of the time offset in the reference video that might correspond to a time offset in the probe video.  And looking at that behavior over time, if there's -- if there are just a few random hits that don't seem to be linearly time-correlated, then it's clearly not going ███████████████████████████████████████████████████████████████████████ of a piece that we call the projection filter.  Q Now, when you say ████████████' what do you mean by that?  A If -- in order to run the projection filter, we need some -- we need data.  We need enough datapoints to perform an analysis and so we -- if we got, say, ████████████████████████████████████ ███████; *see also, e.g.*, *id.* at 87:5-89:11 (explaining that for a data set with between 20 and 35 million, approximately a hundred thousand reference videos are returned as candidates before the projection filter is applied); 91:6-22.

417.  If there are enough time-correlated LSH lookup hits for a given reference work, that reference video and the user-uploaded video are further compared using the "projection filter." The "projection filter," and specifically ███████████████████████████████ is another example of thresholding in the MatchSystem Stage I.  *See, e.g.*, Erb Depo. at 85:6-87:4 ("Now, you've mentioned a couple of times the projection filter.  What is that?  . . . The projection filter is a conceptually something that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Q And this is something that's performed at the projection filter as a means of ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████; *see also, e.g.*, *id.* at 89:17-90:18 (explaining that the projection filter does not access the full fingerprint of the reference video and typically reduces the number of hits by at least two orders of magnitude); *id.* at 91:6-22, 133:22-134:3; GOOG-NETWORK-00002048-59 (describing how the projection filter operates); Pasula Depo. at 102:22-103:10.

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

418. ContentID LSH Version's Stage II compares the full fingerprint of the user-uploaded or probe video with only the full fingerprints of the reference works identified in Stage I (i.e., those potential matches output by the "projection filter"), and outputs "raw matches." *See, e.g.*, Erb Depo. at 91:2-5 ("Q And am I correct that that Stage II processing is only performed with respect to the now pruned set of candidates [output from Stage I]? A Correct."); *id.* at 92:24-93:11 ("[W]hat happens in Stage II? A For each video ID that is a candidate that comes out of Stage I, we fetch the full fingerprint of the reference and compare the full fingerprint of the reference and the user-uploaded video at the appropriate -- at -- well, effectively at all possible combinations of offsets."); *see also, e.g., id.* at 33:14-20 ("A raw match is the output of the MatchSystem, meaning a prospective march between a user-generated content video and a reference video on either the video, the audio or the melody channel, beginning at a certain time offset in the probe UGC and a given time offset in the reference, and extending for some duration."); 93:19-94:18; GOOG-NETWORK-00780507.

419. Using the full fingerprints, Stage II's comparison begins by ▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆ the corresponding subfingerprints of the user-uploaded video and each of reference works identified in Stage I, and ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ *See, e.g.*, Erb Depo. at 93:12-18 (Q And how is [Stage II's] comparison performed? A We compute ▆▆▆▆▆▆



. . . Q And am I correct that, for each of these -- I assume there is a comparison that's done for each of the candidate fingerprints. A Yes. Q And what's the output of each of those comparisons? A A set of matches. What I described earlier as raw matches or sometimes referred to as candidate matches."); *see also, id.* at GOOG-NETWORK-00018607-08 ("Given two fingerprints X and Y, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

420. Stage II uses the ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ if there is a period of time during which the user-uploaded video and the reference work being compared are sufficiently similar to be a match—with that period of time being another example of a threshold used to determine whether or not a reference video is a near neighbor (or neighbor or approximate nearest neighbor). ▆▆▆▆▆▆▆▆▆▆▆ are the distance or difference functions that Stage II uses to make this comparison. *See, e.g.*, Erb Depo. at 216:6-19 ("Q And

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

to your knowledge, in terms of the distance or difference functions used to ██████████████ that's the distance or difference function, correct? A Yes.); *id.* at 99:12-106:16 ("[I]n the current implementation of Stage II, known as the Sensitive Stage II, the idea is that we



**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



*see also, e.g.*, GOOG-NETWORK-00610863-70 (describing Sensitive Stage II); Erb Depo. at 185:3-186:23 (indicating GOOG-NETWORK-00610863-70 accurately described Sensitive Stage II); *id.* at 186:24-188:4 ("Step one in the algorithm as appears here [on GOOG-NETWORK-00610866] is that areas of interest are determined, do you see that?  A Yes.  Q And how is that performed? What is the mechanism or the value by which the system determines that something is an area of interest?  A

); *id.* at 200:11-202:24 (Q. And the document on page [GOOG-NETWORK-00610]869 or the page ending in 869 in step seven, it references

; *id.* at 188:5-200:10, 219:24-221:19 (further describing the Sensitive Stage II algorithm); Pasula Depo. at 103:11-104:13; GOOG-NETWORK-00785269:

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

**Stage 2**



421.  I understand that the version of Stage II I describe immediately above (Sensitive Stage II) was implemented at some point in 2014.  Prior to 2014, Stage II was referred to as the "spike algorithm."  Because it



*See, e.g.*, Erb Depo. at 216:6-217:17

*id.* at 123:10-125:8 ("Q Now, at some point in time, am I correct that the algorithm used in Stage II was referred to as the spike algorithm?  A Yes.  That was the predecessor of the Sensitive Stage II.  Q And what's the difference between the spike algorithm and the Sensitive Stage II algorithm?  A The spike algorithm is --

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

*see also, e.g.*, *id.* at 12:20-13:2, 125:16-127:6 (indicating the spike algorithm was used for Stage II at least as early as August 2011); *id.* at 218:16-219:23, 221:6-19; GOOG-NETWORK-00000412; GOOG-NETWORK-00000416; GOOG-NETWORK-00001614-19; GOOG-NETWORK-00162593-95; GOOG-NETWORK-00700323-27; GOOG-NETWORK-00700423-26; GOOG-NETWORK-00702836-38; GOOG-NETWORK-00702889-90.

422.  As I discuss above, the Content ID LSH Version search is a non-exhaustive search for a near neighbor because the search does not compare to all possible matches (*i.e.*, all records in the reference data set).  This is true even if the search does not locate a near neighbor.  *See, e.g.*, Erb Depo. at 70:19-21 ("[The MatchSystem], for each user-uploaded video, it creates a collection of zero or more matches and its output is this collection of matches."); *id.* at 91:17-92:23 ("I know that there are cases where the set that comes out of Stage I is much larger than a thousand, but the -- or sometimes it's completely empty as well.  But depending on the nature of the user-uploaded video, but that's the general outline.  Q Now, when you say it's completely empty, does that mean that basically, the Stage I process didn't find any sufficient matching LSH bands and so there's essentially no candidates to examine further?  A Correct.  Q And what does the system do when that occurs?  A That's a great question.  I think we run stage – I'm not completely certain, but I believe we run Stage II with an empty input set.  Q Okay.  So it's not -- as far as you know, the video proceeds into Stage II or the processing proceeds into Stage II; but essentially, since there's no input set, there wouldn't be anything to compare.  A Correct.  Q And I'm assuming, but tell me if I'm misunderstanding, that the end result of that would be that the system would determine there are no matches and there would be no, I think what you described as a raw match for that particular uploaded video.  A For that channel, for that uploaded video, yes."); *id.* at 96:19-99:11 ("Q And is there one or more than one such raw match [output from Stage II] for a particular candidate video ID fingerprint?  A There are zero or more.  There may be none, there may be one, there may be many."); *id.* at 218:16-19 ("Q What was the -- well, in the spike algorithm, the end resulting output was various matches, correct?  Zero or more matches?  A Correct.").

423.  The "raw matches" output from the Content ID LSH Version's MatchSystem are then sent to the claiming system for further analysis.  As I mentioned above, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  This is another example of a threshold that is applied to determine whether or not a reference video is a neighbor, a near neighbor, or an approximate nearest neighbor of a user-uploaded video.  *See, e.g.*, Erb Depo. at 111:22-114:11 ("Now, earlier today, I believe at some point, you mentioned something that I think you

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



NETWORK-00008864 (email discussing these thresholds); GOOG-NETWORK-00014310;
GOOG-NETWORK-00162595; GOOG-NETWORK-00000668:

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

# YouTube video matching



424.  I understand that Defendants argue that Content ID LSH Version does not identify a neighbor or a near neighbor (or an approximate nearest neighbor).  They assert that "the first stage of the search does not employ a threshold of any kind, but simply selects a group of likely candidates, regardless of their distance or difference from the query.  Similarly, the second stage of the search determines a match based upon which works exhibit the most similarity over time, as visualized by a heat map, but does not employ a defined threshold based on a distance or difference."  Defendants' Response to Network-1's Interrogatory No. 7 (dated May 14, 2015).  As a preliminary matter, Defendants' own witnesses and documents characterize this search as a search for a neighbor, a near neighbor, or an approximate nearest neighbor.  Moreover, as I explain above, there are numerous thresholds that the Content ID LSH Version uses to determines whether a potential match is similar enough to the user-uploaded video to be reported as a match, including at least the following:  (a) the distance or difference (of zero) between LSH bands in the LSH lookup (Stage I); (b) the ███████████ ████████████████ (Stage I); (c) ██████████████████ in the projection filter (Stage I); (d) the ███████████████ (Stage II); and (e) ████████████████ (claiming logic).  I address each of these thresholds in turn.

    a.  The LSH lookup portion of Stage I looks for exact LSH band matches.  A step of a search algorithm that looks for such exact matches using a threshold (i.e., a distance or difference of zero) to determine is a given LSH band is a match.  *See, e.g.*, Erb Depo. at 70:10-72:7 ("In Stage I, we look up in an index to see if any reference video had the precise value for an LSH band, meaning the same offset and the same value of the subfingerprint; and, if so, we record the time offset in the reference and the

time offset of the subfingerprint that we're looking at in the -- in the user video along with the video identity – identity of the reference video.").

b.  The matching LSH bands from the LSH lookup portion of Stage I are pieced together to determine whether there ar ██████████████████████████████████████ ██████████████████████████████████████████ is a threshold that is a tied to the distance or difference between the features extracted from the reference work and the features extracted from the user-uploaded video. *See, e.g.*, Erb Depo. at 82:9-85:5 ("So if you, for a moment, just think only about a single reference video and imagine that you look at the collection, for every subfingerprint that we look up out of the probe at various offsets, look at the collection of all the return values, all of the hits that we get from the LSH band lookups for that over time; so effectively, what that does is, it shows us a map of the time offset in the reference video that might correspond to a time offset in the probe video. And looking at that behavior over time, if there's -- if there are ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ Q Now, when you say ████████ what do you mean by that? A If -- in order to run the projection filter, we need some -- we need data. We need enough datapoints to perform an analysis and so ██████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████).

c.  The ████████████████ in the "projection filter" is another threshold that is a tied to the distance or difference between the features extracted from the reference work and the features extracted from the user-uploaded video. If there is ████████████████████████ ████████████████████████ *See, e.g.*, Erb Depo. at 85:6-87:4 ("The projection filter is a conceptually ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ Q And this is something that's performed at the projection filter as a means of ██████████████████ A. Yes.").

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



d.  In the ███████████████ of Stage II, there is als████

███████████████. *See, e.g.*, Erb Depo. at 216:6-19

█████████████████ *id.* at 99:12-106:16 ("[I]n the
current implementation of Stage II, known as the Sensitive Stage II, the idea is that

e.  Finally, the "raw matches" output from the Match System are processed by the
claiming logic, which applies another threshold related to the distance or difference
between the extracted features of the user-uploaded video and the reference work—
███████████. With both the Sensitive Stage II and the spike algorithm, the

███ *See, e.g.*, Erb Depo. at 111:22-114:1

█████████████ *see also, e.g., id.* at 125:4-15

425.  Review of source code produced by Defendants in this case confirms my analysis of this
claim element.  As an example, ███████████████████████

---

[428] See definition at lines 192-223 of file ███████████████

████ ████ OOG-NETWORK-SC-00001135-36)
[429] See implementation at lines 197-198 of file █████████████

████ ████ (GOOG-NETWORK-SC-00001135)
[430] See implementation at lines 174-186 of file █████████████

████ ████ (GOOG-NETWORK-SC-00001113)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



---

431 See implementation at lines 510-573 of file ███████████████

████████████ (GOOG-NETWORK-SC-00001116-17)

432 The `Stage I` and `Stage II` do not appear to refer to the same "Stage I" and "Stage II" I describe above when discusses Defendants' testimony and their documents.

433 See file ███████████████

(GOOG-NETWORK-SC-00000153-55)

434 See lines 56-58 of file ███████████████

(GOOG-NETWORK-SC-00000153)

435 See lines 56-58 of file ███████████████

(GOOG-NETWORK-SC-00000153)

436 See implementation at lines 47-67 of file ███████████████

cc. (GOOG-NETWORK-SC-000001090-91)

437 See implementation at lines 230-281 of the file ███████████████

.    (GOOG-NETWORK-SC-00000151)

438 See implementation at lines 246-272 of file ███████████████

.cc. (GOOG-NETWORK-SC-00000101)

439 See implementation at lines 276-446 of file ███████████████

.cc. (GOOG-NETWORK-SC-00000101-04)

440 See implementation at lines 211-229 of file ███████████████

(GOOG-NETWORK-SC-00000100)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



[441] See implementation at lines 42-81 of file ███████████ (GOOG-NETWORK-SC-00000175 to 0176).

[442] See comments at lines 90-93 of file ███████████ (GOOG-NETWORK-SC-00000105-106)

[443] See implementation at lines 42-81 of file ███████████ (GOOG-NETWORK-SC-00000175-76)

[444] See implementation at lines 249-316 of file ███████████ (GOOG-NETWORK-SC-00000168-69)

[445] See implementation at lines 585-591 of file ███████████ (GOOG-NETWORK-SC-00000173)

[446] See implementation at lines 615-691 of file ███████████ (GOOG-NETWORK-SC-00000174)

[447] See lines 671-673 of file ███████████ (GOOG-NETWORK-SC-00000174)

[448] See implementation at lines 69-86 of file ███████████ (GOOG-NETWORK-SC-00001090)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



426.  It is my opinion that the Content ID LSH Version meets claim element 18[c] literally. However, to the extent this limitation is not literally met, for example, because the search algorithm of the Content ID LSH Version does not "correlat[e] . . . the first electronic media work with an electronic media work identifier" because it does not "correlate" but rather "can be used to determine whether a video uploaded to YouTube is similar in some sense to any of the video, audio, or melody content in one or more reference," this limitation is met under the doctrine of equivalents.  *See* Defendants' Fourth Supplemental Response to Interrogatory No. 7 (dated September 30, 2019).  The Content ID LSH Version's search algorithm performs substantially the same function (matching an unknown work with a reference work) in substantially the same way (comparing the unknown work or features extracted from the

---

[449] See implementation at lines 283-319 of file ███████████████████████

(GOOG-NETWORK-SC-00000151-52)
[450] See implementation at lines 407-583 of file ██████████████████████

███████     (GOOG-NETWORK-SC-00000129-32)
[451] See implementation at lines 72-92 of file ████████████████████████

███████     (GOOG-NETWORK-SC-00000124)
[452] See definition at lines 24-196 of file █████████████████

███████     (GOOG-NETWORK-SC-00000135-38)
[453] See definition at lines 110-176 of file ████████████████

███████     (GOOG-NETWORK-SC-00000125-26)
[454] See implementation at lines 204-385 of file ██████████████

███████     (GOOG-NETWORK-SC-00000126-29)
[455] See implementation at lines 178-202 of file ██████████████

███████     (GOOG-NETWORK-SC-00000126)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

unknown work to reference works or features extracted from reference works) to obtain substantially the same result (determining if the two works match) as would any technology that "correlat[es] . . . the first electronic media work with an electronic media work identifier."

427.  In sum, the Content ID LSH Version correlates a user-uploaded video (first electronic media work) based on features extracted from that video.  This correlation is based on a non-exhaustive search identifying a near neighbor (or a neighbor or an approximate nearest neighbor).  The Content ID LSH Version applies numerous thresholds to determine whether a potential match is a close enough match for there to be a "claim" by a content owner made on the user-uploaded video.  As I detail below, this correlation or "match" between the first uploaded media work (user-uploaded video) and the electronic media work identifier (of the reference work) is then written to a database that is part of the claiming system.  *See, e.g.*, analysis for '464 patent claim element 18[d] and citations therein.

*Content ID Siberia Version*

**Fingerprinting**

428.  Before any correlation occurs, the Content ID Siberia Version similarly electronically extracts features from each audio and/or visual work uploaded by a YouTube user to generate its digital "fingerprint."  This "fingerprint," which is made up of "embeddings" that are each a vector ███████████████, is electronic data that is sampled, calculated, and/or otherwise derived from the work itself.  Google's technical witnesses explained in detail how the fingerprints and embeddings are generated using ██████████████████████████ ████████████████████, part of the Google Brain project.  The same general framework is used to generate fingerprints for each of the video, audio, and melody "channels," and for regular uploads as well as live streams.  *See, e.g.*, Pasula Depo. at 21:22-29:13 ("The neural network-based fingerprinting also – well, I guess not also.  It generated ██████████ as the sub fingerprint; is that correct?  A No.  ███████████.  Q Thank you.  Sorry.  A And we stopped referring to them as sub fingerprints.  Q What is the reference to them at this point?  A Embeddings.  Q E-M-B-E-D--  A Yeah.  Things embedded in a space, yeah, It's -- yeah.  It's what they would be called in the literature of neural networks.  Q And can you describe what each embedding is?  . . . It's a ███████████████████████.  Q And that's represented by ████████████  A Yes.  It's a vector which is a description of a point in space.  Q And what does that ███████████████████ represent with respect to the underlying video?  A Not much.  It's not so much that it represents something intrinsically.  It has sort of a certain property.  Q Well, so when you say it has a certain property, what do you mean by that?  A So we trained the neural network so that embeddings corresponding to -- in video, video frames that came from the same footage, from the same point in the same footage, end up close together in the same space, even if they have been heavily transformed; and that embeddings that come from completely different frames, are far away.  Q So an individual embedding, is that generated from a snapshot of a point in time within the video?  A For the video channel, it's a single frame.  Q And that single frame, how often are those captured to generate the embeddings?  A I believe it is still ██████████████.  Q So let's step to just one of those.  So I take it, then, ████████████████, there is something that essentially extracts a single frame at that point in time from the video, and then that is processed in some way to generate ██████ ████████████████████  A I believe we just request a transcode that has

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

███████████ from YouTube's infrastructure or we ask it to transcode it in such a way and then we process each frame individually.  Q When you say you ask it to process a transcode, can you just explain to me what that means?  A. So there are many different video represent -- a video can be represented many different ways, with like higher, smaller resolution.  There can be different frame rates, different N codings of the video.  We ask for a specific N coding which is -- in which the frames are explicit -- represented explicitly.  And they occur ███████████.  YouTube has a lot of infrastructure for purchasing different transcodes for different purposes. Q.  And so -- so you receive that transcode, and then it -- that's essentially a collection of frames from the video; is that fair?  A Yes.  Q Okay.  And each of those frames is then processed to generate one of these vectors or embeddings?  A For the video channel, yes.  Q And how is it different from the audio channel?  A The audio channel is -- well, based on audio, and audio is a wave form.  So what we do is we produce what is called a spectrogram.  It is a visual representation of the frequencies and the times in the audio wave form, and it basically sort of shows the notes that are occurring at different points in time and how they're sustained.  And so we produces this rolling tape of what's going on with audio, and then we take snapshots of it and produce embeddings from those.  . . . And is there a third way that -- I believe you also mentioned there is a melody channel.  A I am less familiar with how the melody channel preprocessing is done.  They also use spectrograms, but then they do some more processing on it to really only extract musical notes and to make sure that these notes are invariant to pitch shift.  So if you -- if you move the whole melody like a half tone up, it still ends up in the same place.  Q Is there -- once the frames are captured or the spectrogram is captured for audio, is there different code that is ███████████ for the different channels or is it the same ones they've been preprocessed?  A It is the same framework.  There are -- the system is actually, very complicated in other ways.  There are several other things that might happen in the different channels.  But in the end, they all use a neural network.  Q And do they call that neural network through the same code or is it different code for each one?  A I mean, it's the same neural network, what you call it, tool kit, ███████ Q Did you say ███████████  A Yeah, ███████████ It is famous among engineers.  Q And so the neural network is what's used in each instance to calculate the ███████████  A That is correct.  I mean, a different neural network for each channel."); *see also, e.g.*, *id.* at 35:20-36:13, 125:17-127:22, 134:11-25, 155:4-156:13, 172:19-174:7; Kumar Depo. at 15:21-16:25, 17:13-23, 91:12-22, 102:13-23; Konrad Depo. at 79:24-80:14, 136:19-138:22; Erb Depo. at 54:9-55:20, 60:17-61:24, 240:10-25, 242:17-244:25, 317:10-318:3; Defendants' Response to Network-1's Request for Admission No. 55 (dated May 14, 2015) ("[a]dmit[ting] that the Content ID system uses fingerprints of uploaded videos").

429.  The "fingerprints" of reference works to which the "fingerprint" of the user-uploaded video is subsequently compared are generated in the same fashion.  *See, e.g.*, Kumar Depo. at 30:20-31:6 ("Q The underlying embeddings from the query are obtained in the same way as the embeddings from the references; is that right?  A That's right."); *see also, e.g.*, Pasula Depo. at 31:4-33:8, 36:16-21, 174:16-175:2.

430.  For user-uploaded videos, more than one sequence of embeddings may be used to represent a single video in certain situations ███████████  In instances where there are multiple sequences of embeddings for a single uploaded video, those sequences of embeddings are generated in the same way as for a video with a single sequence

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

of embeddings.  *See, e.g.*, Pasula Depo. at 29:14-30:24 (Q So the number of these vectors that would be used to represent a given video is dependent on the length of the video; is that fair? A Yes.  We might also use several different sequences of embeddings to represent a single video.  Q And is that because there might be video channel, audio channel or others, or is there some other --  A There is another thing.  Q Go ahead.  A I don't know if you've seen on YouTube



.”); GOOG-NETWORK-00783283                              *see also, e.g.*, GOOG-NETWORK-00770925; GOOG-NETWORK-00781031; GOOG-NETWORK-00789217-19; GOOG-NETWORK-00789369-71.

431.  In addition, for the video channel, there is a step referred to as

*See, e.g.*, Pasula Depo. at 36:16-38:10 (“So the neural network-based embeddings, those are used to create the references that are in the index; is that correct?  A Several things are done to those embeddings.  And then some of them are placed in the index.  Q Okay.  So walk me through.  When you say several things are done to those embeddings, what do you mean?  A So sometimes, in -- well, actually, also in audio.  In video,

); *id.* at 58:22-59:9 (“When you have the uploaded video, there's a process that's sort of -- if I understood you correctly, you generate the embeddings,

is that fair?  A Yes.  This process is like the first stage of either indexing or look up.”); *see also, e.g.*, Erb Depo. at 241:1-242:16.

432.  Defendants' documents described the “fingerprinting” process used in the Content ID Siberia Version in a manner that is consistent with the testimony of Google's technical witnesses.  *See, e.g.*, GOOG-NETWORK-00702117 (“At the core of our matching technology lies a robust and compact representation of video content.  This compact representation is generated by a neural network

GOOG-NETWORK-00790986 (“Fingerprint: Compact representation of the image that provides a distance measure”); GOOG-NETWORK-00786357-60:

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



GOOG-NETWORK-00770923:



*See also, e.g.*, GOOG-NETWORK-00699390-98; GOOG-NETWORK-00699885-90; GOOG-NETWORK-00700607-09; GOOG-NETWORK-00701278-80; GOOG-NETWORK-00702421; GOOG-NETWORK-00704330; GOOG-NETWORK-00754011; GOOG-NETWORK-00754431-38; GOOG-NETWORK-00781030; GOOG-NETWORK-00781127; GOOG-NETWORK-00781872-73; GOOG-NETWORK-00787651; GOOG-NETWORK-00788058-66; GOOG-NETWORK-00789361-62; GOOG-NETWORK-00789372; GOOG-NETWORK-00790993-94; GOOG-NETWORK-00791817-19; GOOG-NETWORK-00791839-41.

433.  Review of source code produced by Defendants in this case confirms my analysis of this claim element.



**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

434.

435.

436.



---



[456] See definition at lines 20-34 of file ███████████████████████ (GOOG-NETWORK-SC-00001055)

[457] See comment at lines 13-19 of file ███████████████████████ (GOOG-NETWORK-SC-00001055)

[458] See implementation at lines 16-21 of file ███████████████ (GOOG-NETWORK-SC-00000675)

[459] See comment at lines 14-15 of file ███████████████████ (GOOG-NETWORK-SC-00000675)

[460] See lines 17-28 of file ███████████████████ (GOOG-NETWORK-SC-00000722).

[461] See line 11-16 of file ███████████████████ (GOOG-NETWORK-SC-00000722).

[462] See implementation at lines 14-33 of file ███████████████ (GOOG-NETWORK-SC-00000195).

[463] See lines 54-329 of file ███████████████████ (GOOG-NETWORK-SC-00000871 to 0875).

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

███████████████████████████████████████████████████████████████

**Correlating**

437.  Once the Content ID Siberia Version generates a "fingerprint" of the user-uploaded video, it then attempts to correlate the user-uploaded video (i.e., determining whether any reference works are neighbors, near neighbors, or approximate nearest neighbors to the user-uploaded video) by comparing that "fingerprint" with "fingerprints" of reference works (which each have an electronic media work identifier).  As I note above in my discussion of the Content ID LSH Version, this process is commonly referred to as finding a *match* between the uploaded work and a reference work.

438.  As I mention above, this identification in the Content ID Siberia Version is based on a search that identifies a near neighbor (or a neighbor or an approximate nearest neighbor)—a close, but not necessarily exact or the closest, match of a feature vector, compact electronic representation, or set of extracted features to another.  I understand that a portion of the search is based on what are known as ScaM.  *See, e.g.*, GOOG-NETWORK-00780160 ("Instead of LSH, ScaM is used to do Approximate Nearest Neighbor Search."); GOOG-NETWORK-00789360 ("Siberia: a new, sharded match engine . . . ScaM ==approximate nearest neighbor search"); GOOG-NETWORK-00699371 ("ScaM (Scalable Matching) or Approximate Nearest Neighbor (ANN) Search . . . The goal is to create a framework that can efficiently retrieve (exact or approximate) nearest neighbors from small to **massive databases** containing billions of items."); GOOG-NETWORK-00701295 ("[W]e use approximate nearest neighbor search (ANN) based on ScaM technology, without own implementation optimized for batching queries.  We find a number of approximate nearest neighbors for each shot."); Kumar Depo. at 78:2-6 ("What is ScaM?  A It is just a project name for one of my teams.  We work on approximate similarity search algorithms, so it's an umbrella name for many of those algorithms."); *see also, e.g.*, Pasula Depo. at 57:6-58:5 ("Q And the query, the unknown embedding, is compared to ████████████████████████████████████████ ███████    A Within the ████████████████████████, yes.  Q And what's the output of that comparison?  A. Well, it's an ordered list in terms of ████████████████████.  So that's not ██████████████████    It's an ██████████████████████.  And we usually take the top -- in the case of this index, I believe it's the ██████████████ that we found per ████████████████████████.  Q So that would be ████████████████████ from the reference index?  A Yes.  Well, I mean, ██████████████; Kumar Depo. at 44:22-45:16 ("So you deal primarily only with that first piece, the lock up of the embeddings and the retrieval of those candidate embeddings?  A Right.  I would just try to clarify that look up is a very overloaded term in our community.  So just to make sure that means returning the most similar – approximately most similar items given a query embedding.  Q Now, when you say approximately most similar, what do you mean by that?  A Because it is an approximate similarity search.  So we return ████████████████████  But these are most similar in the approximate sense.  Because our ████████████████████

---

[464] See lines 39-42 of file ████████████████████████ ██████████████████████████████████ ████████████████ (GOOG-NETWORK-SC-00000871).

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

█████████████  It is not exact.  Q So it is possible that there is a more similar embedding somewhere that would not be retrieved?  Yes."); *id.* at 99:19-24 ("Q Mr. Kumar, you mentioned a number of times the nature of the sort of ScaM search operations that are used as part of Content ID.  Now, those are not exact matching techniques; is that correct?  A Right."); *id.* at 166:19-24 ("So am I understanding correctly that this is illustrating the notion that a query using this kind of partitioning might not find the actual nearest neighbor because the nearest neighbor might be in a different partition from where it was searched?"); Konrad Depo. at 82:18-83:8; GOOG-NETWORK-00701295 ("Videos do not need to be exact duplicates to be detected."); GOOG-NETWORK-00700605 ("ScaM is used within Siberia ████████████ ███████████████████████████████████████████████████████████ . . . In Siberia, this is just the beginning and followed by grouping all the nearest neighbors by references and refining/aligning the candidates."); Erb Depo. at 245:2-22.

439.  The search algorithm of the Content ID Siberia Version has three main stages:  "Index Lookup," "Sparse," and "Verifier."  *See, e.g.*, GOOG-NETWORK-00701295 ("A lookup runs in three stages: **search**, **sparse refining**, and **verification**."); GOOG-NETWORK-00781530:



GOOG-NETWORK-00770926:

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



GOOG-NETWORK-00792065:



*See also, e.g.*, Pasula Depo. at 134:11-25, Kumar Depo. at 43:20-44:90, 55:24-56:11; GOOG-NETWORK-00701282; GOOG-NETWORK-00781875; GOOG-NETWORK-00787652; GOOG-NETWORK-00789630.

440. Prior to the "index lookup," the "fingerprints" of the reference works (comprised of the embeddings ▮▮▮▮▮▮ I discuss above) are further manipulated, and indexed in a specific way. I understand the indexing and resulting index lookup are based on a data structure developed by the ScaM (scalable matching) research team within Google. I also understand that ScaM is an umbrella term for a number of data structures and associated algorithms, but here I aim to describe only those used in the Content ID Siberia Version. *See, e.g.*, Pasula Depo. at 81:4-14 ("I've seen references that some portions of the match system use something

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

called ScaM scaleable [sic] matching.  A Yes.  Q How does that relate to the match system that you've been describing?  A. So the index, this structure we were talking about with the ███████████████████████████████████████, that is a data structure that was developed by the ScaM team in New York.").

441.  Each of the embeddings of the sequences of embeddings extracted from a given reference work is ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████ of each embedding is what is stored in the reference index.  *See, e.g.*, Pasula Depo. at 45:7-47:16 ("Q And so when a given embedding is stored within the index, I take it it's stored with some metadata that indicates essentially which video ID it comes from and probably some other information about where in that video it comes from?  A So actually, what is stored is – it's like a reverse index.  What is stored is ██████████
███████████████████████████████████████████████████████████████████
████████████████████████████████████████ Q And so when you say it's ██████████ can you explain what you mean. ██████████████████ A The embedding that we're █████
████████████████████████████████████████████████████████████████
████████████████████████████ What kind of █████
██████████ A I think in this index, this is █████████████████ that I can try to explain.  Q In general terms, so when you say █████████████████████ first of all, what do you mean by that? A I mean that when you are doing the ████████
████████████████████████████████████████████████████████████████
██████████████████ . . . Q So the embedding is ██████████
██ , but you might not ████████
██████████████ ; is that correct?  A When you're ███████
██████████████ Q I see.  Okay.  So the hashing is --
█████████████████████████ A That is correct.  Q But it's ██████
████████████████████████████████████████████ A Yes.");
Kumar Depo. at 28:25-29:7 ("Q Now, in connection with a look up operation, is the same ████████████████████████████████████ A No.  Q Okay.  And is that ███████████████████ A Yes."); Pasula Depo. at 112:11-114:4 ("[W]hat happens with those █████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

███████████████████████████████████████████████████████████; *see
also, e.g.*, Pasula Depo. at 139:9-25; Kumar Depo. at 13:18-15:4, 17:24-18:12, 18:17-22:4,
24:2-27:11, 27:24-28:24, 30:20-31:1, 75:8-76:6, 156:10-16; GOOG-NETWORK-00701226-
31.

442.  Each of the reference indices (video, audio, and melody) is comprised of ████████
of the embeddings I described above.  Each of these indices is divided into a certain number of
"shards."  For simplicity, I will use the video index as an example, but each of the reference
indices are structured in the same manner.  The reference video index ████████████████
Information about a given reference video is placed █████████████
███████████████████████████████████ *See, e.g.*, Pasula
Depo. at 39:6-41:5 ("And so then -- so the index has some collection of those values for each
video; is that a fair characterization?  A The contents of the index are generated using these
embeddings.  Q And what's the sort of data structure form of that index?  Is it a data base?
Can you describe it in some way?  A Well -- so first of all, the index is divided -- is sharded, is
parallelized.  It's divided into a bunch of smaller indexes that can each fit on one machine. . . .
And how many shards are there for the video index?  A For the -- ████████████████████
████████████████████ . . . Q And how was – what's the
organizing principle by which the things are divided into the shards?  A █████████.  Q And
am I correct that ████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████  A That is correct."); Kumar Depo. at 34:14-20 ("Q How many shards are
there for the partner video index?  A I don't remember exact number.  Q I've heard references
████████.  Is that consistent with your understanding? A It is about that."); *see also, e.g.*,
Pasula Depo. at 42:18-23, 108:14-109:5; Kumar Depo. at 34:24-36:7, 49:3-14.

443 ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████  *See, e.g.*, Pasula Depo. at 43:6-45:6 ("So how -- within a given shard, how is
the storage of the index organized?  A So within the shard, the ████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████  Q You mentioned there are ████████████████.  A Yes.  Q Is that true for
████████████  A Yes. ████████████████████████████████.  Q And

254

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

did I understand you correctly, are chosen so that within -- obviously, it's not exact, but more or less there are ███████████████████████████████████████████████████████ A Yes. Although, it is very approximate.  I think some are like ███████████████████████. But there is ████████████████████████████████████. And this is done using a ███████████████████████████████████████████████████ ██████████ "); Kumar Depo. at 165:15-166:18 ("Q ██████████████████████████████████████████████████████████ ██████████ "); Konrad Depo. at 173:1-15 ("Q And my understanding is the ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████ "); *see also, e.g.*, Pasula Depo. at 109:6-8, Kumar Depo. at 34:21-23, 36:8-37:15, 49:3-14, 156:10-16, 157:10-15; GOOG-NETWORK-00781874, GOOG-NETWORK-00790995:



GOOG-NETWORK-00701295; GOOG-NETWORK-00702301; GOOG-NETWORK-00781876; GOOG-NETWORK-00789689-90; GOOG-NETWORK-00790997.

444.  The "index lookup" step of the search ███████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████ The Content ID Siberia Version then outputs the ████████████████████████████ that are most similar to a given embedding from the user-uploaded video. ████████████████████████████████ hold that the Content ID Siberia Version uses—in order for a ████████████████████████████████ ████████████████████ *See, e.g.*, Pasula Depo. at 51:19-56:4 ("[H]ow does the look up operation or the comparison, however you want to describe it, how does that work?  A So this is very long.  So you have a video which you want to look up which is represented by a sequence of embeddings.  And the first thing you will do is you will try to see if anything in the index might possibly be matching those individual embeddings.  So you will, ██████████████████ ████████████████████████ -- I mean, you will be looking them up in many indexes, but let's

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

say you're looking them up in just a single index, right?  You will send them against ██
██ of that index, and in each ████, you will try to -- you will first -- for each of those
embeddings, you will first scan all of these ████████ that we talked about earlier and compare
that embedding ██████████████████████ like the ones we discussed, like
████████████ . . . . ["A]m I understanding correctly that each embedding is sort of
looked up ███████████  A On an abstract level, yes.  On an actual implementation
level, not really.  Q Okay.  So -- so -- and I want to kind of walk through that look up process,
and I -- from the level of abstraction, I think it may be simpler if we talk about a single
embedding.  A Yes, sure.  Q But if that doesn't work, let me know.  So if we take that single
embedding, the index or ████████████████████████ as you described earlier, correct?
A Yes.  Q And each of those is ████████████████          A Each
███████████████ Q Okay.  So while there might be ███████, those actually sort of
represent, if you will, █████████████████████  A Yes.  Q Okay.  And you
compare the single embedding from the uploaded video to that list of █████████ . Is that --
does that make sense?  Is that the next step was my question.  A Yes.  Q And based on that
look up against the ███████████, how many ████████ are sort of identified to be processed
further with that particular embedding?  A So this depends in general on the particular type of
look up you are doing.  Usually when you're looking up new uploads against what we have
been referring to as the reference index, ███████████████?  A Yes.  Q And how is
that look up performed to ██████████████  A You go though all of them.  You do ████
███████████████████  Q Okay.  So you compare -- you do
██████████████████████ are the ones you then move to
the next step?  A Yes."); *id.* at 111:11-112:10 ("Q What -- do you know what █████████████
████████████████ Is that the ████████████████████████
███████████████████████████████████████████████  Q Okay.  A
So yeah.  Do you know what that is?  Q Not exactly.  I was going to ask if you could explain to
me ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████  Q And that ████████████ . Is that -- A
Yes.  Q And just the top 55 are used, then?  A Yes."); Kumar Depo. at 39:5-8 ("Q So when the
look up operation first compares to ████████████, that's just a comparison to those
███████; is that correct?  A That's right."); *see also, e.g.*, Pasula Depo. at 110:15-23;
Kumar Depo. at 29:8-30:19, 37:16-38:5, 60:19-64:5; Konrad Depo. at 85:2-24, 173:17-174:6;
Erb Depo. at 245:23-246:19.

445.  The Content ID Siberia Version then ████████████████████ identified in the
prior step in more detail.  To be clear, the system ████████████████████████
████  The Content ID Siberia Version outputs ████████████████████████
█████████████████████████████████████ as I described
for the prior step.  This is another example of a threshold that the Content ID Siberia Version
applies—in order for ███████████████████████████████████████████████
██████████████████████████████████████████  *See, e.g.*
Pasula Depo. at 56:5-58:5 ("So then what's that next step with those █████████  A And then

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

in all of the -- in each of those partitions, you ███████████████████████
███████████████████ . . . . Q So each partition has some, I assume,
███████████████████ A Yes. Q And those are all ███████████, correct? A Yes. Q
And the query, the unknown embedding, is compared to all of the hashes within that index or
██████████████ A Within the █████████████████, yes. Q And
what's the output of that comparison? A. Well, it's an ordered list in terms of ████
█████████ So that's not the same █████████. It's an █████████
█. And we usually take the top -- in the case of this index, I believe it's the
that we found ██████████████████████. Q So that would be the
████████ from the reference index? A Yes. Well, I mean, ████████████
████████; Kumar Depo. at 40:19-42:16 ("What does that K represent? So it's
a number of essentially █████████████; is that fair? A Yes. Q And is that K a certain
█████████████████ A It is ███████ Q So for each of the ████████
██████████, correct? A Just to understand
correctly, each of the ██████████████████ Q Right. A For each query,
we will ████████████████████████████
of a few hundred. Q Okay. So -- and I think I've seen references to I think it's ████ A
That will be one example, yes. Q Okay. So in that instance, ████████████████
███████ A That's right. Q Okay. So what I'm trying to understand is you've looked at -- I
think the number I've heard elsewhere ██████████████████████.
There's an output. So if we assume ████████████████████
█████████. Because these are the things which you will return
after ████ ███████ Q Okay. So you get
████████████, correct? A That's right. Q So let's see. If I have
████████████; is that right? A. Somewhere around that."); *id.* at 64:6-
65:12 ("Q And once those ████████████████
████████, correct? A Yes. Q And did I understand you correctly that at that point,
██████████████ is computed? Or
within ████████, rather, excuse me, is computed? A Yes. Q And is that
████████████████████████████████
█████████████ A It's computed
████████. Q And then the ████████████████
████████ A That's right. One computes the ████
████████████████████████████████
Q And the output of that is then the ████████████████
████████ for example? A One can take these ████████
███████. Q And that sort is just whichever has -- I guess it would be the
████████████, that's number one and so on? A Yes."); Erb Depo. at 237:10-18 ("It's a
system that partitions the reference -- all the references, all the ████████ into a
-- in a way that allows us to take a subfingerprint from a probe video and know exactly what
████████████████████████████████████
███ so that we can then search within those -- ████████████; *see also, e.g.,*
Pasula Depo. at 59:17-60:5, 110:24-111:3, 113:19-114:10; Kumar Depo. at 37:16-38:17, 39:9-
19, 67:24-69:25, 74:23-75:7, 85:18-89:3; Konrad Depo. at 174:7-18; Erb Depo. at 237:19-
238:4, 238:17-23, 247:5-13, 248:11-249:17.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

446.  The search of the Content ID Siberia Version is non-exhaustive because the search does not compare to all possible matches (*i.e.*, all records in the reference data set).  The fact that the first step in the search (index lookup) is non-exhaustive renders the entire search algorithm non-exhaustive.  As I discuss in more detail below, only the reference works that have ███ ██████ that came back as matches from the index lookup step are subjected to further consideration.  *See, e.g.*, Pasula Depo. at 110:24-111:9 ("And then [an embedding from the uploaded video] will be compared to just the a████████████████████ correct?  A Yes.  And it's never compared to the ████████████████, correct?  . . . A Not during that lookup specifically."); 57:20-58:5 ("Q So that would be the ████████████████ from the reference index?  A Yes.  Well, I mean, the ████████████████. . . . Q And is that a clarification?  Because it's ████████████████ A Yeah."); 150:20:151:15 (testifying concerning GOOG-NETWORK-00702118:  "Q Where Mr. Granstrom describes the aspects of the query process, and he writes 'In this way, the search is both non-exhaustive, as it happens for ████████████████ . . .'  Do you see that?  A Yes.  Q And is he -- what is he describing there?  . . . A Well, he is describing the ScaM system, I'm pretty sure, and he is saying that we do not search -- we will not be searching all ████████████.  We've been discussing that before, but ████████████████."); Kumar Depo. at 85:10-17 ("Q So you're not going to compare the search query to everything in the database, only a subset?  A That's right.  Q Specifically, only a subset of the records, i.e., the references that ████████████████ ██████ correct?  Yes."); *see also, e.g.*, Kumar Depo. at 39:5-15.

447.  Once ████████ index hits are output, the Content ID Siberia Version then sorts them by video (puts all the embeddings ████████████ from the same video together).  It then ████████████████████████████████████████████████ is another example of a threshold that is tied to the distance or difference between the user-uploaded video and a given reference work.  *See, e.g.*, Pasula Depo. at 60:11-24 ("What happens next with all those index hits?  A . . . The first meaningful thing that happens is you separate them out per reference video.  So all these hits were coming from all the different videos on the -- ████████████████████████  So from now on, pretty much anything we would talk about would be about the pair of videos, no longer about the whole index."); *id.* at 63:7-18 ("Q And what kind of filtering is being done, then?  A . . . ████████████████████████████████████████ ████████████████████████████████████████ ████; *id.* at 239:19-240:15 ("So in the case where ████████████████████████████████████████ for each embedding that was run against the index; is that right?  A Yes.  Q And those would all still be passed to the sparse refiner?  A So before they passed the sparse refiner, they would ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████  A. That's right."); *see also, e.g.*, Konrad Depo. at 197:22-198:3.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

448.  The reference works that have ███████████████████ subjected to further consideration.  The next step is known colloquially as "sparse" or "sparse refiner."  Conceptually, sparse refiner *uses only the index hits* ██████████████████ ████████████████████████████████████████████ for the reference video to potentially be a match—with ██████████ being another example of a threshold used to determine whether or not a reference video should be subjected to further consideration in the next step of the search algorithm.  *See, e.g.*, Pasula Depo. at 61:19-63:24 ("Q. So after the index hits are sort of ██████████ what's the next step in the analysis of the query?  A So the next step is something that we call sparse.  And the reason it is called sparse is because it's -- we have incomplete information about the relationship between the two videos.  So the way we think about what we have now as you will -- as you probably will see if you've seen our documents. ████████████████████ So they are ███████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ y, you just put up in this case.  And if we had the full embeddings which we will later, you could have ████████████████ but we don't have that right now.  We only have hits.  That's why we call it sparse. . . . Q Is this sparse -- is this doing some further filtering of the results?  A Yes.  Q And what kind of filtering is being done then?  . . . [W]e attempt to find -- to see if these hits that sort of ████████████████████████████████████████████ ████████████████████████████████████ *id.* at 64:23-66:4 ("Q In a general sense, does -- is sparse sort of a step in the process that cuts down at least some of the candidate video IDs, reference IDs, that might be further compared?  A Yes. ███████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████████████ Because sometimes you might have two videos that just generally resemble each other.  Like if you look at two recordings that take place in this room, a lot of the frames in those recordings will look a lot like each other, and those recordings will probably just █████████████████ Q And so sparse is the portion of the system that's -- or the portion of the process that's designed to kind of remove some of those poor candidates; is that fair?  A Yeah.  I mean, the whole system is -- I mean, what you're doing from -- once you get your index hits, is you're actually just trying to filter out more and more.  In sparse, the way I think about it, is sparse is everything that works on the index hits that doesn't have the full information.  That's why it's sparse."); *see also, e.g.*, Kumar Depo. at 42:17-44:15; Konrad Depo. at 86:6-87:6, 197:5-11; GOOGLE-NETWORK-00701295-96 ("[T]he search stage find nearest neighbors for ████████████████ and groups the results by reference.  Sparse refining is the process of taking such probe/reference pairs and deducing potential matching regions from the nearest neighbor hits."); GOOG-NETWORK-00781877; GOOG-NETWORK-00790998.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

449.  The final step of the search algorithm is known as the "verifier."  Like sparse, ▮▮▮
▮▮▮▮▮ but uses the *full embeddings* rather than just the index hits.  I understand
that there have been at least two versions of the verifier.  An earlier version ▮▮▮▮
▮▮▮▮▮ examined by the verifier, and ▮▮▮▮▮
▮▮▮▮▮ another example
of a threshold used by the Content ID Siberia Version.  A later version ▮▮▮▮▮
▮▮▮▮▮ Each of these criteria are also examples of thresholds
used by the Content ID Siberia Version to determine if a given reference work is sufficiently
similar to a user-uploaded work or not.  *See, e.g.*, Pasula Depo. at 67:7-71:6 ("So what's the
next step after sparse?  A The next step is currently called the verifier.  Like it verifies things.
Q And what's the general operation, what does the verifier do?  A So in abstract terms, it is
pretty much the same thing as sparse except that it works on the full embeddings and on ▮▮
▮▮▮▮▮ . . . So we take these
▮▮▮▮▮
▮▮▮▮▮
▮▮▮▮▮
▮▮▮▮▮
▮▮▮▮▮
▮▮▮▮▮ .  Q Okay.  A But what we actually do is we first
figure out ▮▮▮▮▮ We try to figure out ▮▮▮▮▮
▮▮▮▮▮ Because you know, there could be more than
actually came out of sparse or they could be in a slightly different place.  So we sort of -- we
figure out ▮▮▮▮▮ I don't remember what that part of the algorithm is called, but for
sure, ▮▮▮▮▮
▮▮▮▮▮
▮▮▮▮▮ I mean, we're not writing this down.  The computer is
calculating these things, and you know, keeping track of them.  Or like ▮▮▮▮▮
▮▮▮▮▮ So we write down -- down to say, like a
▮▮▮▮▮
▮▮▮▮▮ . Q Is there a different system that's used?  A
For -- yes, we us ▮▮▮▮▮
▮▮▮▮▮ Q I see.  A And in CoverCat, that's the melody
system, we use something called ▮▮▮▮▮
▮▮▮▮▮ . . . . Q So putting aside the CoverCat for a moment, is this machine learning in the
form of -- I assume, basically, what you're describing is ▮▮▮▮▮
▮▮▮▮▮ A For like a given combination of inter -- like I mean, ▮▮▮▮▮
▮▮▮▮▮ And actually, we don't always
use ▮▮▮▮▮
▮▮▮▮▮ ; *id.* at 71:18-74:13 ("Q And I take it that those ▮▮▮▮▮ pieces, each has some

260

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

kind of parameter around -- A Yes.  Q -- which it's measured?  A Yes.  . . . Q So -- and I think you said they're something in the order of ▇▇▇▇▇▇▇▇
A There are ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  I think eventually, they only use ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  Q I see.
So there is ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇, yeah.  Q So there is around ▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇ Is that --  A Yes.  It's not just ▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇ . . . Q So you have these ▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇ A Yeah.  Q. And the ▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Is that essentially --  A The ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Q Okay.  And then -- A ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇ Q I see.  So for example, when it looks ▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇ A That can happen, yes.  Q Okay. So what is the sort of end output of this verifier?  A It is the -- it is the set of matches that have been verified as actually being matches.  By which I mean, it is -- they are pairs of end points, like – it's -- in like regular English, it would be like from seconds -- in video A, from second 10 -- video A from second 10 to second 30 matches video B from second 70 to second 90.  I cannot remember if this is at this point stored in seconds or indexes into the embedding or whatever, but that's the general idea.  Q I see.  So the verifier is outputting a set of time-based matches that have been determined to actually constitute matches?  A Yes.");  *id.* at 158:7-20 (testifying concerning GOOG-NETWORK-00783282:  "And then can you explain to me this portion that refers to the ▇▇▇▇▇▇▇▇▇▇▇▇▇.  A Yes.  So apparently at this point, all we were doing in the final stage of the verifier is after we had -- after we had figured out ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Q And then I take it if ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, it would be characterized as a match?  A Yes.  And then in the change, it's saying that we -- now we have ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇ Q. And you're talking about -- this is on page 282, this description of the change, that it's including an ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ A Yes.  Q And so the idea is that in the Video 7 or in the change that was at this time --  A Yes.  Q -- you would -- it would be ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ A Yes.
Q Got it.  And how is that different now?  A It is much more complicated now.  Q Because of the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ A Yeah.  Because now it is – it's not ▇▇▇▇▇▇▇▇▇▇ Q And so how does that ▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇ So it's -- yeah.  Q And did I understand you correctly that each of those decisions ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



when was that switch to ▮▮▮▮▮▮▮▮▮▮ implemented?  A. I want to say a year ago, but maybe it's two years ago."); *see also, e.g.*, *id.* at 240:25-241:18; Kumar Depo. at 57:4-58:18; Konrad Depo. at 87:6-25, 88:12-94:4, 198:4-15; GOOG-NETWORK-00701296 ("The final stage verifies the candidate matches and outputs high-precision matches.  This is made possible by loading the reference shot sequence for each probe reference pair creating ▮▮▮▮▮▮▮▮▮, a structure that contains the exact similarity between any probe/reference ▮▮▮▮ . . . .").

450.  As I discuss above, the Content ID Siberia Version search is a non-exhaustive search for a near neighbor because the search does not compare to all possible matches (*i.e.*, all records in the reference data set).  This is true even if the search does not locate a near neighbor.  *See, e.g.*, Pasula Depo. at 239:3-240:24 ("Q Now, when you're doing the overall search, it is possible that ultimately, verifier does not identify any matches; is that right?  A That is more common than -- that is the more common case --  Q Okay.  A -- in the index that we have been talking about.  Q Right.  And why would it determine – so let me just walk through.  So in the case where the verifier ultimately doesn't identify anything as a match, the index look up, that would still generate I think you said ▮▮▮▮ index hits for each embedding that was run against the index; is that right?  A Yes.  Q And those would all still be passed to the sparse refiner?  A So before they passed the sparse refiner, they would be sort of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Q I see.  A So there is some ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ A. That's right.  Q. And if it's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and it's possible that something would be output from there but not passed at the verifier?  A Yes.  Q Okay.  And so if it didn't meet the necessary requirement threshold for being a match in the verifier, there would be no match identified?  A Yes."); Kumar Depo. at 56:22-57:3 ("So am I correct that it's quite possible that even though all those embeddings are output as index hits, the system might ultimately, not identify any match between the query video and videos in the reference index?  A It is possible.  . . . So the combination of the spare and the verifier, at the end of that even though it output whatever fixed number of index hits, there might be no match called, correct?.  A That's right."); Konrad Depo. at 62:20-23 ("But not every video that's uploaded generates any matches.  Correct?  A There are videos that generate no matches, yes."); *see also, e.g.*, Kumar Depo. at 57:4-58:18; GOOG-NETWORK-00701282; GOOG-NETWORK-00701295; GOOG-NETWORK-00702295.

451.  I understand that Defendants assert that "a process of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and/or neural networks" is not a "search."  *See, e.g.*, Defendants' Supplemental Response to Interrogatory No. 7 (dated October 18, 2019).  I understand this argument to be in reference to the verifier.  I disagree with Defendants.  A person of ordinary skill in the art would understand

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

that the ▮▮▮▮▮▮▮▮ under discussion is clearly part of the search process.  A search algorithm is designed to find an object satisfying desired criteria.  The verifier uses ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ are part of the overall search methodology of the Content ID Siberia Version.  The ▮▮▮▮▮▮▮▮▮ is used as part of the search algorithm to remove from consideration objects that, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to meet the criteria for a near neighbor (or neighbor, or approximate nearest neighbor).  *See, e.g.*, Pasula Depo. at 67:1-71:6, 71:18-74:13, 158:7-20.

452.  The matches output from the verifier are then sent to the claiming system for further analysis.  As I mentioned above in regard to the Content ID LSH Version, a "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, which the claiming system then uses to determine ▮▮▮▮▮▮▮▮▮▮▮▮▮ for a "claim" to be made.  This is another example of a threshold that is applied to determine whether or not a reference video is a neighbor, a near neighbor, or an approximate nearest neighbor of a user-uploaded video.[465]  *See, e.g.*, Wang Depo. at 32:7-34:2 ("Q And I think that you mentioned that the match claiming team takes information from matches from the match system? A Mm-hmm.  Q And how does that work?  A This is very fuzzy to me, because it is not my area.  But I can only speculate that the match claiming team is called via API from the Matching team.  But like I said, this is not my area, so I'm only speculating.  Q And with -- with matches that are found by the match system, are those first fed into the match claiming team or the -- or something the -- that your claiming team works on?  A It's first fed through the match claiming team.  Their logic, to be precise.  Q In -- in general, what does the match claiming team's logic do with those matches?  A A video can have lots of matches, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ . . . Q You'd mentioned that the match claiming team ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, is that determined by the match claiming logic or something else?  A I'm not exactly certain, but I just know it's one of the inputs from something, but I'm not exactly certain.  Q So you're not sure if it's the -- the matching component of content ID that provides ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ A I'm pretty sure it's actually the -- the match ▮▮▮▮▮▮▮▮▮▮▮▮, just thinking about it logically.");  Erb Depo. at 250:18-24 ("Q And ultimately computes ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ A Yes.  Q And the ▮▮▮▮▮▮▮▮▮▮▮▮ is used then to determine whether there's a match or not a match?  A Correct.");  *see also, e.g.*, Wang Depo. at 105:6-8 ("Is it the match claiming logic that

---

[465] I included a description of an analogous feature in the preceding section concerning the Content ID LSH Version, relying on testimony and documents concerning the older system.  However, I understand that claiming system was generally, in terms of functionality, unchanged between the Content ID LSH Version and the Content ID Siberia Version.  Therefore, my analogous analysis in the Content ID LSH Version section applies here, and the analysis in this paragraph (relying on testimony and documents concerning the newer system) also applies in the Content ID LSH Version section above.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

decides where a claim should be made?  A Yes."); *id.* at 36:18-37:10; Pasula Depo. at 76:15-25; GOOG-NETWORK-00781530:



453.  Review of source code produced by Defendants in this case confirms my analysis of this claim element.  As an example,



---

[466] See implementation at lines 35-40 of file ████████████████████████ ███████████████████ (GOOG-NETWORK-SC-00000364)

[467] See line 38 of file ███████████████ ██████████████████ (GOOG-NETWORK-SC-00000153)

[468] See implementation at lines 676-840 of file ███████████████ █████████████████ (GOOG-NETWORK-SC-00000341-43)

[469] See a source code comment at line 675 of file ███████████████ █████████████ (GOOG-NETWORK-SC-00000341)

<u>**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**</u>
<u>**PROSECUTION/ACQUISITION BAR MATERIALS**</u>



[470] See line 776 of file ███████████████████████████

███████████████ (GOOG-NETWORK-SC-00000342).

[471] See implementation at lines 110-144 of file ████████████████

████████████████████ (GOOG-NETWORK-SC-00000365)

[472] See implementation at lines 146-179 of file ████████████████

████████████████████ (GOOG-NETWORK-SC-00000365-66)

[473] See implementation at lines 247-288 of file ██████████████████

███████. (GOOG-NETWORK-SC-00000996-97)

[474] See definition at lines 42-100 of file ██████████████████████

██████████████ (GOOG-NETWORK-SC-00001001-02)

[475] See lines 111-222 of file ████████████████████████████████

(GOOG-NETWORK-SC-00000248-50)

[476] See lines 36-41 of file ████████████████████████████████

██████ (GOOG-NETWORK-SC-00001001)

[477] See implementation at lines 122-203 of file ████████████████

████ GOOG-NETWORK-SC-00000994 to 0996)

[478] See declaration at lines 61-64 of file ██████████████████████

██████ GOOG-NETWORK-SC-00001001)

[479] See lines 59-60 of file ████████████████████████████████████

██████ (GOOG-NETWORK-SC-00001001)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



454.  Continuing this example, the

---

[480] See definition at lines 86-113 of file

(GOOG-NETWORK-SC-00000714)

[481] See implementation at lines 338-407 of file

(GOOG-NETWORK-SC-00000711-12)

[482] For the preceding line cites, see file

(GOOG-NETWORK-SC-00000711-12)

[483] See implementation at lines 148-197 of file

(GOOG-NETWORK-SC-00000708)

[484] See lines 39-42 of file

(GOOG-NETWORK-SC-00000713)  My understanding is that the current implementation uses asymmetric hashing, but for completeness I have also included the Hamming option as well.

[485] See definition at lines 21-106 of file

(GOOG-NETWORK-SC-00000470-71)

[486] See lines 1-2 of file

(GOOG-NETWORK-SC-00000470)

[487] See implementation at lines 64-97 of file

.  (GOOG-NETWORK-SC-00000467-68)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**



455. ████

---

[488] See definition at lines 133-336 of file ████

(GOOG-NETWORK-SC-00000669-72)
[489] See implementation at lines 75-80 of file ████

(GOOG-NETWORK-SC-00000668)
[490] See lines 60-74 of file ████

(GOOG-NETWORK-SC-00000667-68)
[491] See implementation at lines 157-186 of file ████

(GOOG-NETWORK-SC-00000495)
[492] See implementation at lines 265-289 of file ████

(GOOG-NETWORK-SC-00000496-97)
[493] See definition at lines 156-330 of file ████ h.

(GOOG-NETWORK-SC-00000901-04)
[494] See implementation at lines 1076-1115 of file ████

(GOOG-NETWORK-SC-00000490)
[495] See definition at lines 30-82 of file ████

(GOOG-NETWORK-SC-00000974 – 0975).
[496] See implementation at lines 112-158 of file ████

GOOG-NETWORK-SC-00000971 – 0972).
[497] See lines 37-38 of file ████

(GOOG-NETWORK-SC-00000974).

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



---

[498] See lines 39-41 of file ███████████████████
██████████████ (GOOG-NETWORK-SC-00000974). ████████

[499] See lines 45-46 of file ███████████████████
██████████████ (GOOG-NETWORK-SC-00000974). ████████

[500] See lines 47-49 of file ███████████████████
██████████████ (GOOG-NETWORK-SC-00000974). ████████

[501] See lines 25-54 of file ███████████████████
██████████████ (GOOG-NETWORK-SC-00000981). ████████

[502] See lines 57-90 of file ███████████████████
██████████████ (GOOG-NETWORK-SC-00000981 to 0982). ████████

[503] See implementations at lines 19-32 and 57-70 of file See lines 25-54 of file ████
██████████████████████████████████
██████████████ (GOOG-NETWORK-SC-00000978 – 0979). ████

[504] See implementation at lines 141-204 in file ████████████████
███████████████████████

[505] See definition and implementation in files ████████████
████████████████████████████
███████ ██ ███████████

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

456.  It is my opinion that the Content ID Siberia Version meets claim element 18[c] literally. However, to the extent this limitation is not literally met, for example, because the search algorithm of the Content ID Siberia Version does not "correlat[e] . . . the first electronic media work with an electronic media work identifier" because it does not "correlate" but rather "can be used to determine whether a video uploaded to YouTube is similar in some sense to any of the video, audio, or melody content in one or more reference," this limitation is met under the doctrine of equivalents.  *See* Defendants' Fourth Supplemental Response to Interrogatory No. 7 (dated September 30, 2019).  The Content ID Siberia Version's search algorithm performs substantially the same function (matching an unknown work with a reference work) in substantially the same way (comparing the unknown work or features extracted from the unknown work to reference works or features extracted from reference works) to obtain substantially the same result (determining if the two works match) as would any technology that "correlat[es] . . . the first electronic media work with an electronic media work identifier."

457.  In sum, the Content ID Siberia Version correlates a user-uploaded video (first electronic media work) based on features extracted from that video.  This correlation is based on a non-exhaustive search identifying a near neighbor (or a neighbor or an approximate nearest neighbor).  The Content ID Siberia Version applies numerous thresholds to determine whether a potential match is a close enough match for there to be a "claim" by a content owner made on the user-uploaded video.  As I detail below, this correlation or "match" between the first uploaded media work (user-uploaded video) and the electronic media work identifier (of the reference work) is then written to a database that is part of the claiming system.  *See, e.g.*, analysis for '464 patent claim element 18[d] and citations therein.

458.  As shown above, each of the Content ID Accused Instrumentalities meets claim element 18[c].

### 4.9.5.  '464 patent claim element 18[d]

> *18[d] storing, by the computer system, correlation information associating the first electronic media work and the first electronic media work identifier;*

459.  Each of the Content ID Accused Instrumentalities meets claim element 1[c].

460.  I understand that the parties dispute the construction of "correlation information."  I understand that Defendants assert this term is indefinite, and that Network-1 asserts this term should be given its ordinary meaning or, alternatively, construed as "information that associates the first electronic media work with an electronic media work identifier."  In my view, the alternative construction is consistent with the ordinary meaning of this phrase. Therefore, whether this term is simply given its ordinary meaning or construed as "information that associates the first electronic media work with an electronic media work identifier" does not affect my infringement analysis.

---

██████████████████████████████████████████████
██████  (GOOG-NETWORK-SC-00000988 to 0992).

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

461.  When each of the Content ID Accused Instrumentalities identifies a match between a user uploaded media work and a reference media work, the claiming system[506] of each of the Content ID Accused Instrumentalities then stores information associated the user-uploaded media work with the electronic media work identifier that corresponds to the reference media work to which the user-uploaded media work was correlated.  Once a claim is created, a database record is created that contains, among other things, identifiers for both the user-uploaded video and reference work.  *See, e.g.*, Erb Depo. at 158:19-25 ("The claiming system that I described earlier as one of the side effects of creating a claim writes a record into the claim table."); Rosenstein Depo. at 26:14-27:3 ("Do you know if, for example, a pointer or anything like that that connect the now-identified video to whatever content asset it was matched to is created to -- A Yes.  Q And how is that done?  A A claim is created that contains the identifier for the video and the identifier for the asset.  Q And where is that claim you described stored or created?  A In another database."); Wang Depo. at 39:2-42:7 ("Q And when you -- when your claiming logic receives – receives the information we discussed from the match claiming logic, does it store that information somewhere?  A Yes.  Q Where is that?  A In our claim back end, the Bigtable. . . . Q So when the information comes into the claim back end from the match claiming logic, how is it -- how is it stored in Bigtable?  A We store the fields in the Bigtable row."); *id.* at 63:12- ("Q so the linkage between the matched reference and the user-uploaded video is stored after the match claiming team calls your API?  A Yes.  The linkage is stored within a claim.  That's what a claim is."); Konrad Depo. at 47:3-48:21 ("Q And does the claim platform store the identifier for a given video and somehow link that to the various claims that it's -- that are -- that are associated with the video?  . . . I Believe that the claim platform has a -- has encrypted video IDs with which it reference to the claimed video, and also has some identifier in how it links an asset in which the claim is against or multiple, yeah."); *see also, e.g.*, Erb Depo. at 33:2-10, Pasula Depo. at 74:14-75:14.

462.  As shown above, each of the Content ID Accused Instrumentalities meets claim element 18[d].

### 4.9.6.  '464 patent claim element 18[e]

> *18[e] generating, by the computer system, a tag associated with*
> *the first electronic media work;*

463.  Each of the Content ID Accused Instrumentalities meets claim element 18[e].

464.  Each of the Content ID Accused Instrumentalities generates a tag that is associated with the first electronic media work (the user-uploaded video).  For example, the various pieces of information generated that relate to the button, banner, and/or link displayed on the watch page of a monetized user-uploaded video are tags.  Some of those tags are comprised of a URL.

---

[506] I understand that the functionality of the claiming system did not change when the matching system changed from the Content ID LSH Version to the Content ID Siberia Version.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

465.  When there is a claim generated that has a "monetize" policy, an advertisement is displayed on the user-uploaded video's watch page.  *See, e.g.*, analysis for '464 patent claim element 1[d] and citations therein.

466.  As an example of a YouTube video with such advertisements, please see the video found at URL https://www.youtube.com/watch?v=ffA7_OaGqiY.  This video begins with an ad break and plays further videos during ad breaks throughout the video.  The screenshot below was captured from the above URL and it displays an ad break in progress:



Examination of the advertisement shows multiple clickable items, including by selecting the "Save Your Time" banner, the "Learn More" button, or by clicking the URL displayed below the grey box, "godaddy.com/pro".  Each of these clickable items is reflective of a tag that is generated by each of the Content ID Accused Instrumentalities.  The following screenshot provides a close up of these clickable items:



467.  Using the menu option to view debug information for the advertisement (by right clicking on the video and selecting copy debug info), a snippet of code can be abstracted from the video advertisement.  For example, on page 4 of this code is an identifier "ad-text" associated with a value of "godaddy.com/pro", an identifier "visit-advertiser:1y" associated with a value of "godaddy.com/pro", and a "span" html element identified as "ytp-ad-button-text" associated with a value of "godaddy.com/pro".  *See* **Exhibit C** (the file YouTube_AdBreak1_dbg_info.txt obtained as I describe above).  These identifiers correspond to the godaddy.com/pro URL displayed below the banner.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

468.  Clicking on the "Save Your Time" banner, the "Learn More" button, or the "godaddy.com/pro" URL will cause the user's web browser to be directed to the advertiser's desired web page, further confirming that a tag containing a hyperlink was generated.  The following screenshot shows the web page displayed to the user after clicking on any of the options described above:



469.  The Google support page found at https://support.google.com/displayspecs/answer/6055025?hl=en&ref_topic=4588474  for YouTube content creators and advertisers discusses actions defined for an ad.  The screenshot below identifies two URLs required for video ads.  These two URLs allow such a tag to be generated based on an instruction that contains a hyperlink to a URL:

| Display URL | Required | Required by Google Ads UI. The domain will show on the live video. |
|---|---|---|
| Final URL | Required | The destination can be your website or YouTube video or channel. |

470.  In addition to ad breaks that play advertiser videos, banner advertisements that display over the video are supported as well.  The screenshot below was also captured from the video found at URL https://www.youtube.com/watch?v=ffA7_OaGqiY and it shows an example of a banner advertisement:

<u>**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**</u>
<u>**PROSECUTION/ACQUISITION BAR MATERIALS**</u>



Selecting the Honey advertisement in the above screenshot directs the user to the advertiser's desired web page, indicating that a tag containing a hyperlink was similarly generated. As an example, selecting the banner ad above will take the user to the joinhoney.com site shown in the screenshot below:



273

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

471.  Source code produced by Defendants confirms my analysis concerning this claim element.  For example.



472.  As shown above, each of the Content ID Accused Instrumentalities meets claim element 18[e].

---

[507] See definition at lines 259-313 of file ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
(GOOG-NETWORK-SC-0000446)
[508] See definition at lines 163-239 of file ▮▮▮▮▮▮▮▮▮▮▮ (GOOG-NETWORK-SC-0000447-48)
[509] See definition at lines 191 to 236 of file ▮▮▮▮▮▮▮▮▮. (GOOG-NETWORK-SC-0000447-48)
[510] See definition at lines ▮▮▮▮▮▮▮▮▮▮ (GOOG-NETWORK-SC-0000447)
[511] See definition at lines 198-201 of ▮▮▮▮▮▮▮▮ (GOOG-NETWORK-SC-0000447)
[512] See definition at lines 266-288 of file ▮▮▮▮▮▮▮ (GOOG-NETWORK-SC-0000448)
[513] See definition at lines 243-247 of file ▮▮▮▮▮▮▮. (GOOG-NETWORK-SC-0000448)
[514] See definition at lines 18-38 of file ▮▮▮▮▮▮▮▮▮▮▮ (GOOG-NETWORK-SC-0000379)

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

### 4.9.7. '464 patent claim element 18[f]

> *18[f] providing, from the computer system to a first user electronic device, the first electronic media work and the tag;*

473. Each of the Content ID Accused Instrumentalities meets claim element 18[f].

474. Each of the Content ID Accused Instrumentalities generates a tag containing a hyperlink associated with the user-uploaded video (first electronic media work) and provides the user-uploaded video and the tag containing a hyperlink to a first user electronic device (the device of an individual who is viewing the user-uploaded video being monetized). *See, e.g.*, analysis for '464 patent claim element 18[e] and citations therein.

475. As shown above, each of the Content ID Accused Instrumentalities meets claim element 18[f].

### 4.9.8. '464 patent claim element 18[g]

> *1[g] receiving, at the computer system, a request generated at the first user-electronic device and related to the tag;*

476. Each of the Content ID Accused Instrumentalities meets claim element 18[g].

477. Each of the Content ID Accused Instrumentalities obtains from the first user electronic device (the device of the individual viewing the user-uploaded video) a request related to the tag (e.g., a request to visit the advertiser's linked website resulting from the user clicking on an item containing the link). *See, e.g.*, analysis for '464 patent claim element 18[e] and 18[f] and citations therein.

478. As shown above, each of the Content ID Accused Instrumentalities meets claim element 18[g].

### 4.9.9. '464 patent claim element 18[h]

> *18[h] generating, using the computer system, machine-readable instructions based upon the associated information to be used in performing, at the user electronic device, the action; and*

479. Each of the Content ID Accused Instrumentalities meets claim element 18[h].

480. I understand the parties agree that "machine-readable instructions" means "code or pseudocode that is executed using a computer processor, *i.e.*, that is discernable by a computer processor and dictates steps to be carried out by one or more computer processors." I have applied this construction in my analysis below.

481. Each of the Content ID Accused Instrumentalities generates machine-readable instructions (the URL) based upon the associated information (monetize policy) to be used in performing, at the user electronic device, the action (displaying an ad with a hyperlink and

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

redirecting the user to the hyperlink's URL upon request by the user). *See, e.g.*, analysis for
'464 patent claim element 18[e], 18[f], and 18[g] and citations therein.

482.  As shown above, each of the Content ID Accused Instrumentalities meets claim element
18[h].

### 4.9.10.    '464 patent claim element 18[i]

> *18[i] providing, from the computer system to the first user
> electronic device, the machine-readable instructions to perform the
> action in response to the request.*

483.  Each of the Content ID Accused Instrumentalities meets claim element 18[i].

484.  I understand the parties agree that "machine-readable instructions" means "code or
pseudocode that is executed using a computer processor, *i.e.*, that is discernable by a computer
processor and dictates steps to be carried out by one or more computer processors."  I have
applied this construction in my analysis below.

485.  Each of the Content ID Accused Instrumentalities provides machine-readable instructions
(the URL) the first user electronic device to perform the action (redirecting the user to the
hyperlink's URL) in response to the request (the user clicking on the link).  *See, e.g.*, analysis
for '464 patent claim element 1[e], [f], 1[g], and 1[h] and citations therein.

486.  As shown above, each of the Content ID Accused Instrumentalities meets claim element
18[i].

487.  In sum, in my opinion each of the Content ID Accused Instrumentalities meets all of the
limitations of claim 18 and thereby infringe claim 18 of the '464 patent.

### 4.10.  '464 patent claim 25

> *25. The method of claim 18, wherein the first electronic media
> work is received from a first electronic device, the associated
> information is received from a second electronic device, and the
> first electronic device, the second electronic device, and the first
> user electronic device are different from one another.*

488.  Each of the Content ID Accused Instrumentalities meets claim 25.

489.  As an initial matter, each of the Content ID Accused Instrumentalities meets all the
limitations of claim 18, the claim from which claim 25 depends.  *See, e.g.*, analysis for '464
patent claim 18 and citations therein.

490.  With each of the Content ID Accused Instrumentalities, the first electronic media work
(user-uploaded video) is uploaded by a first user using a first electronic device, and the
associated information is received from a second electronic device operated by a rights holder.
The first user electronic device is a device operated by a second user viewing the user-

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

uploaded media work uploaded by the first user.  *See, e.g.*, analysis for '464 patent claim 18 and citations therein.

491.  As shown above, each of the Content ID Accused Instrumentalities meets claim 25.

### 4.11.  '464 patent claim 27

> *27. The method of claim 18, wherein the associated information is related to an advertisement.*

492.  Each of the Content ID Accused Instrumentalities meets claim 27.

493.  As an initial matter, each of the Content ID Accused Instrumentalities meets all the limitations of claim 18, the claim from which claim 27 depends.  *See, e.g.*, analysis for '464 patent claim 18 and citations therein.

494.  When each of the Content ID Accused Instrumentalities identifies a match between a media work uploaded by a user and a reference media work for which the rights holder has set a policy of "monetize" for matching user-uploaded works, the user-uploaded media work remains available on YouTube, and advertisements may be displayed in association with it when it is accessed by another YouTube user through his or her computer or mobile device .  *See, e.g.*, analysis for '464 patent claim element 18[d], 18[e], 18[f], 18[g], 18[h], and 18[i] and citations therein.

495.  As shown above, each of the Content ID Accused Instrumentalities meets claim 27.

### 4.12.  '464 patent claim 33

> *33. The method of claim 18, wherein the machine-readable instructions comprise a hyperlink to a URL.*

496.  Each of the Content ID Accused Instrumentalities meets claim 33.

497.  I understand the parties agree that "machine-readable instructions" means "code or pseudocode that is executed using a computer processor, *i.e.*, that is discernable by a computer processor and dictates steps to be carried out by one or more computer processors."  I have applied this construction in my analysis below.

498.  As an initial matter, each of the Content ID Accused Instrumentalities meets all the limitations of claim 18, the claim from which claim 33 depends.  *See, e.g.*, analysis for '464 patent claim 18 and citations therein.

499.  Each of the Content ID Accused Instrumentalities provides machine-readable instructions that comprise a URL to a user viewing a user-uploaded video.  *See, e.g.*, analysis for '464 patent claim element 18[e], 18[f], 18[g], 18[h], and 18[i] and citations therein.

500.  As shown above, each of the Content ID Accused Instrumentalities meets claim 33.

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

**5.    ALLEGED NON-INFRINGING ALTERNATIVES**

501.  I understand that YouTube is contending that there are certain activities that would represent "non-infringing alternatives."  I understand that a non-infringing alternative is a modification to an accused instrumentality that, if implemented, would render the accused product non-infringing.  Further, I have been informed that a non-infringing alternative must be feasible (i.e., technically feasible and economically feasible) and commercially acceptable.  I also understand that Defendants have the burden of establishing that there are, or were, at least one viable non-infringing alternative(s) that could be applied to the Content ID Accused Instrumentalities.  I understand that to meet their burden of proof, Defendants must show that the materials needed to implement the non-infringing alternative were readily available; the non-infringing alternative was well known in the field at the time of infringement; and all of the necessary equipment, know-how, and experience to use the non-infringing alternative were available at the time of infringement to establish a non-infringing alternative, where all of which are required to establish that a non-infringing alternative exists or existed, in addition to the other requirements I have described.

502.  As I have explained in detail above, the Asserted Claims of Network-1's patents are directed to methods for identifying works based on the work itself, rather than an embedded signal, metadata, or some other information appended to the work, and then determining an action to take based on such identification.  In short, the Asserted Patents teach that features are extracted from both reference and unknown works; that efficient search methodologies are used to identify or "match" to reference works that bear similarity to the unknown work that is the subject of the query; and then an action is taken based on an unknown work "matching" a reference work.

503.  These innovations result in at least four significant categories of benefits:  (1) identification of the unknown work does not depend on additional information like metadata being appended to the work; (2) the unknown work can be matched with reference works that are not only exact matches, but also bear similarity to a given reference work; (3) the search methodologies use efficient techniques such that "matches" can be found quickly and without consuming unnecessary computer resources; and (4) the actions taken based on the "matches" are automatic, i.e., not requiring manual input. Therefore, for something to be a "non-infringing alternative," it must at least convey these benefits to be deemed an "alternative." *See, e.g.*, Konrad Depo. at 28:1-11 ("The goal of ContentID is to provide content owner an ability to manage their copyrighted content at scale on YouTube.  To be able to do that, it's important that we detect content resue for all uploaded videos and not just a small subset."); *see also, e.g.*, *id.* at 236:6-237:5 ("Are you aware of any commercially available solution for identifying content that offers the same channels as YouTube ContentID does?  A I don't know of any.").

504.  Network-1 asked Defendants an interrogatory relating to any design-arounds or non-infringing alternatives, and in response, Defendants listed fifteen alleged non-infringing alternatives.  In my view, none of these "alternatives" proposed by Defendants is a true "alternative" to the technology claimed in the Asserted Claims.  To my knowledge, Defendants have also not implemented any of these proposed "alternatives."  In addition, many of Defendants' "proposed alternatives" appear to be self-serving statements indicating that they

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

could design a system that does not meet a certain claim element, without explaining what the design of that system would look like, entail, cost, or perform.

505. _Proposed Alternative No. 1._ "The first available non-infringing alternative is geographically locating the servers running the Accused Instrumentalities, or a portion of the Accused Instrumentalities, outside of the United States." Defendants' Third Supplemental Response to Network-1's Interrogatory No. 13 (dated May 14, 2015).

    a. I have not seen any evidence that Defendants have evaluated whether or not this proposed "alternative" is technically feasible or not. _See, e.g._, Erb. Depo. at 262:8-12 ("Q. Did you perform any analysis of what performance issues or delays there might be with adopting this switch of moving the location of data centers that implement the ContentID system?  A No."); Konrad Depo. at 69:4-16 ("Q Have there been any discussions about whether that's feasible and under what circumstances Google would be able to do that?  A I have been in conversations about this yesterday as part of the preparation to this meeting.  We have never discussed this otherwise.  Q And when you say you were in conversations yesterday, what do you mean?  What are you referring to?  A As part of the preparation of this deposition we discussed whether it would be difficult to operate ContentID just in data centers exclusively outside the United States.").

    b. I understand that Defendants technical witnesses testified that implementing this "alternative" would require some work, but "not a heavy amount of work."  However, Google has provided no indication that they have done any evaluation of how much would work be required to make this switch. _See, e.g._, Erb Depo. at 260:24-261:10 ("Q What would be the cost to switch in this manner?  A To the best of my knowledge, there would be no cost associated with it except for the labor, maybe two days' worth of engineering time, for someone to actually configure the system in a different data center and to -- and bring up all the relevant servers, build the database or replicate it to the -- build the fingerprint store and the reference index in the appropriate new data center."); Konrad Depo. at 68:15-69:3 ("Q Do you have any understanding of what would be required to, for example, not have any in the US?  A I believe that would be -- the first thing that we would be doing is we would contact the resource planners, Christine Moor's team, to make sure we have enough provisioning in other data centers.  I guess there would be other teams that could be locating their services out of non-US data centers and we could get those resources there and, once we would have that, it would be as simple as pushing a couple of configuration to bring it up in non-US data centers, yes."); _see also, e.g._, _id._ at Konrad Depo. at 70:9-74:2 (clarifying that he was only referring to the matching, not the fingerprinting or claiming portions of the system).

    c. Critically, the amount of work required is not the only relevant evaluation.  Whether a proposed "alternative" is a viable alternative also hinges on whether the alternative is technically feasible and whether there are disadvantages to the proposed alternative, including costs beyond the direct costs of implementing the alternative.  I understand that Defendants tend to track Content ID operations based on the location of the upload, indicating that there is likely some geographic relationship between the

<u>**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**</u>
<u>**PROSECUTION/ACQUISITION BAR MATERIALS**</u>

upload location and the processing location.  Mr. Konrad also testified that at least portions of the operation of Content ID are geographically linked.  *See, e.g.*, Konrad Depo. at 52:14-23 ("So the part of the match system that we refer to as fingerprinting is typically done in the same data center where the transcoding is done, I believe."); *id.* at 53:14-54:1 ("Q And when you said that the fingerprinting is done where the transcoding is done, what determines which data center handles the transcoding of a particular upload?  . . . I believe it might be related to the location of where the video is uploaded).

d.  Defendants also track matches made by the Content ID Accused Instrumentalities based on location of upload.  *See, e.g.*, Konrad Depo. and associated "errata" at 57:15-59:14, 66:23-67:4 (indicating Defendants track matches made by Content ID based on where the video was uploaded); *see also, e.g.*, GOOG-NETWORK-00803587.

e.  Defendants' witnesses also explained that there are advantages to processing a user-generated video near the point of upload (i.e., advantages to processing a U.S. upload in the United States), and to being able to distribute processing over as many data centers as possible.  *See, e.g.*, Erb Depo. at 259:17-262:4 ("Q Do you have any understanding of what that would mean in terms of an alternative to the way the Google system is currently operated?  A I think so.  Q What would that mean?  A I think that would mean running, for example, the fingerprinting and/or the match servers and/or the claiming logic on, in data centers that are outside the United States.  Q Why doesn't Google currently do that?  A Because we -- first, we have no reason to do that.  And second, because there are some minor advantages to running servers close to where the user uploads give it to us.  Q Where are those advantages?  A We avoid the delays and the -- and the network traffic to transport the video data from the United States to a data center in, for example, Europe."); Konrad Depo. at 70:9-71:7 ("In general, the more flexibility you have, the higher utilization can be for these kinds of systems.  So, whenever a service can run everywhere, there is some advantages in overall utilization."); *see also, e.g.*, Wiseman Depo. at 49:14-50:10.

f.  In my view, there are significant outstanding questions (both technical and cost-related) concerning whether or not locating the servers (or a portion of the servers) running the Content ID Accused Instrumentalities outside the United States is a viable alternative.  Particularly for videos uploaded in the United States, this would likely cause delays in processing due to, for example, issues with latency and load balancing.  In addition, I do not agree that there would not be much work to re-provision Content ID processing to occur in non-U.S. data centers.  As Mr. Konrad explained, this would likely require not only re-provisioning Content ID data flow, but also the data flow of various other operations carried out by Google and YouTube.  In addition, I understand that transmitting data, particularly such large amounts of data, is not without cost—unless Google was using their own cables, Google would likely have to pay by peak load, and moving large amounts of video data from one place to another would greatly affect peak load.  Even if Google laid their own underwater cables to transmit such data from, for example the United States to Asia, building and maintaining underwater cables that span from one end of the

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

Pacific Ocean to the other costs many millions of dollars.  *See, e.g.*,
https://www.itworld.com/article/2947934/heres-what-to-takes-to-lay-googles-
9000km-undersea-cable.html.  Defendants have provided no information about or
analysis concerning this issue.

g.  Finally, as I describe in detail above, there are numerous other YouTube and Google
functionalities that rely on Content ID content identification technology to function
including:  (1) ███████████████████████████████████████████
█████████  (2) identifying and removing un-safe content from YouTube, (3) providing
links for users to make purchases or view other promoted content, (4) ████████████
████████████████████████████████████████████████████████████  (5) ███████
enhancing "brand safety" by identifying user-uploaded videos containing ads, and (6)
identifying and enhancing the contents of users' Google Play libraries.  *See, e.g.*,
Section 2 analysis and citations therein.  Defendants have not addressed how locating
the servers (or a portion of the servers) running the Content ID Accused
Instrumentalities outside the United States would impact these and other products and
services that rely on Content ID's content identification technology.

506.  *Proposed Alternative No. 2.*  "The second available non-infringing alternative is a content
recognition system employing a brute force search to identify matches."  Defendants' Third
Supplemental Response to Network-1's Interrogatory No. 13 (dated May 14, 2015).

a.  I understand that Defendants assert that this alternative is non-infringing "[b]ecause a
brute force search is not 'non-exhaustive.'"  *See id.*  I agree that this proposed
alternative could potentially be non-infringing.  However, there are several reasons
why this is not a viable alternative.

b.  First, one of Defendants' technical witnesses testified that Defendants lack ample
computing resources to implement this option.  *See, e.g.*, Erb Depo. at 175:16-176:15
("Q Now, am I correct that it would be possible, at least in theory, to implement a
system that eliminate Stage I and performed some comparison of fingerprints directly
between a probe video's fingerprint and all the fingerprints in the reference list?  A
When you say theoretically possible, you don't -- you mean I should ignore all
constraints of whether or not Google has enough computers and that sort of things?
A Exactly.  A Yes.  Then in that case, yes.  Q And I think your answer may have
alluded to this, but why wouldn't you implement the system in that way?  A Because
Google doesn't have enough computers.  Q Okay.  And that's because the resource-
intensity of performing all those comparisons would be prohibitive in terms of what
would be entailed?  A Yes.  It would require many, mnay, many orders of magnitude
more computing resources than the actual system.").

c.  Second, even if Defendants have enough computing resources to run brute force
searches for matches every video uploaded to YouTube, developing this system
would require a substantial amount of time and work to implement.  *See, e.g.*, Erb
Depo. at 262:13-264:9 ("Q And do you have any sense of what it would cost to
develop such a system?  A It would -- it would cost -- it's hard to give an exact

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

amount, but it's -- it would be a minimum of a couple of staff years' worth of work. Q Staff years, is that what you said?  Yes."); *see also, e.g.*, *id.* at 264:13-265:16.

d.  Second, this proposed alternative would not convey all of the benefits I mention above.  For example, in my opinion, such a search would not use efficient techniques such that "matches" can be found quickly and without consuming unnecessary computer resources.  Defendants' technical witnesses agreed.  In particular, Mr. Konrad testified that it would be ████████████████████████████████ ████████ more computationally expensive to brute force searches on the Content ID data set.  *See, e.g.*, Konrad Depo. at 190:3-192:25 ("Q Well, what -- let's put it this way, would you recommend YouTube to shift to that approach for Content ID? . . . [N]o, I would not make a recommendation to do all these pair-wise comparisons. . . . Q Why not?  A I believe it would be inefficient.  Q And I assume it would also be materially most costly to run the system that way?  A If we would keep everything as is and, instead of partition the system, always do all the lookups against -- across all partitions, it would be most costly to operate the system.  Q How much more?  A That depends on the constant I referred to earlier.  So, for the ████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ *see also, e.g.*, Erb Depo. at 265:17-266:2 ("Q Is it likely that it would operate with the same speed and efficiency as the current system?  A In my opinion, it's unlikely."); Kumar Depo. at 102:4-8.

e.  Finally, Google has not attempted to develop such a system and has not done any analysis on its viability.  *See, e.g.*, Erb Depo. at 264:10-12 ("Q Am I correct that Google hasn't undertaken to develop such a system?  A Not to my knowledge."); *id.* at 266:14-18 ("Q But you don't know how you would actually go about designing that system, sitting here today.  A No.  I'm -- I haven't given it any thought.").

507.  *Proposed Alternative No. 3.*  "The third available non-infringing alternative is a content recognition system that identifies matches by searching for bit-for-bit identical copies of a query work."  Defendants' Third Supplemental Response to Network-1's Interrogatory No. 13 (dated May 14, 2015).

a.  I understand that Defendants assert that this alternative is non-infringing "[b]ecause such a system does not require extracting features from a work" and "because such a system searches only for exact matches."  *See id.*  I agree that this proposed alternative could potentially be non-infringing.  However, there are several reasons why this is not a viable alternative.

b.  This proposed alternative would not convey all of the benefits I mention above.  For example, in my opinion, such a search would not allow the unknown work to be matched with reference works that are not only exact matches, but also bear similarity to a given reference work.  *See, e.g.*, Erb Depo. at 266:19-267:22 ("Q And is there some advantage to having a system that can identify not only bit for bit exact copies, but also those that aren't exact copies?  A Yes.  Q What is the advantage of having a system that can not only identify bit for bit copies?  A The versions of videos that

people upload to YouTube are often transcoded or modified and the current ContentID system can match those as well as the bit for bit exact copies. So it effectively has higher recall. Q And is there some advantage to having higher recall? A There is some advantage to having higher recall.").

c. Google already has a system that identifies bit for bit copies, but has not switched to Content ID to run on this system because it would not be feasible to use it for the purposes of Content ID. *See, e.g.*, Erb Depo. at 267:23-269:20 ("Q Google in fact has a separate system that does identify bit for bit copies, is that correct? A In a limited context. Q That system uses an MD5 Hash, correct? A In part. Q When you say 'in part,' what do you mean? A The MD5 matching is only done for videos uploaded by the same user. So the – we detect a bit for bit copy of a video uploaded by a given user. So we're using more than just the MD5 Hash for matching. We're also using a user ID of the uploader. Q I see. So the MD5 matching is only applied to videos uploaded by the same user, not to other videos already in the system. A Correct. Q I see. Why doesn't Google simply use an MD5-based matching system across the entire system instead of ContentID? A Because of the higher recall that ContentID offers over the -- the set of videos that our partners would like to identify content in. And because the current ContentID system can identify an excerpt from a reference work or the inclusion of some or all of a reference work as part rather than the whole, the totality of the user-uploaded video. Q And is that ability to identify similar videos or videos with excerpts important to YouTube partners to your understanding? A Yes."); Konrad Depo. at 82:18-84:7 ("I'm not sure how helpful a system would be that identifies identical re-uploads. That's just not a system that we need for the platform; it wouldn't be useful for our content owners."); *id.* at 227:11-228:3 ("And using Md5 hashing wouldn't allow ContentID to function the same way as it does in its either LSH or current Siberia implementations. Is that fair? . . . Computing one Md5 on all the bytes of a video and then comparing that to an Md5 of uploaded videos would only enable us to see whether it was bit-wise the same file and not whether there was content reuse in parts or any kind of transformations or anything like that. . . . Q And so that would not provide the kind of output you're looking for with the ContentID system. Is that fair? A No, we would not be able to enable a content owner to manage the content and scale the why -- the way they wanted.").

508. *Proposed Alternative No. 4.* "The fourth available non-infringing alternative is a content recognition system that identifies matches by conducting a neighbor search based on full copies [of] query and known works, not extracted features." Defendants' Third Supplemental Response to Network-1's Interrogatory No. 13 (dated May 14, 2015).

a. I understand that Defendants assert that this alternative is non-infringing "[b]ecause such a system does not extract features from a work." *See id.* I agree that this proposed alternative could potentially be non-infringing. However, there are several reasons why this is not a viable alternative.

b. Google has not attempted to develop such a system and has not done any analysis on its viability, its cost, or how long it would take to develop. *See, e.g.*, Erb Depo. at 272:19-22 ("Q And is it fair to say that google has not explored or analyzed what it

<u>CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS</u>

would take to implement such a system?  A It's fair to say."); *see also, e.g.*, *id.* at 269:21-272:18.

   c.   This proposed alternative would not convey all of the benefits I mention above.  For example, in my opinion, such a search would not use efficient techniques such that "matches" can be found quickly and without consuming unnecessary computer resources.  Extracting features from, or creating a compact representation of, a user-uploaded video (as well as the reference video) saves time in the computation because much less data is potentially examined in determining whether the files are similar or not.  *See, e.g.*, Erb Depo. at 271:14-25 ("Q What's the size of the full video file of a sort of average user-uploaded video?  A As far as I know, and this is an approximate answer, as far as I know, it's a few megabytes.  Q And what's the typical size of the full fingerprint that's utilized by the ContentID system for a video?  A An average fingerprint, an average combination of audio, video and melody fingerprints would, for a typical video, would add up to around a hundred kilobytes.").

   d.   In addition to the much greater time and computational resources that would be required for such a system, Defendants have not explained *how* they would compare videos without using "extracted features."  For example, they have not suggested what in this case corresponds to the distance metric or difference function they would use.  It is my opinion that it would be difficult to develop a system that was not, at least in part, based on extracted features.  Because of this, I would need to have a detailed description of such a system in order to determine whether or not it was indeed a viable alternative, and Defendants have provided no such description.

509. *Proposed Alternative No. 5.*  "The fifth available non-infringing alternative is a content recognition system that identifies matches by computing a hash of a query work and searching for exact matches to the hashes of known works."  Defendants' Third Supplemental Response to Network-1's Interrogatory No. 13 (dated May 14, 2015).

   a.   I understand that Defendants assert that this alternative is non-infringing "[b]ecause a hash is derived from the binary code of a work, rather than its audio or visual features, such a system does not extract features" and "because such a system searches only for exact matches."  *See id.*  I disagree that this proposed alternative would be non-infringing.  First, a hash is derived from the work itself.  A computer does not qualitatively view the audio and visual features of a work, but rather performs computations on data in the files to extract features from a work.  Second, a system that generates hashes does not necessarily look for exact matches.  There are many different kinds of hashing, and some allow only for exact matching and others allow for matches to neighbors, near neighbors, and approximate nearest neighbors.  And even if a portion of the search looks for exact matches to hashed values that only represent *portions* of a work, the overall search algorithm can still look for matches to neighbors, near neighbors, and approximate nearest neighbors.  If the proposed alternative used a hashing method that only allows for an overall search method that located exact matches, I agree that it could potentially be non-infringing.  However, there are several reasons why this is not a viable alternative, many of which are similar as for Proposed Alternative No. 3.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

b. Proposed Alternative No. 5 would not convey all of the benefits I mention above. For example, in my opinion, such a search would not allow the unknown work to be matched with reference works that are not only exact matches, but also bear similarity to a given reference work. *See, e.g.*, Erb Depo. at 272:23-273:25 ("Q Can you explain how such a system would function? A Yes. The system would compute a standard Hash like an MD5 Hash on -- in my design, it would -- it would do it independently on the audio channel and the video channel. And then we would index all of the -- the index key would be the Hash value and the -- in the key value store, the video IDs of the references would be the values that we would store and when a user-uploaded video was being processed, we would compute again the Hash of the audio and the video, and look it up in that lookup table to see what reference works had exactly the same Hash values. Q And why doesn't Google use such a system now? A For the same reason that we don't use the third alternative, which is that it has lower recall."); *see also, e.g.*, *id.* at 266:19-267:22 ("Q And is there some advantage to having a system that can identify not only bit for bit exact copies, but also those that aren't exact copies? A Yes. Q What is the advantage of having a system that can not only identify bit for bit copies? A The versions of videos that people upload to YouTube are often transcoded or modified and the current ContentID system can match those as well as the bit for bit exact copies. So it effectively has higher recall. Q And is there some advantage to having higher recall? A There is some advantage to having higher recall.").

c. Google already has a system that identifies bit for bit copies, but has not switched to Content ID to run on this system because it would not be feasible to use it for the purposes of Content ID. *See, e.g.*, Erb Depo. at 271:21-274:5 ("Q And why doesn't Google use such a system now? A For the same reason that we don't use the third alternative, which is that it has lower recall. Q And the difficulties or potential problems with implementing are the same as you described with the third alternative? A Yes."); *see also, e.g.*, *id.* at 267:23-269:20 ("Q Google in fact has a separate system that does identify bit for bit copies, is that correct? A In a limited context. Q That system uses an MD5 Hash, correct? A In part. Q When you say 'in part,' what do you mean? A The MD5 matching is only done for videos uploaded by the same user. So the – we detect a bit for bit copy of a video uploaded by a given user. So we're using more than just the MD5 Hash for matching. We're also using a user ID of the uploader. Q I see. So the MD5 matching is only applied to videos uploaded by the same user, not to other videos already in the system. A Correct. Q I see. Why doesn't Google simply use an MD5-based matching system across the entire system instead of ContentID? A Because of the higher recall that ContentID offers over the -- the set of videos that our partners would like to identify content in. And because the current ContentID system can identify an excerpt from a reference work or the inclusion of some or all of a reference work as part rather than the whole, the totality of the user-uploaded video. Q And is that ability to identify similar videos or videos with excerpts important to YouTube partners to your understanding? A Yes."); Konrad Depo. at 82:18-84:7 ("I'm not sure how helpful a system would be that identifies identical re-uploads. That's just not a system that we need for the platform; it wouldn't be useful for our content owners."); *id.* at 227:11-228:3 ("And using Md5 hashing wouldn't allow ContentID to function the same way as it does in its either

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

LSH or current Siberia implementations.  Is that fair?  . . . Computing one Md5 on all the bytes of a video and then comparing that to an Md5 of uploaded videos would only enable us to see whether it was bit-wise the same file and not whether there was content reuse in parts or any kind of transformations or anything like that.  . . . Q And so that would not provide the kind of output you're looking for with the ContentID system.  Is that fair?  A No, we would not be able to enable a content owner to manage the content and scale the why -- the way they wanted.").

510.  *Proposed Alternative No. 6.*  "The sixth available non-infringing alternative is a content recognition system that identifies matches by computing a hash of a query work [and] searching for neighbors among the hashes of known works."  Defendants' Third Supplemental Response to Network-1's Interrogatory No. 13 (dated May 14, 2015).  I understand that Defendants assert that this alternative is non-infringing "[b]ecause a hash is derived from the binary code of a work, rather than its audio or visual features, such a system does not extract features."  *See id.*  I disagree that this proposed alternative would be non-infringing.  As I explain in relation to Proposed Alternative No. 5, a hash is derived from the work itself.  A computer does not qualitatively view the audio and visual features of a work, but rather performs computations on data in the files to extract features from a work.  And a hash that can find "neighbors" in terms of the audio or video content is necessarily a hash that encodes information about the audio or video content, and is therefore derived from its audio or visual features.

511.  *Proposed Alternative No. 7.*  "The seventh available non-infringing alternative is a content recognition system that identifies matches by conducting a search that does not employ a threshold."  Defendants' Third Supplemental Response to Network-1's Interrogatory No. 13 (dated May 14, 2015).  I understand that Defendants assert that this alternative is non-infringing because such a system "does not employ a 'threshold' based on a 'distance or difference.'"  *See id.*  Although it is not entirely clear what sort of system Defendants are proposing, I agree that this proposed alternative could potentially be non-infringing.  However, such a system is not a viable alternative because it would not convey all of the benefits I mention above.  For example, in my opinion, such a search would not allow the unknown work to be matched with reference works that are not only exact matches, but also bear similarity to a given reference work.  *See also, e.g.*, analysis for Proposed Alternative Nos. 3 and 5.  If Defendants do provide further specifications or technical details on what type of system they envision for this proposed alternative, I reserve the right to supplement my opinion to address that system in further detail.

512.  *Proposed Alternative No. 8.*  "The eighth available non-infringing alternative is a content recognition system that identifies matches by analyzing the metadata of a query work (e.g., artist, title, track, and work length.)"  Defendants' Third Supplemental Response to Network-1's Interrogatory No. 13 (dated May 14, 2015).

   a.  I understand that Defendants assert that this alternative is non-infringing because, among other things, "extract audio or visual features from a work."  *See id.*  I agree that this proposed alternative could potentially be non-infringing.  However, there are several reasons why this is not a viable alternative.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

b. Google has not attempted to develop such a system and has not done any analysis on its viability, its cost, or how long it would take to develop. *See, e.g.*, Erb Depo. at 284:2-286:14 ("Q What percentage provide accurate metadata?  A I don't know the percentage.  Q You never studied what that might be?  A No. . . . Q Have you explored what the cost would be of switching to that kind of system?  A No.  Q Has anyone at Google undertaken to design such a system at Google?  A No.  Q Have you explored in any way what the commercial feasibility of having such a system would be in terms of Google's interactions with its partners?  A No.").

c. This proposed alternative would not convey all of the benefits I mention above.  For example, in this instance, analysis of the unknown work depends on additional information like metadata being appended to the work, and are not analyzed based on the content of the work itself.  Mr. Kumar agreed that such a system would not meet the goals of Content ID and would not be possible.  *See, e.g.*, Kumar Depo. at 81:16-82:17 ("Q Has Google looked at using only metadata and not using the match system to identify videos?  . . . I believe it at times that questions like this were asked.  There's always an understanding that that wouldn't be possible.  It is hard to assess based on a metadata whether a song occurs in a -- somewhere in a – in a video, or a snippet of a movie occurs somewhere in a video. . . . Q So, when you say that it wouldn't be possible, you mean it wouldn't -- I guess what wouldn't be possible?  A We wouldn't be able to find all the matching pairs that we're currently finding just by looking at the metadata.  Our uploaders do not annotate their videos with exact sequences of, 'Here I've used that asset, and here I've used this asset'. They might at times say that they have used a certain song.  They might somewhere sometimes refer to a song or a movie without actually using the content, so each of those combinations happen. So it's, in general, not possible to do what we do -- exactly what we do based on metadata.").

d. Finally, I note that at Mr. Erb's deposition, he suggested that "digital watermarking" could be a potential alternative.  However, this is not a viable alternative for the same reasons that reliance of metadata is not viable.  Indeed, Mr. Erb made the decision to not use digital watermarking in lieu of the Content ID system for similar reasons. *See, e.g.*, Erb Depo. at 301:23-302:10 ("Q And Google has chosen not to adopt a watermarking approach, correct?  A So far correct.  Q Who made that decision?  A I did.  Q Why?  A Because of the lack of coverage of some of the material that we covered today."); *see also, e.g.*, *id.* at 298:17-301:22.

513. *Proposed Alternative No. 9.*  "The ninth available non-infringing alternative is Audible Magic . . . ."  Defendants' Third Supplemental Response to Network-1's Interrogatory No. 13 (dated May 14, 2015).

a. I have not conducted an infringement analysis to determine whether or not "Audible Magic" infringes any of the Asserted Claims.  It is unclear what exactly Defendants mean by "Audible Magic."  If Defendants do identify a specific product/version to which they are referring, I reserve the right to supplement my opinion to address that specific product/version.  Even assuming that the "Audible Magic" product to which

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

Defendants are referring is non-infringing (which Defendants have not specified), there are several reasons why this is not a viable alternative.

b. Audible Magic is, as the name implies, only an audio identification product. This would not meet the needs of Content ID because it cannot do video and/or melody matching. *See, e.g.*, Erb Depo. at 287:4-15 ("What's your understanding of what kind of a system Audible Magic implements? A They implement some form of proprietary audio identification technology. Q Is that just, to your understanding, an audio system as opposed to a video or melody-based system? A Yes."); *id.* at 289:6-25 ("Q You do disclose to partners the fact that you do video matching, though, is that correct? A We disclose to partners that we do audio, video and melody matching but we don't disclose how or any of the details. Q But Audible Magic would not, to your understanding, do video or melody matching; so that would be a change from the perspective of the partners, correct? A If the only thing that we were using was Audible Magic, then that would be a change. It's – that's on the basis of the assumption, though, that the only change that we would make would be to switch to using only Audible Magic.").

c. 

d. Defendants have done no analysis on the technical feasibility or costs ███████
████████████. In particular, Defendants had no insight into, outside the context of this litigation, specifically how Audible Magic functioned. *See, e.g.*, █████████
███████████████████████

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

███████████████████████████████████████████

*see also, e.g.*, Erb Depo. at 288:9-289:5 ("And am I correct that you've done no analysis of what the costs might be for switching to the Audible Magic system?  A That's correct.  Q And you also don't know what effectiveness that might have relative to the current system?  A That's correct.").

e.  Finally, Defendants routinely test the accuracy of the Content ID system, and "tune" the precision and recall of the system as needed to meet technical and business goals. If Defendants were not in control of the reference data set, as they may not be if they switched to a third-party provider like Audible Magic, they would not be able to continuously improve their system through internal testing and tuning. *See, e.g.*, Erb Depo. at 116:16-120:25.

514.  *Proposed Alternative No. 10.*  "The tenth available non-infringing alternative is Google's Claim Your Content ('CYC') system, a predecessor to Content ID, which used, among other components, ████████████████████  Defendants' Third Supplemental Response to Network-1's Interrogatory No. 13 (dated May 14, 2015).

a.  I have not conducted an infringement analysis to determine whether or not "Claim Your Content" infringes any of the Asserted Claims.  It is unclear what exactly the technical details of this system are.  If Defendants do identify a specific product/version to which they are referring, I reserve the right to supplement my opinion to address that specific product/version.  Even assuming the "Claim Your Content" to which Defendants are referring is non-infringing, this is not a viable alternative.

b.  I understand that "Claim Your Content" may be a predecessor to Content ID ███████████████████.  Although Claim Your Content did have a video component, Claim Your Content is therefore not a viable alternative ████████████████████ ███████████  *See, e.g.*, analysis for Proposed Alternative No. 9 and citations therein.  Defendants have done no analysis on the feasibility or costs of again using Claim Your Content, but have since moved away from Claim Your ████████████ ██████ and have since developed several iterations of their own solution.

515.  *Proposed Alternative No. 11.*  "The eleventh available non-infringing alternative is Videntifier, from Videntifier Technologies . . . ."  Defendants' Third Supplemental Response to Network-1's Interrogatory No. 13 (dated May 14, 2015).

a.  I have not conducted an infringement analysis to determine whether or not "Videntifier" infringes any of the Asserted Claims.  It is unclear what exactly Defendants mean by "Videntifier."  If Defendants do identify a specific product/version to which they are referring, I reserve the right to supplement my opinion to address that specific product/version.  Even assuming that the "Videntifier" product to which Defendants are referring is non-infringing, there are several reasons why this is not a viable alternative.

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

b. Videntifier is, as the name implies, only a video identification product. This would not meet the needs of Content ID because it cannot do audio and/or melody matching. *See, e.g.*, Erb Depo. at 293:17-20 ("Q Would Videntifier replace the audio and melody identification? A No, Videntifier only handles video matching."); Konrad Depo. at 235:17-24:5 ("It would also not have been an alternative because I don't believe they had all the channels that we were matching on. Q And when you say 'the channels' I just want to make sure -- I think I know what you're referring to -- are you talking about audio, video, melody as channels? A Exactly.").

c. 

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



d. Defendants have also not done any analysis on the costs or technical feasibility of switching to Videntifier.  In particular, Defendants have no insight into specifically how Videntifier functions,



e. Finally, Defendants routinely test the accuracy of the Content ID system, and "tune" the precision and recall of the system as needed to meet technical and business goals. If Defendants were not in control of the reference data set, as they may not be if they switched to a third-party provider like Videntifier, they would not be able to continuously improve their system through internal testing and tuning.  *See, e.g.*, Erb Depo. at 116:16-120:25.

516. *Proposed Alternative No. 12.*  "The twelfth available non-infringing alternative is a manual claiming system allowing users to perform keyword, metadata, or other searches to identify and claim content."  Defendants' Third Supplemental Response to Network-1's Interrogatory No. 13 (dated May 14, 2015).

a. I agree that this proposed alternative could potentially be non-infringing if keyword or metadata searches were used as the queries.  It is unclear what is meant by "other searches," so I am not able to analyze this portion of the alternative.  This proposed alternative is otherwise not a viable alternative for the same reasons as Proposed Alternative No. 8.  *See, e.g.*, analysis for Proposed Alternative No. 8 and citations therein.

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

b.  This proposed alternative would not convey all of the benefits I mention above.  For example, the actions taken based on any "matches" based on any search performed by this proposed alternative do not result in automatic action because they require manual input from a user (i.e., a partner).  *See, e.g.*, Erb Depo. at 293:21-295:21.

c.  Defendants have also not done any analysis on the costs or other impacts of switching to a system that has only a manual claiming system.  *See, e.g.*, Erb Depo. at 295:22-296:2 ("Q Has Google evaluated what the potential costs or impact might be of switching to only using a manual claiming system like described here?  A No, we haven't evaluated that.").

517.  *Proposed Alternative No. 13.*  "The thirteenth available non-infringing alternative is the suite of rights management products and services offered by ZEFR."  Defendants' Third Supplemental Response to Network-1's Interrogatory No. 13 (dated May 14, 2015).

a.  I have not conducted an infringement analysis to determine whether or not "ZEFR" infringes any of the Asserted Claims.  It is unclear what exactly Defendants mean by "ZEFR."  If Defendants do identify a specific product/version to which they are referring, I reserve the right to supplement my opinion to address that specific product/version.  Even assuming that whatever "ZEFR" product to which Defendants are referring to is non-infringing, there are several reasons why this is not a viable alternative.

b.  ZEFR would only allow for manual claiming, and as I discussed above, a system with only manual claiming is not a viable alternative.  *See, e.g.*, analysis for Proposed Alternative No. 12 and citations therein; Erb. Depo. at 296:3-298:16; Konrad Depo. at 29:5-30:2.

c.  Defendants have also not done any analysis on the costs or other impacts of switching to ZEFR.  *See, e.g.*, Konrad Depo. at 29:23-30:2 ("Q Have you ever evaluated whether Zefr provides any kind of alternative solution that could be used instead of ContentID at Google?  A I don't think that was ever a topic, no.").

518.  *Proposed Alternative No. 14.*  "The fourteenth available non-infringing alternative is a content recognition system that performs a search designed to identify the closest, but not necessarily exact, match of a feature vector, compact electronic representation, or set of extracted features to another."  Defendants' Fourth Supplemental Response to Network-1's Interrogatory No. 13 (dated September 30, 2019).  Even if a search designed to identify the "closest match" could potentially be non-infringing, this is not a viable alternative.  In particular, identifying the "closest match" or the "nearest neighbor" in the entire data set, as opposed to a neighbor, near neighbor, or approximate nearest neighbor is significantly more computationally intensive.  Such a content recognition system would therefore not provide all of the benefits of the invention, including the use of efficient techniques such that "matches" can be found quickly and without consuming unnecessary computer resources.  Indeed, Mr. Kumar testified that one of the reasons to do an approximate nearest neighbor search, rather than a nearest neighbor search, is for efficiency reasons.  *See, e.g.*, Kumar Depo. at 62:4-19 ("Q And when you say in one realization, it's done approximately, what do you mean by that?

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

A That means we may not be getting ███████ closest ones, but approximately closest ones.  Q And why is that?  Why would they be approximately the closest?  A Because of speed reasons.  The same speed, accuracy, resource trade off.").

519.  _Proposed Alternative No. 15._  "The fifteenth available non-infringing alternative, at least with respect to the asserted claims of the '464 patent, is a content recognition system that does not perform one or more of the steps of 'generating, by the computer system, a tag associated with' an 'electronic media work'; 'providing, from the computer system to the user electronic device, the first electronic media work and the associated tag'; 'obtaining, by the computer system from the user electronic device, a request related to the associated tag'; 'generating, using the computer system, machine-readable instructions based upon the associated information to be used in performing, at the user electronic device, the action'; and/or 'providing, from the computer system to the user electronic device, the machine-readable instructions to perform the action in response to the request.'"  Defendants' Fourth Supplemental Response to Network-1's Interrogatory No. 13 (dated September 30, 2019).  I agree that this proposed alternative could potentially be non-infringing.  However, without these features, Defendants would not be able to have any advertisements that, for example, allow a user to click through to an advertiser's webpage or to a complete video of an ad.  This is therefore not an "alternative" to practicing the '464 patent.

## 6.    NON-COMPARABILITY OF LICENSES

520.  I understand that over the course of this case Defendants have produced a number of license agreements that they have with other parties.  I also understand that Defendants may rely on such licenses and assert that they are relevant to the "hypothetical negotiation" that would have occurred between the parties to this case, which I understand is addressed in detail by Jeff Kinrich in his expert report concerning damages.  I only address the technological aspects of several of those license agreements below.

521 ████████████████████████████████████████████
███████████████████████                     _See, e.g._, GOOG-NETWORK-00801846-85; GOOG-NETWORK-00801895-927; GOOG-NETWORK-00801939-76; GOOG-NETWORK-00802004-68.  In my opinion, as I explain below, none of these licenses relate to technology that is comparable to that of the Asserted Claims.  None of these licenses are to patents that involve content identification technology.

a.



**CONFIDENTIAL OUTSIDE COUNSEL ONLY –**
**PROSECUTION/ACQUISITION BAR MATERIALS**

b.

c.

d.

522

523.  In my opinion, the technology encompassed by this license is not comparable that of the Asserted Patents.



**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**



4.

524.

525.

## 7.    CONCLUSION

526.  It is my opinion that the Content ID Accused Instrumentalities infringe the Asserted Claims of the Asserted Patents.  I reserve the right to supplement or amend my opinions in response to opinions expressed by Defendants' experts or in light of any additional evidence, testimony, or other information that may be provided to me after the date of this Report or insufficiently in advance of the date of this Report, including at trial. In addition, I expect that I may be asked to testify in rebuttal as to issues that may be raised in the reports of Defendants' experts, or to issues that may be raised by fact witnesses and technical experts at trial.

527.  I anticipate that I may create demonstratives that I will use at trial to help explain to the jury various issues, such as background technology of the Asserted Patents, content identification technologies generally, and the operation of Defendants' various accused systems.  In order to aid the Court and jury in understanding my opinion, I intend to create

**CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS**

demonstrative exhibits for trial. These demonstrative exhibits will include non-graphical illustrations (such as documents, charts, tables, etc.) and graphical illustrations (such as figures, drawings, pictures, videos, etc.). While these demonstratives have not yet been created, they will be completed and demonstrated at trial.  To further aid the Court and jury in understanding my opinion, I anticipate that I may demonstrate the operation of the Content ID Accused Instrumentalities at trial, including a live demonstration of the Content ID Accused Instrumentalities or a prerecorded demonstration of the Content ID Accused Instrumentalities. A live demonstration may include having physical products in Court and/or access to the products via an Internet connection.  For a prerecorded demonstration, I will create a video, or series of videos, demonstrating the operation of the Content ID Accused Instrumentalities . I may also create a series of slides if it is more convenient for me to do so.  In any case, the videos or slides may include voice overs, highlighting, and call outs. These demonstratives will be prepared in advance for trial and I anticipate these demonstratives will be exchanged according to the protocol agreed to by the parties for exchanging trial demonstratives.

CONFIDENTIAL OUTSIDE COUNSEL ONLY –
PROSECUTION/ACQUISITION BAR MATERIALS

I declare under penalty of perjury that the foregoing is true and correct.

Executed December 20, 2019 in Lexington, Massachusetts.

By: _____

Dr. Michael Mitzenmacher, Ph.D.